

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

AUG - 3 2016

AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK**

---

**VLADIMIR JEANTY,**

*Plaintiff,*

*-Against-*

**The City of Utica;**

**Mark Williams, Chief of Police, Utica Police Dept.; individually and in his official capacity;**

**Police Officer Michael F. Cerminaro, badge #1301, individually and in his official capacity;**

**Investigator Peter Paladino, badge #6290, individually and in his official capacity;**

**Lieutenant Sean Dougherty, badge #2553, individually and in his official capacity;**

**Police Officers John Doe #1-6; individually and in their official capacity;**

**John Doe #7, Corporation Counsel, City of Utica, individually and in his official capacity;**

**Honorable Scott D. McNamara, Oneida County District Attorney, individually and in his official capacity;**

**Asst. District Attorney Grant Garramone, individually and in his official capacity;**

**Asst. District Attorney Steven Cox, individually and in his official capacity;**

**Micaela Parker, individually and as an employee of Gatehouse Media, LLC.;**

**Fran Perritano, City Editor, individually and as an employee of Gatehouse Media LLC.;**

**Ron Johns, Editor, individually and as an employee of Gatehouse Media LLC.;**

**Gatehouse Media, LLC.**

*Defendants.*

---

**COMPLAINT**

6:16-cv-966 (BKS/TWD)

**Jury Trial**

**Demanded**

Plaintiff VLADIMIR JEANTY ('Plaintiff'), Pro-se, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.  This is a civil rights action to recover money damages in the form of compensatory punitive and special damages arising out of various Utica Police Department officers and State Prosecutors from the Oneida County District Attorney's Office violation of plaintiff Vladimir Jeanty's rights secured to him by the Civil Rights Act 42 USC 1983, 1985, 1986, of rights secured by the Fourth, Fifth, Sixth, Fourteenth Amendments to the US Constitution and the laws of the State of New York.

2.  This complaint also seeks to recover money damages in the form of compensatory, punitive and special damages arising out of Defendants Gatehouse Media LLC., and Scott D. McNamara, Oneida County District Attorney's defamation of plaintiff Vladimir Jeanty in an article published subsequent to the dismissal of the indictment in the underlying criminal case.

3.  Plaintiff was deprived of his Constitutional rights, when; while driving he was stopped and detained by Police Officer Michael Cerminaro, arrested by Police Officers Michael Cerminaro and Kevin LoGalbo, and later indicted; all without reasonable or probable cause.

4.  Defendants, police officers denied plaintiff his right to a fair trial by knowingly and purposely withholding discoverable evidence and material evidence in the form of Brady, Giglio and impeachment material known to them from the prosecutor, Court and defendant.

5.  Plaintiff was then maliciously prosecuted for criminal possession of a controlled

substance in the 5th and 7th degrees and sentenced to a term of 2 ½ years with 2 years post release supervision; both of which were served to maximum termination.

6. After an investigation by plaintiff which began before his conviction in 2010 and ended 2013 plaintiff successfully had his conviction vacated on June 27, 2015 and the indictment dismissed in his favor on August 10, 2015; defendants Gatehouse Media and Scott D. McNamara defamed plaintiff in an article written August 12, 2015 and printed on August 12 and 13, 2015.

7. As a result of the above Constitutional and State law violations plaintiff Vladimir Jeanty now brings this action as fully set forth below.

8. Plaintiff Vladimir Jeanty's allegations are based upon information and belief the source of which are Plaintiffs own investigation into the investigation by the police of the underlying criminal matter; which consisted of (among others acts):

    a. filing a F.O.I.L request prior to trial in March of 2010;

    b. obtaining various Utica Police Department records (i.e., arrest report, MasterCard detail Standard Incident Report (SIR)) relating to the underlying matter, 22 photographs and Utica Police Department's Policy and Procedures manual;

    c. a surreptitiously recorded conversation made by plaintiff on December 21, 2012 with the supervising officer and evidence technician then Sgt. Sean Dougherty;

    d. statements made by the trial Judge Michael L. Dwyer in a memorandum dated March 12, 2010;

    e. Statements made by defendant Scott D. McNamara, DA during the post-

3

conviction proceedings and in two written affidavits.

    f.   Plaintiffs own personal observations and knowledge of the circumstances as they relate to the underlying matter.

## JURISDICTION, VENUE AND CONDITIONS PRECEDENT

9.  This action arises under 42 U.S.C. §§, 1983, 1985, and 1986 , of Title 42 of the United States Code and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under the common laws of the State of New York.

10. This action is for money damages to redress the deprivation by the defendants of rights secured to the plaintiff by the Constitution and laws of the United States and State of New York. Jurisdiction of this court is invoked under the provisions of 28 U.S.C. §§1331, 1343(3) and 1367(A) and the aforementioned statutory and constitutional provisions.

11. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of New York, the judicial district in which the claims arose.

12. On or about October 15, 2015, Plaintiff served upon Defendants City of Utica and County of Oneida timely notices of the present claims pursuant to New York General Municipal Law § 50-e. A hearing pursuant to New York General Municipal Law § 50-h was held on February 11, 2016 at 1 Kennedy Plaza, Utica NY with County and City defendants attorneys

13. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) excluding interest and costs and/or otherwise is within the jurisdiction of this Court.

14. This action has been commenced within one year of August 10, 2015, the accrual of Plaintiff's causes of action.

15. Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

## PARTIES

16. Plaintiff, *VLADIMIR JEANTY, (hereinafter Jeanty or Plaintiff),* is a resident of the State of New York and of the United States, and resides within the Eastern District of New York.

17. Defendant, the *CITY OF UTICA, (hereinafter the City)* during all times mentioned in this Complaint, is a municipal corporation organized and existing through and by virtue of the laws of the State of New York and  maintains offices at 1 Kennedy Plaza, in the City of Utica and State of New York and which municipal corporation is located in the Northern District of New York and at all times relevant hereto employed defendants, UPD Police Chief Mark Williams, PO Michael F. Cerminaro, Inv. Peter Paladino, Sgt. Sean Dougherty, John Doe Police Officers #1-6, John Doe #7 Corporations Counsel Attorney. The City of Utica has established or delegated to defendant, Chief Mark Williams the responsibility for establishing and implementing policies, practices, procedures, and customs used by law enforcement officers employed by the City of Utica regarding arrests, investigations, and various police practices and procedures.

18. Defendant, the *CITY OF UTICA POLICE DEPARTMENT, (hereinafter UPD)* during all times mentioned in this Complaint, is a department organized and existing under the laws of the State of New York, and is located in the City of Utica, County of Oneida and State of New York and at all times relevant hereto employed the hereafter named City Defendants. The City Utica Police Department is a duly formed and organized para-military department of the City of Utica which is charged with the duty of being

responsive to the needs of the community, preserving the rights of all who live, work and visit in the City of Utica, maintaining a feeling of safety and security through the prevention of crime, protection of persons and property and maintenance of order, and of enforcing and following all laws, rules, regulations and policies.

19. Defendant, *MARK WILLIAMS, (hereinafter Williams)* all times mentioned in this Complaint, was/is the duly appointed Chief of Police for the City of Utica Police Department. As Chief of Police, Defendant, Mark Williams, was and is responsible for the supervision, training and discipline of the Defendants; Lieutenant Sean Dougherty, Officer Michael F. Cerminaro, John Doe Officers #1-6, and Inv. Peter Paladino. As Chief of Police, Defendant, Mark Williams, was and is further responsible for making and/or implementing policies and practices used by law enforcement officers employed by the City of Utica regarding practices and procedures relating to the arrest and investigations relating to all crimes. At all times relevant to this Complaint, Defendant, Mark Williams, as Chief of Police for the City of Utica acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica. Defendant, Mark Williams, is sued in his individual and official capacity.

20. Defendant, *LIEUTENANT SEAN DOUGHERTY, (hereinafter Dougherty),* during all times mentioned in this Complaint, was a duly appointed Police Sergeant employed by the City of Utica with the City of Utica Police Department and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the City of Utica Police Department policies, he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica. Defendant, Lieutenant Sean Dougherty, is sued in his individual and official capacity.

21. Defendant, *OFFICER MICHAEL F. CERMINARO, (hereinafter Cerminaro),* during all times mentioned in this Complaint, was and is, a duly appointed Police Officer employed by the City of Utica with the City of Utica Police Department and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the City of Utica Police Department policies, he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica. Defendant, Officer Cerminaro, is sued in his individual and official capacity.

22. Defendant, INVESTIGATOR PETER PALADINO, during all times mentioned in this Complaint, was and is, a duly appointed Police Investigator employed by the City of Utica with the City of Utica Police Department and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the City of Utica Police Department policies he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica. Defendant, Investigator Paladino, is sued in his individual and official capacity.

23. Defendants, *OFFICERS JOHN DOE #1-6, (hereinafter John Doe #1-6),* are fictitious names intended to represent the names of any and all duly appointed police officers employed by the City of Utica with the City of Utica Police Department, who participated in the acts complained of in this Complaint and whose real identities are as yet to be ascertained. They acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica, Said Defendants are sued in their individual and official capacities.

24. Defendant, *JOHN DOE #7, CORPORATION COUNSEL ATTORNEY, (hereinafter John Doe #7),* at all relevant times, was and is an Attorney within the City of Utica

7

Corporations Counsel Office, is employed by the City of Utica, and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the City of Utica policies, the laws of the State Of New York; he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of Utica, and acted within the scope of his employment. He is sued in his individual and his official capacities.

25. During all times mentioned in this Complaint, the defendants were acting in concert; and were to act under color of law, color of the Constitution, statutes, laws, charters, ordinances, rules, regulations, customs and usages of the State of New York and the City of Utica.

26. Defendant, *COUNTY OF ONEIDA, (hereinafter the County)*, during all times mentioned in this Complaint, is a municipal corporation organized and existing through and by virtue of the laws of the State of New York and who maintains offices at 800 Park Ave, in the City of Utica and State of New York and which municipal corporation is located in the Northern District of New York and at all times relevant hereto employed County defendants District Attorney Scott D. McNamara, Asst. District Attorney Steven Cox and Asst. District Attorney Grant Garramone. The County of Utica has established or delegated to defendant, Scott D. McNamara the responsibility for establishing and implementing policies, practices, procedures, and customs used by law enforcement officers employed by the City of Utica, County of Oneida and Assistants District Attorneys regarding arrests, investigations and prosecutions relating to all crimes.

27. Defendant, *the Oneida County District Attorney's Office, (hereinafter OCDA)*, is an agency of the County of Oneida. The District Attorney, and Assistant District Attorneys,

8

employed by the D.A.'s Office are agents and employees of the County of Oneida, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

28. Defendant, *SCOTT D. MCNAMARA, (hereinafter McNamara)*, at all relevant times, was and is the duly elected District Attorney of Oneida County, is employed by the County of Oneida, and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the County of Oneida policies, the laws of the State Of New York; he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the County of Oneida, and acted within the scope of his employment. He is sued in his individual and his official capacities.

29. Defendant, *STEVEN COX, (hereinafter Cox)*, at all relevant times, was and is an Assistant District Attorney of Oneida County, is employed by the County of Oneida, and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the County of Oneida policies, the laws of the State Of New York; he acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the County of Oneida, and acted within the scope of his employment. He is sued in his individual and his official capacities.

30. Defendant, *GRANT GARRAMONE, (hereinafter Garramone)*, at all relevant times, was and is an Assistant District Attorney of Oneida County, is employed by the County of Oneida, and is charged with carrying out his lawful duties and responsibilities in accordance with law, as well as the County of Oneida policies, the laws of the State Of New York; he acted toward Plaintiff under color of statutes, ordinances, customs, and

usage of the State of New York and the County of Oneida, and acted within the scope of his employment. He is sued in his individual and his official capacities.

31. Defendant *MICAELA PARKER, (hereinafter Parker),* at all times set forth in this complaint was a news reporter for the Observer Dispatch in Utica NY.

32. Defendant *FRAN PERRITANO (hereinafter Perritano),* at all times set forth in this complaint was Micaela Parker's supervisor and City Editor for the Observer Dispatch in Utica, NY.

33. Defendant *RON JOHNS (hereinafter Johns),* at all times set forth in this complaint was Micaela Parker and Fran Perritano's supervisor and Editor for the Observer Dispatch in Utica, NY.

34. Defendant *GATEHOUSE MEDIA, LLC., (also The OD)* is a Limited Liability Corporation within the State of New York. Is the employer of Micaela Parker, Fran Perritano, and Ron Johns. Gatehouse Media, LLC., is responsible for setting and enforcing the policy and procedure for the reporting, editing and publishing of article in its website and newspaper.

## SUMMARY OF COMPLAINT

35. Plaintiff was unlawfully arrested on October 15, 2009 by UPD officers Michael Cerminaro and Kevin LoGalbo.

36. Plaintiff was indicted on November 24, 2009 on the charges of Criminal Possession of a Controlled Substance in the 5th and 7th degree to wit: Plaintiff was falsely accused of possessing 1.2g of a substance consisting of 500mg or more of Cocaine HCL. The matter was captioned People v. Vladimir Jeanty, Indictment #09-480.

37. Plaintiff was maliciously prosecuted/wrongfully convicted between October 15, 2009

and March 24, 2010

38. Plaintiff was unlawfully imprisoned from October 15, 2009 to December 3, 2009 and March 24, 2010 to August 2, 2012.

39. Plaintiff was arrested on October 15, 2009 without probable cause.

40. Plaintiff was indicted on November 24, 2009 without probable cause.

41. Plaintiff was wrongfully and maliciously convicted on March 24, 2010.

42. Plaintiff was sentenced to 2 ½ years imprisonment and was released on August 2, 2012.

43. Plaintiff's conviction was vacated in his favor June 28, 2015 by Oneida County Judge Barry M. Donalty.

44. Plaintiff's indictment was dismissed in his favor on August 10, 2015 by Oneida County Court Judge Michael L. Dwyer.

45. Police Officer Michael F. Cerminaro, badge #1301, executed and filed a false deposition in support of and fabricated physical evidence in support of a felony and misdemeanor complaint filed by defendant Paladino against Jeanty.

46. UPD Investigator Peter Paladino, badge #6290, knowing Cerminaro's deposition to be false, falsely accused and charged Plaintiff of Criminal Possession of Controlled Substance in the 5th and 7th degrees.

47. During the course of a thorough field investigation UPD Lieutenant Sean Dougherty, badge #2553, took 18 or more crime scene photographs; he also witnessed and participated in a complete investigation/search (along with Cerminaro, Paladino and John Doe Officers #1-6) of the crime scene area between Park Ave and Kemble St in Utica NY.

48. Cerminaro and Paladino were aware of Dougherty's actions.

49. Dougherty was aware of Cerminaro, Paladino and John Doe Officers #1-6's activities at the alleged crime scene; which included but was not limited to:

    a. Finding a contraband substance strewn about on the ground in an alleyway/driveway and elsewhere.

    b. Cerminaro's possession of a bag.

    c. Cerminaro and Paladino fabricating evidence by misrepresenting among other facts; the condition and location it was found.

50. Cerminaro, Paladino and Dougherty falsified official UPD records by falsifying and/or omitting the actual facts, events and circumstances and result of their investigation.

51. Cerminaro and Paladino knowingly and purposely provided the prosecutor false information and fabricated physical evidence so that Jeanty would be arraigned and held and prosecuted on these known false charges.

52. Cerminaro and Paladino repeated this false information in their testimonies at the preliminary hearing on October 20, 2009, so that Jeanty could be held for Grand Jury action on these known false charges.

53. Cerminaro and Paladino repeated this false information in their testimonies at the Grand Jury presentation on November 20, 2009, so that Jeanty would be indicted on these known false charges.

54. Cerminaro repeated this false information in his testimony at the Dunaway/Mapp hearing on January 8, 2010 so that the fabricated evidence would not be ruled inadmissible and be used against Jeanty at trial on these known false charges.

55. Cerminaro and Paladino repeated this false information in their testimonies at trial on

March 23, 2010; so that Jeanty could be convicted and incarcerated for these known false charges.

56. Cerminaro, Paladino and John Doe Officers #1-6 never informed the prosecutor of Dougherty's activities as Supervisor and Evidence Technician at the scene during the investigation.

57. Dougherty himself never informed the prosecutor of his activities at the scene as Supervisor and Evidence Technician.

58. Between the period of March 3 to March 24 2010 Cerminaro, Paladino John Doe #1-6 conspired with John Doe #7 and decided not to forward to OCDA Office the 22 or more photographs in their possession.

59. The material withheld consisted of 22 UPD photographs taken by Dougherty and Sgt. Alban Uryniak (retired), which showed the true and exact result of the crime scene investigation by Cerminaro, Paladino, John Doe Officers #1-6 and Dougherty.

60. The 22 or more photographs clearly show among other facts:

   a. Where, approximate time and what condition the contraband evidence was found.

   b. Who was present during the investigation?

61. The 22 or more photographs clearly show that plaintiff did not and could not have committed the crimes Plaintiff was accused of because the contraband was already there before Jeanty ran through the area.

62. The 22 or more photographs clearly show that Cerminaro's Deposition dated October 15, 2009 was in all respect false.

63. The 22 or more photographs show that Paladino's complaints were in all respect

false.

64. The evidence withheld also consisted of the knowledge of material evidentiary facts about the crime scene investigation known to Dougherty as Supervisor and Evidence Technician.

65. Plaintiff obtained these 22 photographs in response to an Article 78 petition in Supreme Court challenging denial of access to records by UPD and OCDA pursuant to F.O.I.L.

66. Plaintiff filed a complaint from prison with UPD Chief of Police Mark Williams regarding the actions of Cerminaro, Paladino and Dougherty.

67. Williams ignored plaintiff's complaint.

68. Plaintiff wrote from prison at least 3 letters to OCDA Scott D. McNamara complaining of the police officers conduct prior to and during plaintiff's trial.

69. McNamara ignored plaintiff's complaints.

70. In December 2011, McNamara unlawfully obtained an order to have the physical evidence in the underlying matter destroyed using a knowingly false affidavit of a UPD officer.

71. Upon release from prison Plaintiff resumed his investigation of His alleged crime.

72. On December 21, 2012 Plaintiff surreptitiously made a recording of a meeting involving Dougherty, Inv. Joseph Trevasani, City of Utica First Asst., Corp. Counsel Charles Brown and Himself.

73. This surreptitious recording provided plaintiff further proof necessary to prove plaintiff did not or could not have committed the alleged acts or crimes which plaintiff was accused of.

74. In the recording Dougherty made various statements exculpatory in nature regarding statements made to him by Cerminaro and based on his own personal observations and actions.

75. Plaintiff filed a detailed CPL 440 motion to Vacate Judgment and Conviction on March 8, 2015.

76. *Upon information and belief*, Subsequent to the filing of the 440 motion McNamara conducted an extensive investigation regarding allegation raised in Jeanty's 440 motion.

77. McNamara decided to oppose the 440 motion despite knowing that the underlying indictment was legally defective and having in his possession incontrovertible proof that Jeanty was not guilty.

78. Upon consent of the prosecutor, the conviction was vacated on June 27, 2015.

79. By motion of the prosecutor, the indictment was dismissed on August 10, 2015.

80. Despite the criminal matter being vacated and the indictment dismissed, McNamara on or about August 12 made various defamatory statements about Jeanty to OD reporter Micaela Parker, which she printed knowing them to be factually and materially false.

81. Plaintiff now brings this action.

## ALLEGATIONS

82. On October 15, 2009 Plaintiff was at a female friend's house on the 1400 block of Elm St.

83. Plaintiff exited said premises from the rear door and went towards his car parked on the opposite side of Elm St. facing south.

84. Plaintiff crossed Elm St and entered his car (Rented, gray 2009 Chevy Impala)

85. While crossing Plaintiff saw a UPD vehicle at the intersection of Elm and Eagle St.

86. This vehicle was stopped at a red light facing south.

87. While seated in his car and speaking on the phone, plaintiff saw the UPD patrol car cross over Eagle St. while driving South on Elm.

88. This vehicle was driving at an unusual slow speed.

89. This vehicle passed Plaintiff who was still parked on the side of the street.

90. Plaintiff and the driver of the patrol car made eye contact.

91. The patrol car reached Elm St and Hobart and made a left turn, heading east.

92. The patrol car was car number 55 driven by PO Michael Cerminaro badge #1301.

93. Cerminaro was responding to a disorderly conduct call on Dudley Ave.

94. Plaintiff ended his phone call and proceeded to drive South on Elm towards Hobart St.

95. While approximately 100ft from the 4way intersection at Elm St. and Hobart St. facing South, Plaintiff saw to his left, (East) the same patrol car (Cerminaro) now heading west on Hobart towards plaintiff at the 4 way intersection.

96. *Upon information and belief,* Cerminaro abandoned his response to his earlier dispatched call at 2:08p to Dudley Ave relating to a disorderly conduct call.

97. *Upon information and belief,* Cerminaro had made a U-turn on Hobart to return towards plaintiff's location.

98. *Upon information and belief,* Cerminaro was suspicious of plaintiff because he was a black male in a known high crime area.

99. Plaintiff and the patrol car arrived at the Elm St/Hobart Ave 4-way intersection at the same time.

16

100.    This 4-way intersection had unobstructed views from all 4 directions of at least 30 feet from each corner.

101.    Plaintiff's right turn signal was already on.

102.    Plaintiff came to a complete stop at the 4-way intersection at Hobart and Elm streets.

103.    Plaintiff waited for the patrol car to move.

104.    The patrol car did not move.

105.    Plaintiff made a right hand turn onto Hobart St heading west.

106.    The patrol car immediately followed plaintiff heading west on Hobart St. towards Kemble St.

107.    Cerminaro ran plaintiffs license plate through NYSPIN at 2:10 and 2:12 while pursuing Jeanty on Hobart St. At approximately 2:14 Cerminaro activated his emergency light to pull Jeanty over for an alleged traffic infraction

108.    The results from NYSPIN came back that the registration was valid and the car was registered to a car rental company.

109.    *Upon information and belief,* Cerminaro manually deactivated the dash-board camera in his patrol car.

110.    *Upon information and belief,* Cerminaro pulled plaintiff over because plaintiff was a black mail.

111.    *Upon information and belief,* Cerminaro pulled plaintiff over because plaintiff was driving a rental vehicle.

112.    *Upon information and belief,* Cerminaro pulled plaintiff over because plaintiff was in a high crime area.

17

113.   Plaintiff turned right on Park Ave heading north and pulled over.

114.   Cerminaro exited his patrol car and approached plaintiff on the driver side window.

115.   Cerminaro was alone.

116.   Cerminaro requested and received plaintiff's driver license, rental agreement and insurance information.

117.   Cerminaro communicated with UPD dispatch over his patrol communicator on his person.

118.   At approximately 2:15p dispatch advised Cerminaro that Plaintiff's license was valid.

119.   Dispatch advised Cerminaro that Plaintiff had no warrants.

120.   Cerminaro returned to his patrol car.

121.   Cerminaro returned to plaintiff's window without any citations.

122.   Cerminaro questioned Plaintiff about where he was going to, where he was coming from.

123.   Cerminaro asked plaintiff if he was in possession of any *'bud.'*

124.   Cerminaro asked plaintiff if he was in possession of any *'soft or hard.'*

125.   Cerminaro did not issue plaintiff any traffic tickets.

126.   Cerminaro did not let plaintiff go.

127.   Plaintiff left the scene without having received any citation or his license and other documents.

128.   Plaintiff stopped his vehicle approximately 150 ft. away.

129.   Plaintiff exited his vehicle.

130.   Plaintiff ran behind Joel Spanish restaurant and climbed a 5ft fence and got onto a roof.

131.   Plaintiff continued to run across various rooftops.

132.   Cerminaro pursued plaintiff.

133.   Cerminaro stopped his car in the driveway off Joel Spanish Restaurant.

134.   Cerminaro exited his car and pursued Plaintiff unto various rooftops.

135.   Plaintiff followed by Cerminaro jumped off an approximate 12ft building into a courtyard area behind Park Ave.

136.   Plaintiff followed by Cerminaro continued to run down a 200ft plus driveway/alleyway which exited unto Kemble St.

137.   Plaintiff followed by Cerminaro turned left unto a sidewalk heading North on Kemble.

138.   Plaintiff followed by Cerminaro ran behind 1224 Kemble.

139.   Plaintiff laid on the grass behind 1224 Kemble.

140.   Plaintiff was than arrested/handcuffed by police Officer Kevin LoGalbo badge #4996 and Cerminaro.

141.   Plaintiff was searched, no contraband was found on or near plaintiff.

142.   Cerminaro was within 15 feet of plaintiff during the chase on the rooftop and driveway/alleyway from Park Ave to Kemble St.

143.   Dougherty arrived on the scene approximately 1 minute after Cerminaro and LoGalbo arrested plaintiff.

144.   At the direction of Dougherty, Plaintiff was taken into Officer LoGalbo's patrol car and transported to UPD Headquarters approximately 10 minutes later.

145.   Officer LoGalbo recorded plaintiff while transporting him to UPD headquarters.

## UPD HEADQUARTERS

146.   Plaintiff arrived at UPD headquarters at approximately 2:35pm.

147.   Plaintiff was seated handcuffed on a bench.

148.   Officer Rocco Zasa took $1739 from plaintiff and put it in an envelope.

149.   Sgt. Uryniak photographed plaintiff's injuries to his hands and feet, he also photographed plaintiffs face.

150.   At approximately 3:30pm Cerminaro and Paladino arrived at UPD headquarters in the booking area where Jeanty was sitting.

151.   Paladino yelled out *"we found it"*, while raising up a 12"x8" plastic bag.

152.   Plaintiff responded *"you found what?"*

153.   Paladino responded *"the bag you threw."*

154.   Plaintiff responded *"I don't know what you're talking about. I didn't throw anything."*

155.   Paladino than conferred with Cerminaro.

156.   Paladino, Cerminaro and Officer Zasa escorted plaintiff into another cell area with bathroom stalls.

157.   Plaintiff was stripped and cavity searched.

158.   No contraband was found on Plaintiff.

159.   Paladino left the booking area.

160.   Plaintiff was again handcuffed to a wall in the booking area.

161.   Paladino at approximately 4:00pm returned and told Plaintiff he was charging him with drug possession.

162.    Paladino charged Plaintiff with Criminal Possession of a Controlled Substance in the 5th and 7th degrees in a Complaint with Cerminaro's supporting deposition.

163.    Plaintiff was booked by Officer Zasa.

164.    Paladino gave Plaintiff a copy of the complaints.

165.    Paladino did not give plaintiff a copy of Cerminaro's deposition.

166.    Paladino escorted plaintiff into Utica City Court to be arraigned.

167.    Plaintiff was arraigned in Utica City Court before Judge Balzano.

168.    Paladino conferred with an ADA in Court.

169.    *Upon information and belief,* Paladino repeated to the ADA the same false allegations as set forth in Cerminaro's deposition and in the complaints.

170.    Plaintiff's bail was set at $20,000.

171.    Plaintiff was remanded and transported to Oneida County Jail.

## THE CRIME SCENE INVESTIGATION

172.    Sgt. Dougherty was the assigned 8-4p shift patrol supervisor.

173.    Sgt. Dougherty was the assigned evidence technician.

174.    Upon arrival Dougherty approached Cerminaro and LoGalbo who had plaintiff in custody and handcuffed. All were standing in the backyard of 1224 Kemble St.

175.    Dougherty instructed LoGalbo to put plaintiff in his patrol car.

176.    Plaintiff could see Dougherty, Cerminaro and John Doe #1-6 speaking while standing in the driveway of 1224 Kemble St.

177.    Dougherty and Cerminaro than left the area and headed towards the alleyway where Police Officer John Doe #1-6 were present.

178.    Plaintiff was taken off the scene at approximately 2:35pm.

179.   *Upon information and belief,* Sgt. Dougherty searched the driveway where Cerminaro and plaintiff ran down.

180.   *Upon information and belief,* Sgt. Dougherty searched the courtyard area where Cerminaro and plaintiff jumped down to from the rooftop above.

181.   *Upon information and belief,* Sgt. Dougherty searched the backyard area of 1224 Kemble St. where plaintiff was arrested.

182.   Cerminaro searched the driveway/alleyway of 1220 Kemble St. where he and plaintiff ran down.

183.   Cerminaro searched the courtyard area where he and plaintiff jumped down to from the rooftop above.

184.   *Upon information and belief,* Cerminaro searched the backyard area of 1224 Kemble St. where plaintiff was arrested.

185.   *Upon information and belief,* Paladino searched the driveway/alleyway area of 1220 Kemble St. where Cerminaro and plaintiff ran down.

186.   *Upon information and belief,* Paladino searched the courtyard area where Cerminaro and plaintiff jumped down to from the rooftop above.

187.   *Upon information and belief,* Paladino searched the backyard area of 1224 Kemble St. where plaintiff was arrested.

188.   Paladino searched the rooftops which Cerminaro and Plaintiff ran across

189.   *Upon information and belief,* Paladino and others searched plaintiff's car while it was parked on Park Ave.

190.   *Upon information and belief,* Police Officer John #1-4 searched the courtyard area where Cerminaro and plaintiff jumped down to from the rooftop above.

191.   *Upon information and belief,* Police Officer John #1-4 searched the backyard area of 1220 Kemble St. where plaintiff was arrested.

192.   *Upon information and belief,* Police Officer John #1-4 searched the rooftops which Cerminaro and Plaintiff ran across

193.   *Upon information and belief,* Police Officer John Doe #1-6 searched plaintiff's car while it was parked on Park Ave.

194.   Cerminaro at some point located a white and chunky substance strewn about on the ground in the driveway/alleyway of 1220 Kemble St. where He and Plaintiff ran down.

195.   *Upon information and belief,* Paladino at some point located a white and chunky substance strewn about on the ground in the driveway/alleyway of 1220 Kemble St. where Cerminaro and Plaintiff ran down.

196.   *Upon information and belief* Paladino reported his findings to Dougherty while on Kemble St.

197.   Cerminaro reported his finding's to Dougherty while on Kemble St.

198.   Dougherty photographed the contraband on the ground in the driveway/alleyway on 1220 Kemble St.

199.   Dougherty had Cerminaro place a torn plastic bag at the base of the building behind 1224 Kemble St. and photographed it.

200.   Cerminaro was present when the contraband was being photographed in the alleyway/driveway by Dougherty as depicted in photographs taken at 2:43p, 2:44p (2) and 2:46p (2) on Kemble St.

201.   Paladino was present when the contraband was being photographed in the

alleyway/driveway by Dougherty as depicted in photographs taken at 2:43p, 2:44p (2) and 2:46p (2) on Kemble St.

202.    *Upon information and belief,* Paladino collected the loose contraband found on the ground in the driveway/alleyway of 1220 Kemble St. as depicted in a photographs taken at 2:43p, 2:44p (2) and 2:46p (2) on Kemble St.

203.    *Upon information and belief,* Paladino placed the loose contraband found on the ground in the driveway/alleyway of 1220 Kemble St. into a small zip-lock evidence bag as depicted in the photograph taken by NYSP Forensic Scientist Mary France.

204.    *Upon information and belief,* Cerminaro collected the loose contraband found on the ground in the driveway/alleyway of 1220 Kemble St. as depicted in a photographs taken at 2:43p, 2:44p (2) and 2:46p (2) on Kemble St.

205.    *Upon information and belief,* Cerminaro placed the loose contraband found on the ground in the driveway/alleyway of 1220 Kemble St. into a small zip-lock evidence bag.

206.    *Upon information and belief,* Cerminaro found a torn plastic bag at some unknown location and unknown time.

207.    *Upon information and belief,* Paladino saw Cerminaro find this torn plastic bag.

208.    The torn plastic bag was found empty as depicted in a photographs timestamped at 2:42p (3).

209.    The torn plastic bag had no contraband in it as depicted in a photographs timestamped at 2:42 (3).

210.    Cerminaro had this torn plastic bag in his hand/possession for an unknown period of time.

211.   Cerminaro had this torn plastic bag in his hand/possession before Dougherty arrived on the scene.

212.   Cerminaro had the drugs in his possession before Dougherty arrived on the scene.

213.   Cerminaro showed the torn plastic bag to Dougherty.

214.   Cerminaro told Dougherty that he found the contraband on the ground in the driveway/alleyway.

215.   Dougherty instructed Cerminaro to place the bag on the ground at the base of the building where plaintiff and Cerminaro jumped down to as depicted in photographs timestamped at 2:42p (3).

216.   Dougherty photographed the torn plastic on the ground at the base of the building where Cerminaro and plaintiff jumped off of as depicted in photographs timestamped 2:42p (3).

217.   *Upon information and belief,* Cerminaro also found additional evidence in the Courtyard area where he and Plaintiff jumped down to.

218.   Paladino found no contraband on the rooftops he and Police Officer John Doe #1-6 searched.

219.   Dougherty photographed other areas of 1220 Kemble St.

220.   Dougherty photographed the interior and exterior of plaintiff's car parked on Park Ave.

221.   An unknown UPD officer placed all the cellphones found in plaintiff's car on the passenger seat.

222.   Dougherty photographed these cellphones.

223.   No contraband was found in plaintiff's car or on his person.

224.   *Upon information and belief,* the police found a baseball sized amount of contraband throughout the search area.

225.   *Upon information and belief,* the police did not voucher the entire amount of contraband found in the search area.

226.   The police only reported that they found 1.2 grams alleged to have been inside a torn plastic bag alleged to have been possessed and discarded by plaintiff during the foot pursuit at the base of the building from which Cerminaro and plaintiff jumped down to.


## CERMINARO'S DEPOSITION/RADIO TRANSMISSIONS/PALADINO'S ACCUSATORIALS

227.   Cerminaro wrote a deposition on October 15, 2009.

228.   There are 4 variations of this deposition as indicated by the 4th sequence provided at trial.

229.   *Upon information and belief,* Cerminaro initially sought to investigate Plaintiff because he was black male in a known drug area,

230.   *Upon information and belief,* Cerminaro stopped Plaintiff because he was a black male, driving a rental, in a known drug area.

231.   Cerminaro knowingly and falsely swore that plaintiff ran a stop sign at Hobart and Elm Streets.

232.   Cerminaro knowingly and falsely swore that plaintiff was shaking during the traffic

26

stop while on Park Ave.

233.   Cerminaro knowingly and falsely swore that plaintiff pulled out a large plastic bag containing a white powdery substance while running on a roof.

234.   Cerminaro knowingly and falsely swore that plaintiff tore on and ripped this alleged bag with his teeth while running on a roof.

235.   Cerminaro knowingly and falsely swore that plaintiff ate some alleged contraband substance from this alleged bag while running on a roof.

236.   Cerminaro knowingly and falsely swore that plaintiff discarded a torn plastic bag to the ground after jumping off the roof to the courtyard area.

237.   Cerminaro knowingly and falsely swore that he immediately retrieved this alleged torn plastic bag on the ground from the base of the building from which he and plaintiff jumped to.

238.   Cerminaro knowingly and falsely swore that he turned this alleged bag to Paladino on Park Ave.

239.   Cerminaro knowingly and falsely swore that the 1.2g of contraband was found in an alleged torn plastic bag as opposed to on the ground.

240.   Cerminaro knowingly and falsely swore that the evidence that he found was secured under his exclusive custody and control.

241.   Cerminaro swore to the alleged facts in his deposition knowing them to be in all respect false.

242.   *Upon information and belief* Cerminaro knowingly and falsely swore to the false allegations in his deposition for the purpose of having plaintiff charged with crimes relating to his allegations.

243.   *Upon information and belief,* Cerminaro was aware that the police found a larger amount of contraband on the ground throughout the search area than was reported.

244.   Cerminaro knowingly omitted from his reports and deposition that the actual evidence found was loose drugs on the ground in the driveway/alleyway.

245.   Cerminaro knowingly omitted from his reports and deposition that the contraband was not found in the bag that he alleged Jeanty possessed and discarded.

246.   Cerminaro knowingly omitted from his report and deposition that Dougherty assisted in the search and took various photographs of the crime scene and the evidence found.

247.   Cerminaro transmitted/broadcasted on his radio what he saw while running at approximately 2:17p stating *"He's on the roof of the building. He's on the roof of the building, going towards Oneida."*

248.   Immediately thereafter he stated *"He's going Northbound on Kemble."*

249.   At approximately 2:19p Cerminaro *stated "Be advised -57. I'll get you the address. I'm going to ask UFD for a ladder, there are several **items** on the roof"*

250.   Cerminaro's alleged last transmission was at 2:19p *"The address is 1224 Kemble with a suspect in custody."*

251.   *Upon information and belief,* Cerminaro first mentioned drugs after a search was conducted of the area and/or Paladino, Dougherty and John Does #1-6 arrived on scene.

252.   Prior to their arrival Cerminaro simply mentioned ***"items"***

253.   This remotely vague and ambiguous term later became ***"drugs",*** after they searched the area and found contraband in the alleyway/driveway.

254.   Paladino executed and swore too two complaints naming plaintiff as defendant, Cerminaro signed the jurats.

255.   Paladino knew Cerminaro's allegations in his October 15, 2009 deposition to be false because he was present and witnessed Cerminaro, John Doe Police Officers #1-6 and Dougherty's actions.

256.   Paladino knew the charges in the complaint to be false.

257.   Paladino knew plaintiff did not possess cocaine or any narcotic drugs.

258.   Cerminaro signed the jurats in the complaints knowing that they were false.

## PETER PALADINO'S ADDENDUM, PROPERTY RECEIPTS AND PHYSICAL EVIDENCE

259.   *Upon information and belief,* Paladino signed the jurat on Cerminaro's deposition knowing the allegations therein to be false.

260.   Paladino signed the jurat on Cerminaro's deposition for the purpose of charging plaintiff with crimes relating to these known false allegations.

261.   Paladino created a false property receipt #71953.

262.   *Upon information and belief,* Paladino backdated this false property receipt to show that it was created on October 15, 2009.

263.   *Upon information and belief,* Paladino collected the contraband substance found on the ground on Kemble St. in the driveway/alleyway on October 15, 2009.

264.   *Upon information and belief,* Paladino placed the contraband evidence found on the ground on Kemble St. into a small UPD evidence zip-lock bag on October 15, 2009 as depicted in a photograph taken by NYSP Forensic Scientist Mary France.

265.   *Upon information and belief,* On Kemble St. Paladino was provided by

Cerminaro, a torn plastic bag separate from the contraband substance found on the ground in the driveway/alleyway on October 15, 2009.

266.    Paladino falsely reported on his property receipt #71953 that the contraband substance from the ground came from the torn plastic bag.

267.    Paladino falsely reported on his property receipt #71953 that the contraband substance from the ground came from Cerminaro.

268.    Paladino, at all times knew that the contraband substance in property receipt #71953, (property detail log #11735) was never in the alleged torn plastic bag property receipt #71953, (property detail log #11736).

269.    Paladino falsely reported who found the contraband evidence at the alleged crime scene.

270.    Paladino did not place the contraband (evidence) in the UPD property room on October 15, 2009.

271.    Paladino placed the contraband substance (1.2g) into the property room and issued a property number on October 21, 2009 at 9:44am.

272.    Paladino placed the torn plastic bag into the property room and issued a property number on October 21, 2009 at 9:45am.

273.    The contraband evidence, a torn plastic bag and contraband in a separate evidence bag was unsecured and unaccounted for between October 15, 2009 and October 21, 2009.

274.    Paladino prepared the contraband evidence to be sent to NYS Police Forensic Laboratory for testing on January 20, 2010.

275.    Paladino did not send the alleged torn plastic bag.

276.   Paladino did not provide the prosecutor with the truthful facts of which he was aware of regarding who found the contraband evidence, where it was found, in what condition and its chain of custody.

277.   Paladino falsely reported to the prosecutor that the substance He, Cerminaro, John Doe Police Officers #1-6 and Dougherty found, was found in a torn plastic bag as opposed to on the ground.

278.   Paladino falsely reported to the prosecutor, and falsely testified at all times relevant that he removed the contraband from the torn plastic bag and transferred it after weighing into the zip-lock evidence bag.

279.   Paladino omitted from his reports the truthful account of what transpired at the crime scene and at UPD.

280.   Paladino withheld from the prosecutor the activities of Cerminaro, John Doe Police Officers #1-6, and Dougherty at the crime scene.

## GRAND JURY PRESENTATION

281.   A Grand Jury presentation was held on November 20, 2009.

282.   The Grand Jury presentation was conducted by ADA Grant Garramone.

283.   Cerminaro and Paladino testified.

284.   Cerminaro repeated his false allegation as sworn to in his deposition and testified to at the preliminary hearing.

285.   The following false testimony by Cerminaro was given to the Grand Jury as responses to questions from Garramone:

Q.   *Can you tell the Grand Jury how you came to have contact with Vladimir Jeanty on October 15th, 2009?*

A.      ….While I was behind him, he reached into his waistband and he pulled out, like, a large plastic bag. Inside this bag was a white in color substance that had the appearance of crack cocaine. He put it in his mouth and started eating it. He also started ripping it with his teeth. From that point we jumped from the second floor roof to the ground. When he hit the ground, probably a twenty, thirty-foot drop, he dropped the plastic bag on the ground. Once he was in custody there was several patrol officers on scene, and I turned custody of him over to them and immediately returned to the area where he dropped the plastic bag. And inside this plastic bag was the remnants of a white in color powder and chunky substance which had the appearance of crack and powder cocaine. I secured that and gave it over to Investigator Paladino of the Metro Unit, who was on scene.

Q.      Officer did you and other officers search the area of the pursuit to look for any   other narcotics?

A.      Yes.

Q.      Were you able to locate anything else?

A.      Nothing.

Q.      The only evidence that remained was what was discarded from the defendant when he  dropped it?

A.      Correct.

Q.      That is what you secured?

A.      Yes.

> Q.     And you took that into your exclusive custody and control until you
>
> turned it over to
>
> A.     Correct.
>
> Q.     And from the time you secured it, to the time you turned it over to
>
> Investigator Paladino, did it remain in your custody and control?
>
> A.     Yes.
>
> Q.     Did you alter it in any way?
>
> A.     No.
>
> Q.     You believed it was crack cocaine, is that correct?
>
> A.     Correct.

286.   Cerminaro was specifically asked by Garramone if he or the police found anything else at the alleged crime scene.

287.   Cerminaro answered 'NO'

288.   Cerminaro knew this answer to be false.

289.   Cerminaro knew that:

a.     Plaintiff was at all times relevant throughout the chase on the rooftop and driveway/alleyway, in Cerminaro's eyesight.

b.     The evidence found was the loose substance that He Himself found on the ground and collected and was placed in a UPD evidence bag.

c.     That other contraband was found throughout the search area and not reported.

d.     He did not know how this substance got on the ground.

e.     He did not find any torn plastic bag at the base of the building.

f.      Whatever bag that He did find at an unknown location and time was at all times empty.

g.      Plaintiff was not shaking or nervous.

h.      That there were not 5 cell-phones on Plaintiffs seat.

i.      That Plaintiff did not pull out a large bag containing a large quantity of any substance.

j.      That plaintiff did not eat or bite into large bag containing any large quantity of any contraband.

290.    Cerminaro falsely testified to the Grand Jury about the facts and circumstance relating to the investigation conducted by Himself, Paladino, Dougherty and John Doe police officers #1-6.

291.    Cerminaro knowingly and falsely testified at the Grand Jury so that an indictment for felony charges would be voted for against plaintiff.

## THE PHYSICAL EVIDENCE/ NYS POLICE LAB REPORT

292.    Cerminaro, Paladino, Dougherty and John Doe #1-6 found contraband substance strewn about in the driveway/alleyway on 1220 Kemble St.

293.    The loose contraband evidence found on the ground at 1220 Kemble St. was entered into evidence under property detail log number 11735.

294.    The contraband evidence Property detail log #11735 was marked and identified at trial as 'Peoples 3'.

295.    The torn plastic bag, Property detail log #11736 was marked and identified at trial as 'Peoples 4'.

296.    The contraband evidence was tested by NYS Police Forensic Scientist Mary A.

France, (hereinafter France.)

297.   The lab results determined the contraband evidence to contain 520mg of the narcotic drug cocaine (HCL.)

298.   The contraband evidence had as adulterants (cutting agents), Levamisole and Caffeine.

299.   Forensic Scientist Mary France photographed the contraband evidence before she homogenized the substance for testing.

300.   The substance was Cocaine HCl not Cocaine Base (Crack).

301.   The substance photographed by France identically resembles the contraband on the ground in the driveway/alleyway as shown in the photograph she took.

302.   The substance she tested came straight from the ground at the crime scene.

303.   The substance she tested did not chemically match the residue in the torn plastic bag Cerminaro and Paladino alleged that it came from.

## THE CONSPIRACY (UPD and CORPORATION COUNSEL)

304.   *Upon information and belief,* at some point between 2:15pm and 4:30pm on October 15, 2009 Cerminaro, Paladino, Dougherty and John Doe Officers #1-6 conferred with each other.

305.   A decision was made not to report all the facts relating to the evidence found during the field investigation.

306.   Dougherty and John Doe officer's #1-6 did not file any reports as required by departmental policy and procedure and NYS law.

307.   *Upon information and belief,* Paladino filed false property receipts and a false addendum on or about October 21, 2009.

35

308.   Cerminaro filed his false report on October 15, 2009.

309.   Cerminaro made at least 4 material changes to his addendum/deposition dated October 15, 2009.

310.   *Upon information and belief*, Cerminaro and Paladino decided to falsely report and falsely testify when necessary that Cerminaro found a torn plastic bag at the base of the building with contraband inside it as written in Cerminaro's false deposition.

311.   Cerminaro omitted from his addendum/deposition that Dougherty photographed the physical evidence at the crime scene.

312.   Cerminaro falsely reported to the prosecutor and later falsely testified that the contraband was originally found inside an alleged torn plastic bag alleged to have been possessed and discarded by plaintiff.

313.   Paladino omitted from his addendum the amount, location and condition of the physical evidence found at the crime scene.

314.   Paladino omitted from his addendum that Dougherty took photographs at the crime scene of the contraband found.

315.   Paladino omitted from his reports that the contraband which he help find and collect from off the ground in the driveway/alleyway was put directly into a small UPD evidence bag.

316.   Paladino instead falsely stated to the prosecutor and later testified that the contraband was inside an alleged torn plastic bag alleged to have been possessed by plaintiff.

317.   Dougherty reviewed Cerminaro's and other UPD officer's addendums to the SIR on October 15, 2009 and October 16, 2009.

318.   Dougherty knew that Cerminaro omitted the fact that Dougherty acting as evidence technician took numerous photographs with the assistance of Cerminaro, Paladino and John Doe officer's #1-6.

319.   Dougherty and John Doe officers #1-6 were aware of Cerminaro and Paladino's intent of misrepresenting the facts of their investigation.

320.   Dougherty and John Doe officers did not themselves write any addendums to the SIR.

321.   *Upon information and belief,* Dougherty who was Supervisor at the scene, participated in the investigation and witnessed Cerminaro, Paladino and John Doe Officers #1-6 actions he also read Cerminaro and Paladino's addendums did not instruct them to correct their reports for omitting the facts that Dougherty photographed the contraband evidence and where the contraband was found, its condition and what amount was found.

322.   *Upon information and belief,* Dougherty took no steps to correct Cerminaro and Paladino's official reports.

323.   *Upon information and belief* Between March 10, 2010 and March 24, 2010 Dougherty, Cerminaro, Paladino and/or John Doe #1-6 spoke with John Doe #7 of the Corporation Counsels Office regarding a packet of files/records regarding RMS #09-52210 relating to plaintiffs charges.

324.   This packet of files/records were provided by PO Fitzgerald on March 11, 2010 to John Doe #7 of Corporation Counsels Office for review, before possible disclosure to Jeanty in response to Jeanty's March 3, 2010 F.O.I.L request served upon UPD and OCDA.

325.   John Doe #7 made the decision that the records were exempt from disclosure to Jeanty due to the fair trial exemption provided for by the Freedom Of Information Law.

326.   *Upon information and belief,* John Doe #7 on instructions from Cerminaro, Paladino Dougherty and/or John Doe #1-6 was directed not to forward among other records/files the 22 or more photographs taken by Sgt. Uryniak at UPD and Sgt. Dougherty at the crime scene.

327.   *Upon information and belief* John Doe #7 withheld these records from OCDA despite knowing he had a legal obligation to forward the files/record to the OCDA.

### OMNIBUS MOTIONS/DISCOVERY

328.   Defendant's trial counsel, Ms. Rebecca L. Wittman, Esq., properly executed and filed and Omnibus Motion and Discovery demand dated January 6, 2010.

329.   Defense Counsel requested all Brady and exculpatory material.

330.   Defense Counsel requested *'all photographs taken by law enforcement'* relative to the underlying matter.

331.   Garramone responded on/about January 7, 2010.

332.   Garramone responded that no Brady material existed at the time and that a conference could be scheduled at a later time regarding discovery pursuant to CPL 240.20.

333.   A discovery conference was held on March 19, 2010 at the OCDA's office between defense counsel Ms. Wittman and the trial prosecutor Mr. Schultz.

334.   Mr. Schultz provided defense counsel with the NYS police Lab report.

335.   No other records or files were provided at that time.

336.   On January 27, 2010, trial Judge Michael L. Dwyer ordered the People to provide

the defense with all Brady material and discoverable material.

## POST TRIAL

337.   Plaintiff wrote McNamara numerous times between July 2010 and November 2011; after receiving the records responsive to his F.O.I.L request.

338.   Plaintiff provided McNamara with a copy of the previously undisclosed photograph/newly discovered evidence and the trial transcripts of Cerminaro and Paladino's testimony.

339.   Plaintiff requested that McNamara review this new information and review plaintiff's trial due to the clear misconduct of the Police officer witnesses.

340.   McNamara did not respond to plaintiff's letter/complaint.

341.   Trial prosecutor Kurt Schultz responded by letter dated January 15, 2011.

342.   On or about November 2011, despite numerous filings in Oneida County Supreme Court regarding various Article 78 petition for failure of OCDA and UPD to disclose records; OCDA under a blanket motion, without notice to plaintiff obtained an order from the trial Judge Michael Dwyer to improperly destroy the physical evidence in plaintiff's case.

343.   The motion to destroy the physical evidence was supported by a false supporting affidavit of PO Taurisano (UPD Property room clerk).

344.   This false affidavit alleged that plaintiff did not have direct appeal pending relating to the underlying conviction.

345.   McNamara submitted this false affidavit knowing that plaintiff had a direct appeal pending in the Fourth Department Appellate Division.

346.   Plaintiff's appeal is pending as of today's date.

347.    Plaintiff needed the physical evidence preserved so that the alleged torn plastic bag with residue could be tested; as it was never previously tested.

## PLAINTIFF'S CIVILIAN COMPLAINT WITH UPD

348.    Plaintiff filed a civilian complaint with UPD on or/about January, 2011.

349.    Plaintiff filed this complaint with UPD Chief Mark Williams.

350.    Plaintiff filed this complaint based on the newly discovered evidence which consisted of among other things the 22 UPD Incident photographs.

351.    Plaintiff specifically complained about Cerminaro and Paladino false testimony as follows:

  a.      Cerminaro and Paladino falsely testified at trial that no photographs existed.

  b.      Cerminaro and Paladino falsely testified at trial that no one took any photographs relating to the underlying case.

  c.      Cerminaro falsely reported what was found during his investigation on October 15, 2009.Cerminaro falsely reported where the evidence was found during his investigation on October 15, 2009.

  d.      Cerminaro and Paladino perjured themselves at plaintiff's trial and all other proceedings.

  e.      Dougherty failed to comply with UPD police and procedures by failing to timely upload the 22 or more photographs he took during the investigation on October 15, 2009, and failing to write a narrative as required by UPD policy and procedure.

352.    Chief Williams, ignored plaintiff complaint.

353.   Cerminaro, Paladino and Dougherty were not reprimanded nor disciplined.

354.   Dougherty was instead promoted from Sergeant to Lieutenant.

## UPD POLICIES AND PROCEDURES

355.   UPD has a policy and procedure manual in place.

356.   Chapter 5 Article 6 "Evidence Collection, Preservation and Processing" establishes procedures governing the collection and preservation of physical evidence by UPD officers at various types of crime scenes.

357.   This Chapter as written is inadequate in protecting defendants' rights relating to a defendants' right of access to and perseveration of evidence.

358.   *Upon information and belief,* Chief Williams himself requires his officers to immediately retrieve evidence in direct violation of UPD written Policy and procedure.

359.   *Upon information and belief,* Supervisors do not enforce UPD Policy and Procedures in Chapter 6 Article 5 of the General Order.

360.   *Upon information and belief,* Officers do not follow this written policy and procedure in Chapter 6 Article 5 of the General Order.

361.   *Upon information and belief,* Supervisors who have no knowledge of the underlying facts in a case review officer's filings and arbitrarily approve them.

362.   *Upon information and belief,* Supervisors or any officers are improperly allowed to have multiple roles during a crime scene investigation.

363.   Dougherty was the patrol supervisor and the assigned evidence technician.

364.   Dougherty was allowed to act as an evidence technician even though he had not been properly trained as an evidence technician.

365.   *Upon information and belief,* Dougherty acted as ET even though he was not

allowed under the policy.

366.   Dougherty photographed the contraband found by Cerminaro.

367.   Cerminaro manipulated the contraband he found before collecting it.

368.   Cerminaro ignored the department's policy requiring that he not handle evidence which can be easily contaminated such as drug evidence.

369.   Cerminaro collected the evidence and failed to properly mark and secure the evidence in a proper container with a legal seal as required by department policy.

370.   *Upon information and belief,* Paladino and Police Officers John Doe #1-6 found additional contraband and did not follow department policy regarding collection and preservation of evidence.

371.   *Upon information and belief,* Paladino and Police Officer John Doe #1-6 collected the additional contraband found and have never properly entered this evidence into the UPD RMS system.

372.   *Upon information and belief,* Dougherty was fully aware once He arrived on the scene that Cerminaro had at minimum tampered with any evidence/contraband found.

373.   *Upon information and belief,* UPD has in its possession contraband drug evidence found at the crime which they have not entered into the UPD RMS system and is not part of their inventory but is in their possession.

374.   *Upon information and belief,* Chief Williams is aware that Chapter 6 Article 5 of the General Order is not followed as written and does not enforce this policy.

375.   *Upon information and belief,* UPD and the OCDA do not have a policy or procedure in place regarding the preservation/destruction of evidence relating to defendants who have direct appeals pending.

376.   *Upon information and belief,* the OCDA, Scott McNamara arbitrarily motions Judges Dwyer or Donalty for an order to destroy evidence.

377.   *Upon information and belief,* McNamara uses false affidavits which state that the evidence is not related to any case with a direct appeal pending. No one verifies this information before providing it to a Judge.

378.   *Upon information and belief,* McNamara allowed the evidence in plaintiff case to be destroyed even though his office was well aware that plaintiff appeal was pending in the Fourth Department.

379.   Plaintiff had written McNamara multiple times regarding his case before the order was issued.

380.   *Upon information and belief,* McNamara and UPD destroyed the physical evidence because plaintiff was going to seek an order to have the OCDA/UPD produce and submit the evidence to an independent lab for testing of the residue in the torn plastic bag. This residue was not tested by the NYS Police lab in 2010.

381.   UPD Officers are allowed to hold evidence and not voucher or store it in a secured property room for multiple days.

## DECEMBER 21, 2012 MEETING/RECORDING

382.   Plaintiff was released from prison on August 2, 2012 at the maximum term of imprisonment.

383.   On or about October 15, 2012, Plaintiff had a conversation with City of Utica First Asst. Corporation Counsel Charles N. Brown regarding plaintiffs multiple F.O.I.L requests.

384.   Brown suggested that he set up a meeting with UPD official to discuss said

F.O.I.L request and the records involved.

385.   On October 25, 2015; by phone call and later by letter a meeting was set-up for December 21, 2012.

386.   On December 21, 2012, at UPD Headquarters; Plaintiff met with UPD's Sgt. Sean Dougherty, Inv. Joseph Trevasani and First Asst. Corp. Counsel Charles Brown.

387.   The meeting lasted from 10:00am to approximately 11: 30am.

388.   Plaintiff surreptitiously recorded the meeting.

389.   During this meeting, Inv. Trevasani explained that per UPD Police Chief Williams, UPD personnel were required to immediately pick up evidence regardless of the need to or not; in direct violation of UPD written policy and procedures.

390.   Dougherty explained his involvement in the October 15, 2009 investigation.

   a.   He stated that the police did not know what happened. The officers simply *'thought'* plaintiff discarded the contraband they found.

   b.   He stated that he witnessed Cerminaro with a bag in his hands when he arrived on the scene.

   c.   He stated that Cerminaro found the contraband on the ground, collected it and placed it in the bag.

   d.   He stated that the remainder of the contraband found was in UPD property

   e.   He did not know why Cerminaro and Paladino testified in the manner in which they did.

   f.   Dougherty admitted to knowingly violating UPD written policy and procedures. He admitted not memorializing in the RMS his activities at the alleged crime scene.

44

g.    He admitted that he did not upload the photographs he took into the RMS as he was required to do.

## PLAINTIFF'S CPL 440 MOTION

391.   Plaintiff filed a Pro-Se CPL 440.10 Motion to Vacate Judgment on March 8, 2015 with Oneida County Court.

392.   The Motion sought relief pursuant to CPL 440.10(1), (b), (c), (f), (g), and (h).

393.   Among other official records, Plaintiff provided as newly discovered evidence and Brady/Giglio Material; the 22 Utica Police Department Incident Photographs taken by Defendant Dougherty and Sgt. Uryniak (retired).

394.   Plaintiff provided the relevant trial and pre-trial hearings transcripts relating to the allegations made in the 440 motion.

395.   The People, by ADA Cox filed an opposition to Plaintiffs 440 motion on April 14, 2015.

396.   ADA Cox opposed the motion despite having been provided incontrovertible proof and evidence in support of the motion to vacate.

397.   Plaintiff's first appearance was scheduled for April 27, 2015 before trial Judge Michael L. Dwyer.

398.   On April 27, 2015 Oral argument was held off the record before Judge Dwyer, the people were represented by ADA Steven Cox.

399.   Based on allegations against Judge Dwyer of biasness, prejudice and conflict, Judge Dwyer recused himself.

400.   The matter was transferred by Judge Dwyer to Judge Donalty for further oral argument and/or hearing.

401.   Between April 27, 2015 and June 27, 2015, defendant McNamara conducted an extensive investigation as told by Judge Dwyer.

402.   McNamara spoke to the trial prosecutors (ADA's Garramone and ADA Schultz), the police officers involved (Cerminaro, Paladino, Dougherty and others).

403.   McNamara reviewed all UPD and OCDA files relating to the prosecution of indictment 09-480, People v. Jeanty.

404.   Defendant McNamara, having investigated the matter fully, made the decision to oppose the motion to vacate the conviction and dismiss the indictment.

405.   McNamara opposed the motion to vacate despite having obtained irrefutable and incontrovertible proof in the motion papers and from his investigation that plaintiff/defendant did not and could not have committed the crime charged.

406.   McNamara learned in the course of his investigation:

a.   That Cerminaro and Paladino were in the photographs taken by Dougherty on October 15, 2009.

b.   That Cerminaro and Paladino committed perjury at every proceeding before trial, at the Grand Jury and during the trial.

c.   That the physical evidence had been manufactured and fabricated by Cerminaro and Paladino. These officers alleged to have found the contraband in a torn plastic bag, alleged to have been possessed and thrown by plaintiff.

d.   The photographs in now McNamara's possession show that the contraband was found on the ground and only on the ground.

e.   The contraband was collected by Cerminaro and/or Paladino and placed in a UPD evidence bag.

    f.     Dougherty as Supervisor and Evidence Technician that day was aware of these facts and was a participant in the investigation.

    g.     That the officers involved in the investigation omitted the abovementioned material, exculpatory facts from their reports and testimony.

    h.     His Office became aware of the police officers Misconduct after plaintiffs trial in 2011 and that prosecuting attorney Kurt Schultz did not attempt to correct these grave errors.

407.   McNamara decided to further oppose the motion to vacate the conviction and dismiss the indictment; he directed his ADA's to reprosecute plaintiff.

408.   Plaintiff was required to appear at least 5 additional times between May and August, 2010

### MAY 18, 2015 ORAL ARGUMENT AND JUNE 27, 2015 VACATUR

409.   Judge Dwyer recused Himself on April 27, 2015 based on Plaintiffs allegations of judicial bias, prejudice and various instances of impropriety.

410.   On May 18, 2015 and appearance was scheduled before Judge Barry M. Donalty.

411.   The People were represented by District Attorney Scott D. McNamara.

412.   McNamara opposed plaintiff's motion but consented to a hearing.

413.   A hearing was scheduled for July 27, 2015.

414.   At the scheduled hearing on July 27, 2015 ADA Grant Garramone consented to the total relief requested by Plaintiff in His motion; with the exception that the indictment not be dismissed and the matter be returned to the trial calendar.

415.   No hearing was held as scheduled on June 27, 2015 as previously scheduled.

416.   On June 27, 2015, Judge Donalty vacated the judgment of conviction dated May 13, 2010 and remanded the matter back to Judge Dwyer for trial.

## AUGUST 10, 2015 DISMISSAL

417.   Plaintiff's case was put back on Judge Dwyer trial calendar.

418.   Judge Dwyer had previously recused/disqualified himself on April 27, 2015 from the matter of People v. Jeanty.

419.   Plaintiff appeared before Judge Dwyer on July 20, 2015, July 27, 2015 and August 3, 2015

420.   A fact finding hearing was scheduled for August 10, 2015 by Judge Dwyer.

421.   On August 10, 2015 District Attorney Scott McNamara on behalf of the People orally motioned pursuant to CPL 210.40 to have the indictment dismissed in the interest of justice.

422.   Plaintiff opposed the oral motion to dismiss the indictment in the interest of justice.

423.   Plaintiff informed the Court that he wanted to go to trial.

424.   Plaintiff informed the Court that he was not joining the People's motion.

425.   No fact finding hearing was held as previously scheduled by Judge Dwyer.

426.   No fact finding hearing was held as required by statute.

427.   Judge Dwyer dismissed the indictment over plaintiff's objection.

## THE AUGUST 12 AND 13, 2015 OBSERVER DISPATCH ARTICLE (Exhibit #1).

428.   On/about March 17, 2015 Jeanty contacted and spoke to Fran Perritano by phone at 315-792-5016.

429.   Jeanty explained to Perritano that he had filed a post-conviction motion in Oneida County Court seeking to vacate the judgement of conviction of March 24, 2010.

430.   Jeanty told Perritano that Jeanty had photographic proof from UPD records obtained via a F.O.I.L request, proving that he did not commit the crimes charged, that Police Officer Michael Cerminaro and Inv. Peter Paladino knowingly testified falsely (committed perjury) at trial. They knowingly created false records and manufactured/fabricated the evidence against Jeanty.

431.   Jeanty told Perritano that he also had a recording of Lieutenant Sean Dougherty, the supervisor and evidence technician on October 15, 2009; that would further support the statements in paragraph 82.

432.   Jeanty requested that Perritano either, look at the records himself, have his reporter look at the records or have his reporter be present in Court to cover the proceedings.

433.   Perritano told Jeanty to contact him if Jeanty was successful in getting the matter vacated or dismissed.

434.   Perritano told Jeanty that it was not Gatehouse Media, LLC.'s normal practice to cover cases in the manner Jeanty was requesting.

435.   Perritano explained that He would only consider printing an article if Jeanty succeeded in his motion.

436.   Jeanty contacted Perritano by email on April 24, 2015 and May 18, 2015.

437.   Jeanty contacted Parker by phone at 315-792-5063 on May 17, 2015 and left a voicemail, requesting she return his call and the possibility of her attending any of the proceedings regarding Jeanty's motion.

438.   Jeanty contacted Parker by phone at 315-792-5063 on May 18, 2015 and explained to Parker the same facts as Jeanty left on her voicemail.

439.   Parker told Jeanty that she was too busy to cover such a case.

440.   Parker told Jeanty to contact her if Jeanty succeeded in his motion.

441.   Jeanty contacted Parker by email dated May 17, 2015 and May 18, 2015 requesting she attend the proceedings in County Court relating to Jeanty's Motion.

442.   Parker did not respond.

443.   Parker did not attend any of the proceedings in the matter of People v. Jeanty, I09-480.

444.   On August 12, 2015 at 1:14pm and 1:22pm Parker called Jeanty to discuss the dismissal of the underlying criminal matter on August 10, 2015.

445.   Jeanty explained again to Parker the basis of His motion and the proof he had in support of His motion and allegations.

446.   Jeanty questioned Ms. Parker about her experience and knowledge in reporting on criminal/court proceedings.

447.   Jeanty requested Parker verify her information before printing any article.

448.   Jeanty informed Parker that she should not rely solely on any statements made by any public official related to the underlying matter.

449.   At 3:17pm on August 12, 2015, Parker posted on OD.com an article titled *"Man seeks to appeal dismissal of 2010 cocaine case."*

450.   The article was reprinted on August 13, 2012 in the paper edition.

451.    Parker had in Her possession official records and documents of the underlying proceedings to compare and/or verify the statements made to her by McNamara and/or Jeanty

452.    Parker had as her sources Mr. Jeanty, Defendant McNamara and official Court records and documents.

453.    Parker was well aware after speaking to Jeanty and reviewing the official court records that any statement by McNamara were not reliable, truthful or accurate.

454.    Parker negligently and with reckless and total disregard of her responsibilities as a reporter and the truth, wrote and printed the August 12 and 13 2015 articles.

455.    Parker, knowingly published the defamatory article on UticaOD.com at 3:17pm and again on August 13, 2015 in the paper edition.

456.    Parker chose to accept and print McNamara's false allegations and opinions despite having official records and documents relating to People v. Jeanty (I09-480) in her possession; knowing the fact that they did not relate to or represent what occurred/transpired in the proceedings in the matter of People v. Jeanty I09-480 as clearly shown in the records and documents in her possession.

457.    These statements/articles were the personal thoughts and opinions of McNamara and were of no direct or specific relation to the underlying matter.

458.    These statements/articles left out material and relevant facts that showed that Jeanty could not have/did not commit the charges levied against him.

459.    On August 13, 2015 Jeanty was contacted by various Utica residents about an article written on UticaOD.com and the paper edition relating to the August 10, 2015 dismissal.

51

460.   Jeanty read the article for the first time on August 13, 2015 on Gatehouse Media, LLC., website UticaOD.Com.

461.   The Observer Dispatch is read by approximately 100,000 or more people daily in printed form.

462.   The Observer Dispatch is read over 100,000 or more times on UticaOD.com.

## COMMUNICATIONS WITH POLLY G. SACKS, GENERAL COUNSEL GATEHOUSE MEDIA, LLC.

463.   On or about October 5, 2015 Jeanty contacted Counsel for Gatehouse Media, LLC., Ms. Polly G. Sacks, Esq.

464.   Ms. Sack's assistant Sheryl Costa contacted Jeanty by phone on October 5, 2015. She informed Jeanty of Ms. Sacks email address.

465.   Jeanty sent a detailed email to Ms. Sacks on October 25, 2015 regarding the August 12 and 13, 2015 articles. Jeanty also requested they retract the article as it was factually false, incorrect and defamatory.

466.   Ms. Sacks responded to Jeanty on October 27, 2015.

467.   Ms. Sacks wrote:

> *"The allegedly offending statements in the article were taken from official records and statements of a public official (DA) and thus falls squarely within the 'fair report privilege'."*

Ms. Sacks further stated:

> *"If indeed any of these official statements or documents were incorrect, we can certainly consider a follow up article if you*

*provide us with objective proof or evidence of the incorrect*

*statements."*

468.   Jeanty responded on October 29, 2015 and received no further responses from Ms. Sacks.

469.   The matter of People v. Jeanty was dismissed and sealed as of August 10, 2015, by order of Judge Michael L. Dwyer. CPL 210.40 CPL 160.50.

*470.*   Ms. Sacks acknowledged that Parker and Perritano had in their possessions 'documents' and 'official records' relating to the underlying criminal matter.

471.   Parker and Perritano had records in their possession upon which to fact check the statements made by McNamara and Jeanty, but did not.

472.   Each statement complained of is false and can be proven to be false.

473.   The articles written and published on August 12 and 13, 2015 in the Observer Dispatch, whether online or in print, are as a whole false and defamatory.

## MCNAMARA, AND THE AUGUST 12 AND 13, 2015 OBSERVER DISPATCH ARTICLES ARTICLE (EXHIBIT #1).

474.   Parker contacted McNamara on or about August 12, 2015.

475.   McNamara gave Ms. Parker His own personal opinion about the matter of People v. Jeanty l09-480 and what he believes occurred during the proceedings in that matter.

476.   McNamara was aware of all the truthful and correct facts relating to the matter and knowingly and purposely left them out.

477.   The statements he gave Parker were exaggerated, false and he knew them to be false.

## THE ARTICLE DATED AUGUST 12 AND 13, 2015, PARAGRAPH 6 ARTICLE

## (EXHIBIT #1).

478.   McNamara falsely stated that Jeanty was a **'bit of a difficult individual'.**

479.   McNamara knew that Jeanty was simply not going to plead guilty to any charges relating to this false arrest and malicious prosecution.

480.   *Upon information and belief,* McNamara was upset by the fact that Jeanty rejected His offer to Jeanty to plead guilty to a violation of **Penal Law section 240.20 (7):** *a person "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.*

481.   *Upon information and belief,* McNamara knew that Jeremy D. Alexander, Jeanty's assigned counsel had attempted, without success to have Jeanty accept the above mentioned disposition.

482.   *Upon information and belief,* McNamara knew that His ADA's on previous appearances had vigorously and unsuccessfully attempted to have Jeanty accept the aforementioned disposition.

483.   *Upon information and belief,* McNamara knew that Judge Michael L. Dwyer also vigorously attempted, without success to have Jeanty accept the aforementioned disposition.

484.   *Upon information and belief,* Based on Jeanty's refusal to accept the offered disposition, and the fact that Jeanty had made serious and provable allegations of misconduct by His Office, UPD and the trial Judge, McNamara labeled Jeanty as *'a difficult individual'*; because Jeanty was vigorously pursuing a hearing and/or new trial to prove these allegations.

485.   *Upon information and belief,* McNamara also labeled Jeanty as **'a difficult individual'** because Jeanty would not provide His office the recording of Sgt. Dougherty until Sgt. Dougherty testified at a hearing or new trial.

486.   McNamara at all times opposed Jeanty's Motion to Vacate and dismiss the indictment.

487.   *Upon information and belief,* McNamara knew that he himself motioned to have the indictment dismissed and that Judge Dwyer granted it in the best interest of McNamara, the Utica Police Department and Judge Dwyer.... **not the public and not Jeanty's**.

488.   McNamara knew that if he proceeded with the matter any further, the truth would come out that His office maliciously, prosecuted Jeanty, unjustly convicted Jeanty and that Cerminaro, Inv. Paladino and Sgt. Dougherty (among other) manufactured a crime, fabricated evidence, falsified records and committed perjury at various court proceedings, all to the knowledge of his office and the presiding Judge Michael L. Dwyer.

489.   *Upon information and belief,* McNamara's office consented to the vacatur of the conviction to avoid a fact finding hearing.

490.   M *Upon information and belief,* McNamara motion to dismiss the indictment to again avoid the second scheduled fact finding hearing.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPH 7 ARTICLE (EXHIBIT #1).

491.   In paragraph 7 McNamara knew that the five (not six) cell phones found in Jeanty's rental vehicle were staged in the photograph taken by Sgt. Dougherty.

492.   He knew that only 2 cell phones were visible to Cerminaro during the traffic stop.

493.   He exaggerated the number to 6 and where/when they were found so that the public would conclude that Jeanty had to be a drug trafficker.

494.   The cellphones were all immediately returned to Jeanty on August 15, 2009. There was never any connection made or confirmation that the none working cellphones were related to any drug trafficking activity.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPH 8 ARTICLE (EXHIBIT #1).

495.   In paragraph 8, McNamara exaggerates the alleged size of the alleged bag that Jeanty allegedly possessed.

496.   He further falsely stated that the officer found a '*marble sized*' amount of cocaine when officers took Jeanty into custody.

497.   McNamara knew that the contraband found were much smaller, minute pieces of loosely scattered 'cocaine'; which totaled 1.2 gram gross.

498.   McNamara knew that the actual evidence found did not match what was reported by Cerminaro and Inv. Peter Paladino in their records or testimony.

499.   McNamara knew that this contraband was found approximately 30 minutes after Jeanty was arrested and taken off the scene **NOT** '*when officers took [Jeanty] into custody*'.

500.   McNamara made this statement to convey to the public that Jeanty was arrested in a proximately close, if not immediately close area to the alleged contraband found; thereby possessing the cocaine.

501.   McNamara knew that the police did not know how the contraband was where it was and that Jeanty did not put it there.

**The Articles dated August 12 and 13, 2015, paragraph 8 ARTICLE (Exhibit #1),**

502.   McNamara told Parker that *'Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away.'*

503.   A baseball masses approximately 5 ½ ounces.

504.   McNamara was alleging that Jeanty possessed approximately 5 ½ ounces of cocaine and destroyed evidence by eating and discarding it. These are serious crimes in clear violation of:

*PL sec. 220.18(1), Criminal Possession of a controlled substance in the 2nd Degree, class A-II felony. A person is guilty of criminal possession of a controlled substance in the second degree when he or she knowingly and unlawfully possesses:*

*1.   one or more [...] substances containing a narcotic drug and said [...] substances are of an aggregate weight of four ounces or more[.]*

*PL sec 220.16(1) Criminal Possession of a controlled substance in the 3rd degree, class B felony. A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses:*

*1.   A narcotic drug with intent to sell it[.]*

*PL sec 195.05 obstructing governmental administration in the 2nd degree, class A Misdemeanor. A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to*

*prevent a public servant from performing an official function, by means [of] interference[.]*

505.   Inv. Peter Paladino's complaints charged Jeanty with; and Jeanty was subsequently indicted of the charges of:

**PL sec 220.03 Criminal Possession in the 7th degree, class A Misdemeanor.**

*A person is guilty of criminal possession of a controlled substance in the seventh degree when he or she knowingly and unlawfully possesses a controlled substance*

**PL sec 220.06(5) Criminal Possession in the 5th degree, class E Felony.** *A person is guilty of criminal possession of a controlled substance in the fifth degree when he knowingly and unlawfully possesses:*

**5.    Cocaine and said cocaine weighs five hundred milligrams or more.**

506.   McNamara statements to Parker do not concur with the actual charges Jeanty was charged, indicted and convicted of.

507.   McNamara knowingly made these false statements because he knew that as District Attorney his statements as printed would be believed as factual by the reading public at large.

508.   McNamara made these statements knowing they were never proven to be true.

509.   McNamara added elements to the alleged crimes/charges against Jeanty so that the reading public would believe Jeanty to be guilty of these crimes.

510.   McNamara exaggerated the weight of the contraband Jeanty was alleged to have possessed and charged with by using the phrase *'baseball size'*.

511.   McNamara knew the actual aggregate weight of the contraband Jeanty was charged with possessing was 1.2 grams.

512.   McNamara knew the actual weight of the cocaine relating to the charges was 520mg.

513.   McNamara knew no large bag nor any large quantity of any contraband was found nor could be found because Cerminaro had lied in His deposition.

514.   McNamara knew that none of the allegation about any alleged illegal conduct by Jeanty was ever proven to be true because what the Officer alleged was physically and logically impossible.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPHS 8, 10, 11 ARTICLE (EXHIBIT #1),

515.   McNamara is fully aware of the huge drug trafficking problem affecting the Utica, NY area.

516.   McNamara purposely and knowingly interchanged the use of the words *'Cocaine'* and *'Crack'* as if they're synonymous. Even though he knows New York State does not have a 'specific' *'Crack'* statute to punish a **'Crack'** as a crime.

517.   McNamara knows that New York State punishes possession of *'Crack'* as possession of a narcotic drug: *COCAINE*.

518.   McNamara used the word **'Crack'** because he knows of the stigma that the public attaches to *'Crack'*.

519.   McNamara knows that the public does not see **'cocaine'** in the same light as it does *'Crack.'*

520.   McNamara used *'Crack'* so that the reading public would be more convinced of Jeanty's guilt because he knows black males are mostly associated with the trafficking of *'Crack'* and Jeanty is a black male.

521.   McNamara knew that the contraband found was **cocaine** and not *'Crack'*.

### The Articles dated August 12 and 13, 2015, paragraph 9 ARTICLE (Exhibit #1)

*522.*   The statement in this paragraph was made directly by McNamara or directly by Parker or both.

*523.*   In paragraph 9 McNamara or Parker falsely stated that *'photos were taken of the smaller ball of cocaine[.]'*

*524.*   McNamara or Parker falsely stated *'[T]he chunks reportedly bit off were never photographed or collected.'*

*525.*   McNamara or Parker purposely used the words *'ball'* and *'chunks'* to give the impression that large amounts of cocaine were involved in this matter and a large amount of cocaine was found.

526.   McNamara knew that there was no other evidence to be photographed or collected because Cerminaro's allegations were false. There were no other chunks of anything, anywhere to be found or collected.

527.   McNamara knew that the photographs clearly showed that Jeanty was not biting any cocaine.

528.   McNamara knew that the police searched the rooftops where Jeanty allegedly discarded the alleged contraband and they found no evidence on the rooftops even though they should have.

529.   He further falsely stated that *'[T]he 22 photographs] were never turned over to the District Attorney's Office, so the evidence wasn't included in the trial, among other concerns.'*

530.   McNamara knew that his office, ADA Kurt Schultz were aware of the photographs.

531.   McNamara knew that the photographs were turned over to his office but were instead suppressed by ADA Kurt Schultz who prosecuted the case.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPH 10 ARTICLE (EXHIBIT #1)

*532.*   In paragraph 10, McNamara falsely stated *'Jeanty claims that the police planted the cocaine visible in the photos, and that the other chunks of cocaine never existed.'*

*533.*   Jeanty did not claim that the police planted the cocaine.

534.   McNamara knew that the only evidence Jeanty claimed was planted by UPD was the alleged plastic bag and contraband on the ground as photographed by Sgt. Dougherty.

535.   Jeanty made these allegation because Sgt. Dougherty told him that the bag and substance was placed on the ground by Cerminaro to be photographed in that location.

536.   Jeanty alleged in his motion that Cerminaro and Paladino manufactured/fabricated the physical evidence they presented in the criminal matter by falsely reporting the condition, form and location where it was found.

537.   McNamara knew that Cerminaro did not find the evidence in the location or condition he alleged in his false deposition.

538.   McNamara knew that Inv. Peter Paladino lied about the condition in which he received the evidence from Cerminaro.

539.   McNamara knew that the photographs contradicted the allegations made by Cerminaro and charges filed by Inv. Peter Paladino.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPH 11 ARTICLE
## (EXHIBIT #1)

*540.*   In paragraph 11 McNamara falsely states *'[I]t could substantiate his claim there wasn't crack on the ground[.]'*

*541.*   Jeanty never made any claim (allegation) relating to crack.

542.   McNamara knew that the alleged substance found was cocaine.

*543.*   Jeanty alleged that the Police (Cerminaro) did indeed find contraband on the ground in the driveway.

*544.*   Jeanty alleged that the contraband found was never in the alleged bag allegedly found by Cerminaro.

*545.*   Jeanty further alleged that the Police (Cerminaro) knowingly and purposely did not report where they found the actual evidence.

*546.*   McNamara knew that had the Police truthfully reported where they found evidence and when; they would not have been able to charge Jeanty as they did and there would have been no prosecution of Jeanty.

547.   McNamara knew that the photographs absolutely substantiated all of Jeanty's allegations in His motion.

548.   McNamara knew that on June 29, 2015 ADA Grant Garramone consented to the complete relief requested by Jeanty in his motion to vacate the judgment and conviction.

549.   McNamara knew that the photographs proved that Cerminaro's deposition/statement of October 15, 2009 was false in its entirety.

*550.*   McNamara knew that the only claim which would have been substantiated and proven were the claims by Jeanty as outlined in paragraph 82 and more specifically in His 440 motion.

*551.*   McNamara took every step possible to assure that no hearings were ever held.

## THE ARTICLES DATED AUGUST 12 AND 13, 2015, PARAGRAPH 12 ARTICLE (EXHIBIT #1)

552.   This statement was made by McNamara to Parker or it's her own personal statement.

553.   In paragraph 12 McNamara or Parker falsely states that the evidence was destroyed as a result of some unknown *'standard for the [DA's] office'.*

554.   McNamara knew that the evidence was improperly destroyed.

555.   He knew that the evidence was destroyed even though Jeanty still had his direct appeal pending.

556.   McNamara had the evidence destroyed so Jeanty could not gain access to it for further testing.

557.   Specifically, McNamara knew that the bag and its residue were never tested by the NYS Police Forensic Lab because this piece of evidence was never sent out to be tested.

558.   Testing of the bag and its residue would have proven that there never was any cocaine in the bag.

559.   McNamara presented the motion to destroy the physical evidence, supported by a false affidavit signed by a UPD officer falsely swearing that no direct appeal was pending relating to any of the evidence McNamara was seeking to have destroyed.

560.   Jeanty had written his office in 2010 and 2011 requesting that they preserve the physical evidence because of the direct appeal pending and Jeanty's intent on filing post-conviction motion once released from prison.

561.   He knew that the evidence was destroyed unlawfully and without notice to Jeanty as the defendant in the underlying matter.

562.   Jeanty direct appeal is still pending at the Fourth Department Appellate Division as of today's date.

563.   Jeanty did not commit any of the criminal acts alleged and attributed to him by Cerminaro in his October 15, 2009 deposition/statement.

564.   Jeanty did not commit any of the criminal acts alleged and attributed to him by McNamara as stated by him to Parker.

565.   Jeanty did not commit any of the criminal acts alleged and attributed to him by Parker as written and published in the OD, online and in paper form.

566.   Jeanty did not make any of the allegations attributed to Jeanty by McNamara and printed by Parker in the OD.

567.   McNamara knew the falsity in Cerminaro's statements because He personally investigated the matter sometime between April 2015 and July 2015.

568.   McNamara knew the falsity in His own statements because He personally investigated the matter sometime between April 2015 and July 2015.

569.   McNamara knew the falsity in His own statements because they do not concur with the (false) deposition written by Cerminaro.

570.   McNamara knowingly made these false statements because he previously stated *'I do not believe there was exceptional serious misconduct by the police. [I] don't believe the police did anything wrong'*.

571.   McNamara does not know or understand the law as it relates to discovery and 'Brady Material'.

572.   He has previously stated that His office is not required to provide a defendant with photographs taken by a law enforcement officer relating to an underlying charge, which are specifically requested for.

573.   He does not understand what is discoverable under NYS law.

574.   He does not know what material/evidence should be provided to a defendant under NY and Federal Constitutional rights.

575.   McNamara does not understand when his Assistant District Attorney's or Police Officer are violating a defendants rights to discovery and 'Brady Material'.

576.   McNamara believes and previously stated that the photographs withheld from Jeanty were not required to be provided to Jeanty and his attorney.

577.   The article written by Parker in the OD on August 12, 2015 and August 13, 2015 (whether online or in paper form) as a whole and each outlined and individually identified statement given by McNamara were libel per se and otherwise defamatory because among other things they charge Jeanty with various serious crimes and are

entirely false and can be proven to be false. These statements and article implied that Jeanty was indeed guilty of these crimes as a matter of fact.

## OTHER PROCEEDINGS

578.   Plaintiff filed a notice to appeal the dismissal dated August 10, 2015 on September 8, 2015 with the New York State Appellate Division Fourth Department.

579.   Plaintiff filed a motion to reargue/reconsider the dismissal dated August 10, 2015.

580.   Judge Dwyer denied the motion on September 30, 2015.

581.   Plaintiff filed a notice of appeal On October 28, 2015.

582.   Plaintiff filed an Article 78, Writ of Prohibition challenging Judge Dwyer improperly presiding over Plaintiffs case despite having legally disqualified/recused himself on April 27, 2015.

583.   The Fourth Dep.t Appellate Division dismissed the petition on January 16, 2016.

584.   Plaintiff filed an application for leave to appeal to the NYS Court of Appeal on February 10, 2016.

585.   The NYS Court of Appeal denied the Application on May 3, 2016.

586.   Plaintiff filed an Article 78 Writ of Prohibition and Mandamus in Oneida County Supreme Court.

587.   Judge Siegel dismissed the Petition on April 28, 2016.

588.   Plaintiff filed a Notice of Appeal on July 11, 2016.

589.   Plaintiff filed a Claim in the NYS Court of Claims on April 18, 2016, currently pending before CCJ McCarthy.

590.   Plaintiff filed a summons and complaint against McNamara and various Newspaper defendant for an article printed in the Utica Observer Dispatch which libeled

plaintiff, falsely implying/reporting that plaintiff was guilty of possessing cocaine/crack among other falsities.

## DAMAGES

591.   The actions of the Defendants, acting within the scope of their employment and agency for the City of Utica, deprived Plaintiff Vladimir Jeanty of his rights under the laws of New York and the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

592.   As a direct and foreseeable result of Defendants' misconduct, Mr. Jeanty was incarcerated for 2 ½ and spent an additional 1 year on post release supervision, for a crime he did not commit. Mr. Jeanty will never be able to get this time of his life back, and his incarceration severely impacted his relationships with his family.

593.   In addition, due to Mr. Jeanty's continued efforts to vindicate himself, plaintiff experienced multiple instance of harassment from NYSDOCC staff resulting in multiple confinements totaling approximately 210 days in segregated housing. Plaintiff witness multiple instance of extremely violent inmate on inmate and staff on inmate attacks. Plaintiff had to associate himself with the 'Blood' gang to be able to survive while in prison population.

594.   Mr. Jeanty was taken away from his family at the time his twin son were approximately 42 days old.

595.   Mr. Jeanty's children were eventually placed in foster care do to the neglect of their mother who was stressed out and over burden of caring for 4 children by herself.

596.   Mr. Jeanty had to serve his sentence with no visits from family. And minimal or not contact from his family do to having been incarcerated for 'drug' again.

597.   To add insult to injury, once Mr. Jeanty thought he had cleared his name. Mr. McNamara, who could not convict him based on the fabricated evidence and meaningless, irrelevant other evidence he had; decided to convict Mr. Jeanty in the public's eye by defaming him with the assistance of Ms. Parker and the Observer Dispatch.

598.   The unlawful, intentional, willful, deliberately indifferent, reckless and/or bad faith acts and omissions of Defendants caused Mr. Jeanty the following damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; extreme fear; loss of family relationships; severe psychological damage; legal expenses; loss of income and earning capacity; infliction of physical injury and physical sickness; inadequate medical care; inadequate dental care; humiliation, indignities and embarrassment; degradation; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunities, vocational opportunities, personal fulfillment, voluntary sexual activity, family relationships, reading, television, movies, travel, enjoyment and expression, for which he is entitled to monetary relief.

### AS AND FOR A FIRST CAUSE OF ACTION

**_42 U.S.C. § 1983 Claim in Violation of Mr.  Jeanty's right to a fair trial, denial of due process under the Fourth, Fifth, Sixth and Fourteenth Amendments, and denial of Brady and Giglio Material (Defendants Cerminaro, Paladino and Dougherty, John Doe Police Officers #1-6 and John Doe #7 City of Utica Corporation Counsel.)_**

599.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

600. Defendant Cerminaro, Paladino, Dougherty and John Doe #1-6, acting individually and in concert with one another; began the process whereupon plaintiff was charged with and convicted of the underlying charges. Defendants conducted an investigation at the alleged crime scene, found and collected evidence, fabricated a narrative alleging that plaintiff possessed contraband which they found, executed and swore to a deposition in support of two complaints. Forwarded all this material to the prosecutor and to a City Court Judge who arraigned and ordered plaintiff held to answer for these charges.

601. Defendant Cerminaro, Paladino, Dougherty and John Doe #1-6, acting individually and in concert with one another; deliberately withheld materially exculpatory and impeachment evidence from prosecutors, thereby depriving him of his clearly established constitutional rights under the Fifth, Sixth and Fourteenth Amendment of the United States Constitution, including but not limited to his right to a fair trial, his right to Brady and Giglio Material, his right not to be deprived of liberty as a result of the fabrication and manufacturing of evidence by a government investigator/actor, and his right not to be deprived of liberty without due process of law.

602. Defendant Cerminaro, Paladino, Dougherty and John Doe #1-6, acting individually and in concert with one another; deliberately fabricated and falsified physical evidence, deliberately fabricated allegedly inculpatory acts (i.e., running stop sign, shaking uncontrollably, possessing and pulling out a large bag containing a large amount of cocaine and biting and eating this bag, discarding cocaine and a plastic bag while running) made by Mr. Jeanty during the traffic stop and subsequent foot chase,

and repeatedly and consistently misrepresented to prosecutors that those actions had been committed by Mr. Jeanty.  These fabrications and falsifications were used against Mr. Jeanty to charge, indict and cause his conviction.

603.   Defendant Officers also suppressed materially exculpatory Brady Material (22 or photographs) and impeachment Giglio Material (22 or more photographs did exist) from the prosecution and defense, including without limitation the fact that the Cerminaro, Paladino, Dougherty and John Doe officers #1-6 fabricated and manufactured the physical evidence (1.2g of cocaine) and misreported/misrepresented the actual facts and circumstances upon which the contraband evidence was found collected and processed by Cerminaro and Paladino. Specifically they alleged that the 1.2g of contraband was originally in a torn plastic bag, allegedly possessed and discarded by Mr. Jeanty when in fact this contraband was found on the ground and placed in an evidence bag by the officers. Further they omitted from all their reports the actions of Dougherty as evidence technician (photographing of the crime scene and contraband evidence.) Furthermore, defendants found additional contraband in addition to the 1.2g and did not report this fact and are in current possession of this contraband. These misrepresentations by fabrication, manufacturing and omission lead to Mr. Jeanty's being charged, indicted and convicted.

604.   Mr. Jeanty was in the Defendant Officers' custody during their investigation. A reasonable person in Mr. Jeanty's position would have perceived his freedom to be absolutely restricted and would not have understood himself to be free to leave. In fact he could not leave as he was handcuffed in a patrol car and later to a wall at UPD headquarters.

605.   Defendant Officers' misrepresentation of facts, manufacturing and fabrication of evidence was designed to overbear Mr. Jeanty's will by making it impossible to defend under any circumstance. (Police officers word against a black male with a prior drug conviction who ran from the police). The false facts and fabricated/ manufactured evidence was used to try to convince Mr. Jeanty to accept a guilty plea or risk 4 years in prison if convicted at trial. The false facts and fabricated/ manufactured evidence was presented before the grand jury, during pretrial hearings, and at trial.

606.   The Defendant Officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Jeanty's constitutional rights and innocence. No reasonable officer in 2009 would have believed this conduct was lawful.

607.   As a direct and proximate result of Defendants' actions Mr. Jeanty was held, charged, indicted, tried, wrongfully convicted and imprisoned, deprived of post-conviction mechanisms of relief, and suffered the other grievous and continuing damages and injuries set forth above and below.

## AS AND FOR A SECOND CAUSE OF ACTION

### *42 U.S.C. § 1983 Claim in Violation of Mr.  Jeanty's right to a fair trial, denial of due process under the Fourth, Fifth, Sixth and Fourteenth Amendments, and denial of Brady and Giglio Material (Defendants McNamara, Garramone and Cox)*

608.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

609.   Defendants McNamara, Garramone and Cox between April 27, 2015 and June 27, 2015 with no indictment or charges against plaintiff, in response to plaintiff 440

motion did conducted an extensive investigation of the allegations in the 440 motion and of the underlying prior 2009 investigation by Cerminaro, Paladino, Dougherty, John Doe #1-6.

610.   Defendants McNamara, Garramone and Cox, having interviewed Cerminaro, Paladino, Dougherty, Police Officers John Doe #1-6 and reviewing all records in the underlying matter; having in their possession incontrovertible proof that plaintiff did not commit the crimes charged; without any basis or support in law did oppose plaintiffs 440 motion.

611.   Defendants McNamara, Garramone and Cox, having interviewed Cerminaro, Paladino, Dougherty, Police Officers John Doe #1-6 and reviewing all records in the underlying matter including the Grand Jury presentation; having in their possession incontrovertible proof that the original 2009 indictment was legally defective due to the perjured and false evidence presented to that body and fraudulent acts of Cerminaro and Paladino before that body did knowingly and purposely ignore those facts and did seek to re-instate said legally defective indictment.

612.   Defendants McNamara, Garramone and Cox performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Jeanty's constitutional rights and innocence. No reasonable prosecutor in 2015 would have believed this conduct was lawful and constitutional.

613.   As a direct and proximate result of Defendants' actions the legally defective indictment was re-instated against Mr. Jeanty. Plaintiff was made to appear numerous times to defend himself and deprived of post-conviction mechanisms of relief, and suffered the other grievous and continuing damages and injuries set forth below.

## AS AND FOR A THIRD CAUSE OF ACTION

*Malicious Prosecution, 42 U.S.C. § 1983 claim under Fourth, Fifth, Sixth and Fourteenth Amendments and State Laws (Defendants Cerminaro, Paladino, Dougherty, John Doe Police Officers #1-6, John Doe #7 City of Utica Corporation Counsel).*

614.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

615.   Defendants Cerminaro, Paladino Dougherty, John Doe Police Officers #1-6, John Doe #7 City of Utica Corporation Counsel, and City of Utica, with malice and without probable cause to prosecute Mr. Jeanty for Criminal Possession of a Controlled Substance in the 5th and 7th degrees; acting individually and in concert, caused Mr. Jeanty to be arrested, charged, and prosecuted for those crimes; thereby violating Mr. Jeanty's clearly established right, under the Fourth,  and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

616.   Defendants Cerminaro, Paladino Dougherty, John Doe Police Officers #1-6, John Doe #7 City of Utica Corporation Counsel, and City of Utica, with malice and without probable cause to prosecute Mr. Jeanty acting individually and in concert, caused Mr. Jeanty to  be arrested, charged, and prosecuted for these crime. Furthermore, the Defendants' misconduct throughout the investigation and during the Grand Jury presentation vitiated any probable cause to prosecute Mr. Jeanty: the defendants intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury, including that they fabricated and manufactured the physical evidence to be what it was, falsified official police records by

omitting materially exculpatory facts and falsifying inculpatory acts alleged to have been committed by Mr. Jeanty, that they failed to make a complete and full statement of facts to the District Attorney and Grand Jury; misrepresented, falsified, fabricated and manufactured evidence; deviated so egregiously from acceptable police practices as to demonstrate intentional or reckless disregard for proper procedures; they failed to accurately and truthfully report the results of their investigation when a reasonable police officer or person would have done so—including exculpatory evidence that would have confirmed Mr. Jeanty's innocence such as, for example, truthfully reporting that the contraband found was there before Mr. Jeanty ran through the alleyway/driveway and that Cerminaro did not see Mr. Jeanty discard any of the contraband found or as alleged; thereby violating Mr. Jeanty's clearly established right, under the Fifth and Sixth Amendments of the United States Constitution not to be arrested, held or prosecuted without probable cause.

617.   The Defendant Officers performed the above-described acts under color of state law, deliberately, intentionally, and with malice or reckless disregard for the truth and Mr. Jeanty's rights.

618.   Defendant Officers initiated and continued the prosecution against Mr. Jeanty without probable cause, in violation of Mr. Jeanty's clearly established constitutional rights. No reasonable officer or person in 2009 would have believed this conduct to be lawful.

619.   Mr. Jeanty maintained from October 15, 2009 to present, his innocence of the crimes charged.

620.   The prosecution finally terminated in Mr. Jeanty's favor on August 10, 2015,

when the indictment was dismissed.

621.   As a direct and proximate result of defendants' conduct, Mr. Jeanty was maliciously prosecuted, wrongly convicted and imprisoned, and suffered the other grievous and continuing damages and injuries set forth below.

## AS AND FOR A FOURTH CAUSE OF ACTION

### *42 U.S.C. §§ 1983, 1985 and 1986 Civil Rights Conspiracy (Defendants Cerminaro, Paladino, Dougherty, John Doe Police Officers #1-6 and John Doe #7 Corporation Counsel).*

622.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

623.   Defendants Cerminaro, Paladino, Dougherty, John Doe Police Officers #1-6 and John Doe #7 Corporation Counsel, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Mr. Jeanty of his clearly established Fourth, Fifth, Sixth, and Fourteenth Amendment rights to be free from malicious prosecution, fabrication of evidence, coercion and deprivation of liberty without due process of law, and to a fair trial. No reasonable officer or person in 2009 would have believed this conduct was lawful.

624.   In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts.

625.   Defendants Cerminaro deliberately failed to document and disclose materially exculpatory evidence to prosecutors and the Grand Jury as required by law and UPD policy and procedure; deliberately fabricated inculpatory evidence including without limitation that:

a.      Mr. Jeanty ran a traffic stop,

b.      was shaking uncontrollably during the traffic stop,

c.      Mr. Jeanty possessed and pulled out a large bag containing a large amount of cocaine and did eat from it and discarded the contraband while on the rooftop,

d.      Mr. Jeanty allegedly discarded a bag at the base a the building;

e.      falsified reports and other accounts of the investigation; further Cerminaro omitted from his reports and  failed to document and disclose materially exculpatory evidence to prosecutors,

f.      including the fact that Mr. Jeanty did not and could not have committed the crimes charged because the contraband was on the ground before plaintiff ran through the area

g.      that Dougherty photographed the crime scene and the contraband,

h.      that the contraband was found on the ground in the driveway/alleyway and not in any bag

i.      the torn plastic bag was found empty and never had any contraband in it and

j.      that additional contraband was found at the crime scene, was not reported and is currently still in UPD's possession. Cerminaro deliberately failed to report these exculpatory facts to prosecutors and the Grand Jury.

626.  Defendant Paladino deliberately failed to document and disclose materially exculpatory evidence to prosecutors and the Grand Jury as required by law and UPD policy and procedure; deliberately fabricated inculpatory evidence including without

limitation that

    a.    The 1.2g of contraband came out of the torn plastic bag alleged to have been possessed and discarded by Mr. Jeanty; as opposed to off the ground and collected by Cerminaro, Paladino and John Doe #1-6 and placed in a UPD evidence bag.

    b.    Falsely stating that he transferred the contraband from this alleged torn plastic bag into an evidence bag.

    c.    That the evidence was properly entered into property as opposed to being held for 6 days without being accounted for between 10/15/2009 and 10/21/2009.

    d.    Falsifying official records, specifically property receipts and property detail logs.

    e.    That additional contraband was found at the crime scene, was not reported and is currently still in UPD's possession. Paladino deliberately failed to report these exculpatory facts to prosecutors and the Grand Jury.

627.   Defendants Dougherty deliberately failed to document and disclose materially exculpatory evidence to prosecutors and the Grand Jury as required by law and UPD policy and procedure; including without limitation that:

    a.    He was a material witness

    b.    He observed Cerminaro, Paladino and John Doe Police Officers #1-6 actions at the crime scene,

    c.    he reviewed Cerminaro and Paladino's addendums, was aware of the omitted facts and did not as a supervisor have them correct their false reports,

    d.    he took 18 or more photographs while at the crime scene and that he

failed to write an addendum as required by law and UPD policy and procedure.

628.   Defendants John Doe police officers #1-6 deliberately failed to document and disclose materially exculpatory evidence to prosecutors and the Grand Jury as required by law and UPD policy and procedure; deliberately fabricated inculpatory evidence including without limitation that:

    a.    they found and collected additional contraband evidence which was not reported or inventoried

    b.    that Dougherty photographed the contraband found at the crime scene.

629.   Defendant John Doe #7 Corporation Counsel deliberately failed to forward materially exculpatory (Brady) and disclosable (CPL 240.20) evidence to prosecutors on or about March 11, 2010 consisting of 22 or more crime scene photographs taken by Dougherty and Sgt. Uryniak. Defendant deliberately removed said photographs which were in his possession from a file folder provided to him for review by PO Fitzgerald in response to a F.O.I.L request filed by plaintiff on March 3, 2010. John Doe #7 agreed at the direction of Cerminaro, Paladino, Dougherty and/or John Doe #1-6 to withhold the photographs from the prosecutor even though all records and files were requested by the prosecutor.

630.   Defendants Cerminaro, Paladino, Dougherty and John Doe Police Officers #1-6 deliberately committed the overt acts in concert with John Doe #7 described in paragraphs #629 to:

    a.    Conceal the truth regarding their activities regarding the investigation on October 15, 2009.

    b.    To conceal the fact that Dougherty himself was a material witness.

c.      Further their goal of having plaintiff be prosecuted and ultimately convicted

or accept a plea for crimes he did not commit.

631.    As a direct and proximate result of defendants' actions Mr. Jeanty was wrongfully

convicted and imprisoned and suffered the other grievous and continuing damages and

injuries set forth above and below.

### AS AND FOR A FIFTH CAUSE OF ACTION

### *42 U.S.C. § 1983 Failure to Intervene (Dougherty, Police Officers John Doe  #1-6*

### *and John Doe #7 Corporation Counsel).*

632.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

633.    By their conduct and under color of state law, Defendant Dougherty, John Doe

Police Officers #1-6 and/ or John Doe #7 Corporation Counsel had opportunities to

intervene on behalf of Mr. Jeanty to prevent his malicious prosecution, violation of his

right to a fair trial, and violation of his right to be free from unlawful and prolonged

detention and seizure, right to be free from fabrication and manufacturing of evidence,

coercion and deprivation of liberty without due process of law, but, due to their

intentional conduct and/or reckless or deliberate indifference, declined or refused to do

so.

634.    Defendant Dougherty, Police Officers John Doe #1-6 and John Doe #7

Corporation Counsels failure to intervene violated Mr. Jeanty's clearly established

constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. No

reasonable officer or person in 2009 would have believed that failing to intervene to

prevent the defendants from fabricating inculpatory evidence, withholding and/or

suppressing materially exculpatory evidence, deliberately failing to properly and lawfully report the facts as they actually occurred, and causing Mr. Jeanty to be arrested, indicted and prosecuted without probable cause was reasonable or lawful.

635. Mr. Jeanty has maintained since October 15, 2009, he is innocent of the crimes charged.

636. The prosecution terminated in Mr. Jeanty's favor on August 10, 2015, when the indictment was dismissed.

637. As a direct and proximate result of defendants' failure to intervene, Mr. Jeanty was wrongfully charged, indicted, convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth below.

## AS AND FOR A SIXTH CAUSE OF ACTION

### *42 USC 1983, Monell Claim/negligent training, supervision and supervision against City of Utica for the action of Defendants Williams, Dougherty, Cerminaro, Paladino, Police Officer John Doe #1-6, Corporation Counsel John Doe #7.*

638. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

639. As Police Chief, defendant Mark Williams was responsible for the training, supervision and discipline of the Defendants, Lieutenant Dougherty, Officer Cerminaro, Inv. Paladino, Officers John Doe #1-6 and was further, responsible for making and/or implementing policies and practices used by law enforcement officers employed by the City of Utica and the City of Utica City Police Department regarding arrests, evidence collection, preservation, processing and production to prosecutors as discoverable (CPL 240.20), under Brady v. Maryland and Giglio v. United States.

640.   As Police Chief, Chief Williams failed to implement a policy and practice to refresh in the field investigative skills, continuing education and training in the proper manner by which police personnel are to investigate crimes, collect and preserve evidence, and provide to the prosecutor and grand jury complete and truthful information as requested.

641.   The Defendants' policy of inadequately training, supervising or disciplining the members of the Utica Police Department, specifically, Defendants, Dougherty, Cerminaro, Paladino and Officers John Doe #1-6, amounted to deliberate indifference to the constitutional rights of the plaintiff.

642.   The defendants' procedure of inadequately training, supervising or disciplining the members of the Utica Police Department amounted to a conscious disregard to the constitutional rights of the Plaintiffs.

643.   Cerminaro, Paladino, Dougherty, Police Officers and Police Officer John Doe #1-6, committed the above mentioned violations because Dougherty as Supervisor and Evidence Technician allowed Paladino, Cerminaro and John Doe #1-6 to violate UPD policy and procedure, which in turn violated plaintiffs constitutional rights.

644.   UPD's policy allowing one officer to have multiple critical responsibilities allowed Cerminaro, Paladino, Dougherty, and Police Officer John Doe #1-6, to violate UPD policy and procedure, which in turn violated plaintiff's constitutional rights.

645.   UPD's policy having a supervisor review officers reports and activities relating to investigations; who himself was not part of that investigation allowed Cerminaro, Paladino, Dougherty, and Police Officer John Doe  #1-6, to violate UPD policy and procedure undetected, which in turn violated plaintiffs constitutional rights.

646.   In plaintiffs case Sgt. Peter Scalise and Lt. Louis Capri reviewed and/or wrote reports in Plaintiff's case #09-52210 even though they did not actively participate nor had any personal knowledge of any facts relating to the events and/or investigation in the underlying matter which allowed Cerminaro, Paladino, Dougherty, and Police Officer John Doe #1-6, to violate UPD policy and procedure, which in turn violated plaintiffs constitutional rights.

647.   The Defendants, the City of Utica, and the City of Utica City Police Department ratified the Defendant police officers' decisions, as it knew to a moral certainty that its police officers would confront the particular, routine and recurring situation herein described, as there is a municipal history of this type of misconduct and knew incorrect action by police officers has and would result in a constitutional violation.

648.   The City of Utica, the City of Utica Police Department and the Chief of Police, Mark Williams have done nothing to investigate the pervasive failure of its police officers to follow clearly established laws and Chapter 5 Article 6 of UPD's General Order by the Defendants Dougherty, Cerminaro, Paladino and John Doe #1-6. Williams condoned the aforementioned behavior of said police officers.

649.   The City of Utica, the City of Utica Police Department and its officers, agents, employees and representatives, including Chief of Police, Mark Williams, have done nothing to discipline said police officers and has therefore, condoned the aforementioned behavior of said police officers.

650.   Chief Williams has since promoted Dougherty twice. First to Professional Standards within the department and second from Sergeant to Lieutenant.

651.   Williams promoted Dougherty despite Dougherty admitted directly to Williams in

82

writing that he knowingly violated UPD policy and procedure which directly and proximately caused the violation of plaintiff's constitutional rights.

652.   Williams, despite been aware, as early as January 2011, of Cerminaro, Paladino, Dougherty and Police Officer John Doe #1-6 violations of UPD policy and procedures, committing perjury at various legal proceeding, fabrication of evidence among other egregious, unlawful and unconstitutional acts; has yet to discipline these officers nor has taken any steps to ensure that they do not reoccur.

653.   As a direct and proximate result of the acts and omissions of the Defendants herein, the Plaintiff has sustained serious psychological and emotional effects and continues to suffer from the same, all as a direct result of the Defendants' conduct, which constitutes negligence.

654.   The acts and omissions described in the above paragraphs was undertaken by the Defendants under the color of law.

655.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of defendant City of Utica, which is forbidden by the Constitution of the United States.

656.   The aforementioned customs, policies, usages, practices, procedures and rules of defendant City of Utica and the Utica Police Department included, but were not limited to policies, customs and practices wherein UPD Officers conduct investigations in an arbitrary manner with no direct supervision or direction. UPD Officers are routinely faced with the simple task of having to document the truth but don't because of the lack of direct supervision and proper training.   UPD Officers conduct their investigation determined to charge anyone with a crime regardless of whether they committed the

crime or not. UPD policy and procedure is only in place in place for purposes of accreditation. Not to be put into actual use. UPD Officers do not know the meaning of term such as, among others; 'Brady Material', 'Giglio Material', 'discoverable material' and 'exculpatory material'. These words/phrases do not appear in UPD Policy and Procedure manual. With respect of gathering and storing evidence, UPD has no meaningful procedure in place. Investigators such as Paladino and Cerminaro collect evidence, do not properly voucher or store the evidence. There is no manner of maintaining a proper, traceable chain of custody. Paladino held the contraband evidence in the underlying case in an uncontrolled manner for 6 days before vouchering it. This provided him with six days to manipulate the evidence to be what he wanted it to be. Furthermore at the crime scene, Cerminaro, Paladino, Police Officer John Doe #1-6 and Dougherty did find a greater amount of contraband during their search. They collected this contraband and never vouchered it. This allows Investigators such as Paladino to have access to uncontrolled contraband drug evidence; with which he can use to manipulate evidence in any drug case, by adding to make evidence 'heavier' thereby sustaining a higher felony charge. The end objective and result is to create a believable narrative in drug cases involving minority males. UPD Officers know that their word will always be believed over a minority defendants. UPD officers in drug cases in particular create false versions of events to justify their actions.

657.   The aforementioned customs, policies, usages, practices, procedures and rules of defendant City of New York and the New York City Police Department were the moving force behind the violation of plaintiffs' constitutional rights as described herein. As a result of the failure of defendant City of Utica and the City of Utica Police

Department to properly recruit, screen, train, discipline, and supervise its officers, including the individual defendants, defendant City of Utica has tacitly authorized, ratified, and has been deliberately indifferent to, the acts and conduct complained of herein.

658.   The foregoing customs, policies, usages, practices, procedures and rules of defendant City of Utica and City of Utica Police Department were the moving force behind the Constitutional violations suffered by plaintiffs as alleged herein.

659.   The foregoing customs, policies, usages, practices, procedures and rules of defendant City of Utica and City of Utica Police Department were the direct and proximate cause of the constitutional violations suffered by plaintiffs as alleged herein.

660.   As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of Utica and City of Utica Police Department, plaintiff was unlawfully arrested, detained and prosecuted.

661.   Defendants collectively and individually, while acting under color of state law were directly and actively involved in violating plaintiffs' constitutional rights.

662.   All of these rights are secured to the plaintiff by the provisions of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and by Title 42 U.S.C. §1983 , 1985 and §1986.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### *Abuse of Process (McNamara, Cox and Garramone).*

663.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

664.   Defendant issued legal process by opposing plaintiff motion to vacate and

dismissal of the indictment.

665.  McNamara did this despite knowing that as a matter of fact and as a matter of law the underlying indictment which he sought to reinstate was legally defective.

666.  McNamara originally opposed the motion to vacate and dismissal of the indictment.

667.  McNamara than consented to vacating the conviction but opposed dismissal of the indictment.

668.  McNamara had plaintiff return to court on 5 additional dates arguing against plaintiff's allegations even though he had no legal arguments against plaintiff's motion.

669.  On August 10, 2015 McNamara moved to dismiss the indictment.

670.  Nothing had changed from the filing of the motion to the vacatur of the conviction to the dismissal of the indictment. All the facts were still the same.

671.  McNamara opposed the motion for the sole purpose of trying to have plaintiff accept a plea which plaintiff had already made clear he would not because he was not guilty of the charges filed against him.

672.  At all times relevant McNamara had no intentions of prosecuting plaintiff.

673.  McNamara sought to obtain a copy of the recording plaintiff had in his possession of defendant Dougherty admitting that Cerminaro, Paladino, John Doe Police Officer #1-6 and himself violated multiple UPD procedures and several of plaintiff constitutional rights.

674.  McNamara originally opposed the 440 motion to obtain collateral objectives outside the legitimate ends of the legal process, including but not limited to having plaintiff be guilty of some charge so that the fact relating to the misconduct of the Police

Officers involved and maybe his Office would not come out.

675.   McNamara acted with intent to do harm to Mr. Jeanty without any excuse or justification for doing so.


## AS AND FOR AN EIGHTH CAUSE OF ACTION

### *Defamation, Libel per se, Constitutional Malice, Common Law Malice (McNamara).*

676.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

677.   McNamara knowingly falsely stated to Parker as printed in paragraph 6 of the August 12 and 13, 2015 articles:

*"I think it was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice[.]"*

678.   McNamara knowingly falsely stated to Parker as printed in paragraph 7 of the August 12 and 13, 2015 articles:

*When the officer questioned Jeanty on the six cell phones visible in the vehicle, Jeanty drove away before stopping at Oneida Square[.]*

679.   McNamara knowingly falsely stated to Parker as printed in paragraph 8 of the August 12 and 13, 2015 articles:

*While he was running, Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away[.] The cocaine was about the size of a marble when officers took him into custody.*

680.   McNamara knowingly falsely stated to Parker as printed in paragraph 9 of the August 12 and 13, 2015 article:

*Photos were taken of the smaller ball of cocaine, but the chunks reportedly bit off were never photographed or collected. The photos were never turned over to the District Attorney's Office, so the evidence wasn't included in trial, among other concerns.*

681.   McNamara knowingly falsely stated to Parker as printed in paragraph 10 of the August 12 and 13, 2015 articles:

*Jeanty claims that the police planted the cocaine visible in the photo's and that the other chunks of cocaine never existed."*

682.   McNamara knowingly falsely stated to Parker as printed in paragraph 11 of the August 12 and 13, 2015 articles:

*"[I]t could substantiate his claim there wasn't crack on the ground making it Brady material, meaning it could be favorable to the defendant[.]"*

683.   McNamara knowingly falsely stated to Parker as printed in paragraph 12 of the August 12 and 13, 2015 articles:

*The cocaine in evidence was destroyed following Jeanty's conviction, as is standard for the office.*

684.   McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing they would be printed in the OD.

685.   McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing they were factually false and inaccurate.

686.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing they would be believed as true by the reading public.

687.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing He had no legally valid, relevant or admissible evidence upon which to prosecute or convict Jeanty at the March 2010 trial or at a new trial.

688.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing that the UPD fabricated the evidence against Jeanty to charge Jeanty and to obtain a conviction against Jeanty.

689.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing that the Police Officer witnesses committed perjury at the Preliminary Hearing, the Grand Jury Presentation and at the March 2010 trial.

690.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing that these statements did not factually match the allegations in Cerminaro's deposition, the complaint or the indictment.

691.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing that the evidence was improperly destroyed. And that no legal procedure was followed to destroy physical evidence while a defendant has a direct appeal pending.

692.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker because He could not obtain a conviction in Court therefore he would convict Jeanty in the eyes of the public.

693.  McNamara knowingly falsely made each statement in the aforementioned paragraphs to Parker knowing that his statements would be believed and accepted as facts because he is the District Attorney of Oneida County.

694.  McNamara's false statements imputed to Jeanty the commission of uncharged crimes—to wit: *1.) Criminal Possession of a Controlled Substance in the 2nd degree, A-II felony,  Penal Law section 220.18(1), 2.) Criminal Possession of a Controlled Substance in the 3rd degree, B felony, Penal Law section 220.16(1) and 3.) Obstructing governmental Administration in the 2nd degree, A Misdemeanor Penal Law section 195.05*

695.  When McNamara spoke to Parker he did so knowing that the matter of People v Jeanty, I09-480 had been dismissed pursuant to CPL 210.40 and the matter was sealed pursuant to CPL 160.50.

696.  When McNamara spoke to Parker he did so outside of his duties as the prosecutor/advocate in the matter of People v. Jeanty, Indictment 09-480.

697.  McNamara's defamatory statements were re-printed in paper format on August 13, 2015 in the Observer Dispatch.

698.  McNamara made the previously identified defamatory statements knowing they were false and recklessly disregarding their truth or falsity.

699.  McNamara made the previously identified defamatory statements because his Office, Jeanty's assigned counsel and the presiding Judge could not convince Jeanty to accept a plea to an offer of a violation pursuant to *Penal Law section 240.20(7), Disorderly Conduct, a violation.*

700.   McNamara made the previously identified defamatory statements because his office had to consent to vacate the conviction and to dismiss the indictment on a pro-se motion by a minority defendant.

701.   At the time that McNamara uttered the slanderous, defamatory statements to Parker, McNamara was motivated and driven by common law and constitutional malice, He knew that the statements were in there entirety false and untrue, and the statements were uttered with reckless and wanton disregard for the truth.

702.   Further, the aforementioned statements/acts of McNamara were willful, malicious, intentional, calculated and deliberate.

703.   McNamara made said defamatory statements for the sole purposes of defaming Jeanty.

704.   McNamara made the knowingly false and defamatory statements even though He was in possession of all the records and documents relating to the underlying matter, He had personally investigated the allegations made by Jeanty in the 440 motion, and He had personally spoken to all persons involved in the investigation and prosecution of Jeanty. He was personally involved in all aspects of the matter.

705.   McNamara was giving Parker His personal opinion of His personal thoughts about the matter of People v. Jeanty I09-480 as He wants them to be.

706.   McNamara was not providing Parker with factual statements relating to the underlying matter.

707.   McNamara withheld the following known facts about the underlying case:

a.   The Police manufactured/fabricated the physical evidence to support the charges against Jeanty and the photographs proved it.

b.      The Police and His office knowingly withheld from Jeanty the photographs and the identity of the Supervisor/Evidence Technician (Sgt. Sean Dougherty) from Jeanty so that Jeanty could not prove His innocence.

c.      The 2010 conviction was vacated based on His Office's consent to all the allegation in Jeanty's Motion to Vacate the 2010 conviction.

d.      He personally sought and obtained an order to destroy the physical evidence relating to Jeanty's case using a false sworn affidavit alleging that Jeanty did not have a direct appeal pending. McNamara personally knew that Jeanty had a direct appeal pending.

e.      The 2 police officer witnesses committed perjury at all pre-trial proceedings and at trial.

708.    McNamara failed to get a new conviction and convince Jeanty accept a plea.

709.    McNamara sought to have Jeanty convicted (second time) in the eyes of the public by making known false statements regarding the underlying case.

710.    Jeanty had fought extremely hard to clear his name of the false allegations made by Cerminaro; and succeeded.

711.    Jeanty had already served 2 ½ years in state prison for the first unjust conviction.

712.    McNamara's refusal to accept and acknowledge the fact that Jeanty was unjustly convicted and maliciously prosecuted was the driving force behind the false statements He made to Parker.

713.    McNamara gave Parker His personal opinion and beliefs as if they were facts knowing Parker would believe Him and print anything He said without verifying it, as she always does.

## AS AND FOR AN NINTH CAUSE OF ACTION

### *Defamation Libel per se Constitutional Malice, Common Law Malice (Parker, Perritano and Gatehouse Media).*

714.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

715.   Parker and Perritano failed to take a minimum amount of care to verify the statements made by McNamara against the records and documents in their possession before printing her factually false article.

716.   Parker and Perritano had in their possession official records and documents which factually and substantially contradicted McNamara's statements.

717.   Parker and Perritano had spoken to Jeanty, who gave them statements on various dates which substantially and factually contradicted McNamara's statements.

718.   Parker and Perritano made a conscious decision to accept as true/accurate McNamara's statements and print them even though the records and documents in their possession contradicted what she was told by McNamara.

719.   Parker and Perritano failed to recognize that McNamara had a motive to provide her with false statements of alleged facts. That motive was the fact that McNamara was forced to (1) consent to vacate the underlying conviction, (2) request dismissal of the indictment and (3) that Jeanty made serious allegations against UPD, His office and the trial judge which would have been proven as true.

720.   Parker and Perritano did not have the knowledge, understanding and experience to report or cover criminal matters.

721.   Perritano failed/refused to have a reporter cover the proceedings.

722.  Parker failed to attend any Court proceedings.

723.  Parker, Perritano, Gatehouse Media are the Oneida County and Utica Police's 'personal' tabloid newspaper.

724.  They willingly print any and all negative stories about minorities specifically when related to crimes.

725.  At the time that Parker wrote and published the libelous, defamatory statements in the OD Parker  and Perritano knew or should have known that the statements were in there entirety false and untrue, therefore the statements were written with reckless and wanton disregard for the truth.

726.  Further, the aforementioned acts of Parker were willful, wanton, intentional, calculated, deliberate and indifferent.

727.  Perritano failed to properly supervise and train Parker.

728.  Perritano allowed Parker to publish the defamatory article in the OD.

729.  Defendants Parker, Perritano, Gatehouse Media, LLC., published libelous Statements made by McNamara to Parker with actual and constitutional malice.

730.  Defendants Parker, Perritano, and Gatehouse Media, LLC., possessed actual knowledge or should have known of the falsity of certain of their libelous statements against Jeanty and acted with reckless disregard for the truth in maliciously publishing all of the false and defamatory statements against Jeanty.

731.  Defendants Parker, Perritano and Gatehouse Media, LLC., published libelous Statements made by McNamara with actual and Constitutional malice by failing to procure any credible corroboration whatsoever before their publication.

732.   Rather than investigating or procuring independent and credible corroboration of McNamara's defamatory statements, Defendants Parker, Perritano and Gatehouse Media, LLC., relied exclusively on McNamara, the District Attorney who had motive to lie and was a compromised and patently incredible and an unreliable source.

733.   Defendants Parker, Perritano and Gatehouse Media, LLC., did not attempt to view the records or hear the recording that Jeanty offered them.

734.   Defendants Parker, Perritano and Gatehouse Media, LLC., had official records to corroborate the statements given by McNamara but failed to correct their article before printing.

735.   Defendants had clear reasons to doubt the veracity of McNamara statements as he was the one who requested that the matter be dismissed and Jeanty offered to provide documentary proof and a recording to substantiate his allegations.

736.   *'[A]mong other concerns.'* This phrase was either given to Parker by McNamara or Her own personal statement. Parker ignored the obvious fact that there were *'other concerns'* in the proceeding and did not report them; even though she had the records and documents relating to the proceeding.

737.   Defendants uttered, published the aforementioned statements with common law malice, constitutional malice that is, maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's rights and total disregard for the truth which was in their possession.

738.   Defendants McNamara maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's rights, stated the aforementioned slanderous statements in order

to gain favor with the public and to make up for having lost to a pro se minority defendant.

739.   Defendants McNamara maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's rights, stated the aforementioned slanderous statements in order to keep Jeanty's reputation in ruin as a criminal and a felon.

## AS AND FOR A TENTH CAUSE OF ACTION

### Respondeat Superior and Joint and Several liability (Gatehouse Media).

740.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

741.   Defendant Gatehouse Media is vicariously liable for the negligent acts, commissions, or omissions of its employee and/or agent, Micaela Parker and Fran Perritano, who were at all times relevant hereto acting on behalf of defendant Gatehouse Media and within the scope of their employment with defendant Gatehouse Media, under the doctrine of Respondeat Superior.

742.   Defendant Gatehouse Media, LLC., was complicit in the publication of libelous statements in the August 12 and 13, 2015 articles, it authorized, participated in, and/or ratified its publication.

743.   Defendant Parker was acting within the scope of her employment with, and as an agent for, Gatehouse Media, LLC., upon maliciously publishing the libelous statements in the August 12 and 13, 2015 articles.

744.   Defendant Perritano was acting within the scope of his employment with, and as an agent for, Gatehouse Media, LLC., upon maliciously publishing libelous statements in the August 12 and 13, 2015 articles.

745.   The individual Defendants' (Parker and Perritano) acts and omissions are imputed to Gatehouse Media, LLC., as a matter of law.

746.   The individual Defendants' (Parker and Perritano) state of mind with respect to the publication of libelous statements printed in the August 12 and 13, 2015 articles, including their knowledge or lack of knowledge regarding the truth or falsity of those statements, is imputed to Gatehouse Media, LLC., as a matter of law.

747.   Defendant Gatehouse Media, LLC., is therefore vicariously and/or jointly and severally liable under the theory of Respondeat Superior for the individual Defendants' publication of libelous statements in the August 12 and 13, 2015 articles.

748.   Gatehouse Media LLC., failed to properly train Parker and Perritano regarding their responsibilities as reporters in criminal matters.

749.   Gatehouse Media, LLC., failed to properly supervise Parker and Perritano.

### JURY TRIAL DEMANDED

750.   Plaintiff hereby demands a trial by jury of all issues properly triable thereby.

### PRAYER FOR RELIEF

*WHEREFORE,* plaintiffs Vladimir Jeanty prays for relief as follows:

a.      That the jury find and the Court adjudge and decree that plaintiff Vladimir Jeanty shall recover compensatory damages in the sum of $2,000,000 against the individual defendants and the City Utica, jointly and severally, together with interest and costs; and punitive damages in the sum of $1,000,000 against each individual defendants, jointly and severally.

b.      That the plaintiff Vladimir Jeanty recover the cost of the suit herein, including reasonable fees.

**FURTHER,** Plaintiff Vladimir Jeanty respectfully request judgment against Defendant as follows:

a.      Ordering Defendants to pay special damages in an amount to be determined at trial;

b.      Awarding pre and post-judgment interest, costs, and such other and further relief as this Honorable Court deem just, proper and equitable.

Dated:    East Meadow, New York

August 1, 2016

VLADIMIR JEANTY, Plaintiff Pro-Se
P.O Box 76
Uniondale, NY 11553-0076
(516)661-5720
Rimidalv@yahoo.com

# EXHIBIT

# '1'

_Newspaper_

# Man seeks to appeal dismissal of 2010 Utica cocaine case

BY MICAELA PARKER
mparker@uticaod.com

**Paragraph**

**1**

UTICA – Nassau County resident Vladimir Jeanty served as his own attorney for about six months in an attempt to get a 2010 conviction dismissed.

**2**

On Monday he was successful, but he wasn't happy about it.

**3**

"I wanted a retrial, because had I had a retrial it would have came out that the officer and investigators manufactured the crime, they made up the charges," Jeanty said. "And I have proof of that. My reasoning going to trial again was that I wanted to introduce this info that I didn't have in the original trial."

**4**

Jeanty said he plans to appeal Judge Michael Dwyer's dismissal of the case. In 2010, he served a 2½-year state prison sentence for his conviction of fifth-degree criminal possession of a controlled substance.

**5**

The motion to dismiss was originally made in court by Oneida County District Attorney Scott McNamara.

**6**

"I think it was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice," McNamara said.

**7**

The case began in 2009 when Jeanty was being interviewed by a Utica police officer on Park Avenue during a traffic stop, McNamara said. When the officer questioned Jeanty on the six cellphones visible in the vehicle, Jeanty

drove away before stopping at Oneida Square, climbing a building and running across a roof in an effort to evade police, officials said.

**Paragraph**

**8**

While he was running, Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away, McNamara said. The cocaine was about the size of a marble when officers took him into custody.

**9**

Photos were taken of the smaller ball of cocaine, but the chunks reportedly bit off were never photographed or collected. The photos were never turned over to the District Attorney's Office, so the evidence wasn't included in trial, among other concerns.

**10**

McNamara said the photos are a violation of discovery because the prosecution is required to hand over any photos taken during the investigation to the defense. Jeanty claims that the police planted the cocaine visible in the photos, and that the other chunks of cocaine never existed.

**11**

"Though I don't agree with him, it could substantiate his claim there wasn't crack on the ground, making it Brady material, meaning it could be favorable to the defendant," McNamara said.

**12**

The cocaine in evidence was destroyed following Jeanty's conviction, as is standard for the office.

_Follow @OD_Parker on Twitter or call her at 792-5063._

Page 4ar

Copyright © 2015 Observer-Dispatch 08/13/2015
March 13, 2016 9:16 am (GMT +4:00)                Page 3

Powered by TECNA

**Page 1**

On-line

# Man seeks to appeal dismissal of 2010 cocaine case

## Nassau County resident Vladimir Jeanty served as his own attorney for about six months in an attempt to get a 2010 conviction dismissed. On Monday he was successful, but he wasn't happy about it.

By Micaela Parker

Posted Aug. 12, 2015 at 3:17 PM

UTICA —

*Paragraph 1*

Nassau County resident Vladimir Jeanty served as his own attorney for about six months in an attempt to get a 2010 conviction dismissed.

*2.*

On Monday he was successful, but he wasn't happy about it.

*3*

"I wanted a retrial, because had I had a retrial it would have came out that the officer and investigators manufactured the crime, they made up the charges," Jeanty said. "And I have proof of that. My reasoning going to trial again was that I wanted to introduce this info that I didn't have in the original trial."

*4*

Jeanty said he plans to appeal Judge Michael Dwyer's dismissal of the case. In 2010, he served a 2½-year state prison sentence for his conviction of fifth-degree criminal possession of a controlled substance.

*5*

The motion to dismiss was originally made in court by Oneida County District Attorney Scott McNamara.

*6*

"I think it was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice," McNamara said.

*7*

The case began in 2009 when Jeanty was being interviewed by a Utica police officer on Park Avenue during a traffic stop, McNamara said. When the officer questioned Jeanty on the six cell phones visible in the vehicle, Jeanty drove away before stopping at Oneida Square, climbing a building and running across a roof in an effort to evade police.

*8*

While he was running, Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away, McNamara said. The cocaine was about the size of a marble when officers took him into custody.



Page 1

Page 2

9

Photos were taken of the smaller ball of cocaine, but the chunks reportedly bit off were never photographed or collected. The photos were never turned over to the District Attorney's Office, so the evidence wasn't included in trial, among other concerns.

10

McNamara said the photos are a violation of discovery because the prosecution is required to hand over any photos taken during the investigation to the defense. Jeanty claims that the police planted the cocaine visible in the photos, and that the other chunks of cocaine never existed.

11

"Though I don't agree with him, it could substantiate his claim there wasn't crack on the ground, making it Brady material, meaning it could be favorable to the defendant," McNamara said.

12

The cocaine in evidence was destroyed following Jeanty's conviction, as is standard for the office.

*Follow @OD_Parker on Twitter or call her at 792-5063.*



Page 3

