UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VLADIMIR JEANTY,

                              Plaintiff,

v.                                                                    6:16-cv-00966 (BKS/TWD)


THE CITY OF UTICA; THE COUNTY OF ONEIDA; Chief
of Police MARK WILLIAMS, Utica Police Dept., individually
and in his official capacity; Police Officer MICHAEL F.
CERMINARO, badge #1301, individually and in his official
capacity; Investigator PETER PALADINO, badge #6290,
individually and in his official capacity; Lieutenant SEAN
DOUGHERTY, badge #2553, individually and in his official
capacity; Police Officer EDWARD HAGEN, badge #3750,
individually and in his official capacity; Police Officer ADAM
HOWE, badge #4047, individually and in his official capacity;
Police Officer MICHAEL PETRIE, badge #6612, individually
and in his official capacity; Police Officer DANIEL
TAURISANO, badge #8381, individually and in his official
capacity; Sergeant DAVID DARE, badge #1960, individually
and in his official capacity; Sergeant PETER SCALISE,
badge #7547, individually and in his official capacity;
Lieutenant LOUIS CAPRI, badge #1174, individually and in
his official capacity; Investigator JOSEPH TREVASANI,
badge #8529, individually and in his official capacity; First
Assistant Corporation Counsel CHARLES N. BROWN, City
of Utica, individually and in his official capacity; Honorable
SCOTT D. MCNAMARA, Oneida County District Attorney,
individually and in his official capacity; MICAELA
PARKER, individually and as an employee of Gatehouse
Media, LLC; FRAN PERRITANO, City Editor, individually
and as an employee of Gatehouse Media, LLC; RON JOHNS,
Editor, individually and as an employee of Gatehouse Media,
LLC; GATEHOUSE MEDIA, LLC,

                              Defendants.

_____

**APPEARANCES:**

Vladimir Jeanty
Uniondale, NY 11553
*Plaintiff Pro se*

Michael J. Grygiel
Greenberg Traurig, LLP
54 State Street, 6th Floor
Albany, NY 12207
*For Defendants GateHouse Media, LLC,*
*Micaela Parker, Fran Perritano, and Ron Johns*

Zachary C. Oren
Assistant Corporation Counsel
One Kennedy Plaza
Utica, NY 13502
*For Defendants City of Utica, Michael Cerminaro,*
*Peter Paladino, Sean Dougherty, Mark Williams,*
*Edward Hagen, Adam Howe, Michael Petrie,*
*Daniel Taurisano, David Dare, Peter Scalise,*
*Luis Capri, Joseph Trevasani, and Charles N. Brown*

William P. Schmitt
Schmitt & Lascurettes, LLC
1508 Genesee Street, Suite 3
Utica, NY 13502
*For Defendants Honorable Scott D. McNamara and*
*The County of Oneida*

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff pro se Vladimir Jeanty brings this expansive action against Defendants under 42

U.S.C. § 1983 and New York State law for alleged constitutional and tort injuries resulting from

his arrest on October 15, 2009, subsequent prosecution, and a related news report.  (Dkt. No. 33).

Currently before the Court are several motions: 1) a motion to dismiss and related supplemental

1

motion by Defendants GateHouse Media, LLC, Micaela Parker, Fran Perritano, and Ron Johns (the "Press Defendants") (Dkt. Nos. 23, 41); 2) a motion to dismiss by Defendants Honorable Scott D. McNamara and the County of Oneida (the "County Defendants") (Dkt. Nos. 21, 50); and 3) a motion for judgment on the pleadings by Defendants City of Utica, Michael Cerminaro, Peter Paladino, Sean Dougherty, Mark Williams, Edward Hagen, Adam Howe, Michael Petrie, Daniel Taurisano, David Dare, Peter Scalise, Luis Capri, Joseph Trevasani, and Charles N. Brown (the "Utica Defendants").[1]  (Dkt. No. 59).

## II.    PROCEDURAL HISTORY

On or about March 21, 2016, Plaintiff filed a very similar complaint in State of New York Supreme Court, County of Oneida, alleging claims against most of the defendants now sued in this action.  (Dkt. No. 23-2).  After several motions to dismiss (Dkt. Nos. 23-3–23-7), Plaintiff filed an amended complaint in state court (Dkt. No. 23-8), which precipitated further motions to dismiss.  (Dkt. Nos. 23-9–23-14).  While those motions were pending, Plaintiff commenced the present action on August 3, 2016.  (Dkt. No. 1).  Following the Press Defendants' motion to dismiss the Complaint (their third overall such motion) (Dkt. No. 23), Plaintiff discontinued the state court action (Dkt. No. 41-4), and filed the Amended Complaint on October 30, 2016.  (Dkt. No. 33).

## III.    FACTS

Plaintiff's Amended Complaint is 103 pages (791 paragraphs) in length and attaches six documents as exhibits.  (Dkt. No. 33).  Therefore, the Court will discuss below the specific

---

[1] The Press Defendants have also moved to dismiss a cross-claim against them, Dkt. No. 64, which the Court held in abeyance pending resolution of Dkt. Nos. 23, 41, 50, and 59.  (*See* Dkt. No. 70).

allegations necessary to resolve the pending motions.  In broad strokes, Plaintiff alleges that on

October 15, 2009, he was arrested by members of the Utica Police Department ("UPD"), who

fabricated certain evidence against him and withheld exculpatory evidence.  (*Id.*, ¶¶ 41, 64-277).

The Oneida County District Attorney's Office then charged Plaintiff with criminal possession of

a controlled substance in the 5th and 7th degrees, and he was indicted, tried, and convicted on the

charges.  (*Id.*, ¶¶ 44-45, 148, 297-308).  Following Plaintiff's release from custody in 2012, he

successfully moved to vacate his conviction and dismiss the indictment, which led to an

allegedly defamatory newspaper article.  (*Id.*, ¶¶ 57-59, 62, 411-600).  The newspaper article is

attached to the Amended Complaint (Dkt. Nos. 33-3, 33-4), and is discussed in full below.[2]

## IV.    STANDARD OF REVIEW

The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss also applies

to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings.  *Altman v. J.C. Christensen &*

*Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015).  To survive a motion to dismiss, "a complaint

must provide 'enough facts to state a claim to relief that is plausible on its face.'"  *Mayor & City*

*Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must provide factual allegations sufficient

"to raise a right to relief above the speculative level."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

The Court must accept as true all factual allegations in the complaint and draw all reasonable

---

[2] Plaintiff also attached to the Amended Complaint a Verified Notice of Claim for his state court action, a related receipt letter, and a Notice of Examination (Dkt. Nos. 33-1, 33-2), as well as an affidavit submitted by Defendant McNamara in support a motion to dismiss the state court action (Dkt. No. 33-5), and a Supporting Deposition by Defendant Cerminaro related to Plaintiff's arrest.  (Dkt. No. 33-6).

inferences in the plaintiff's favor.  *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253

(2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A

complaint that has been filed *pro se* "must be construed liberally with 'special solicitude' and

interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515

(2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).  "Nonetheless, a pro

se complaint must state a plausible claim for relief." *Id.*

When deciding a motion to dismiss, the Court's review is generally limited to "the facts

as asserted within the four corners of the complaint, the documents attached to the complaint as

exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun &

Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  For purposes of this decision, the facts are

taken from the Amended Complaint and assumed to be true, *Faber v. Metro. Life Ins. Co.*, 648

F.3d 98, 104 (2d Cir. 2011), unless contradicted by documents attached to the Amended

Complaint or incorporated by reference therein.  *See Blue Tree Hotels Inv. (Canada), Ltd. v.

Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (rejecting

allegations that were "belied" by letters attached to the complaint); *In re Polaroid ERISA Litig.*,

362 F. Supp. 2d 461, 472 (S.D.N.Y. 2005) ("this Court need not credit conclusory allegations

that are belied by more specific allegations or the documents incorporated in the Complaint").

Here, the Court has also considered exhibits attached to the Amended Complaint on which

Plaintiff has relied and whose authenticity is not disputed, specifically the newspaper article and

the affidavit of Defendant McNamara.  *See Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221-22

(N.D.N.Y. 2014).

## V.    DISCUSSION

Liberally construed, the Amended Complaint asserts the following causes of action under

Section 1983: 1) a Fourteenth Amendment Procedural Due Process fair trial claim based on an

alleged *Brady/Giglio*[3] violation and the fabrication of evidence, against some of the Utica

Defendants (Count 1); 2) a Fourth Amendment malicious prosecution claim against some of the

Utica Defendants (Count 3); 3) a claim that some of the Utica Defendants provided false

information to the District Attorney during the State post-conviction process (Counts 2 and 4)[4];

4) a failure to intervene claim against some of the Utica Defendants (Count 5); and 5) a *Monell*[5]

claim against the City of Utica (Count 6).  (Dkt. No. 33).  Plaintiff also asserts several causes of

action under New York State law: 1) malicious prosecution against some of the Utica Defendants

(Count 3); 2) a defamation claim against the County Defendants (Counts 7 and 8); 3) a

defamation claim against the Press Defendants (Count 9); 4) a *respondeat superior* claim against

GateHouse Media, LLC for the actions of the individual Press Defendants (Count 10); and 5) a

defamation claim against Defendant Cerminaro and the City of Utica (Count 11).  (*Id.*).  The

Court will address each claim as it relates to the pending motions, in turn.

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

[4] To the extent that Plaintiff seeks to assert a claim for malicious prosecution or some other alleged constitutional violation in connection with the State post-conviction process (Dkt. No. 33, ¶¶ 643-45, 57-59), the Utica Defendants have not specifically addressed these allegations, and neither has the Court.

[5] *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 694-95 (1978).

### A.  Section 1983 Claims

#### 1)  Procedural Due Process Fair Trial Claim

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)), *cert. denied sub nom. Fappiano v. City of New York, N.Y.*, 137 S. Ct. 341 (2016).  Police officers deny "a defendant a fair trial when [they] create[] 'false information likely to influence a jury's decision and forward[] that information to prosecutors.'"  *Id.* (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  "A fair trial claim may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant."  *Id.*  "The latter theory of liability is essentially a civil claim seeking damages for a *Brady* violation."  *Id.*  Here, Plaintiff alleges that Defendants Cerminaro, Paladino and Dougherty "deliberately fabricated and falsified physical evidence, deliberately fabricated allegedly inculpatory acts . . . made by Mr. Jeanty during the traffic stop and subsequent foot chase, and repeatedly and consistently misrepresented to prosecutors that those actions had been committed by Mr. Jeanty."  (Dkt. No. 33, ¶ 635).  Plaintiff further alleges that "Defendant Officers also suppressed materially exculpatory Brady Material (22 or more photographs) and impeachment Giglio Material (22 or more photographs did exist) from the prosecution and defense."  (*Id.*, ¶ 636).  Therefore, the Court construes Plaintiff's fair trial claim as one for denial of procedural due process, with two components: 1) a *Brady/Giglio* violation; and 2) fabrication of evidence.  *See also Long v. New York City*, No. 14 Civ. 9908, 2016 WL 4203545, at *4, 2016 U.S. Dist. LEXIS 104837, at *12-13 (S.D.N.Y. Aug.

8, 2016) ("The Second Circuit construes a claim of denial of a right to fair trial as a procedural, not substantive, due process claim.").

The Utica Defendants argue that Plaintiff's claim must fail because it is barred by the statute of limitations, among other reasons.  (Dkt. No. 59-4, pp. 16-20).  There is no dispute that the statute of limitations applicable to Plaintiff's claim is three years.  *See also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years.").  Plaintiff commenced this action on August 3, 2016.  (Dkt. No. 1).  Thus, Plaintiff's claim is barred if it accrued before August 3, 2013.  The Utica Defendants argue that Plaintiff's claim accrued on or before August 2, 2012—the date Plaintiff was released from custody.  (Dkt. No. 59-4, pp. 18-20).  However, Plaintiff argues that his claim did not accrue "until the favorable termination of the criminal proceedings: the June 29, 2015 vacatur or the August 10, 2015 dismissal."  (Dkt. No. 75, p. 17).

The accrual date of a § 1983 claim "is a question of federal law that is not resolved by reference to state law."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  Ordinarily, "accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Hogan*, 738 F.3d at 518 (citation omitted).  However, the accrual of a claim may be delayed "when a resolution of that action in a plaintiff's favor could not be reconciled with an extant criminal conviction."  *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015).  In other words, the claim will not accrue while it is barred by the Supreme Court's holding in *Heck v. Humphrey*, which states as follows:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive

7

order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. 477, 486-87 (1994).  The rationale for the *Heck* doctrine is that "habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." *Wallace*, 549 U.S. at 392 (quoting *Heck*, 512 U.S. at 482).

Therefore, if the plaintiff is no longer in custody and habeas is consequently unavailable, the *Heck* doctrine no longer applies to bar a claim which undermines the plaintiff's conviction. *See Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Souter, J., concurring) ("After a prisoner's release from custody, the habeas statute and its exhaustion requirement have nothing to do with his right to any relief."); *Teichmann v. New York*, 769 F.3d 821, 829–30 (2d Cir. 2014) (Calabresi, J., concurring) ("The law in this Circuit, however, holds . . . that *Heck* does not bar § 1983 claims when habeas is unavailable, at least so long as the unavailability was not intentionally caused by the plaintiff."); *Poventud v. City of New York*, 715 F.3d 57, 60 (2d Cir. 2013) ("As Poventud is no longer in custody, *Heck* does not bar his claims under § 1983."), *aff'd on other grounds on reh'g en banc*, 750 F.3d 121 (2d Cir. 2014); *Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001) (concluding that *Heck* did not bar the plaintiff's Section 1983 action on behalf of juvenile where,

8

*inter alia*, the juvenile had been released from custody); *Green v. Montgomery*, 219 F.3d 52, 61 (2d Cir. 2000) ("Because it does not appear that Green is presently in state custody, his § 1983 action is not barred by *Heck*."); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999) ("Because Leather is not and never was in the custody of the State, he . . . has no remedy in habeas corpus. Having escaped the jaws of *Heck*, Leather should therefore be permitted to pursue his § 1983 claim in the district court[.]").

Here, Plaintiff's claim necessarily challenges the validity of his conviction, since he alleges that he received an unfair trial due to the *Brady/Giglio* violation and the fabrication of evidence. *See Amaker v. Weiner*, 179 F.3d 48, 51 (2d Cir. 1999) ("this claim sounds under *Brady v. Maryland* . . . and therefore does indeed call into question the validity of his conviction"); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 395 (S.D.N.Y. 2016) ("The gist of the plaintiffs' claim is that they were denied a fair trial and thereby convicted based on fabricated evidence. That claim necessarily challenges each conviction."); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 455 (E.D.N.Y. 2015) (same). Thus, Plaintiff's claim was barred by *Heck* while he was incarcerated because habeas was the appropriate remedy during that time period. But when Plaintiff was released from custody, *Heck* did not bar his claim. Plaintiff alleges that he was released from custody on August 2, 2012. (Dkt. No. 33, ¶ 55). Plaintiff's allegations show that he was aware of the basis for his claim before the date of his release. (*Id.*, ¶¶ 52, 281, 635-39). Therefore, Plaintiff's claim accrued, at the latest, on the date he was released from custody, August 2, 2012, and not in 2015 when his conviction was vacated.[6]

---

[6] The Utica Defendants argue that the fabricated evidence portion of Plaintiff's claim accrued on October 15, 2009, "the day he was arrested, because he was detained from October 15, 2009 to December 3, 2009 and Plaintiff was aware that Defendants had fabricated evidence against him, the plastic baggie with crack/cocaine, which had been

In sum, it is clear on the face of the Amended Complaint that Plaintiff's claim was not timely filed within the three year statute of limitations and must be dismissed.[7]  *See also John v. Lewis*, No. 15 Civ. 5346, 2017 WL 1208428, at *7, 2017 U.S. Dist. LEXIS 49546, at *16 (E.D.N.Y. Mar. 31, 2017) ("It is Second Circuit law that a plaintiff not in State custody, who thus does not have a *habeas corpus* remedy available, may bring a § 1983 action, even if a successful claim would 'necessarily imply the invalidity of his conviction.'") (citing *Leather*, 180 F.3d at 424); *Brown v. Wagner*, No. 12 Civ. 736S, 2014 WL 234821, at *5, 2014 U.S. Dist. LEXIS 7890, at *15 (W.D.N.Y. Jan. 22, 2014) ("Thus, because Brown, free from custody, does not have the benefit of a habeas corpus remedy, the rule announced in *Heck* will not bar his § 1983 claim here.").

### 2)  Malicious Prosecution

"To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty."  *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).  "To state a claim under New York law for the tort of malicious prosecution, a plaintiff must show: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the

---

forwarded to the prosecutors."  (Dkt. No. 59-4, pp. 19-20).  The Court need not decide whether Plaintiff's claim related to fabricated evidence accrued on October 15, 2009 or August 2, 2012, since Plaintiff's claim is untimely using either date.

[7] Because Plaintiff's procedural due process fair trial claim is barred by the statute of limitations, the Court need not reach the Utica Defendants' argument that it is also barred by *Parratt v. Taylor*, 451 U.S. 527 (1981).  However, it is worth noting that at least two circuits appear to have rejected the same argument.  *See Armstrong v. Daily*, 786 F.3d 529, 541 (7th Cir. 2015) ("No court has accepted the defendants' argument that the *Parratt* analysis applies when the plaintiff is alleging that wrongful conduct [including destruction of exculpatory evidence] corrupted fair fact-finding in the criminal justice system. We will not be the first."); *Castellano v. Fragozo*, 352 F.3d 939, 942 (5th Cir. 2003) ("We hold that a state's manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause, a deprivation of a right not reached by the *Parratt* doctrine.").

proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the

proceeding; and (4) that the proceeding was instituted with malice." *Id.* Here, the Utica

Defendants argue that the pleadings fail to establish that Plaintiff's criminal case was terminated

in his favor or that it was initiated without probable cause. (Dkt. No. 59-4, pp. 21-27).

### a. Favorable Termination

"Whether termination is deemed favorable to the accused is determined in accordance

with applicable state law, here, New York law." *Marcano v. City of Schenectady*, 38 F. Supp. 3d

238, 260 (N.D.N.Y. 2014). "In general, the issue of whether a given type of termination was

favorable to the accused is a matter of law for the court. If, however, there is a question as to the

nature of the circumstances leading to that termination, that question is one for the trier of fact."

*Murphy v. Lynn*, 118 F.3d 938, 950–51 (2d Cir. 1997). New York's highest court has held that

"any termination of a criminal prosecution, such that the criminal charges may not be brought

again, qualifies as a favorable termination, so long as the circumstances surrounding the

termination are not inconsistent with the innocence of the accused." *Cantalino v. Danner*, 754

N.E.2d 164, 167 (N.Y. 2001) (citing *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 755 (N.Y. 2000)).

Here, Plaintiff alleges that he was indicted on the drug charges on November 24, 2009,

prosecuted and then convicted on March 24, 2010, and imprisoned from October 15, 2009 to

August 2, 2012. (Dkt. No. 33, ¶¶ 44-46). On or about March 8, 2015, Plaintiff filed a motion

pursuant to New York's Criminal Procedure Law Section 440.10 to vacate the judgment and

conviction of March 24, 2010. (*Id.*, ¶ 57). Plaintiff alleges that in support of the motion, he

provided "incontrovertible proof" that he "did not and could not have committed the crime

charged." (*Id.*, ¶¶ 389, 98). Plaintiff further alleges that on August 10, 2015, "District Attorney

11

Scott McNamara on behalf of the People orally motioned pursuant to CPL 210.40 to have the indictment dismissed in the interest of justice." (*Id.*, ¶ 415). As a result, Plaintiff alleges that he received a favorable termination, when, on August 10, 2015, "the indictment was dismissed with prejudice by Judge Michael Dwyer." (*Id.*, ¶ 654).

The Utica Defendants argue that, as a matter of law, dismissal of an indictment "in the interests of justice" does not constitute a favorable termination. (Dkt. No. 59-4, pp. 21-22) (citing, *inter alia*, *Hygh v. Jacobs*, 961 F.2d 359, 368 (2d Cir. 1992)). However, under New York law, there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination." *Cantalino*, 754 N.E.2d at 168. Ultimately, "the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." *Id.* Moreover, "[a] case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges." *Id.*

In this case, the circumstances surrounding the dismissal of Plaintiff's indictment remain unclear. Although Plaintiff alleges that he provided proof of his innocence, there is no indication of what precise reasons the trial court gave for dismissing the indictment.[8] Thus, at this stage, the Court cannot resolve the issue of favorable termination, and drawing all reasonable inferences in his favor, Plaintiff's allegations are sufficient. *See also Cantalino*, 754 N.E.2d at 168 (dismissal in the interests of justice may constitute favorable termination when the court's

---

[8] In opposition to the Utica Defendants' motion, Plaintiff has provided what appear to be excerpts of an Article 78 hearing on April 24, 2016, wherein Judge Siegel discussed the dismissal of Plaintiff's indictment. (Dkt. No. 75, pp. 31-32). However, even if this information was properly before the Court, it does not relate to the August 10, 2015 decision wherein *Judge Dwyer* allegedly dismissed the indictment.

"statement of reasons makes clear that it dismissed the charges against plaintiff because they were groundless—not out of mercy or compassion"); *Coleman v. City of New York*, No. 11 Civ. 2394, 2016 WL 4184035, at *3 (E.D.N.Y. Feb. 25, 2016) ("A termination in the interests of justice may nonetheless be favorable, however, where dismissal was based on proffered evidence that conclusively support[ed] a claim of innocence."),[9] *aff'd*, No. 16-915, 2017 WL 1422485, 2017 U.S. App. LEXIS 6957 (2d Cir. Apr. 21, 2017); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368–69 (S.D.N.Y. 2010) ("Here, there are no facts in the record indicating that the termination of the criminal charges [in the interests of justice] was inconsistent with D'Olimpio's innocence; rather, D'Olimpio has testified that several of the documents underlying the initiation of his prosecution were forged and/or false. Thus, summary judgment is not warranted on this ground."); *Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 150 (N.D.N.Y. 2006) ("Here, the facts surrounding the dismissals of the . . . charges, if not in dispute, are at least unknown to this court, thus precluding a summary judgment dismissal of the malicious prosecution claim based on this element.").

### b. Probable Cause

Next, the Utica Defendants argue that there was probable cause to prosecute Plaintiff because "Plaintiff was driving a rental car in a drug related area with multiple cell phones some of which did not work, Plaintiff ran from the police, cocaine was discovered along the route Plaintiff ran, there is a white powdery substance on Plaintiff's black sweatshirt depicted in one of the twenty-two photographs Plaintiff claims is exculpatory, which was taken of Plaintiff at the police station during the date of the incident, and Plaintiff was found with $1,739.00 in cash on

---

[9] Lexis citation unavailable.

13

his person." (Dkt. No. 59-4, p. 21). The existence of probable cause is a complete defense to a claim for malicious prosecution. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). "For purposes of malicious prosecution, probable cause has been defined as 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of,' or whether 'a discreet and prudent person would be led to the belief that a crime had been committed by the person charged.'" *Ahern*, 411 F. Supp. 2d at 150–51 (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994), *Loeb v. Teitelbaum*, 77 A.D.2d 92, 103 (N.Y. App. Div. 2d Dep't Oct. 22, 1980)). "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the defendant at that time." *Id.* (citations omitted).

Here, Plaintiff was charged with criminal possession of a controlled substance in the 5th and 7th degrees.[10] (Dkt. No. 33, ¶ 7). Thus, the question is whether there was probable cause to prosecute on these charges, based on the alleged facts, and taking into consideration Plaintiff's allegation that certain evidence against him was fabricated.[11] The Utica Defendants argue "there was probable cause based on evidence independent from the evidence Plaintiff alleges was fabricated." (Dkt. No. 59-4, p. 24). Although the Utica Defendants point to various other facts informing probable cause, central to the question is what if any facts indicated that Plaintiff

---

[10] As relevant here, a person is guilty of criminal possession of a controlled substance in the fifth degree when he knowingly and unlawfully possesses "cocaine and said cocaine weighs five hundred milligrams or more." N.Y. Penal Law § 220.06(5). A person is guilty of criminal possession of a controlled substance in the seventh degree "when he or she knowingly and unlawfully possesses a controlled substance." N.Y. Penal Law § 220.03.

[11] At this stage the court must assume that Plaintiff's allegations about fabricated evidence are true, and thus the question is whether there exists "untainted probable cause" for the charges against Plaintiff. *See Morse v. Spitzer*, 07 Civ. 4793, 2012 WL 3202963, at *5-6, 2012 U.S. Dist. LEXIS 110241, *16 (E.D.N.Y. Aug. 3, 2012).

possessed a controlled substance.  The Utica Defendants argue that Plaintiff concedes that a "white chalky substance," not fabricated by them, was "found on the ground along the route where Plaintiff fled from Defendant Cerminaro."  (*Id.*, p. 26).  Specifically, Plaintiff alleges in the Amended Complaint that "Cerminaro at some point located a white and chunky substance strewn about on the ground in the driveway/alleyway of 1224 Kemble St. where He and Plaintiff ran down."  (Dkt. No. 33, ¶ 179).

However, Plaintiff also alleges that "the contraband found was there before Mr. Jeanty ran through the alleyway/driveway and that Cerminaro did not see Mr. Jeanty discard any of the contraband found or as alleged."  (*Id.*, ¶ 650).  Plaintiff further alleges that Cerminaro and others failed to accurately and truthfully report what happened to the D.A. and Grand Jury and instead "misrepresented, falsified and manufactured evidence."  (*Id.*).  Given the latter allegations, and drawing all reasonable interferences in Plaintiff's favor, it is plausible that there was no probable cause to prosecute Plaintiff because the police officers did not see him in possession of the contraband found on the ground.  *See United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir. 2004) ("To establish constructive possession, the government must demonstrate that Rodriguez had the power and intention to exercise dominion and control over the heroin.") (internal quotations and citation omitted); *Mendez v. City of New York*, 27 N.Y.S.3d 8, 12 (N.Y. App. Div. 1st Dept. 2016) ("Presence in a public place does not itself prove dominion and control over contraband discovered there.") (citation omitted); *People v. Knightner*, 782 N.Y.S.2d 333, 335 (N.Y. App. Div. 4th Dept. 2004) ("The defendant's mere presence in an area where cocaine was found is not sufficient to establish that he exercised such dominion and control as to establish constructive possession.").  Accordingly, Plaintiff's allegations are sufficient to state a claim for

15

malicious prosecution against defendants Cerminaro, Paladino, and Dougherty based on, among other things, their allegedly "false/perjured testimony at Plaintiff's preliminary hearing, Grand Jury, and trial."  (Dkt. No. 33, ¶¶ 53, 154, 226, 239, 245, 262, 299-308, 343, 631-32, 35, 39).[12]

### c.  Qualified Immunity

The Utica Defendants also argue that the individual defendants are entitled to qualified immunity on Plaintiff's malicious prosecution claim.  (Dkt. No. 59-4, pp. 27-32).  "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Here, Plaintiff alleges, among other things, that Defendants "deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury, including that they fabricated and manufactured the physical evidence to be what it was, falsified official police records by omitting materially exculpatory facts and falsifying inculpatory acts alleged to have been committed by Mr. Jeanty."  (Dkt. No. 33, ¶ 650).  "It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."  *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000).  Therefore, assuming Plaintiff's allegations are true, the unlawful conduct attributed to the Defendants would

---

[12] The Utica defendants do not dispute that they initiated a criminal proceeding against Plaintiff, and moreover, it is well-established that "[a] lack of probable cause generally creates an inference of malice."  *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).  As described below, there are insufficient allegations of personal involvement by defendants Hagen, Howe, Petrie and Dare to support their liability for malicious prosecution.

violate clearly established law and no reasonable police officer could believe otherwise.  *See Shabazz*, 201 F. Supp. 3d at 399 (denying motion to dismiss on the basis of qualified immunity where the alleged unlawful conduct included "creation of a false affidavit and the fabrication of evidence"); *McLennon v. New York City*, 13 No. 128, 2015 WL 1475819, at *10, 2015 U.S. Dist. LEXIS 42920, at *32-33 (E.D.N.Y. Mar. 31, 2015) ("Based on the court's determination that plaintiffs have sufficiently alleged that their prosecution was not based on probable cause and that the officer defendants acted in bad faith by fabricating, misrepresenting, and withholding evidence, a reasonable officer would not have considered the defendants' alleged conduct to be lawful."); *Coggins v. County of Nassau*, 988 F. Supp. 2d 231, 245 n.8 (E.D.N.Y. 2013) ("It is beyond cavil that, *inter alia*, conspiring to and actually falsifying police records, evidence, and testimony violates clearly established rights of which [the defendants] should have known, and that no public official would think it was objectively reasonable to violate those rights."), *aff'd in part, appeal dismissed in part sub nom. Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015).

### 3)  Failure to Intervene

Plaintiff also alleges that Defendants Paladino, Dougherty, Hagen, Howe, Petrie, and Dare "had opportunities to intervene on behalf of Mr. Jeanty to prevent his malicious prosecution, violation of his right to a fair trial, and violation of his right to be free from unlawful and prolonged detention and seizure, right to be free from fabrication and manufacturing of evidence, coercion and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so." (Dkt. No. 33, ¶ 669).  The Utica Defendants argue that Plaintiff's allegations are insufficient to state a claim for failure to intervene.  (Dkt. No. 59-4, pp. 38-41).

17

In general, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intervene is liable for the preventable harm caused by other officers where that officer observes or has reason to know" that other officers have committed a constitutional violation, provided the officer has "a realistic opportunity to intervene to prevent the harm from occurring." *Id.* In other words, liability may only attach when: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

Here, the Utica Defendants argue that Plaintiff's allegations are insufficient because they "reveal that the failure to intervene Defendants did nothing more than process a crime scene and at best not document it correctly due to 'incomplete addendums', nor did they talk to the DA about the case." (Dkt. No. 59-4, p. 39). However, Plaintiff alleges that these defendants were all at the crime scene, were aware that Defendant Cerminaro fabricated evidence, were aware that Defendant Paladino provided false information to the D.A., and did nothing to stop them. (Dkt. No. 33, ¶¶ 180, 240-242, 253, 261, 264, 269, 272, 286, 365). At this stage, drawing all reasonable interferences in Plaintiff's favor, these allegations are sufficient to state a claim for failure to intervene.[13] *See Arbuckle v. City of New York*, No. 14 Civ. 10248, 2016 WL 5793741, at *15, 2016 U.S. Dist. LEXIS 136857, at *43 (S.D.N.Y. Sept. 30, 2016) ("Plaintiffs allege that

---

[13] To the extent the Utica Defendants argue that "there can be no failure to intervene claim without a primary constitutional violation," *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015), Plaintiff has stated a claim for malicious prosecution, as discussed above.

Captain Taylor was a supervisor on the scene and a witness to the circumstances leading up to Soriano's arrest. . . . Thus, the Court finds that Plaintiffs have plausibly alleged that Taylor had a realistic opportunity to prevent Soriano's false arrest."); *Coggins*, 988 F. Supp. 2d at 245 (denying motion to dismiss failure to intervene claim where the "plaintiff has articulated a plausible claim that . . . [the defendant] was aware of a false arrest and malicious prosecution by [the co-defendant] and failed to intervene after that arrest to prevent the continuation of those constitutional violations even though, construing the allegations most favorable to plaintiff, there was sufficient time to intervene"); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012) ("Because plaintiffs properly allege at least one constitutional violation, plaintiffs are entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.").

### a.   Qualified Immunity

The Utica Defendants' assertion of qualified immunity with respect to Plaintiff's failure to intervene claim is also unavailing at this stage, for most of the same reasons discussed above. Crediting Plaintiff's allegations, and since it was clearly established that "a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer," *Zahrey*, 221 F.3d at 355, and that law enforcement officials have a duty to intervene to protect such constitutional rights, *Anderson*, 17 F.3d at 557, the Court cannot conclude that it was objectively reasonable for the defendants to believe that their actions (or inaction) did not violate the law. *See also Ricciuti*, 124 F.3d at 129 ("[T]he failure to intercede must be under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights."); *Matthews*, 889 F. Supp. 2d at 444 ("Qualified immunity .

19

. . is unavailable at this time because additional facts, which discovery should reveal, are required concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights."); *Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 421 (S.D.N.Y. 2004) ("Plaintiffs' allegations fairly admit of the inference that, at least in some of the instances alleged, [the defendants] witnessed other officers (or each other) performing acts that would constitute constitutional violations, either because they constituted excessive force or because they were unreasonable strip searches.  If those allegations prove true, defendants are not entitled to qualified immunity.").

### 4) *Monell* Claim

Plaintiff's *Monell* claim alleges negligent training, supervision, and negligent maintenance of evidence and record keeping against the City of Utica for the actions of Defendants Williams, Dougherty, Cerminaro, Paladino, Hagen, Howe, Petrie, Dare, Trevasani, Taurisano, Capri, and Brown.  (Dkt. No. 33, pp. 83-89)  It is well-established that a municipality may not be held liable under § 1983 on the basis of *respondeat superior*.  *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 694-95 (1978).  Rather, municipalities are responsible only for "their own illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), and are not vicariously liable for civil rights violations perpetrated by their employees.  *See Monell*, 436 U.S. at 691.  In order to sustain a Section 1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and that the violation resulted from an identified municipal policy or custom.  *Monell*, 436 U.S. at 694-95.  A municipal policy or custom may be established by any of the following: 1) a formal policy, officially promulgated by the municipality, *id.* at 690; 2) action taken by the official responsible for establishing policy

20

with respect to a particular issue, *Pembaur*, 475 U.S. at 483-84; 3) unlawful practices by

subordinate officials so permanent and widespread as to practically have the force of law, *City of

St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1985) (plurality opinion); or 4) a failure to train or

supervise that amounts to "deliberate indifference" to the rights of those with whom the

municipality's employees interact.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

      Here, the gist of Plaintiff's *Monell* claim is a failure to train and supervise by the City of

Utica, which led to, among other things, Plaintiff's malicious prosecution.  Thus, the question is

whether the facts alleged permit an inference that the failure to train and supervise amounts to

deliberate indifference.  To support this claim, Plaintiff must show:

> (1) that a policymaker of the municipality knows to a moral certainty that its
> employees will confront a given situation; (2) that the situation either presents the
> employee with a difficult choice of the sort that training or supervision will make
> less difficult or that there is a history of employees mishandling the situation; and
> (3) that the wrong choice by the employee will frequently cause the deprivation of
> a citizen's constitutional rights.

*Young v. County of Fulton*, 160 F.3d 899, 903-04 (2d Cir. 1998) (citing *Walker v. City of New

York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotations and alterations omitted)).

      The Utica Defendants argue that Plaintiff fails to state a claim "because there is no

constitutional right to recordkeeping and the 'negligent maintenance of evidence' is not

actionable as *Monell* claims require a deliberate indifference standard."  (Dkt. No. 59-4, pp. 47-

49).  But Plaintiff alleges more than bad recordkeeping and maintenance of evidence.  Plaintiff

specifically alleges a failure to train and supervise police officers "regarding arrests, evidence

collection, preservation, processing and production to prosecutors."  (Dkt. No. 33, ¶¶ 677-78).

Liberally construed, the Amended Complaint also alleges that the failure to train and supervise

officers in these specific areas led to his malicious prosecution on the basis of false and

fabricated evidence, in violation of Plaintiff's constitutional rights.  (*Id.*, ¶¶ 681-86, 696-700).

Plaintiff further alleges that there is "a municipal history of this type of misconduct" and that the

City of Utica "knew incorrect action by police officers has and would result in a constitutional

violation." (*Id.*, ¶ 687).  At this stage, drawing all reasonable inferences in Plaintiff's favor,

these allegations are sufficient to state a claim.[14]  *See Vasconcellos v. City of New York*, No. 12

Civ. 8445, 2014 WL 4961441, at *13, 2014 U.S. Dist. LEXIS 143429, at *28-29 (S.D.N.Y. Oct.

2, 2014) (denying motion to dismiss *Monell* claim based on alleged failure to train officers);

*Kimbrough v. Town of Dewitt Police Dept.*, No. 08 Civ. 03, 2010 WL 3724017, at *6, 2010 U.S.

Dist. LEXIS 96243, at *18 (N.D.N.Y. Sept. 15, 2010) (denying motion to dismiss *Monell* claim,

noting that "it is hard to fathom how a plaintiff could provide more detail at the pleading stage

regarding a *Monell* claim based on failure to train"); *Ambrose v. City of New York*, 623 F. Supp.

2d 454, 479 (S.D.N.Y. 2009) (denying motion to dismiss part of *Monell* claim based on

allegation that defendant city's failure to train, supervise, and discipline police officers led to

malicious prosecution).

### 5)  Official Capacity Claims

The Utica Defendants argue that Plaintiff's official capacity claims against the individual

defendant should be dismissed because they are redundant of Plaintiff's claim against the City of

Utica.  (Dkt. No. 59-4, pp. 46-47).  Plaintiff has not responded to this argument.  "Personal-

capacity suits seek to impose personal liability upon a government official for actions he takes

under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Official-capacity

---

[14] The Utica Defendants also argue that the individually named defendants should be dismissed from the *Monell* claim.  (Dkt. No. 59-4, p. 46).  However, Plaintiff's *Monell* claim is not directed at the individual defendants, and as explained above, it is adequately pled against the City of Utica.

suits, in contrast, 'generally represent only another way of pleading an action against an entity of

which an officer is an agent.'"  *Id*. (quoting *Monell*, 436 U.S. at 691 n. 55).  "It is not a suit

against the official personally, for the real party in interest is the entity."  *Id*.  Thus, Plaintiff's

official capacity claims against Defendants Cerminaro, Paladino, Dougherty, Williams, Hagen,

Howe, Petrie, Taurisano, Dare, Scalise, Capri, Trevasani, and Brown must be dismissed with

prejudice, since the real party in interest is their employer, the City of Utica, against whom

Plaintiff has also brought suit.  *See LaForgia v. Vergano*, No. 15 Civ. 8589, 2017 WL 3034347,

at *4, 2017 U.S. Dist. LEXIS 109691, at *11 (S.D.N.Y. July 14, 2017) ("The claim against Hoch

in his official capacity is duplicative of the claim against the municipality, and it is therefore

dismissed."); *Kennedy v. City of Albany*, No. 15 Civ. 491, 2015 WL 6394513, at *5, 2015 U.S.

Dist. LEXIS 143568, at *12 (N.D.N.Y. Oct. 22, 2015) (dismissing official capacity claims and

noting that "[a] claim against officers in their official capacity is essentially a claim against the

city"); *Dudek v. Nassau County Sheriff's Dept.*, 991 F. Supp. 2d 402, 413 (E.D.N.Y. 2013)

("[T]his Court dismisses *with* prejudice the claim against the individual officers in their official

capacities . . . because it is duplicative of the surviving *Monell* claim against the County.").

### 6)  Personal Involvement

The Utica Defendants also make a number of arguments specific to certain defendants,

including that they were not personally involved in the alleged constitutional violations.  (Dkt.

No. 59-4, pp. 33-38, 41-45).

### a.  Scalise and Capri

Plaintiff alleges that Scalise and Capri, members of the UPD, "reviewed and/or wrote

reports in Plaintiff's case . . . even though they did not actively participate nor had any personal

23

knowledge of any facts relating to the events and/or investigation in the underlying matter which allowed Cerminaro, Paladino, Dougherty, Hagen, Howe, Petrie and Dare to violate UPD policy and procedure, which in turn violated plaintiffs constitutional rights."  (Dkt. No. 33, ¶¶ 22, 24, 686).  Plaintiff includes Capri as a defendant for his malicious prosecution claim, and both Scalise and Capri are mentioned in the *Monell* claim.

It is well-established that personal involvement of an individual defendant "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  "Because vicarious liability is inapplicable to . . . § 1983 suits," Plaintiff must plausibly allege that "each Government-official defendant, through the official's *own individual actions*, has violated the Constitution."  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added).  "Personal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'"  *Id.* at 67 (quoting *Provost*, 262 F.3d at 155).  Here, Plaintiff does not offer any facts to infer that Scalise or Capri directly and knowingly participated in the alleged malicious prosecution.

In response to the Utica Defendants' motion, Plaintiff clarifies that his alleged theory of personal involvement for Scalise and Capri is actually supervisory liability.  Plaintiff asserts that "the facts are that they 'signed off' on reports that were factually inaccurate. Scalise and Capri were supervisors."  (Dkt. No. 75, p. 58)  To state a claim based on supervisory liability, a plaintiff must allege that:

24

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Plaintiff's allegations fall short of any of the options identified in *Colon*.[15] As discussed above, Plaintiff does not allege direct participation, or that Scalise and Capri were policymakers, and more fundamentally, he does not allege that they were aware of wrongdoing. Rather, he specifically alleges that they did not have "any personal knowledge of any facts relating to the events and/or investigation in the underlying matter." (Dkt. No. 33, ¶ 686). Thus, Plaintiff's mere allegation that Scalise and Capri signed off on inaccurate reports is insufficient to support supervisory liability. Accordingly, Plaintiff's claims against Scalise and Capri must be dismissed.[16] *See Yevstifeev v. Steve*, 860 F. Supp. 2d 217, 224 (W.D.N.Y. 2012) (dismissing claims against police chief where, *inter alia*, the plaintiffs alleged "no personal involvement whatsoever" by the police chief in the alleged constitutional violations); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("an allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to section 1983 liability").

---

[15] The Second Circuit has not expressly addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing personal involvement, *see Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013), but nevertheless, in this case, Plaintiff has failed to show the personal involvement of Scalise and Capri even under the *Colon* standards.

[16] Plaintiff has also clarified that he alleges supervisory liability against Defendants Williams, Dare, and Dougherty. (Dkt. No. 75, pp. 51-52). The Utica Defendants have not specifically addressed these allegations, and therefore, the Court declines to do so as well.

### b. Taurisano

The Utica Defendants also point out that "Defendant Taurisano's name only appears in connection with a *Monell* violation and the Amended Complaint does not alleged any causes of action directly against him."  (Dkt. No. 59-4, p. 43).  Plaintiff alleges that Taurisano, a member of the UPD and the property room clerk, swore to a false affidavit dated November 2, 2011, which led to the "unlawful destruction" of the narcotics evidence underlying Plaintiff's criminal conviction.  (Dkt. No. 33, ¶¶ 29, 54, 295, 336).  In conclusory fashion, Plaintiff alleges that Taurisano swore that there were no pending appeals for Plaintiff's criminal case, when he knew otherwise.  (*Id.*, ¶¶ 291, 294).  However, these allegations do not plausibly suggest that Taurisano was personally involved in the alleged malicious prosecution.  Accordingly, any claim against Taurisano must be dismissed.[17]

### c. Brown and Trevasani

Defendant Brown is the First Assistant Corporation Counsel for the City of Utica and was the "record access appeals officer" for Freedom of Information Law ("FOIL") requests in 2010.  (Dkt. No. 33, ¶¶ 32, 278).  Trevasani, an investigator with the UPD, assisted Brown with responding to Plaintiff's FOIL request.  (*Id.*, ¶¶ 33, 285).  On March 3, 2010, Plaintiff filed a FOIL request for records related to his arrest and prosecution.  (*Id.*, ¶ 11).  Plaintiff was convicted on March 24, 2010.  (*Id.*, ¶ 57).  On May 30, 2010, Plaintiff filed an Article 78 petition to compel the UPD and the Oneida County D.A.'s office to produce the records.  (*Id.*, ¶¶ 49, 51).

---

[17] Plaintiff has declined to clarify his theory of liability against Taurisano.  (Dkt. No. 75, p. 58).  To the extent that Plaintiff's allegations may be construed as a claim based on the post-conviction destruction of exculpatory evidence, any such claim must fail because Plaintiff has not alleged that Taurisano even knew the evidence was exculpatory. *See Newton v. City of New York*, 779 F.3d 140, 158 (2d Cir. 2015) ("we neither discern nor impose an 'absolute' duty on the police to preserve evidence based on a freestanding constitutional due process right"), *cert. denied sub nom. City of New York, N.Y. v. Newton*, 136 S. Ct. 795 (2016).

On July 19, 2010, Brown responded to Plaintiff's request and provided twenty-two previously undisclosed crime scene photographs. (*Id.*, ¶¶ 52, 281). Plaintiff alleges that Trevasani did not print "all the photographs" stored in the UPD records system, but rather "selected and printed 22 photographs that he and Brown felt should be given to plaintiff." (*Id.*, ¶¶ 284-85). Plaintiff further alleges that between May 1, 2010 and March 1, 2015, Trevasani and Brown "failed to inform the DA's office of the fact that Cerminaro, Paladino, Dougherty, Hagen, Howe, Petrie and Dare did not provide the DA with all relevant facts and material relating to the prosecution of Mr. Jeanty." (*Id.*, ¶ 286).

At most, Plaintiff alleges that after his trial and conviction, Trevasani and Brown became aware of a potential *Brady* violation. But there is no allegation that these defendants, who were not involved in Plaintiff's criminal case, had any reason to know that the photographs were exculpatory. Moreover, they did not suppress the photographs; they sent them to Plaintiff, who had them in his possession during the post-conviction proceedings. (Dkt. No. 33, ¶ 52). Plainly, these allegations do not plausibly suggest that Trevasani and Brown were personally involved in any constitutional violation. *See DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (citation omitted); *Gibson v. Superintendent of NJ Dept. of L. and Pub. Safety-Div. of State Police*, 411 F.3d 427, 445 (3d Cir. 2005) ("Without a duty to act, the defendants cannot be liable for failing

to come forward with the exculpatory evidence.").  Accordingly, Plaintiff's claims against Brown and Trevasani must be dismissed.[18]

### d.  Hagen, Howe, Petrie, and Dare

As discussed above, Plaintiff has stated a claim for failure to intervene, including against Defendants Hagen, Howe, Petrie, and Dare.  Plaintiff also names these defendants in his underlying malicious prosecution claim.  (Dkt. No. 33, ¶¶ 642-66).  But the Utica Defendants argue that Plaintiff's allegations are inadequate to support such a claim against these defendants.  (Dkt. No. 59-4, p. 38).  Plaintiff does not appear to contest this point, as his response focuses on malicious prosecution by Defendants Cerminaro, Paladino, and Dougherty.  (Dkt. No. 75, p. 30).  Plaintiff's malicious prosecution claim against Hagen, Howe, Petrie, and Dare rests on the allegation that they, along with Cerminaro, Paladino, and Dougherty, provided the D.A. with false allegations and information related to his arrest.  (Dkt. No. 33, ¶¶ 643, 650, 657).  However, Plaintiff does not specifically allege that Hagen, Howe, Petrie, and Dare did anything to initiate and/or continue a criminal proceeding against him.  Rather, Plaintiff alleges that they were at the crime scene, "failed to comply with UPD policy and procedure regarding evidence collection, preservation and processing," and "did not communicate and/or forward to the DA and facts they were aware of relating to the crime scene investigation of Oct. 15, 2009."  (*Id.*, ¶¶ 266-71).  These allegations do not support an inference that Hagen, Howe, Petrie, and Dare had any personal involvement in the prosecution.  Therefore, Plaintiff's malicious prosecution claim against them must be dismissed.

---

[18] *Cf. Patterson v. Burge*, 328 F. Supp. 2d 878, 894 (N.D. Ill. 2004) (finding that the plaintiff adequately pleaded a post-conviction procedural due process claim based on a *Brady* violation where the plaintiff alleged that a prosecutor *knowingly suppressed* exculpatory evidence during ongoing judicial proceedings).

### B. New York State Law Claims

#### 1) Defamation against the County Defendants

Plaintiff's seventh cause of action alleges that Defendant McNamara, the D.A. for Oneida County, made a number of defamatory statements to Defendant Parker, which were then reported in a news article about Plaintiff published by the Press Defendants on August 12-13, 2015. (Dkt. No. 33, ¶¶ 703-740). The news article reads as follows (numbering added):

1. Nassau County resident Vladimir Jeanty served as his own attorney for about six months in an attempt to get a 2010 conviction dismissed.

2. On Monday he was successful, but he wasn't happy about it.

3. "I wanted a retrial, because had I had a retrial it would have came out that the officer and investigators manufactured the crime, they made up the charges," Jeanty said. "And I have proof of that. My reasoning going to trial again was that I wanted to introduce this info that I didn't have in the original trial."

4. Jeanty said he plans to appeal Judge Michael Dwyer's dismissal of the case. In 2010, he served a 2½-year state prison sentence for his conviction of fifth-degree criminal possession of a controlled substance.

5. The motion to dismiss was originally made in court by Oneida County District Attorney Scott McNamara.

6. "I think it was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice," McNamara said.

7. The case began in 2009 when Jeanty was being interviewed by a Utica police officer on Park Avenue during a traffic stop, McNamara said. When the officer questioned Jeanty on the six cell phones visible in the vehicle, Jeanty drove away before stopping at Oneida Square, climbing a building and running across a roof in an effort to evade police.

8. While he was running, Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away, McNamara said. The cocaine was about the size of a marble when officers took him into custody.

29

9. Photos were taken of the smaller ball of cocaine, but the chunks reportedly bit off were never photographed or collected.  The photos were never turned over to the District Attorney's Office, so the evidence wasn't included in trial, among other concerns.

10. McNamara said the photos are a violation of discovery because the prosecution is required to hand over any photos taken during the investigation to the defense.  Jeanty claims that the police planted the cocaine visible in the photos, and that the other chunks of cocaine never existed.

11. "Though I don't agree with him, it could substantiate his claim there wasn't crack on the ground, making it Brady material, meaning it could be favorable to the defendant," McNamara said.

12. The cocaine in evidence was destroyed following Jeanty's conviction, as is standard for the office.

(Dkt. Nos. 33-3, 33-4).  Plaintiff alleges that McNamara made the defamatory statements in paragraphs 6, 7, 8, 9, 10, 11, and 12.  (Dkt. No. 33, ¶¶ 476-573).  The gist of Plaintiff's defamation claim regarding the article is that McNamara's statements "charge Jeanty with various serious crimes and are entirely false."  (*Id.*, ¶ 573).  Plaintiff's eighth cause of action alleges that McNamara made further defamatory statements about Plaintiff in an affidavit dated May 13, 2016, which was submitted in support of a motion to dismiss Plaintiff's now-discontinued state court civil case.  (*Id.*, ¶¶ 741-47; Dkt. No. 33-5).

In general, to state a claim for defamation under New York law, a plaintiff must allege: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st. Dept. 1999), Restatement (Second) of Torts, § 558).  The County

Defendants argue that Plaintiff's defamation claim against McNamara must fail because "those published statements made by him were absolutely privileged, and/or were subject to a qualified privilege as a matter of law."  (Dkt. No. 50-2, p. 5).  The Court will discuss each privilege in turn.

### a.  Absolute Privilege

"A prosecutor is entitled to absolute immunity or privilege from a civil lawsuit for damages where the prosecutor's challenged activities are 'intimately associated with the judicial phases of the criminal process.'"  *Friedman v. Rice*, 5 N.Y.S.3d 816, 822 (N.Y. Sup. Ct. 2015) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  "The test is a functional one, looking to the function being performed rather than to the office of the defendant."  *Id.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  "While a prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are protected by a qualified good-faith immunity, conduct within the prosecutor's function as advocate is protected by absolute privilege."  *Id.*

The County Defendants argue that McNamara's statements "clearly related to the criminal prosecution of the plaintiff."  (Dkt. No. 50-2, p. 12).  However, Plaintiff alleges that McNamara made defamatory statements about him to Parker long after Plaintiff's criminal prosecution, conviction, and incarceration, and moreover, after the criminal indictment against him had been dismissed.  (Dkt. No. 33, ¶ 722).  Plaintiff further alleges that when McNamara spoke to Parker, "he did so outside of his duties as the prosecutor/advocate in the matter of People v. Jeanty, Indictment 09-480."  (*Id.*, ¶ 723).  Accepting these allegations as true, and

drawing all reasonable inferences in Plaintiff's favor, the Court cannot conclude that the challenged activities are "intimately associated with the judicial phases of the criminal process." *Imbler*, 424 U.S. at 430.  Accordingly, McNamara's statements are not shielded by the absolute privilege at this juncture.[19]  *See Buckley*, 509 U.S. at 278 ("The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions.  Statements to the press may be an integral part of a prosecutor's job . . .  and they may serve a vital public function.  But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and . . .  qualified immunity is the norm for them.") (internal citations omitted); *see also Peters v. City of Buffalo*, 848 F. Supp. 2d 378, 386 (W.D.N.Y. 2012) (finding that district attorneys were not entitled to absolute immunity where the plaintiff alleged, *inter alia*, that they made "misleading public statements concerning evidence in the case"); *Quartararo v. Catterson*, 917 F. Supp. 919, 958 (E.D.N.Y. 1996) (finding that "defendants' [district attorneys] statements to the media are unprotected by absolute immunity").

### b.  Qualified Privilege

Next, the County Defendants argue that McNamara's statements are subject to a qualified privilege or conditional privilege.  (Dkt. No. 50-2, pp. 13-21).  One such qualified privilege "attaches to statements in which the party communicating possesses a legal duty to communicate information about another, provided that the communicator has a good faith belief that the

---

[19] The County Defendants cite *Friedman* for the proposition that a district attorney is entitled to absolute immunity for statements made "within the ambit of his official duties."  (Dkt. No. 50-2, p. 12).  But the case cited in *Friedman* for that proposition found that the acts complained of were "committed in furtherance of a criminal prosecution." *Calderon v. Westchester County*, 489 N.Y.S.2d 242, 243 (N.Y. App. Div. 2d Dept. 1985).

information is true." *Chase v. Grilli*, 512 N.Y.S.2d 125, 126 (N.Y. App. Div. 2d Dept. 1987).

Another qualified privilege is the so-called "common interest privilege," which extends to

"communication made by one person to another upon a subject in which both have an interest."

*Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992) (citation omitted).  However, "[t]he

shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that

defendant spoke with 'malice.'"  *Id.*  There are two standards for malice: 1) "the constitutional

standard which requires the statements to be made with a high degree of awareness of their

probable falsity"; and 2) "the common law standard which requires a showing of ill will as the

speaker's sole motivation for making alleged defamatory statements." *Friedman*, 5 N.Y.S.3d at

824 (citing *Liberman*, 605 N.E.2d at 349-50).

Here, Plaintiff alleges that Parker contacted McNamara on or about August 12, 2015 for

the purpose of reporting on Plaintiff's case, and "McNamara gave Ms. Parker His own personal

opinion about the matter of People v. Jeanty I09-480 and what he believes occurred during the

proceedings in that matter." (Dkt. No. 33, ¶¶ 468-69).  Courts have found that statements to the

media by district attorneys, or their representatives, are covered by qualified privileges.  *See*

*Friedman*, 5 N.Y.S.3d at 824 (statements to the media by information officers at Nassau D.A.'s

Office protected by the common interest privilege); *Wyllie v. Dist. Atty. of County of Kings*, 770

N.Y.S.2d 110, 115 (N.Y. App. Div. 2d Dept. 2003) (statements to press by spokesman for King's

County D.A. protected by common interest privilege); *Chase*, 512 N.Y.S.2d at 126 ("a qualified

privilege attaches to the allegedly defamatory statements, inasmuch as the defendants, acting in

their capacity as representatives of the Nassau County District Attorney's office, communicated

certain information about the plaintiff's arrest and conviction").  Based on Plaintiff's allegations, McNamara's statements to Parker appear to be likewise protected by a qualified privilege.

Nevertheless, assuming without deciding that McNamara's statements are protected, Plaintiff's allegations of malice are sufficient to overcome a qualified privilege at this stage.[20] Specifically, Plaintiff alleges that McNamara "was aware of all the truthful and correct facts relating to the matter and knowingly and purposely left them out, and that "[t]he statements he gave Parker were exaggerated, false and he knew them to be false."  (Dkt. No. 33, ¶¶ 470-71). Plaintiff further alleges that McNamara "made the knowingly false and defamatory statements even though He was in possession of all the records and documents relating to the underlying matter, He had personally investigated the allegations made by Jeanty in the 440 motion, and He had personally spoken to all persons involved in the investigation and prosecution of Jeanty." (*Id.*, ¶ 731; *see also* ¶¶ 714-17).  Among other things, Plaintiff alleges that McNamara learned in his investigation that: "Cerminaro and Paladino committed perjury at every proceeding before trial, at the Grand Jury and during the trial", "the physical evidence had been manufactured and fabricated by Cerminaro and Paladino"; and the photographs showed "that the contraband was found on the ground and only on the ground."  (*Id.*, ¶ 399).  Plaintiff further alleges that, in speaking to Parker, McNamara withheld facts including that: the police "manufactured/ fabricated the physical evidence to support the charges against Jeanty and the photographs proved it" and the two "police officer witnesses committed perjury at all pre-trial proceedings

---

[20] Some courts have suggested that the application of a qualified privilege should not be decided on a motion to dismiss because it is an affirmative defense which the plaintiff is entitled to rebut and cannot be required to anticipate and plead around.  *See e.g., Demas v. Levitsky*, 738 N.Y.S.2d 402, 410 (N.Y. App. Div. 3d Dept. 2002). Other courts have rejected this notion.  *See Orenstein v. Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y. 2009) (noting "the incorporation of a lack of privilege into the elements of a defamation claim").  However, the Court need not decide this issue because Plaintiff's allegations are sufficient to infer malice, as discussed below.

and at trial." (*Id.*, ¶ 734).  Plaintiff also alleges that McNamara "sought to have Jeanty convicted

(second time) in the eyes of the public by making known false statements regarding the

underlying case," and that he made the statements "for the sole purpose of defaming Jeanty."

(*Id.*, ¶¶ 730, 736).

The County Defendants argue that Plaintiff does not sufficiently allege malice because

McNamara's statements were simply based on his review of Plaintiff's records and interviews

with the arresting/investigating officers and prosecuting attorneys.  (Dkt. No. 50-2, p. 14).

Although some of these documents have been attached to the Amended Complaint, there is no

indication that all of Plaintiff's relevant court and police records are properly before the Court.

Moreover, this sort of fine-tooth and fact-intensive inquiry, comparing McNamara's statements

against the underlying records, is inappropriate at the motion to dismiss stage.[21]  At a minimum,

Plaintiff's allegations are sufficient to plausibly infer constitutional malice, in other words that

McNamara was aware, based on his investigation, that some or all of his statements were

probably false.

Accordingly, the County Defendants' motion to dismiss Plaintiff's defamation claim

must be denied.[22]  *See Biro v. Conde Nast*, 807 F.3d 541, 545-46 (2d Cir. 2015) (holding that

---

[21] To the extent the County Defendants argue that some or all of McNamara's statements "can be shown to be substantially true" based on the underlying documents, (Dkt. No. 50-2, pp. 13-17), this argument is also premature for the same reason.  *See Tannerite Sports, LLC. v. NBCUniversal News Grp.*, No. 15-3485-CV, 2017 WL 3137462, at *7, 2017 U.S. App. LEXIS 13380, at *18 (2d Cir. July 25, 2017) (noting that in "cases where the truth or falsity of the defendant's statement depends on material outside the complaint . . . the outside material may be presented by the defendant at summary judgment so the court may determine whether a legitimate question exists as to its truth or falsity") (discussing *Garcia v. Puccio*, 793 N.Y.S.2d 382, 384 (N.Y. App. Div. 1st Dept. 2005)).

[22] All of the County Defendants' arguments relate to Plaintiff's defamation claim regarding the news article, Plaintiff's seventh cause of action.  (Dkt. No. 33, ¶¶ 703-740).  The County Defendants have not addressed Plaintiff's eighth cause of action concerning statements by McNamara in an affidavit, (*id.*, ¶¶ 741-47), and therefore, the Court declines to do so as well.  In addition, since Plaintiff has stated a claim against McNamara for defamation regarding the news article, the Court rejects the argument that the County should be dismissed since he is immune

where malice must be pled as part of a defamation claim, the allegations must be sufficient to

raise a "plausible inference" of malice), *cert. denied*, __ U.S. __, 136 S. Ct. 2015 (2016); *Giuffre*

*v. Maxwell*, 165 F. Supp. 3d 147, 156 (S.D.N.Y. 2016) (finding that the plaintiff pled sufficient

facts regarding malice "to show a plausible defeat of any qualified privilege defense"); *Peffers v.*

*Stop & Shop Supermarket Co. LLC*, No. 14 Civ. 3747, 2015 WL 5460203, at *8, 2015 U.S. Dist.

LEXIS 126785, at *18 (S.D.N.Y. June 9, 2015) ("Assuming for now that Embry's statement was

protected by a qualified privilege, the Court finds these allegations are sufficient to allege Embry

acted with malice. If Embry did, in fact, fabricate an encounter with plaintiff to provide Stop &

Shop with a basis for firing him, a reasonable jury could conclude Embry acted with malice.

However, this finding is without prejudice to Embry's right to re-assert her qualified privilege at

the summary judgment stage or thereafter."); *Recant v. New York Presbyterian Hosp.*, 901

N.Y.S.2d 910, *4 (N.Y. Sup. Ct. 2009) ("It is impossible on these papers to determine whether or

not there is evidence of actual malice or ill will, which must await a motion for summary

judgment."); *Roberti v. Schroder Inv. Mgt. N.A., Inc.*, No. 04 Civ. 2404, 2006 WL 647718, at *9,

2006 U.S. Dist. LEXIS 10252, at *28 (S.D.N.Y. Mar. 14, 2006) ("[D]ismissal of the defamation

claim on qualified privilege grounds thus is inappropriate because the allegations of the

complaint, construed in the light most favorable to Plaintiff, could support a finding that the

statement was made with the requisite high degree of awareness that it was probably false.").

---

from liability. (Dkt. No. 50-2, p. 21).  *See also Claude H. v. County of Oneida*, 214 A.D.2d 964 (N.Y. App. Div. 4th
Dept. 1995) (recognizing that the County may be vicariously liable for the actions of its local officer, the D.A.).

### 2) Defamation Against the Press Defendants

Plaintiff's defamation claim against the Press Defendants concerns the same article discussed above, which was published in the Utica Observer-Dispatch newpaper and entitled "Man seeks to appeal dismissal of 2010 Utica cocaine case." (Dkt. Nos. 33-3, 33-4). Defendant Parker is the reporter who wrote the article, and Plaintiff alleges that she included defamatory statements about Plaintiff, despite knowing them to be false. (Dkt. No. 33, ¶¶ 36, 62). The statements were attributed to D.A. McNamara, who Parker spoke with before writing the article. (*Id.*, ¶¶ 468-71). Plaintiff alleges that Parker "chose to accept and print McNamara's false allegations and opinions despite having official records and documents" related to his criminal case, and further, Parker "paraphrased McNamara's opinions adopting them as her own." (*Id.*, ¶¶ 450, 585-86). Plaintiff alleges that McNamara and Parker "agreed that she would write an article consistent with the facts as he alleged them as opposed to the facts from the record in her possession." (*Id.*, ¶ 594).

Plaintiff further alleges that he did not commit any of the criminal acts "alleged and attributed to him" by McNamara and/or Parker, and the article wrongfully "implied that Jeanty was indeed guilty of these crimes." (*Id.*, ¶¶ 560-61, 573, 588). As to Defendants Perritano and Johns, Parker's supervisors and editors at the newspaper, Plaintiff alleges that they reviewed the article before publication and knew that it did not "factually represent the facts shown in the records of the underlying matter." (*Id.*, ¶¶ 37-38, 575-76). Plaintiff alleges that Parker and Perritano failed to verify, corroborate, or investigate the statements made by McNamara before publishing the article, and that they "knew or should have known that the statements were in there [sic] entirety false and untrue." (*Id.*, ¶¶ 749, 59, 65-68). Finally, Plaintiff alleges that

37

Perritano and Johns failed to "properly supervise and train Parker" and allowed her to publish the defamatory article.  (*Id.*, ¶¶ 761-62).

The Press Defendants argue that "Plaintiff's libel claim is legally insupportable because the news article he challenges is a scrupulously accurate account of District Attorney McNamara's description of the circumstances leading to Plaintiff's arrest and his successful application for post-conviction relief," and therefore, Defendants are "protected from defamation (and other tort) liability by the 'fair report privilege' enacted in Section 74 of the N.Y. *Civil Rights Law*."  (Dkt. No. 41-5, p. 6; *see also* Dkt. No. 23-16, pp. 19-26).

As discussed above, in order to state a claim for defamation, Plaintiff must allege, among other things, a false statement published to a third party without authorization or privilege.  An absolute privilege exists under Section 74 of New York's Civil Rights Law, which protects the "publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading to the report that is a fair and true headnote of the statement published."  N.Y. Civ. Rights Law § 74 (McKinney).  The purpose of the fair reporting privilege is "in part to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest."  *Beary v. W. Publg. Co.*, 763 F.2d 66, 68 (2d Cir. 1985).  In response to the Press Defendants' motion, Plaintiff argues that the privilege is not applicable, disputing whether the allegedly defamatory article reported on an "official proceeding," and if it did, whether it was a "fair and true" report. (Dkt. No. 79, pp. 18-31).

### a. Official Proceeding

"New York courts have broadly construed the meaning of an official proceeding as used in Section 74." *Fine*, 11 F. Supp. 3d at 214 (quoting *Test Masters Educ. Services, Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009)). "The test is whether the report concerns actions taken by a person officially empowered to do so." *Id.* (citations omitted). Thus, arrests and investigations may constitute official proceedings. *Id.* at 216 (finding that investigation by Syracuse Police Department was "an official proceeding under § 74"); *Geiger v. Town of Greece*, No. 07 Civ. 6066, 2007 WL 4232717, at *6, 2007 U.S. Dist. LEXIS 87466, at *18 (W.D.N.Y. Sept. 4, 2007) (finding that "the Attorney General's investigation into plaintiff's business practices was an official proceeding"); *see also* Restatement (Second) of Torts § 611(h). The same holds true for statements by government officials, such as press releases. *See, e.g., Rodriguez v. Daily News, L.P.*, 37 N.Y.S.3d 613, 615 (N.Y. App. Div. 2d Dept. 2016) (NYPD press releases) *leave to appeal denied*, 73 N.E.3d 358 (N.Y. 2017); *Brewer v. Herald*, No. 14 Civ. 958, 2016 WL 4435232, at *4, 2016 U.S. Dist. LEXIS 110408, at *12 (N.D.N.Y. Aug. 18, 2016) (police press release); *Bouchard v. Daily Gaz. Co.*, 25 N.Y.S.3d 730, 732 (N.Y. App. Div. 3d Dept. 2016) (Department of Justice press release). Indeed, courts have held that even more informal statements by government officials may trigger the privilege.

For example, in the analogous case of *Hudak v. Times Pub. Co., Inc.*, the plaintiff brought an action for defamation against a newspaper, reporter, and editor, and the defendants asserted the Pennsylvania version of the fair reporting privilege, arguing that their article was based on the reporter's interview with the local D.A.  534 F. Supp. 2d 546 (W.D. Pa. 2008).  The court concluded that the D.A.'s reported remarks should "be viewed as a 'report' of 'official action,'"

reasoning that the D.A. "is the chief law enforcement officer of the county and is *the* official

voice with respect to matters pending before his office," and that while the D.A's remarks were

made in an informal interview, "they served the same purpose as a press release or press

conference."  *Id.* at 572.  Similarly, the Second Circuit has found that a television station's

publication of a statement by an FBI spokesman about "the execution of a warrant issued upon

the authorization of a federal judge" fell within Section 74's fair reporting privilege.  *L. Firm of*

*Daniel P. Foster, P.C. v. Turner Broad. System, Inc.*, 844 F.2d 955, 961 (2d Cir. 1988); *see also*

*Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003) (newspaper's publication of police chief's

"official statement" from interview with reporter was protected by the fair reporting privilege).

In this case, the Court finds that the statements made by Defendant McNamara, in the

context of an interview with Defendant Parker about Plaintiff's arrest, prosecution, and post-

conviction motion, fall within the broad meaning of "official proceeding" as used in Section 74.

Plaintiff alleges that McNamara made the defamatory statements in paragraphs 6, 7, 8, 9, 10, 11,

and 12.  (Dkt. No. 33, ¶¶ 476-573).  Reading the article as a whole, paragraphs 1, 2, 3, and 4

introduce the story about Plaintiff's case and Plaintiff's perspective.  (Dkt. Nos. 33-3, 33-4).

Paragraph 5 then leads in to the D.A.'s office view, reporting that the motion to dismiss

Plaintiff's indictment was made by McNamara, and then following with the first quote from

McNamara.  (*Id.*).  In context, all of McNamara's statements concern the D.A.'s decision to

move to dismiss Plaintiff's indictment.  Regardless of whether the statements are 100% true or

not, they served the same purpose as a press release, to inform the public about the D.A. office's

position on Plaintiff's case.[23]  As the Press Defendants argue, these statements "could only be understood as a community newspaper reporting information obtained directly from Oneida County's highest-ranking law enforcement officer concerning Plaintiff's arrest and successful application for post-conviction relief."  (Dkt. No. 23-16, pp. 25-26).  Therefore, the allegedly defamatory statements in the article constitute a report of an official proceeding.[24]

### b.  Fair and True Report

The next question is whether the article is a fair and true report of McNamara's official statements.  For a report to be characterized as "fair and true" within the meaning of Section 74, "it is enough that the substance of the article be substantially accurate."  *Test Masters*, 603 F. Supp. 2d at 589 (quoting *Holy Spirit Assn. for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (N.Y. 1979)).  Put another way, "[w]hen determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision," since "a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author."  *Holy Spirit Ass'n.*, 49 N.Y.2d at 68.  Where "all relevant documents are before a court, it may determine as a matter of law whether allegedly defamatory publications are

---

[23] Plaintiff's conclusory allegation that Defendant McNamara's statements "were the personal thoughts and opinions of McNamara and were of no direct or specific relation to the underlying matter," (Dkt. No. 33, ¶¶ 451, 469, 723, 732), is belied by McNamara's affidavit.  (Dkt. No. 33-5, ¶¶ 14-16).  Moreover, even if McNamara spoke outside his official capacity, Plaintiff's allegations do not suggest that Parker had any inkling of this fact.

[24] Contrary to Plaintiff's arguments (Dkt. No. 79, p. 17), the allegedly defamatory statements in the article are not a report of a judicial proceeding.  Although the title of the article refers to a judicial proceeding—the dismissal of Plaintiff's indictment, the allegedly defamatory statements do not report on what actually happened in that proceeding, but rather describe the D.A.'s view of the case.  The article also does not quote or specifically rely on any pleadings, papers, or in-court statements from the judicial proceeding.  Therefore, the allegedly defamatory statements cannot be read to "convey the substance of the judicial proceeding."  *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012).

41

'fair and true' reports of official proceedings." *Fine v. ESPN, Inc.*, No. 12 Civ. 0836, 2013 WL 528468, at *3, 2013 U.S. Dist. LEXIS 17729, at *11 (N.D.N.Y. Feb. 11, 2013); *see also Test Masters*, 603 F. Supp. 2d at 589.

In this case, Plaintiff does not dispute that the article accurately reflects the statements made by Defendant McNamara.  Indeed, Plaintiff alleges that Parker "chose to accept and print McNamara's false allegations and opinions" and that McNamara and Parker "agreed that she would write an article consistent with the facts as he alleged them as opposed to the facts from the record in her possession."  (Dkt. No. 33, ¶¶ 450, 594).  Plaintiff further alleges that "Parker elected to print her article using McNamara's opinions as factual representations of the underlying matter," that Parker "paraphrased McNamara's opinions adopting them as her own," and that the Press Defendants "relied exclusively on McNamara."  (*Id.*, ¶¶ 585-86, 766).  Thus, Plaintiff's real complaint is that Parker slavishly copied McNamara's statements without corroborating them or telling Plaintiff's side of the story.[25]  However, the accuracy of McNamara's statements is beside the point.  Parker was not required to fact-check the D.A.'s official statements, only to provide a fair and true report of them.[26]  *See Cholowsky v. Civiletti*,

---

[25] Although Plaintiff alleges that McNamara *or Parker* made the defamatory statements in paragraphs 9 and 12, (Dkt. No. 33, ¶¶ 521-23, 549), Plaintiff also alleges that McNamara made all of the defamatory statements in the article and that Parker "relied exclusively on McNamara." (*Id.*, ¶¶ 594, 715-20, 766).  The Court credits the latter allegations, which are consistent with the article overall (Dkt. Nos. 33-3, 33-4) and McNamara's affidavit (Dkt. No. 33-5, ¶¶ 6, 14).  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."); *see also Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (noting the "narrow exception" to the principle that allegations should be accepted as true on a motion to dismiss, "for factual assertions that are contradicted by the complaint itself, [or] by documents upon which the pleadings rely. . .").

[26] Thus, even assuming Plaintiff's allegation is true that Parker omitted certain facts favorable to Plaintiff that were available in his court records, (Dkt. No. 33, ¶¶ 472-75, 527, 578-583), Parker's reporting was nonetheless protected by the privilege to the extent the article was a fair and true report of McNamara's official statements.  Moreover, Plaintiff does not allege that Parker omitted facts *from McNamara's account* so as to alter the accuracy of the article as a report of his official statements.

887 N.Y.S.2d 592, 596 (N.Y. App. Div. 2d Dept. 2009) ("there was no requirement that the publication report the plaintiff's side of the controversy"); *Glantz v. Cook United, Inc.*, 499 F. Supp. 710, 715 (E.D.N.Y. 1979) ("[E]ncompassed within the privilege is the right to publish a 'fair and true' report which contains information that is 'false' as a matter of fact."); *see also* Restatement (Second) of Torts § 611 cmt. a (1977) ("[T]he privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false.").

For example, in *Brewer v. Herald*, the plaintiff brought a libel claim against two newspapers regarding articles about his arrest, which was reported based on a police press release. 2016 WL 4435232, at *4, 2016 U.S. Dist. LEXIS 110408, at *12. In deciding whether Section 74 applied, the court emphasized that the inquiry concerned whether the articles were a fair and true report of the press release, and not whether the articles themselves were accurate. *Id.* The court compared the articles with the press release and granted the newspapers' motion to dismiss, finding that "the content of the publications is no more than a parroting of the press release, and therefore is a 'fair and true report' of the official press release." *Id.* Here, Plaintiff likewise alleges that Parker simply parroted McNamara's official statements, which is confirmed by comparing the article with McNamara's affidavit.[27] Therefore, the Court concludes that the article is a fair and true report of McNamara's official statements.

---

[27] Although a motion to dismiss is typically confined to the pleadings, the Court may compare the article with the official statements because Plaintiff attached to the Amended Complaint a sworn affidavit by McNamara, in which he recounts what he told Parker and avers that "our brief conversation provided the information included within the newspaper article." (Dkt. No. 33-5, ¶ 14). Moreover, Plaintiff himself alleges that "McNamara told Parker all the other false facts included in exhibit 2 (McNamara Affidavit dated May 13, 2016)." (Dkt. No. 33, ¶ 593).

43

Accordingly, the Press Defendants' reporting in the article is absolutely privileged under Section 74, and Plaintiff's defamation claim against them must be dismissed.  *See Geiger v. Town of Greece*, 311 F. App'x 413, 417 (2d Cir. 2009) ("[W]e observe, as the district court did, that the Gannett article uses more colorful language than the press release, but it does not 'suggest more serious conduct than that actually suggested in the official proceeding,' and, therefore, it cannot provide a legal basis for plaintiff's libel claim."); *Akassy v. New York Daily News*, 14 Civ. 1725, 2017 WL 325259, at *3, 2017 U.S. Dist. LEXIS 9155 (S.D.N.Y. Jan. 23, 2017) ("The statements in the article are substantially consistent with Jacobs' affidavit and the court documents and district attorney's press release appended to Defendants' submissions."); *Bouchard*, 25 N.Y.S.3d at 732 ("Although defendants used language that differed slightly from the DOJ press release in their article, given plaintiff's criminal charges and convictions detailed in the press release, the language used 'does not suggest more serious conduct than that actually suggested in the official proceeding.'").

### 3)  Respondeat Superior

"Respondeat superior is not an independent cause of action, but a theory that must attach to an underlying claim."  *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011); *see also Biswas v. City of New York*, 973 F. Supp. 2d 504, 540 (S.D.N.Y. 2013).  As discussed above, Plaintiff has failed to state a claim against the Press Defendants. Accordingly, Plaintiff's derivative *respondeat superior* claim against GateHouse Media, LLC must be dismissed since there is no viable underlying claim.

### 4)   State Law Claims Against the Utica Defendants

The Utica Defendants argue that if all of Plaintiff's federal claims fail, the Court should decline to exercise supplemental jurisdiction over his state law claims.  (Dkt. No. 59-4, p. 49).  However, as discussed above, Plaintiff has stated several claims under Section 1983, and therefore, Plaintiff's state law claims against the Utica Defendants may also proceed.

## VI.   LEAVE TO AMEND

In Plaintiff's opposition to the Utica Defendants' motion for judgment on the pleadings, Plaintiff seeks leave to again amend his complaint; the Utica Defendants oppose the request.  (Dkt. No. 75, p. 57; Dkt. No. 86, p. 5).  In general, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2).  "Although district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings, leave to amend need not be granted when amendment would be futile." *Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016).

In this case, the Court finds that amendment of Plaintiff's procedural due process fair trial claim against the Utica Defendants would be futile because it is barred by the statute of limitations.  Therefore, this claim is dismissed with prejudice.  *See Trombley v. O'Neill*, 929 F. Supp. 2d 81, 106 (N.D.N.Y. 2013) (denying leave to amend where "substantive" defects in Complaint made amending "futile").  In addition, the Court finds that further amendment of Plaintiff's claims against the Press Defendants would be futile since they are shielded by the absolute fair reporting privilege, and therefore, these claims are also dismissed with prejudice. *See McNally v. Yarnall*, 764 F. Supp. 853, 855 (S.D.N.Y. 1991) (denying leave to amend where the alleged statements fell within "the absolute privilege conferred by § 74 of the New York

45

Civil Rights law").  Plaintiff's official capacity claims are also dismissed with prejudice.  *See*

*Dudek*, 991 F. Supp. 2d at 413.  Plaintiff may otherwise amend his allegations.

## VII.   CONCLUSION

For these reasons, it is

**ORDERED** that the Press Defendants' motion to dismiss (Dkt. No. 23) is **DENIED** as

moot; and it is further

**ORDERED** that the Press Defendants' supplemental motion to dismiss (Dkt. No. 41) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants GateHouse Media, LLC, Micaela

Parker, Fran Perritano, and Ron Johns (Counts 9 and 10 of the Amended Complaint) are

**DISMISSED** with prejudice; and it is further

Defendants GateHouse Media, LLC, Micaela Parker, Fran Perritano, and Ron Johns are

**DISMISSED** from this action; and it is further

**ORDERED** that the County Defendants' motion to dismiss (Dkt. Nos. 21, 50) is

**DENIED**; and it is further

**ORDERED** that the Utica Defendants' motion to dismiss (Dkt. No. 59) is **GRANTED**

**in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's procedural due process fair trial claim (Count 1 of the

Amended Complaint) is **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against Defendants Scalise, Capri, Taurisano, Brown,

and Trevasani are **DISMISSED**, and it is further

**ORDERED** that Plaintiff's malicious prosecution claim is **DISMISSED** as against Defendants Hagen, Howe, Petrie, and Dare; and it is further

**ORDERED** that Plaintiff's claims against the Utica Defendants in their official capacities are **DISMISSED** with prejudice; and it is further

**ORDERED** that the Utica Defendants' motion to dismiss is otherwise **DENIED**; and it is further

**ORDERED** that the Press Defendants' motion to dismiss the Utica Defendants' cross-claim against them (Dkt. No. 64) is **DENIED** as moot; and it is further

**ORDERED** that Plaintiff is **GRANTED leave to file a Second Amended Complaint** **within THIRTY (30) days** of the date of this Order, in accordance with the conclusions stated above; and it is further

**ORDERED** that the Clerk of Court shall mail a copy of this Memorandum-Decision and Order to Plaintiff along with copies of the unpublished decisions cited in this decision.

**IT IS SO ORDERED.**

August 18, 2017
Syracuse, New York

Brenda K. Sannes
U.S. District Judge