UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

*In re* MOTION TO QUASH SUBPOENA TO MICAELA PARKER
_____

VLADIMIR JEANTY,

                              Plaintiff,

                                                       6:16-CV-966
v.                                                         (BKS/TWD)

THE CITY OF UTICA, *et al.*,

                              Defendants.
_____

| APPEARANCES: | OF COUNSEL |
|---|---|
| Vladimir Jeanty<br>Plaintiff *pro se*<br>P.O. Box 76<br>Uniondale, New York 11553 | |
| GREENBERG TAURIG, LLP<br>Attorneys for non-party Micaela Parker<br>*On motion to quash subpoena*<br>54 State Street, 6th Floor<br>Albany, New York 12207 | MICHAEL GRYGIEL, ESQ. |
| CITY OF UTICA - CORPORATION COUNSEL<br>Attorneys for Defendants City of Utica, Williams,<br>Cerminaro, Paladino, Hagen, Petrie, Dare<br>1 Kennedy Plaza, 2nd Floor<br>Utica, New York 13502 | ZACHARY OREN, ESQ. |
| KERNAN PROFESSIONAL GROUP, LLP<br>Attorneys for Defendant Dougherty<br>1310 Utica Street<br>P.O. Box 750<br>Oriskany, New York 13424 | DAVID A. BAGLEY, ESQ. |

SCHMITT & LASCURETTES, LLC  WILLIAM P. SCHMITT, ESQ.
Attorneys for Defendant McNamara,
County of Oneida
1508 Genesee Street, Suite 3
Utica, New York 13502

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION AND ORDER

Currently before the Court is GateHouse Media New York Holdings, Inc.'s ("GateHouse") motion on behalf of Micaela Parker ("Ms. Parker") to quash Plaintiff Vladimir Jeanty's ("Plaintiff") non-party subpoena pursuant to Federal Rule of Civil Procedure 45(d)(3)(A)(iii), and to recover its reasonable costs related to its motion. (Dkt. No. 161.) Briefly, GateHouse argues the materials Plaintiff seeks are protected under the federal common law reporters' privilege. (Dkt. No. 161-3.) For the reasons discussed below, GateHouse's motion to quash the subpoena and for its costs is granted in part and denied in part.

**I.  RELEVANT BACKGROUND AND THE PARTIES' CURRENT DISPUTE**

On or about October 15, 2009, the City of Utica Police Department arrested Plaintiff following a traffic stop and subsequent foot pursuit. (Dkt. No. 33 at ¶¶ 89-127.) Plaintiff was charged with, and subsequently indicted, tried, and convicted for criminal possession of a controlled substance in the 5th and 7th degrees. (*Id*. at ¶ 44.) However, Plaintiff alleges his arrest and subsequent conviction was a result of police misconduct. (*Id*. at ¶¶ 3-4.) Plaintiff's criminal conviction was vacated on June 28, 2015, and his indictment was dismissed on August 10, 2015, upon Defendant Oneida County District Attorney, Hon. Scott D. McNamara's ("Mr. McNamara") motion. (*Id*. at ¶¶ 58-59.)

On August 12, 2015, Ms. Parker published an article in *The Observer-Dispatch's* (the "OD" or "Newspaper") website (www.uticaod.com) headlined "Man seeks to appeal dismissal of

2

2010 cocaine case." (*Id*. at ¶ 443.)  The next day, on August 13, 2015, a verbatim copy of the article appeared in the Newspaper's print edition.  (*Id*. at ¶ 449.)

In the article, Ms. Parker credits several statements to Mr. McNamara based on two on-the-record interviews.  (Dkt. No. 161-1 at 2, 3.)  To wit, Mr. McNamara is quoted as saying moving to dismiss Plaintiff's case "was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice."  (*Id*.)  Mr. McNamara is attributed with discussing Plaintiff's criminal case including providing certain details Plaintiff claims are untrue, *e.g*., that Plaintiff was ripping into a baseball size ball of cocaine with his teeth.  (*Id*.)  Mr. McNamara is also quoted disagreeing with Plaintiff's claim that he was framed. (*Id*.)

On August 3, 2016, Plaintiff sued Mr. McNamara along with a host of news media defendants (the "Press Defendants"), including GateHouse and Ms. Parker among other defendants, for defamation and other claims.  (Dkt. No. 1; Dkt. No. 33.)  The Press Defendants successfully moved for dismissal of Plaintiff's claims.  (Dkt. No. 99.)  However, Plaintiff's defamation claim against Mr. McNamara was not dismissed.  (*Id*.)  Plaintiff's claim against Mr. McNamara seeks damages related to his allegedly false statements about Plaintiff's criminal case included in Ms. Parker's news article posted on the OD's website and printed in its paper.  (Dkt. No. 33 at ¶¶ 703-40 (Seventh Cause of Action).)

After the Press Defendants were dismissed from the case, Plaintiff attempted to serve a non-party subpoena on Ms. Parker seeking a broad range of documents related to her conversations with several individuals.  (Dkt. No. 146-1.)  After conferring with counsel for GateHouse and responding to a Court Order, Plaintiff narrowed the scope of his subpoena to its current form that seeks the following: "Documents/Recordings/Emails regarding any discussion,

3

interview, statements between Ms. Michaela Parker and Scott D. McNamara concerning Vladimir Jeanty and/or the matter of People v. Jeanty between October 15, 2009 and August 20, 2015." (Dkt. No. 161-2 at 71 (the "Subpoena").)

GateHouse accepted service of the Subpoena and conferred with Plaintiff to avoid motion practice. However, after failing to reach an agreement, GateHouse filed the instant motion to quash the Subpoena. GateHouse argues the qualified reporters' privilege protects the information Plaintiff seeks from disclosure and the information does not exist in any event. (Dkt. No. 161-3.) Plaintiff, on the other hand, argues the information is not privileged and refuses to accept GateHouse's explanation that the information does not exist. (Dkt. No. 166.)

## II. DISCUSSION

### A. Applicable Law

Pursuant to Federal Rule of Civil Procedure 45(c)(3)(A), a court "must quash or modify a subpoena that . . . (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . ." "The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03 CIV.1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003) (citations omitted).

The Second Circuit recognizes the existence of a qualified reporter's privilege to protect nonconfidential press materials from disclosure. To that end, nonconfidential press materials are privileged unless the party seeking their disclosure demonstrates the materials are (1) "of likely relevance to a significant issue in the case" and (2) "not reasonably obtainable from other

available sources." *Gonzalez v. Nat'l Broadcasting Co.*, 194 F.3d 29, 36 (2d Cir. 1999).[1]  This standard is not as demanding as the standard which applies to confidential materials.  *See id.* at 35.  Nonetheless, the qualified reporters' privilege operates to forbid a litigant free access to "sift through [journalists] files in search of information supporting [his] claims," because such access would undermine the public's perception of the press as an independent institution.  *Id.*  In other words, the qualified reporters' privilege ensures the press is not used as "an investigative arm of the judicial system, the government, or private parties."  *Id.*

B.  **Scope of the Subpoena**

As recounted above, the Subpoena seeks: "Documents/Recordings/Emails regarding any discussion, interview, statements between Ms. Michaela Parker and Scott D. McNamara concerning Vladimir Jeanty and/or the matter of People v. Jeanty between October 15, 2009 and August 20, 2015."  (Dkt. No. 161-2 at 71.)  Though potentially subject to a broader interpretation, the parties have had extensive discussions regarding the documents Plaintiff seeks and have agreed the Subpoena's scope is narrower.  (*See, e.g.*, Dkt. No. 166 at 3 (Plaintiff confirming he seeks "only the original record Ms. Parker created (on her computer) on/or about August 2015 when she at least twice spoke to Defendant McNamara by telephone regarding the matter of People v. Vladimir Jeanty, Indict #09-480 which was vacated on June 29, 2015 and dismissed on August 10, 2015" (internal quotation marks omitted)); Dkt. No. 161-2 at 80 (letter from GateHouse to Plaintiff confirming he is only seeking "documents memorializing or

---

[1]  The Complaint in the present case alleges federal claims under 42 U.S.C. § 1983, along with New York State law claims under the Court's supplemental jurisdiction.  (Dkt. No. 33.)  Plaintiff discusses New York's Shield Law in response to GateHouse's motion to quash.  (Dkt. No. 166 at 5-6.)  However, asserted privileges in actions that raise both federal and pendent state law claims are governed by the principles of federal law.  Fed. R. Evid. 501; *e.g., von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987).

5

otherwise recording Ms. Parker's interview of [Mr. McNamara] that was published in the [Observer Dispatch] on August 12 and 13, 2015.").) Thus, considering the Subpoena's context and the parties' discourse leading up to this motion, the Court interprets the subpoena as seeking *only* documents or informational records memorializing Ms. Parker's interviews with Mr. McNamara regarding Plaintiff.[2]

### C. Existence of Responsive Records

With the foregoing scope in mind, the parties disagree whether responsive records memorializing Ms. Parker's interview with Mr. McNamara exist. (Dkt. No. 161-1 at ¶ 16; Dkt. No. 168 at ¶ 10.) Axiomatically, a party in receipt of a subpoena need not produce documents they do not possess. *See Deleon v. Pichardo*, No. 15CV9804, 2016 WL 7373965, at *2 (S.D.N.Y. Dec. 12, 2016) (noting "[n]o violation of a subpoena *duces tecum* can be demonstrated without showing that the documents requested exist") (citing *Fremont Energy Corp. v. Seattle Post Intelligencer*, 688 F.2d 1285, 1287 (9th Cir. 1982)). Thus, a key consideration for the Court at the outset is whether GateHouse possesses records responsive to the Subpoena.

To that end, in a letter to Plaintiff dated October 4, 2018, GateHouse's counsel, Michael Grygiel ("Mr. Grygiel"), explained that Ms. Parker's interview of Mr. McNamara "was neither audio recorded nor subject to written recordation . . . ." (Dkt. No. 161-2 at 60 (internal quotation

---

[2] As stated above, Plaintiff concedes he only seeks records memorializing Mr. McNamara's interviews in his responsive memorandum of law. (Dkt. No. 166 at 3.) However, the Subpoena, as written, is not so specifically limited. To the extent the Subpoena seeks anything other than contemporaneous recordings of Ms. Parker's interviews with Mr. McNamara, for example, working drafts of the news article or correspondence between Ms. Parker and her colleagues relative to Plaintiff, the Court concludes Plaintiff has abandoned his attempt to obtain such documents and failed to meet his burden to establish such information is likely relevant to a significant issue in this case. Thus, the qualified reporters' privilege protects such information from discovery. *See Schoolcraft v. City of New York*, No. 10 CIV. 6005 RWS, 2014 WL 1621480, at *5 (S.D.N.Y. Apr. 22, 2014) (noting "[w]holesale exposure of press files to litigation scrutiny is an impermissible burden" (internal citations omitted)).

6

marks omitted)).) Mr. Grygiel then followed-up with Plaintiff via email on October 15, 2018, after a telephone conversation on October 12, 2018, reiterating "no records exist that are responsive to the Subpoena[.]" (*Id*. at 80.) He then offered to provide an affidavit stating the same. (*Id*.)

Plaintiff's responsive email dated October 16, 2018, demonstrates he accepted that no technical recording of the interview exists. (*Id*. at 82.) However, Plaintiff contended he is entitled to "any electronic store record (sic) (ESI) of Ms. Parker on her computer on the date and time" of the interviews. (*Id*.) According to Plaintiff, this includes "any rough drafts or 'autosave' files on her computer relating to the subject articles." (*Id*.)

Plaintiff argues Mr. Grygiel explained to him that Ms. Parker did not record the interviews but typed Mr. McNamara's statements directly in her computer. (Dkt. No. 168 at ¶ 9.) Thus, Plaintiff contends a digital copy of Ms. Parker's typed notes exist somewhere in digital form. (*Id*. at ¶ 10.) His rationale is:

> Ms. Parker's practice of typing statements into her computer is similar to what a stenographer does. And based on my own and commonly known understanding of how computers and word processors work; [i]t is my understanding that an electronic record/copy of Ms. Parker[']s actions on the days she spoke to Defendant McNamara do exists (sic).

(*Id*.)

Plaintiff also refused to accept the affidavit Mr. Grygiel offered regarding the non-existence of records. According to Plaintiff, an affidavit from Mr. Grygiel would be insufficient because he would be making such an affidavit "on information and belief" and not his personal knowledge. (Dkt. No. 166 at 11.) Plaintiff asserts any statements in Mr. Grygiel's affidavit "would be belied by the very fact that an electronic record of Defendant McNamara's statement

as typed by Ms. Parker directly into her computer on the day of their conversation does exist unless it was intentionally deleted." (*Id.*)

Thus, Plaintiff's principal point is he believes there is "an electronic record/copy of Ms. Parker's actions on the days she spoke to Defendant McNamara[.]" (Dkt. No. 168 at ¶ 10.) Unfortunately, Plaintiff does not explain exactly what "electronic record/copy" exists. Instead, he nakedly asserts a recording must exist based on his understanding of how computers work without explanation.[3] Thus, Plaintiff has not articulated a reasonable basis to question GateHouse's earlier representation that no recordings of Ms. Parker's interview with Mr. McNamara exist.

Moreover, contrary to Plaintiff's position, an attorney-penned affidavit Mr. Grygiel signed affirming his clients are not in possession of any contemporaneous recordings of the interviews between Ms. Parker and Mr. McNamara could sufficiently satisfy his client's obligation to respond to the Subpoena. Plaintiff's argument that any such affidavit would be on "information and belief" and not his "personal knowledge" shows a fundamental misunderstanding of Mr. Grygiel's role as GateHouse's attorney and his professional obligations with respect to discovery and responding to a non-party subpoena. Rather, the affidavit would likely describe GateHouse's efforts to search for responsive information and would respond to

---

[3] Reading into his arguments, the Court can fathom three possible sources of electronically stored information Plaintiff seeks to obtain from the Subpoena. However, it is extremely doubtful any of these sources would yield results and each likely would impose an undue burden on GateHouse to investigate and produce. First, Plaintiff may be referring to a keylogger program that tracks a computer user's keystrokes and stores that information. Thus, arguably, one could recreate a record of exactly what Ms. Parker typed into her computer on those dates. Second, a once-saved file may have been deleted but that deleted file may still exist on the hard drive if it was never written over. Finally, the computer may have auto-saved a version of the word-processing file Ms. Parker was typing into on the day of the interview and the auto-save version may remain available.

8

Plaintiff's claims regarding whether an extant digital recording of Ms. Parker's actions on the dates of the interviews exist, *e.g.*, if a keylogger system was installed on her computer.

Nonetheless, GateHouse brought this motion to quash in lieu of providing Plaintiff an affidavit regarding whether responsive documents exist. Thus, it would be premature for the Court to definitively find GateHouse could satisfy its obligations to respond to the Subpoena with an affidavit without knowing the contents of such an affidavit. Accordingly, the Court is obligated to consider the merits of GateHouse's motion with respect to the qualified reporters' privilege *assuming* GateHouse could produce some version of the original recordings.

### D. The Qualified Reporters' Privilege

As recounted above, a party seeking nonconfidential press materials in discovery must demonstrate the sought-after documents are: (1) relevant to a significant issue in the case; and (2) not available from another source. *See Gonzalez*, 194 F.3d at 36.

GateHouse argues Plaintiff's motivation to obtain the recordings is to provide the basis for a new claim against Mr. McNamara. (Dkt. No. 161-3 at 18-19; *see also* Dkt. No. 166 at 7 (Plaintiff noting he seeks the original recordings of Ms. Parker's interview with Mr. McNamara to "support an additional claim of defamation").) Thus, GateHouse contends the subpoena is an impermissible "fishing trip" to obtain information related to an as-of-yet unpleaded claim. (Dkt. No. 161-3 at 18-19.) Accordingly, GateHouse asserts granting Plaintiff access to Ms. Parker's records would violate the qualified reporters' privilege because the information is not relevant to a significant issue *currently* in the lawsuit. (*Id*.)

To the extent Plaintiff seeks these recordings merely because they may support a *new* claim against Mr. McNamara, the Court finds he cannot overcome the qualified reporters' privilege. Importantly, the information must be relevant to an *existing* issue in the lawsuit—to

9

provide otherwise would impermissibly transform members of the press into an investigative arm of litigants.  *See Gonzalez*, 194 F.3d at 36 (noting the qualified reporters' privilege ensures that the press is not used as "an investigative arm of the judicial system, the government, or private parties").

However, beyond simply supporting a new claim, Plaintiff suggests the recordings "would provide context and a complete understanding of the statements printed in the article." (Dkt. No. 166 at 7.)  Accordingly, he argues the recordings could be compared against the "facts known to [Mr. McNamara] at the time they were made" to help prove Mr. McNamara made these statements with disregard for their truth.  (*Id*. at 9.)

Based on this rationale, the Court finds it is a close call regarding whether the original recordings satisfy the "twin requirements of relevance and significance" necessary to overcome the qualified reporters' privilege.  *In re McCray, Richardson, Santana, Wise, & Salaam Litig*., 928 F. Supp. 2d 748, 757 (S.D.N.Y.), *aff'd sub nom. In re McCray, Richardson, Santana, Wise, Salaam Litig*., 991 F. Supp. 2d 464 (S.D.N.Y. 2013).

To that end, the recordings are likely relevant to establish what Mr. McNamara knew about Plaintiff's case at the time he made his statements to Ms. Parker.  Under Plaintiff's theory, Mr. McNamara knew Plaintiff had been framed when he spoke to Ms. Parker yet provided untrue statements to create the public perception Plaintiff was guilty and his office did not act inappropriately.  (Dkt. No. 166 at 9; *see also* Dkt. No. 33 at ¶¶ 703-40.)  On the other hand, Mr. McNamara has contended the statements he made to Ms. Parker were true.  (Dkt. No. 129 at ¶ 9.) Whether Mr. McNamara gave false statements to Ms. Parker is a significant issue relative to his defamation claim to prove malice.  Thus, the recordings are likely direct evidence of a significant

10

issue, namely, Mr. McNamara's knowledge of Plaintiff's case at the time he made the statements to Ms. Parker.

Moreover, Mr. McNamara described the information he knew regarding Plaintiff when Ms. Parker interviewed him in an affidavit in a related case. (Dkt. No. 161-2 at 6-24.) Thus, Mr. McNamara's original statements to Ms. Parker could be used to impeach Mr. McNamara and establish he knew more (or less) about Plaintiff's case than what Ms. Parker printed and what he noted in his affidavit. Therefore, the recordings could be used as impeachment material as well as direct evidence that could help Plaintiff prove Mr. McNamara was aware the statements he made to Ms. Parker were untruthful. In other words, this is not a case were the information sought in the subpoena is merely duplicative or serving a "solely cumulative purpose." *United States v. Burke*, 700 F.2d 70, 76 (2d Cir. 1983).

In sum, it is a close call regarding whether a recording of the statements Mr. McNamara said to Ms. Parker would be relevant to a significant issue in this case. Nonetheless, even were the Court to find the original recordings are relevant to a significant issue in the case, Plaintiff has failed to establish the second requirement to overcome the qualified reporters' privilege, *i.e.*, that the relevant information requested in the subpoena is not available from other sources.

Plaintiff argues Ms. Parker's recording is the only source of Mr. McNamara's "original statements," and he cannot attempt to obtain the requested information elsewhere. (Dkt. No. 166 at 10.) It is true the putative recordings are likely the only source of Mr. McNamara's "original statements." However, Plaintiff fails to frame the issue of availability as it relates to the specific relevant information. As discussed above, the relevance of the original recordings is Mr. McNamara's knowledge about Plaintiff's case when he spoke to Ms. Parker. Thus, the key question is whether information relevant to Mr. McNamara's knowledge of Plaintiff's case at

that specific time is unavailable from other sources. Understood in this way, it is evident Plaintiff has yet to fully exhaust the possible sources of that information.

Specifically, Plaintiff has yet to complete the deposition of Mr. McNamara and/or the other individuals involved in his prosecution. Plaintiff can examine Mr. McNamara about the information he knew before he spoke to Ms. Parker. Furthermore, Plaintiff is also in the process of deposing the relevant Utica Police Officers and Oneida County Assistant District Attorneys and questioning them regarding what they shared with Mr. McNamara and when. Taken together, Plaintiff may be able to produce a clear understanding of what Mr. McNamara knew when Ms. Parker interviewed him.

Notably, "[e]stablishing unavailability [] require[s] a showing that [Plaintiff] attempted to obtain the information from another source, or cannot obtain the information from another source." *In re McCray*, 928 F. Supp. 2d at 758. Accordingly, at this juncture, Plaintiff has failed to demonstrate the information he seeks in his subpoena is unavailable from another source. *See In re Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) (noting that, "[b]efore a reporter's resources can be tapped by subpoena, the party seeking the information must demonstrate that other available sources of the information have been exhausted").

In sum, the Court finds the Subpoena seeks information privileged from discovery.

### III.   MOTION FOR COSTS

The Court finds GateHouse is not entitled to its costs related to this motion. Specifically, the Court notes this motion is the result of GateHouse's legal strategy to preemptively move to quash the Subpoena. Had GateHouse responded to the subpoena with an affidavit confirming no documents exist, it might have been able to avoid the Court's involvement in this matter entirely. Were Plaintiff then to file a motion to compel, the Court would have been more sympathetic to

GateHouse's request for its costs as a part of a hypothetical motion for a protective order under Federal Rule of Civil Procedure 26(c). Accordingly, GateHouse's motion for costs is denied.

## IV. CONCLUSION

For the reasons stated above, the Court finds the records Plaintiff seeks are privileged and, therefore, grants GateHouse's motion to quash. However, Plaintiff may, in the future, move the Court to endorse a non-party subpoena to Ms. Parker if he can raise a good faith basis to believe the records exist and are not privileged because they are relevant to a significant issue in this case and not reasonably available from other sources. The Court further finds GateHouse is not entitled to its costs. Accordingly, it is

**ORDERED** that GateHouse's motion for an Order to quash *pro se* Plaintiff's subpoena dated October 10, 2018, is hereby **GRANTED** without prejudice; and it is further

**ORDERED** that GateHouse's motion for costs is **DENIED**; and it is further

**SO ORDERED.**

Dated: September 6, 2019
       Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge