**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

VLADIMIR JEANTY,

                                    Plaintiff,                        6:16-cv-00966 (BKS/TWD)

v.

THE CITY OF UTICA; THE COUNTY OF ONEIDA;
MARK WILLIAMS, Chief of Police, Utica Police Dept.;
Police Officer MICHAEL F. CERMINARO, badge #1301;
Investigator PETER PALADINO, badge #6290; Lieutenant
SEAN DOUGHERTY, badge #2553; and Honorable
SCOTT D. MCNAMARA, Oneida County District
Attorney,

                                    Defendants.

**Appearances:**

Vladimir Jeanty
Uniondale, NY 11553
*Plaintiff, pro se*

Zachary C. Oren
First Assistant Corporation Counsel
One Kennedy Plaza
Utica, NY 13502
*Attorneys for Defendants City of Utica, Michael Cerminaro, Peter Paladino, and Mark Williams
(the "City Defendants")*

William P. Schmitt
Schmitt & Lascurettes, LLC
1508 Genesee Street, Suite 3
Utica, NY 13502
*Attorneys for Defendants Honorable Scott D. McNamara and County of Oneida (the "County
Defendants")*

David A. Bagley
Kernan Professional Group, LLP
1310 Utica Street
Oriskany, NY 13424
*Attorney for Defendant Sean Dougherty*

Hon. Brenda K. Sannes, United States District Judge:

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff pro se Vladimir Jeanty brings this action against Defendants under 42 U.S.C. §

1983 and New York law for alleged constitutional and tort injuries resulting from his arrest on

October 15, 2009 and subsequent prosecution, as well as a related news report. (Dkt. No. 33).

Following this Court's dismissal of certain claims and Defendants at the pleading stage, (Dkt.

No. 99), and Plaintiff's voluntary dismissal of his claims against several other Defendants, (Dkt.

No. 340), Plaintiff's remaining claims are: (1) two separate causes of action under 42 U.S.C. §

1983 for denial of a fair trial against Defendants Cerminaro, Paladino and Dougherty, the first

arising from his criminal proceedings, and the second arising from his post-conviction

proceedings; (2) two separate causes of action under 42 U.S.C. § 1983 and New York law for

malicious prosecution against Defendants Cerminaro, Paladino and Dougherty, the first arising

from his criminal proceedings, and the second arising from his post-conviction proceedings; (3) a

cause of action under 42 U.S.C. § 1983 for failure to intervene against Defendants Paladino and

Dougherty; (4) a *Monell* cause of action against the City of Utica; (5) two separate defamation

causes of action under New York law against Defendants McNamara and the County of Oneida,

the first arising from an August 2015 article by the Utica Observer-Dispatch (the "Observer-

Dispatch"), and the second arising from a May 2016 affidavit by Defendant McNamara; and (6)

a defamation cause of action under New York law against Defendants Cerminaro and the City of

Utica arising from Defendant Cerminaro's October 15, 2009 deposition supporting criminal

charges against Plaintiff (the "Supporting Deposition"). (Dkt. No. 33, at ¶¶ 630-790).

Currently before the Court are three separate motions for summary judgment brought by

the City Defendants, Defendant Dougherty, and the County Defendants, collectively seeking

dismissal of all of Plaintiff's remaining claims. (Dkt. Nos. 300, 307, 308).[1] Plaintiff has responded to all three motions, (Dkt. Nos. 317, 319, 325), and all Defendants have submitted replies, (Dkt. Nos. 343, 344, 346). Also before the Court are the following additional motions: (1) a motion by the City Defendants for an adverse inference due to Plaintiff's alleged spoliation of evidence, (Dkt. No. 310); (2) a motion by Plaintiff to disqualify counsel for the City Defendants, (Dkt. No. 334); and (3) a request by Plaintiff, pursuant to Fed. R. Civ. P. 56(d), to delay resolution of the summary judgment motions and allow him to take the depositions of several additional witnesses, (Dkt. Nos. 317-3, 319-3, 325-3). For the following reasons, the motions for summary judgment by Defendant Dougherty and the County Defendants are granted in their entirety; the City Defendants' motion for summary judgment is granted with respect to all of Plaintiff's claims against them except for his fabrication of evidence claims against Defendant Cerminaro (first and second causes of action) and his defamation claim against Defendants Cerminaro and the City of Utica (eleventh cause of action); and the other pending motions are denied.

## II.    FACTS[2]

### A.    Plaintiff's Arrest

On October 15, 2009, Plaintiff was parked in a rental vehicle by himself on Elm Street in Utica, New York. (Dkt. No. 300-38, at ¶ 1; Dkt. No. 325-1, at ¶ 1). Defendant Cerminaro, a police officer of the Utica Police Department who was patrolling the area in his vehicle, slowly

---

[1] Defendants attached to their summary judgment motions a "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," informing Plaintiff of the requirements for a proper response and the consequence of failing to file a proper response. (Dkt. No. 300-36; Dkt. No. 307-1; Dkt. No. 308, at 3-4).

[2] The following facts are drawn from Defendants' Statements of Undisputed Material Facts pursuant to Local Rule 7.1(a)(3), (Dkt Nos. 300-38, 307-15, 308-5), and Plaintiff's responses to those statements, (Dkt. Nos. 317-1, 319-1, 325-1), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

passed Plaintiff's parked vehicle and made eye contact with Plaintiff, then turned left onto

Hobart Street. (Dkt. No. 300-38, at ¶¶ 2-3; Dkt. No. 325-1, at ¶¶ 2-3; Dkt. No. 300-2, at 54).

Plaintiff then approached the intersection of Hobart and Elm Street facing south and observed

Defendant Cerminaro, who had made a U-turn or a 3-point turn and was now at the same

intersection facing west. (Dkt. No. 300-38, at ¶ 4; Dkt. No. 325-1, at ¶ 4). Plaintiff made a right

turn onto Hobart Street with Defendant Cerminaro following behind him. (Dkt. No. 300-38, at ¶

6; Dkt. No. 325-1, at ¶ 6). Plaintiff proceeded through a green light at the next intersection,

which was the intersection of Hobart and Kemble Street. (Dkt. No. 300-38, at ¶¶ 7-8; Dkt. No.

325-1, at ¶¶ 7-8). As Plaintiff approached the next intersection, Oneida Square, Defendant

Cerminaro activated his overhead lights, and Plaintiff made a right turn onto Oneida Street and

stopped at approximately 1321 Oneida Street. (Dkt. No. 300-38, at ¶¶ 8-10; Dkt. No. 325-1, at ¶¶

8-10). Plaintiff maintains that, up until this point, he had not violated any traffic regulations, and

believes that Defendant Cerminaro profiled him based on his race. (Dkt. No. 325-1, at ¶¶ 2, 4, 6,

7; Dkt. No. 300-2, at 53-58, 69).

Defendant Cerminaro parked his patrol car behind the vehicle Plaintiff was driving,

exited his car and approached Plaintiff's vehicle. (Dkt. No. 300-38, at ¶¶ 11-12; Dkt. No. 325-1,

at ¶¶ 11-12). Defendant Cerminaro asked Plaintiff for his license and registration, at which point

Plaintiff told him that the car was a rental and provided his driver's license and rental agreement.

(Dkt. No. 300-38, at ¶¶ 13-14; Dkt. No. 325-1, at ¶¶ 13-14). Defendant Cerminaro observed

several cell phones in the vehicle Plaintiff was operating; Plaintiff acknowledges that there were

five cell phones in his car at the time, but contends that only two were on the passenger seat and

visible to Defendant Cerminaro. (Dkt. No. 300-38, at ¶ 15 & n.5; Dkt. No. 325-1, at ¶ 15; Dkt.

No. 308-5, at ¶ 2; Dkt. No. 317-1, at ¶ 2). As Defendant Cerminaro continued to question Plaintiff,

including about whether there were illegal drugs in the vehicle, Plaintiff left the traffic stop without

Defendant Cerminaro's consent by putting his car in drive and driving away, leaving Defendant Cerminaro with Plaintiff's driver's license and rental agreement. (Dkt. No. 300-38, at ¶ 16; Dkt. No. 325-1, at ¶ 16; Dkt. No. 308-5, at ¶ 3; Dkt. No. 317-1, at ¶ 3). Plaintiff testified that he left the traffic stop because he believed that he had not violated any laws, that the traffic stop was illegal, and that Defendant Cerminaro was racially profiling him, all of which made him "very angry." (Dkt. No. 300-2, at 69; Dkt. No. 325-1, at ¶ 16).

Defendant Cerminaro radioed dispatch that Plaintiff had fled the stop, then returned to his patrol car and, with the lights activated on the patrol car, began to chase Plaintiff. (Dkt. No. 300-38, at ¶¶ 17-18; Dkt. No. 325-1, at ¶¶ 17-18; Dkt. No. 308-5, at ¶ 4; Dkt. No. 317-1, at ¶ 4). Seeing Defendant Cerminaro chasing him, Plaintiff drove through Oneida Square, turned right onto Park Avenue, and drove approximately 200 feet before putting the vehicle in park and exiting the vehicle near Joel's Spanish Food Restaurant. (Dkt. No. 300-38, at ¶¶ 18-20; Dkt. No. 325-1, at ¶¶ 18-20; Dkt. No. 308-5, at ¶ 4; Dkt. No. 317-1, at ¶ 4). Defendant Cerminaro exited his patrol car and followed Plaintiff on foot. (Dkt. No. 300-38, at ¶ 21; Dkt. No. 325-1, at ¶ 21; Dkt. No. 308-5, at ¶ 4; Dkt. No. 317-1, at ¶ 4). Plaintiff ran behind Joel's Spanish Food Restaurant and used a chain link fence gate to access the roof. (Dkt. No. 300-38, at ¶ 22; Dkt. No. 325-1, at ¶ 22). Defendant Cerminaro chased Plaintiff across several rooftops spanning a distance of approximately 250 feet. (Dkt. No. 300-38, at ¶¶ 23-25; Dkt. No. 325-1, at ¶¶ 23-25). Throughout the chase, Defendant Cerminaro was approximately 15 feet behind Plaintiff. (Dkt. No. 308-5, at ¶ 4; Dkt. No. 317-1, at ¶ 4).

Defendant Cerminaro contends that, during the course of the foot chase, he saw Plaintiff pull a large plastic bag from his waist band, rip the bag open with his teeth, and begin to eat and shake out an off-white substance from the bag, before jumping to the ground and discarding the bag. (Dkt. No. 300-38, at ¶¶ 25, 32; Dkt. No. 307-15, at ¶ 15; Dkt. No. 308-5, at ¶ 5). Plaintiff

maintains that this never happened, and that he never had such a bag in his possession. (Dkt. No. 325-1, at ¶ 32; Dkt. No. 319-1, at ¶ 15; Dkt. No. 317-1, at ¶ 5). Contemporaneous police radio communications reflect that Defendant Cerminaro did not report Plaintiff pulling out, tearing open or discarding a bag while the chase was occurring, but that after the chase was over, Defendant Cerminaro requested a ladder because Plaintiff "threw several items on the roof." (Dkt. Nos. 319-8, 325-8).

After jumping to the ground and (according to Defendant Cerminaro) discarding the bag, Plaintiff ran down an approximately 200-foot driveway leading to Kemble Street, with Defendant Cerminaro still chasing him. (Dkt. No. 300-38, at ¶ 25; Dkt. No. 325-1, at ¶ 25). Seeing police officers coming up Kemble Street from Hobart Street and coming down Kemble Street from Eagle Street, Plaintiff ran behind the back of the home located at 1223 or 1224 Kemble Street, where he was apprehended by police officers. (Dkt. No. 300-38, at ¶¶ 26-27; Dkt. No. 325-1, at ¶¶ 26-27; Dkt. No. 308-5, at ¶ 6; Dkt. No. 317-1, at ¶ 6). After arresting Plaintiff, officers brought him to the front of 1224 Kemble Street. (Dkt. No. 325-1, at ¶ 28).

After Plaintiff was arrested, Defendant Dougherty, who was then a Utica Police Sergeant and Patrol Supervisor, arrived on the scene. (Dkt. No. 307-15, at ¶¶ 8-9; Dkt. No. 319-1, at ¶¶ 8-9). After seeing Plaintiff in front of 1224 Kemble Street, Defendant Dougherty directed that Plaintiff be placed in a police vehicle and driven to Utica Police Headquarters. (Dkt. No. 307-15, at ¶ 9; Dkt. No. 319-1, at ¶¶ 9; Dkt. No. 300-38, at ¶¶ 28-29; Dkt. No. 325-1, at ¶¶ 28-29; Dkt. No. 308-5, at ¶ 6; Dkt. No. 317-1, at ¶ 6). Defendant Dougherty did not otherwise observe Plaintiff's arrest or the events leading to it. (Dkt. No. 307-15, at ¶ 11; Dkt. No. 319-1, at ¶ 11).

At some point following Plaintiff's arrest, officers searched Plaintiff's person and discovered that he was carrying $1,739.00 in U.S. currency, though the parties dispute whether

this discovery occurred at the scene of the chase or later while Plaintiff was held at the police station. (Dkt. No. 300-38, at ¶ 30; Dkt. No. 325-1, at ¶¶ 29-30; Dkt. No. 308-5, at ¶ 9; Dkt. No. 317-1, at ¶ 9).

      **B.**    **Drug Evidence Found at the Chase Scene**

      According to Defendant Cerminaro's account of events, after Plaintiff was arrested, he returned to the area where Plaintiff had jumped off the roof and found a torn, corner-knotted plastic bag, which he immediately secured. (Dkt. No. 300-38, at ¶ 31). Plaintiff admits, for purposes of the pending motions, that Defendant Cerminaro "may have found an alleged torn plastic bag somewhere in the area of the chase," but denies that he ever possessed the bag. (Dkt. No. 325-1, at ¶¶ 31, 36). Defendant Cerminaro maintains, at the time he collected the knotted bag, it contained a chunky and powder substance that was off white in color. (Dkt. No. 300-38, at ¶ 31; Dkt. No. 308-5, at ¶ 7). Plaintiff, by contrast, contends that the bag was empty, and that Defendant Cerminaro (alone or in concert with other Defendants) collected stray pieces of an off-white, chunky substance that were scattered across the ground and placed them in the empty, knotted bag. (Dkt. No. 325-1, at ¶¶ 31, 53; Dkt. No. 317-1, at ¶ 7). Plaintiff admits, however, that he did not personally see any Defendant do so. (Dkt. No. 300-38, at ¶ 54; Dkt. No. 325-1, at ¶ 54).

      Meanwhile, responding to Defendant Cerminaro's call for assistance, Defendant Paladino arrived on the scene on the Park Avenue side of Oneida Square, where he climbed onto the rooftop of Joel's Spanish Restaurant. (Dkt. No. 300-38, at ¶¶ 60-61). In his deposition, Defendant Paladino testified that he searched the rooftops where the chase had occurred for contraband, but did not find any. (Dkt. No. 300-30, at 23). He further testified that, from his vantage point on the rooftops, he saw Defendant Cerminaro on the ground searching for evidence, but he did not specifically see Defendant Cerminaro pick up any evidence off the

ground. (*Id.* at 25-30, 146-47). When he was finished searching for contraband, Defendant

Paladino returned to the ground on the Oneida Square side. (Dkt. No. 300-38, at ¶ 61; Dkt. No.

325-1, at ¶ 61). Then, on the Park Avenue side of Oneida Square, Defendant Paladino met

Defendant Cerminaro, who handed him the corner knotted torn plastic bag that Defendant

Cerminaro claimed to have retrieved from the ground on the chase route. (Dkt. No. 300-38, at ¶

62). Defendant Paladino testified that the only time he was on the Kimble Street side was when

he was exploring the rooftops; he never set foot on the ground of Kimble Street or the alleyway it

connects to, where Defendant Cerminaro allegedly discovered the bag. (*Id.* ¶ 63).[3]

Upon receiving the corner knotted torn plastic bag (which, at least by that point,

contained a white chalky substance) from Defendant Cerminaro, Defendant Paladino went back

to the Utica Police Station with the evidence in order to weigh and test the substance. (Dkt. No.

300-38, at ¶ 64; Dkt. No. 325-1, at ¶ 64). The substance was caught in the knot of the bag. (Dkt.

No. 300-38, at ¶ 65). In order to field test the substance and achieve a more accurate weight,

Defendant Paladino removed the substance from the bag before weighing and testing it. (*Id.* ¶

66). Defendant Paladino performed a field test on the substance, which tested positive for

cocaine. (*Id.* ¶ 67; Dkt. No. 308-5, at ¶ 8). He then weighed the substance on a calibrated scale,

and found that it weighed 1.2 grams in the aggregate. (Dkt. No. 300-38, at ¶ 68; Dkt. No. 308-5,

at ¶ 8). Defendant Paladino then sealed the substance in an evidence bag and placed it in the

Utica Police Department's narcotics safe. (Dkt. No. 300-38, at ¶ 68). However, he did not

---

[3] Plaintiff disputes this, insisting that "Defendant Paladino at some point was on Kemble St and assisted with the search for contraband and observed Defendant Cerminaro picking up evidence." (Dkt. No. 325-1, at ¶ 60). However, the evidence Plaintiff cites for support—including Defendant Paladino's deposition testimony and his testimony in Plaintiff's criminal proceedings—is consistent with Defendant Paladino's assertions that: (1) he was above Kimble Street at one point while searching the rooftops, but never stepped foot on the ground in the alleyway off Kimble Street while it was being searched, and that, (2) while he was on the rooftops, he observed Defendant Cerminaro collecting evidence, but did not see him pick any particular item of evidence off the ground. (*Id.*).

complete the official property detail log entry for the evidence until October 21, and in his deposition, he admitted that there is no documentation beyond his own testimony to prove that the evidence remained in the safe, and was not tampered with, between October 15 and October 21. (Dkt. No. 300-30, at 40, 69-71, 76-79, 191-96).

In January 2010, in connection with Plaintiff's criminal trial, the substance was sent to the New York State Police Forensic Investigation Center for further testing. The New York Lab Technician took photographs of the substance, which do not appear to show any dirt, leaves, grass, twigs or other organic material mixed with it. (Dkt. No. 300-38, at ¶ 56; Dkt. No. 325-1, at ¶ 56). Furthermore, lab testing of the substance found that the substance consisted only of 520 mg of cocaine and two common cutting agents, Levamisole and Caffeine, and did not find any dirt or other environmental contaminants mixed with the substance. (Dkt. No. 300-38, at ¶ 57; Dkt. No. 325-1, at ¶ 57; Dkt. No. 308-5, at ¶¶ 13, 26; Dkt. No. 317-1, at ¶¶ 13, 26).

### C.     The Allegedly Exculpatory Photographs

Shortly after Defendant Cerminaro secured the knotted bag from the chase scene (and before he gave it to Defendant Paladino), Defendant Dougherty spoke with Defendant Cerminaro about what had occurred. (Dkt. No. 307-15, at ¶ 13; Dkt. No. 319-1, at ¶ 13). Subsequently, Defendant Dougherty took photographs of the scene of Plaintiff's arrest and the surrounding area, as well of Plaintiff's car and its contents. (Dkt. No. 307-15, at ¶ 14; Dkt. No. 319-1, at ¶ 14; Dkt. No. 300-38, at ¶ 34). At one point, he directed Defendant Cerminaro to place the knotted bag on the ground where he had found it so that Defendant Dougherty could photograph it in its original place. (Dkt. No. 307-15, at ¶ 15; Dkt. No. 319-1, at ¶ 15). Defendant Dougherty testified that this was done in order to re-create the chase scene and show where Plaintiff and Defendant Cerminaro would have jumped off the roof of a building during the chase, and that

such re-creation is something that is sometimes done pursuant to normal police procedure. (Dkt. No. 307-15, at ¶ 16).

Defendant Dougherty maintains that he did not take these photographs for purposes of a case investigation or as evidence to be used in prosecuting Plaintiff, but because he was concerned that the circumstances of Plaintiff's arrest may lead to an administrative investigation regarding Defendant Cerminaro's use of force. (*Id.* ¶¶ 19-20).[4] Defendant Dougherty has testified that, while he has been trained as a police evidence technician, he was not acting in that capacity at the scene of Plaintiff's arrest. (*Id.* ¶ 12).

The photographs Defendant Dougherty took generally show the chase route, the knotted bag on the ground, a white chunky substance scattered across the ground along that route, and Plaintiff's rental vehicle with five cell phones on the vehicle's seat. (Dkt. No. 300-38, at ¶ 34). In addition to the photographs he took at the crime scene, Defendant Dougherty testified that he later took photographs of Plaintiff himself at the Utica Police Station where Plaintiff was being held, though Plaintiff recalls that these photographs were taken by a different police officer and avers that Defendant Dougherty never photographed him. (*Id.* ¶ 35; Dkt. No. 325-1, at ¶ 35; Dkt. No. 307-15, at ¶ 17; Dkt. No. 319-1, at ¶ 17). These photographs show minor injuries from the foot chase, and one picture shows what appears to be white powder on Plaintiff's black shirt. (Dkt. No. 300-38, at ¶ 35). Altogether, twenty-two photographs were taken in connection with Plaintiff's arrest. (Dkt. No. 300-38, at n.9 (explaining that Exhibit 6 to the City Defendants' motion, Dkt. No. 300-7, contains the complete set of relevant photographs); Dkt. No. 307-15, at ¶ 18 (agreeing); Dkt. No. 319-1, at ¶ 18 (agreeing that this is undisputed)).[5]

---

[4] No complaint regarding Defendant Cerminaro's use of force was ever made, and thus no such administrative investigation was ever conducted. (Dkt. No. 307-15, at ¶ 21; Dkt. No. 319-1, at ¶ 21).

[5] Throughout this decision, when referring to the photographs at issue, the Court cites to Exhibit 6 of the City Defendants' motion, which is contained on a CD that has been filed with the Court. (Dkt. No. 300-6). Other copies of

On October 20, 2009—five days after Plaintiff's arrest—Defendant Dougherty uploaded all twenty-two photographs into the Utica Police Department's Record Management System ("RMS"), an automated computer information system used to maintain offense, arrest, incident and reference file databases. (Dkt. No. 307-15, at ¶¶ 24, 26; Dkt. No. 319-1, at ¶¶ 24, 26). In an affidavit in support of his motion for summary judgment, Defendant Dougherty explains his reason for the five-day delay in uploading the photographs as follows:

> The day following [Plaintiff's] arrest I served a shift as Patrol Supervisor, the two days after that I was off, and following that I took a vacation day. There is no particular reason why I entered the photographs, which were not part of the case investigation or evidence, on October 20. However, I did not intentionally or purposefully delay entering the photographs into the RMS System.

(Dkt. No. 307-3, at ¶ 16). Once Defendant Dougherty uploaded the pictures, they could be accessed in the RMS system by using the assigned RMS Number, 09-52210, and selecting the "Photographs" tab. (Dkt. No. 307-15, at ¶ 29).

Despite Utica Police Department policies requiring evidence technicians to prepare reports describing their activities, Defendant Dougherty did not prepare any narrative or report describing the fact that he took photographs of the crime scene. (Dkt. No. 307-15, at ¶¶ 25, 28; Dkt. No. 319-1, at ¶¶ 25, 28). Defendant Dougherty's explanation for not doing so is that the photographs were not taken for purposes of being used as evidence in Plaintiff's criminal case, and that he was not acting as an evidence technician when he took the photographs. (Dkt. No. 307-15, at ¶¶ 25, 28). However, in his deposition, Mark Williams, Chief of the Utica Police Department, testified that any officer responding to a crime scene in any capacity would be expected to prepare a radio log or narrative describing their activities, and Defendant

---

the same photographs are included with Plaintiff's opposition filings. (Dkt. Nos. 317-10, 317-18, 317-19, 319-12, 319-13, 325-11, 325-14, 325-15).

Dougherty's failure to do so violated Utica Police Department policies. (Dkt. No. 300-32, at 43-44; Dkt. No. 319-27, at 85-87).

After uploading the photographs to the RMS system, Defendant Dougherty performed no other acts related to Plaintiff's arrest or prosecution until 2012, after Plaintiff's release from incarceration. (Dkt. No. 307-15, at ¶ 27; Dkt. No. 319-1, at ¶ 27). He did not testify in any of Plaintiff's criminal proceedings, did not make any representation or presentation to the District Attorney's office in connection with those proceedings, and did not otherwise participate in Plaintiff's indictment, prosecution or conviction. (Dkt. No. 307-15, at ¶¶ 38-40; Dkt. No. 319-1, at ¶¶ 38-40).

### D.   Cerminaro's Supporting Deposition and Plaintiff's Criminal Charges

Following Plaintiff's arrest, Defendant Cerminaro prepared a Supporting Deposition describing his encounter with Plaintiff. (Dkt. No. 300-3, at 2). Defendant Cerminaro wrote that he conducted a traffic stop of Plaintiff's vehicle after Plaintiff "fail[ed] to stop for a stop sign which is located at the intersection of Elm Street at Hobart Street." (*Id.*). The Supporting Deposition went on to describe the encounter as follows:

> I exited my patrol car and initiated conversation with the driver and sole occupant of the vehicle. Jeanty identified himself with a NYS driver license and told me that the vehicle was a rental and he was the person on the lease. While speaking with Jeanty, I took notice to his hands as they were shaking uncontrollably. I asked him if he was cold or nervous because his hands were shaking. Jeanty did not answer my question. I also took notice to [sic] several cell phones on the passenger side seat of his vehicle. When asked about the reason for having several cell phones, Jeanty put the vehicle in drive and fled the scene. I notified headquarters that I had a failure to comply and that the suspected vehicle was now traveling Northbound on Park Ave. Upon turning onto Park Ave, I saw that Jeanty had left the vehicle abandoned and was now fleeing on foot behind Joel's Spanish Food Restaurant (1225 Park Ave).
>
> I engaged in foot pursuit of Jeanty which lead up a chain link fence behind Joel's Restaurant and onto a first floor rooftop. While on this fist [sic] floor roof top, Jeanty had jumped onto the adjoining building's rooftop (2nd floor). While running across this rooftop, I saw Jeanty reaching into his waistband and pull out a large plastic bag. This plastic bag contained a large quantity of a white in color powder substance which had the

appearance and characteristics associated with cocaine. Jeanty placed this place bag in his mouth and began eating the substance all while tearing the bag open with his teeth.

Jeanty then jumped from the 2nd-floor rooftop to the ground and upon landing on the ground, he threw the remnants of the plastic bag to the ground. While still pursuing Jeanty on foot, I was able to grab a hold of him behind 1225 Kemble Street and place him in handcuffs, without further incident.

Multiple units were on scene assisting and I was able to turn physical custody over to Patrolman Logalbo.

I returned to the exact location where I saw Jeanty discard the plastic bag and retrieved this item which contained a quantity of a white in color powder and chunky substance. I secured this item under my exclusive custody and control where it was turned over to Investigator Paladino, while on scene on Park Ave.

(*Id.*). Nowhere in his Supporting Deposition did Defendant Cerminaro mention the fact that Defendant Dougherty had taken photographs of the scene, nor did he mention that he and Defendant Dougherty had seen additional substance scattered along the chase route outside of the recovered bag. (*Id.*). Defendant Cerminaro prepared several subsequent addendums to this narrative, none of which mentioned the photographs or additional contraband. (Dkt. No. 300-15, at 8-11).

Defendant Paladino also prepared a narrative describing his search of the rooftops, his recovery of the seized bag from Defendant Cerminaro, and his testing and weighing of the substance contained therein. (Dkt. No. 300-15, at 11). Defendant Paladino's narrative also does not mention any photographs being taken, or that additional contraband was found outside of the recovered bag. (*Id.*).

On the day of Plaintiff's arrest, relying on Defendant Cerminaro's Supporting Deposition and the evidence that had been collected and tested, Defendant Paladino charged Plaintiff with criminal possession of a controlled substance in the fifth and seventh degrees. (Dkt. No. 300-38, at ¶ 69; Dkt. No. 325-1, at ¶ 69).

E.      **Plaintiff's Criminal Proceedings**

On October 20, 2009, a preliminary hearing was held on Plaintiff's felony charges, at which Defendants Cerminaro and Paladino both testified. (Dkt. No. 308-3). In his testimony, Defendant Cerminaro provided an account of events that was largely consistent with his Supporting Deposition. (*Id.* at 5-27). He testified that, when he found the torn plastic bag on the ground, there was remnants of an "off-white, chunky substance and white-colored, powdery substance" in the bag. (*Id.* at 24-25). He testified that the only evidence he collected and turned over to Defendant Paladino was the bag with the substance inside, and did not mention that he and Defendant Dougherty saw pieces of a white chunky substance on the ground outside the bag. (*Id.*). He further testified, that "[a]s soon as I picked up the bag, I immediately turned it over to Investigator Paladino," omitting the fact that he had first allowed Defendant Dougherty to take pictures of the bag in the place from which he retrieved it. (*Id.* at 10). He was not asked whether any photographs were taken at the scene, and did not mention the existence of any photographs. (*Id.* at 5-27). Defendant Paladino also gave an account consistent with his previous narrative, and did not mention the existence of photographs or contraband other than the bag Defendant Cerminaro gave him. (*Id.* at 27-35). At the conclusion of the preliminary hearing, Plaintiff was held for Grand Jury action. (*Id.* at 35).

On November 23, 2009, Assistant District Attorney ("ADA") Grant Garramone made a grand jury presentation regarding Plaintiff's criminal charges, at which Defendants Cerminaro and Paladino again testified. (Dkt. No. 308-4). Both Defendants again gave accounts that were substantially consistent with their testimony at Plaintiff's preliminary hearing. (*Id.*). Defendant Cerminaro was explicitly asked whether he was "able to locate anything else" besides the bag he had secured and its contents when searching the area of pursuit, and he responded "nothing." (*Id.* at 8). Defendant Cerminaro failed to mention that he and Defendant Dougherty had, in fact, seen

other bits of substance scattered on the ground on the chase route, which Defendant Dougherty photographed. (*Id.*). Again, neither Defendant was asked whether photographs of the scene had been taken, and neither mentioned the fact that Defendant Dougherty had taken such photographs. (*Id.* at 1-17). On November 24, 2009, the grand jury indicted Plaintiff on the charges of Criminal Possession of a Controlled Substance in the fifth and seventh degrees. (Dkt. No. 308-5, at ¶ 12; Dkt. No. 317-1, at ¶ 12).

Plaintiff's case proceeded to trial. Prior to, and on the first day of, Plaintiff's trial, his criminal attorney, Rebecca L. Wittman, made various discovery demands of the District Attorney's ("DA") Office, including demands for all photographs associated with Plaintiff's arrest. (Dkt. No. 308-5, at ¶ 16; Dkt. No. 317-1, at ¶ 16). The presiding judge, the Honorable Michael L. Dwyer, issued numerous orders directing that the DA's office provide any and all such photographs. (Dkt. No. 308-5, at ¶ 16; Dkt. No. 317-1, at ¶ 16). ADA Garramone and Kurt Schultz, the ADA who had assumed responsibility for Plaintiff's criminal prosecution after the grand jury proceedings, investigated and reported that their office was not in possession of any such photographs. (Dkt. No. 308-5, at ¶ 17; Dkt. No. 317-1, at ¶ 17). On the first day of Plaintiff's trial, Judge Dwyer ordered ADA Schultz to travel to the Utica Police Station in person, review the records of the Utica Police Department, and confirm once and for all that no such photographs existed. (Dkt. No. 308-5, at ¶ 17; Dkt. No. 317-1, at ¶ 17). No photographs were located from this review, and therefore none were turned over to Wittman. (Dkt. No. 308-5, at ¶ 17; Dkt. No. 317-1, at ¶ 17). Defendant Dougherty was not aware of Plaintiff's discovery requests or Judge Dwyer's discovery orders, and the photographs he took were never made available to the DA's office or turned over to Plaintiff's defense attorney. (Dkt. No. 307-15, at ¶¶ 34-35; Dkt. No. 319-1, at ¶¶ 34-35).

Defendants Cerminaro and Paladino once again testified at Plaintiff's criminal trial. At trial, in response to questioning, Defendant Cerminaro specifically testified that he did not call an evidence technician to photograph the evidence he collected, explaining that he "didn't see a need to" and "didn't want to leave [the bag] there unattended." (Dkt. No. 300-22, at 184-85, 188). He once again omitted the fact that Defendant Dougherty had, in fact, taken photographs of the bag with Defendant Cerminaro present. (*Id.*). Defendant Paladino also testified that he did not take any pictures of the recovered bag either at the scene or elsewhere, and when asked about the existence of photographs, did not mention the pictures taken by Defendant Dougherty. (*Id.* at 266-68). Once again, neither Defendant mentioned that other off-white chunky substances had been found scattered on the ground outside of the recovered bag. On March 25, 2010, at the conclusion of Plaintiff's trial, Plaintiff was found guilty on both charges upon which he was indicted, and on May 13, 2010, he was sentenced to 2.5 years of imprisonment. (Dkt. No. 308-5, at ¶ 15; Dkt. No. 317-1, at ¶ 15).

F.    **Post-Conviction Events and Proceedings**

1.    *Plaintiff's Receipt of the Allegedly Exculpatory Photographs*

On or about July 19, 2010, during Plaintiff's incarceration, in response to a Freedom of Information Law ("FOIL") request and a subsequent Article 78 proceeding initiated by Plaintiff in New York State Supreme Court, the City of Utica provided him with the twenty-two photographs taken on the date of his arrest. (Dkt. No. 308-5, at ¶ 18; Dkt. No. 317-1, at ¶ 18). Plaintiff subsequently filed a complaint with the Utica Police Department on January 1, 2011. Plaintiff was released from prison on August 2, 2012, after which he served one year of his 2-year post-release supervision sentence. (Dkt. No. 308-5, at ¶ 15; Dkt. No. 317-1, at ¶ 15).

2.    *The Secretly Recorded Meeting*

In June 2011, Defendant Dougherty was assigned to the Utica Police Department's

Professional Standards Bureau. (Dkt. No. 307-15, at ¶ 42; Dkt. No. 319-1, at ¶ 42). In that

capacity, in 2012, Defendant Dougherty was asked to assist the City of Utica Corporation

Counsel's office in connection with ongoing FOIL requests Plaintiff had filed. (Dkt. No. 307-15,

at ¶ 43; Dkt. No. 319-1, at ¶ 43). Defendant Dougherty testified that, in providing this assistance,

he became aware for the first time of Plaintiff's January 2011 complaint, which had been filed

before Defendant Dougherty was assigned to the Professional Standards Bureau. (Dkt. No. 307-

15, at ¶ 43). In June 2012, Defendant Dougherty called Plaintiff's complaint to the attention of

Defendant Williams in his capacity as the Chief of Police, who authorized Defendant Dougherty

to meet with Plaintiff and discuss the circumstances of his arrest and prosecution. (*Id.* ¶¶ 44-45;

Dkt. No. 319-1, at ¶¶ 44-45).

On December 21, 2012, Defendant Dougherty, Investigator Joseph Trevasani, and City of

Utica First Assistant Corporation Counsel Charles Brown met with Plaintiff, and Plaintiff

secretly recorded the meeting. (Dkt. No. 307-15, at ¶ 46; Dkt. No. 319-1, at ¶ 46). During the

meeting, Defendant Dougherty made several statements that Plaintiff contends indicate his

awareness that Defendant Cerminaro improperly collected loose contraband off the ground,

added it to the knotted bag and used it as evidence against Plaintiff, despite never having seen

Plaintiff possess this loose contraband. (Dkt. No. 319-1, at ¶ 47). Specifically, when shown

pictures of the white substance scattered across the ground, Defendant Dougherty agreed that his

officers collected that substance; he said that Defendant Cerminaro "may have picked some of

the loose pieces up and put them in [the] bag"; he said that "somebody should have picked" up

the scattered substance from the ground; and he said that that he "know[s] they picked up some

little pieces of residue, because it's in the property." (Dkt. No. 307-13, at 14, 28, 44). During this

conversation, Defendant Dougherty also stated that there was "obviously a disconnect between what was presented in court and what was [sic] actually happened at the scene," and that he did not know why his photographs were not entered into evidence or why Defendants Cerminaro and Paladino did not disclose the existence of those photographs in their testimony, but that he did not believe that either officer intentionally lied in their testimony or withheld relevant evidence. (*Id.* at 15, 21, 29-30, 38-39).

3.      *Plaintiff's § 440 Motion and Defendant McNamara's Investigation*

On March 8, 2015, Plaintiff filed a motion to vacate his conviction pursuant to § 440.10 of the New York Criminal Procedure Law. (Dkt. No. 307-15, at ¶ 48; Dkt. No. 319-1, at ¶ 48; Dkt. No. 308-5, at ¶ 20; Dkt. No. 317-1, at ¶ 20). Plaintiff attached to his motion the twenty-two photographs taken in connection with his arrest. (Dkt. No. 308-5, at ¶ 20; Dkt. No. 317-1, at ¶ 20). Plaintiff's motion was the first time the DA's office became aware of the existence of these photographs, as they had not been provided to the DA's office during Plaintiff's trial or at any time prior to March 2015. (Dkt. No. 308-5, at ¶¶ 19-20; Dkt. No. 317-1, at ¶¶ 19-20). Shortly thereafter, Defendant McNamara received a phone call from Judge Dwyer, in which Judge Dwyer expressed concern that Plaintiff's conviction may result in his deportation to the Congo, and asked Defendant McNamara to consider consenting to the motion and giving Plaintiff a dispensation that would not result in Plaintiff's deportation. (Dkt. No. 300-38, at ¶¶ 73-75).

After receiving this phone call, Defendant McNamara began investigating the circumstances of Plaintiff's case. As part of his investigation, he questioned several ADAs who were involved and reviewed records from the Utica Police Department and his own office regarding Plaintiff's prosecution. (Dkt. No. 308-5, at ¶ 22). Defendant McNamara also contacted the Utica Police Department to determine how photographs were maintained in its record management system. (*Id.* ¶ 24; Dkt. No. 317-1, at ¶ 24). He also directed ADA Garramone to

review the test results of the contraband collected at the time of the Plaintiff's arrest to determine

whether any dirt or environmental contaminants were in the contraband used in Plaintiff's

prosecution. (Dkt. No. 308-5, at ¶ 26; Dkt. No. 317-1, at ¶ 26). Garramone did so, and confirmed

that the lab reports revealed no evidence of such contaminants. (Dkt. No. 308-5, at ¶ 26; Dkt. No.

317-1, at ¶ 26).

      In May 2015, in connection with this investigation, ADA Garramone directed Defendant

Dougherty to prepare a narrative concerning his involvement in Plaintiff's arrest and,

specifically, his taking of photographs that were never turned over to the DA's office. (Dkt. No.

307-15, at ¶ 49; Dkt. No. 319-1, at ¶ 49; Dkt. No. 308-5, at ¶ 25; Dkt. No. 317-1, at ¶ 25). In his

narrative, Defendant Dougherty described his arrival on the scene following Plaintiff's arrest and

his discussions with Defendant Cerminaro. (Dkt. No. 307-3, at 37). The narrative went on to

explain his decision to take photographs and subsequent events, in pertinent part, as follows:

> I knew that typically, the Metro Unit didn't take photographs of drug evidence at the
> time, however because of the pursuit, potential for injury (to both the suspect and
> Cerminaro) and the possibility that I would eventually have to complete some type of
> administrative investigation, I took photographs of the scene. While I was taking these
> photographs, I asked Cerminaro to place the bag exactly where he found it so I could
> document it's [sic] location in relation to the second roof top Jeanty jumped from during
> the pursuit. I don't believe that Metro Investigator Peter Paladino ever saw me take any
> photographs, which is why he probably testified the way he did during Jeanty's court
> appearances.

(Dkt. No. 307-3, at 37-38). Defendant Dougherty's narrative then recounted his discovery of

Plaintiff's January 2011 complaint, as well as a subsequent discussion with ADA Schultz in

which Defendant Dougherty "attempt[ed] to make him aware of [Plaintiff's] allegations and the

extent of my involvement"; Schultz "dismissed [his] concerns, basically saying not to worry

about it."[6] (*Id.* at 38). The narrative also described Defendant Dougherty's December 2012 meeting with Plaintiff and stated that, at that meeting, he told Plaintiff that "there was no conspiracy, I took the photographs and was present at the time of his arrest," and that he "would testify to that fact" "if need be." (*Id.* at 38-39).

At some point,[7] Defendant McNamara and members of his staff met with Defendants Cerminaro, Paladino and Dougherty and interrogated them concerning their involvement in Plaintiff's case. (Dkt. No. 308-5, at ¶ 23). Defendant McNamara testified that, at the time of this meeting, he was considering bringing perjury charges against one or more of the officers in connection with their false testimony at Plaintiff's criminal trial. (Dkt. No. 300-16, at 72-73, 79; Dkt. No. 300-17, at 24-25). In their depositions, Defendant McNamara and ADA Garramone (who was also at the meeting) testified that, under questioning, Defendant Cerminaro insisted that he continued to have no recollection of any pictures being taken, even after being shown the pictures and acknowledging that his feet were visible in one of them. (Dkt. No. 300-16, at 75, 82, 86-87, 129, 133-34; Dkt. No. 300-18, at 100-03). They also testified that Defendant Paladino told them he was never aware of any photographs being taken, and may not have been present when they were taken at the scene. (Dkt. No. 300-16, at 74-75, 80; Dkt. No. 300-18, at 80, 101, 104, 140). During the meeting, the officers also advised McNamara regarding their recollection of the size of the contraband they observed and collected during Plaintiff's arrest. (Dkt. No. 308-5, at ¶ 23). Based on this meeting and the rest of Defendant McNamara's investigation, he concluded

---

[6] In his deposition, Schultz denied that such a conversation with Defendant Dougherty ever occurred. (Dkt. No. 300-20, at 81-82, 84).

[7] The County Defendants' Statement of Material Facts places this meeting on July 28, 2015. (Dkt. No. 308-5, at ¶ 23). However, as discussed further below, Defendant McNamara described his conclusions regarding Defendants Cerminaro and Paladino's recollection of the photographs at a hearing in May 2015. (Dkt. No. 317-14, at 8-9). This appears to suggest that Defendant McNamara's interrogation of these officers actually took place much earlier, and that the July 2015 meeting referenced in Defendant McNamara's deposition testimony was a different, subsequent meeting. In any event, the precise sequence of events is not material for purposes of the present motions.

that the explanations provided by the officers made sense, and that Defendants Cerminaro and

Paladino had not committed perjury during Plaintiff's criminal proceedings. (Dkt. No. 308-5, at ¶

27; Dkt. No. 317-1, at ¶ 27; Dkt. No. 307-15, at ¶ 53; Dkt. No. 319-1, at ¶ 53).

          4.     *Plaintiff's Post-Conviction Court Proceedings*

On May 18, 2015, while Defendant McNamara's investigation into Plaintiff's case was

ongoing, oral argument on Plaintiff's § 440 motion was held before the Hon. Barry M. Donalty

of the Oneida County Court.[8] (Dkt. No. 317-14). Defendant McNamara appeared personally to

argue the motion on behalf of the DA's office. (*Id.* at 7-9). During his argument, he explained

that, based on his interviews with Defendants Cerminaro and Paladino, Defendant Paladino "was

not even there when the pictures were taken," and Defendant Cerminaro "conceded he was

there" and acknowledged that "obviously they took pictures because my feet are in the picture,"

but maintained that he "[did not] remember [Defendant Dougherty] taking pictures." (*Id.* at 8-9).

Following oral argument, Judge Donalty ordered an evidentiary hearing on Plaintiff's § 440

motion that was limited to the question of whether the failure to produce the photographs during

Plaintiff's trial constituted a *Brady*[9] or *Rosario*[10] violation, while making clear his conclusion

that all the other allegations underlying Plaintiff's motion were "speculation" with no factual

support. (*Id.* at 9-10; *see also* Dkt. No. 325-21 (declaration from Judge Donalty reiterating that

his decision to vacate Plaintiff's conviction was based solely on a potential violation of *Brady*

and/or *Rosario*)).

---

[8] Because some of the allegations underlying Plaintiff's § 440 motion included accusations against Judge Dwyer, Judge Dwyer recused himself and transferred the case to Judge Donalty for purposes of adjudicating the motion. (Dkt. No. 317-14, at 4).

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

[10] *People v. Rosario*, 9 N.Y.2d 286 (1961).

On June 29, 2015, ADA Garramone, at the direction of Defendant McNamara, consented to an order vacating Plaintiff's judgment of conviction, and the conviction was vacated. (Dkt. No. 308-5, at ¶ 28;[11] Dkt. No. 317-1, at ¶ 28; Dkt. No. 317-20). On the record, Garramone did not provide reasons for the DA's office's decision to consent to the vacatur. (*Id.*). In his deposition, Defendant McNamara testified that he did not believe that the withheld photographs were *Brady* or *Rosario* material, but that Plaintiff nonetheless should have received the photographs during his trial pursuant to the DA's office's policy of turning over a defendant's entire file to the defense, and thus that vacating Plaintiff's conviction was the just approach. (Dkt. No. 300-16, at 59-60, 98-100, 113-14). Plaintiff's indictment was not dismissed at that time, and the case was returned to Judge Dwyer's trial calendar for retrial. (Dkt. No. 308-5, at ¶ 28; Dkt. No. 317-1, at ¶ 28; Dkt. No. 317-20).

During the re-trial process, the DA's office offered to resolve Plaintiff's case by allowing him to plea to a disorderly conduct charge, and Plaintiff's assigned attorney recommended that he accept the offer, but he refused. (Dkt. No. 300-13, at 7). At a hearing on July 27, 2015, Judge Dwyer and Plaintiff discussed Plaintiff's refusal to accept the plea. Plaintiff informed Judge Dwyer, in substance, that he could not accept a plea because he believed that a criminal conviction of any kind could result in his deportation to the Congo, where his life could be threatened. (*Id.* at 7-18).

On August 10, 2015, at a hearing before Judge Dwyer, Defendant McNamara appeared and moved to have Plaintiff's indictment dismissed in the interests of justice pursuant to § 210.40 of the Criminal Procedure Law. (Dkt. No. 308-5, at ¶ 29; Dkt. No. 317-1, at ¶ 29). Defendant McNamara explained that he did "not believe the police intentionally lied" and did

---

[11] The County Defendants' Statement of Material Facts references the incorrect date of July 27, 2005.

"not believe the intent of the police were trying to hide anything [sic]," but nonetheless that he believed that Plaintiff "should have had those pictures" and that they "would have been able to support his claim," even though the "evidence was pretty clear of what took place in that he was in a traffic stop, possessed cocaine and ultimately was convicted of that." (Dkt. No. 325-13, at 5-6). Defendant McNamara went on to explain the various factors forming the basis for his motion to dismiss the indictment, which included the following: (1) Plaintiff had been charged only with possession of a controlled substance, and had already served his full prison term for that crime; (2) the drug evidence used at Plaintiff's trial had already been destroyed pursuant to a court order, which would be a "serious hindrance" to the prosecution on retrial;[12] (3) Plaintiff was "not a known drug dealer in this community," was "not involved in any violent crime as typically associated with drug dealing," had a "family" and "job," and "has been crime free since being released from prison"; and (4) "a conviction of any type would result in [Plaintiff] being deported," which was "not what [the DA's office was] looking for in this case, nor was it ever a situation that [the DA's office was] looking for." (Dkt. No. 325-13, at 6-9). Plaintiff's attorney stated that he "did a similar assessment of the factors relating to an interest of justice dismissal" and that Defendant McNamara's analysis "very closely tracks the assessment that I had of those same factors." (*Id.* at 9). Plaintiff himself opposed the relief, arguing that he had been convicted based on police misconduct and insisting on proceeding with the retrial so that he could have the opportunity to prove his allegations. (*Id.* at 9-16).

---

[12] In November 2011, the DA's office had obtained a court order authorizing the destruction of the contraband introduced at Plaintiff's trial, and the contraband was subsequently destroyed. (Dkt. No. 308-5, at ¶ 14; Dkt. No. 317-1, at ¶ 14). Plaintiff alleges that the DA's office obtained this order using a supporting affidavit that falsely stated that there was no appeal pending from Plaintiff's conviction, when in fact such an appeal was pending. (Dkt. No. 317-1, at ¶ 14).

After hearing the arguments, Judge Dwyer granted Defendant McNamara's motion and dismissed Plaintiff's indictment, stating that he "agree[d] with all of the statements that have been made by Mr. McNamara," that "[i]f there was a second conviction I would not give [Plaintiff] anymore jail or prison time," that Plaintiff "has family that he works very hard in supporting," and that "he's done well for himself" and is "working to better himself." (*Id.* at 16-17). Judge Dwyer also stated that "the Court is not saying that . . . it does not feel that there was sufficient evidence on the record to support the original conviction." (*Id.* at 17).

### G.   McNamara's Alleged Defamation of Plaintiff

On or about August 12, 2015, Defendant McNamara spoke with reporter Micaela Parker at the Observer-Dispatch regarding Plaintiff's case and the dismissal of his conviction. (Dkt. No. 308-5, at ¶ 30; Dkt. No. 317-1, at ¶ 30). Thereafter, the Observer-Dispatch published an article online on August 12, 2015, and in its print edition on August 13, 2015. The online version of the article reads, in its entirety, as follows:

> Nassau County resident Vladimir Jeanty served as his own attorney for about six months in an attempt to get a 2010 conviction dismissed.
>
> On Monday he was successful, but he wasn't happy about it.
>
> "I wanted a retrial, because had I had a retrial it would have came out that the officer and investigators manufactured the crime, they made up the charges." Jeanty said. "And I have proof of that. My reasoning going to trial again was that I wanted to introduce this info that I didn't have in the original trial."
>
> Jeanty said he plans to appeal Judge Michael Dwyer's dismissal of the case. In 2010, he served a 2 1/2-year state prison sentence for his conviction of fifth-degree criminal possession of a controlled substance.
>
> The motion to dismiss was originally made in court by Oneida County District Attorney Scott McNamara.
>
> "I think it was the right thing to do even though he's a bit of a difficult individual, it was the right thing to do in the interest of justice," McNamara said.

The case began in 2009 when Jeanty was being interviewed by a Utica police officer on Park Avenue during a traffic stop, Mr. McNamara said. When the officer questioned Jeanty on the six cell phones visible in the vehicle, Jeanty drove away before stopping at Oneida Square, climbing a building and running across a roof in an effort to evade police.

While he was running, Jeanty was ripping into a baseball sized bag of cocaine with his teeth and throwing pieces of it away, McNamara said. The cocaine was about the size of a marble when officers took him into custody.

Photos were taken of the smaller ball of cocaine, but the chunks reportedly bit off were never photographed or collected. The photos were never turned over to the District Attorney's Office, so the evidence wasn't included in trial, among other concerns.

McNamara said the photos are a violation of discovery because the prosecution is required to hand over any photos taken during the investigation to the defense. Jeanty claims that the police planted the cocaine visible in the photos, and that the other chunks of cocaine never existed.

"Though I don't agree with him, it could substantiate his claim there wasn't crack on the ground, making it Brady material, meaning it could be favorable to the defendant," McNamara said.

The cocaine in evidence was destroyed following Jeanty's conviction, as is standard for the office.

(Dkt. No. 33-3, at 2-3). The print version of the article is substantially identical, except that the seventh paragraph ends with, "Jeanty drove away before stopping at Oneida Square, climbing a building and running across a roof in an effort to evade police, *officials said*." (Dkt. No. 33-4, at 2 (emphasis added)).

On May 13, 2016, Defendant McNamara submitted an affidavit in support of a motion seeking dismissal of Plaintiff's complaint against him and the County of Oneida in New York State court proceedings. (Dkt. No. 33-5). In his affidavit, Defendant McNamara made statements that Plaintiff alleges are defamatory, including statements averring Defendant McNamara's belief that Plaintiff was guilty of possession of illegal narcotics and that one of the photographs withheld during Plaintiff's criminal case appears to depict Plaintiff with cocaine on his black shirt. (Dkt. No. 33, at ¶¶ 741-47).

25

### III.     STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where the plaintiff proceeds pro se, the Court must read his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV.   SUMMARY JUDGMENT MOTIONS

### A.   Preliminary Evidentiary Issues

As a preliminary matter, in their reply to Plaintiff's opposition, the City Defendants raise objections to several pieces of evidence Plaintiff relies on, specifically: (1) the transcript and recording of his December 2012 meeting with Defendant Dougherty and others, and (2) an affidavit from Plaintiff's criminal defense attorney, Rebecca Wittman. (Dkt. No. 346-2, at 10-11, 20-22). Plaintiff's opposition submissions included an affidavit describing the December 2012 recording and transcript that attempts to demonstrate their authenticity and admissibility, (Dkt. No. 317-4, 319-4, 325-4), but he has not had a meaningful opportunity to respond to the City

Defendants' specific objections.[13] In any event, as will become clear from the analysis below, neither piece of evidence is dispositive on any of the conclusions the Court reaches. Therefore, the Court will consider them as part of the record for purposes of the summary judgment motions, without prejudice to any Defendant's right to object to their use at a subsequent stage of the proceedings.[14]

### B. Count I: Fair Trial Claim Against Defendants Cerminaro, Paladino and Dougherty Arising from Plaintiff's Criminal Conviction

Construed liberally, Plaintiff's fair trial claim against Defendants Cerminaro, Paladino and Dougherty may be reasonably read as proceeding under two separate legal theories: (1) a *Brady* claim based on these Defendants' failure to turn over the twenty-two allegedly exculpatory photographs[15] during Plaintiff's criminal trial; and (2) a fabrication of evidence claim based on Plaintiff's allegations that these Defendants picked up loose contraband off the ground along the chase route, improperly commingled it with an empty bag, and charged Plaintiff with possession of that contraband, relying on Defendant Cerminaro's false testimony that he had seen Plaintiff possess the bag. The Court evaluates both theories with respect to all three Defendants.

---

[13] Plaintiff attempted to file unauthorized sur-replies to Defendants' replies, (Dkt. Nos. 350-53), but as this District's Local Rule 7.1(b) does not permit sur-replies on summary judgment motions, these sur-replies were stricken from the record and have not been considered by the Court.

[14] Plaintiff states in his affidavit supporting his Rule 56(d) request that he has "concurrently filed an FRE 201(e) request to be heard on whether the Court should take judicial notice of the 8/10/2015 dismissal transcript and am requesting a hearing to determine the actual basis for dismissal of the indictment and the admissibility of that transcript." (Dkt. No. 317-3, at ¶¶ 25; Dkt. No. 319-3, at ¶¶ 25; Dkt. No. 325-3, at ¶¶ 25). Based on the Court's review of the docket, no such request has been filed.

[15] In his opposition to the City Defendants' motion, Plaintiff provides a litany of other evidence that he believes constitutes *Brady* material, but his list includes evidence that arose *after* Plaintiff's conviction (including statements Defendant Dougherty made during the secretly recorded December 2012 meeting) and references to "true observations" and "personal knowledge" of several Defendants with no ties to any concrete evidence existing at the time of Plaintiff's trial. (Dkt. No. 325, at 7-8). Plaintiff's contentions that certain Defendants fabricated evidence using loose contraband they found on the ground and falsely testified that Plaintiff had possessed it are addressed separately in the context of Plaintiff's fabrication of evidence claim.

1.      *Brady Claim*

The Second Circuit has recognized *Brady* violations as actionable under 42 U.S.C. §

1983. *Poventud v. City of New York*, 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc). "A classic

*Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused,

either because it is exculpatory, or because it is impeaching; that evidence must have been

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"

*Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (quoting *United States v.*

*Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). However, the Second Circuit has "never held that

anything less than an intentional *Brady* violation establishes a [civil] § 1983 due process claim

for damages." *Id.* at 118. The City Defendants and Defendant Dougherty argue that Plaintiff's

*Brady* claim must be dismissed because he cannot establish any of the foregoing three elements.

(Dkt. No. 300-39, at 9-22; Dkt. No. 307-16, at 8-11).

a.      Exculpatory or Impeachment Evidence

As to the first element, the City Defendants spend a significant portion of their briefing

on their contention that the photographs are not "exculpatory." (Dkt. No. 300-39, at 11-16).

However, they fail to address whether the photographs constitute impeachment evidence,

particularly in light of testimony during Plaintiff's criminal proceedings which suggested that no

contraband was located other than the knotted bag. (Dkt. No. 300-22, at 184-85, 188, 266-68;

Dkt. No. 308-4, at 8). For purposes of this analysis, the Court assumes, without deciding, that

Plaintiff has raised a genuine dispute of material fact as to the first element of his *Brady* claim.

b.      Intentional Suppression

i.      *Defendant Dougherty*

Plaintiff points to no record evidence from which a reasonable jury could find that

Defendant Dougherty intentionally, purposefully or willfully suppressed the photographs taken

on the day of Plaintiff's arrest. Plaintiff has, at most, established that Defendant Dougherty's delay of several days in uploading the photographs to the RMS, combined with his failure to prepare a radio log or narrative documenting the fact that those photographs were taken, violated the Utica Police Department's policies, and that these policy violations contributed to the fact that the photographs were never located and provided to the DA's office for production during Plaintiff's criminal trial. (Dkt. No. 307-13, at 39-40 (Defendant Dougherty's acknowledgment to Plaintiff, in a surreptitiously-recorded meeting, that he should have uploaded the pictures the day he took them, and that his failure to do so led to them not being available for Plaintiff's preliminary hearing); Dkt. No. 300-4, at 32, 136 (Defendant Dougherty's deposition testimony acknowledging that he did not complete a radio log as required by policy); Dkt. No. 300-5, at 40-41 (same); Dkt. No. 300-32, at 43-44 (Chief of Police Mark Williams' testimony that the failure to complete such a radio log violates police department policy); Dkt. No. 319-27, at 85-87 (same); Dkt. No. 300-4, at 34 (Defendant Dougherty's deposition testimony acknowledging that a radio log or narrative would have alerted "someone looking" to the fact that photographs existed)). Plaintiff has also raised evidence suggesting that Defendant Dougherty at some point reviewed Defendant Cerminaro's Supporting Deposition, which did not mention the existence of any photographs, and did not require him to amend his narrative to add the fact that photographs were taken. (Dkt. No. 300-4, at 88-91).

However, all of Defendant Dougherty's explanations for his actions contained in the record—including in his surreptitiously-recorded December 2012 meeting with Plaintiff, his May 2015 narrative prepared for ADA Garramone, his deposition testimony, and his affidavit in support of his summary judgment motion—have been consistent. Namely, Defendant Dougherty has always averred that he was not performing the role of an evidence technician while taking

30

the photographs;[16] that he took them in order to completely and accurately document the chase scene for purposes of a potential use-of-force investigation; that he did not view them as potential evidence for Plaintiff's criminal prosecution that needed to be documented pursuant to the policies applicable to evidence technicians; and that his five-day delay in uploading the photographs to the RMS was due to neglect and intervening vacation days. (Dkt. No. 307-13, at 9-10, 12, 17, 24-26; Dkt. No. 300-4, at 21-23, 28-29, 31-33, 44-45; Dkt. No. 307-3, at ¶¶ 8-9, 12, 13-14, 16 & p. 37-38). Plaintiff clearly does not believe these explanations, but points to no record evidence beyond his own speculation that would cast doubt on them, such as inconsistent explanations by Defendant Dougherty or contradictory statements by any other witnesses. While the Court may not evaluate Defendant Dougherty's credibility on a summary judgment motion, his consistent and uncontroverted testimony may serve as a basis for summary judgment in his favor where Plaintiff has adduced no evidence to rebut it. *Cf., e.g., Holmes v. City of New York*, No. 14-cv-5253, 2018 WL 1604800, at *5, 2018 U.S. Dist. LEXIS 53419, at *13-14 (S.D.N.Y. Mar. 29, 2018) (granting summary judgment on § 1983 claim based on officer's uncontroverted testimony regarding his policymaking authority); *Mackinney v. Burger King Corp.*, No. 05-cv-188, 2006 WL 3501142, at *2, 2006 U.S. Dist. LEXIS 87515, at *6-7 (E.D.N.Y. Dec. 4, 2006) (finding that, in the face of uncontroverted testimony rebutting constructive notice claim, "it was incumbent upon plaintiff to produce evidence raising a question as to the Defendant's constructive notice").

Moreover, other than neglecting to write a narrative documenting the existence of the photographs or require Defendant Cerminaro to do so, there is no evidence that Defendant

---

[16] Defendant Dougherty's assertion is consistent with Defendant Cerminaro's testimony at Plaintiff's trial that he never called an evidence technician to take photographs for use as evidence. (Dkt. No. 300-22, at 184-85, 188).

Dougherty took any action to suppress the photographs from Plaintiff's criminal proceedings. To the contrary, he uploaded them to the RMS (albeit five days after they were taken, but well in advance of Plaintiff's criminal trial and the associated discovery requests), where they could have been accessed by searching the assigned RMS number for Plaintiff's case and selecting the "Photographs" tab. (Dkt. No. 300-4, at 33-34; Dkt. No. 300-5, at 40-41 (Defendant Dougherty's testimony that uploading the photographs to the RMS is "the extent of what [he] would do" to fulfill his obligation to "provide all the evidence [he] had relating to the case of this incident to the prosecutor," other than preparing an accompanying radio log)).[17] Furthermore, as Plaintiff concedes, Defendant Dougherty played no role in Plaintiff's prosecution, never testified in any of Plaintiff's criminal proceedings, and was not aware of either Plaintiff's discovery requests or Judge Dwyer's orders requiring the production of photographs related to Plaintiff's arrest. (Dkt. No. 307-15, at ¶¶ 27, 34, 38-40; Dkt. No. 319-1, at ¶¶ 27, 34, 38-40). Thus, during Plaintiff's criminal proceedings, Defendant Dougherty had no opportunity to make the prosecution or Plaintiff's counsel aware of the photographs. The record is unclear as to the reason why the photographs were never identified and turned over to the DA's office during Plaintiff's criminal proceedings, but there is simply no evidence suggesting that Defendant Dougherty's intentional suppression of the photographs was that reason.

---

[17] Plaintiff cites the deposition testimony of Edin Selimovic, the Utica Police Department's Sergeant Unit Commander for Management Information Systems, for the proposition that "Defendant Dougherty was able to intentionally upload photograph and not be added to the 09-52210 RMS file by not adding a narrative." (Dkt. No. 319-1, at ¶¶ 28-30). However, even read in the light most favorable to Plaintiff, the cited portion of Selimovic's testimony merely suggests that Defendant Dougherty was not listed on the "officers" tab in Plaintiff's case file within the RMS because he was not included in the police report documenting Plaintiff's arrest and did not manually add himself to the list of involved officers. (Dkt. No. 319-23, at 80-81). It does not contradict Defendant Dougherty's testimony that the uploaded pictures were available on the "photographs" tab, or otherwise suggests that he did anything to hide the existence of these photographs.

Plaintiff's reliance on *Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019), is misplaced. In *Goudy*, an officer removed an exculpatory video from the police evidence room and retained it for 14 months with no explanation, returning it only after trial prosecutors tried and failed to locate it and the judge definitively blocked defense counsel from seeing the police reports describing it. *Id.* at 839-40. This case does not contain the same type of circumstantial evidence from which malicious intent can be inferred. Defendant Dougherty made the photographs available in the RMS only five days after he took them, and months in advance of Plaintiff's trial. His blunder was his failure to document his involvement with an accompanying narrative so that the photographs' existence would be obvious to anyone reviewing Plaintiff's case file. For the reasons discussed, there is no evidence suggesting that that failure was motivated by an intent to withhold the photographs from Plaintiff's criminal proceedings. Therefore, because Plaintiff has failed to raise a genuine issue of material fact as to Defendant Dougherty's intent, Defendant Dougherty is entitled to summary judgment on Plaintiff's *Brady* claim against him.

ii. *Defendant Paladino*

Plaintiff also has put forth no evidence suggesting that Defendant Paladino's failure to inform prosecutors of the existence of the photographs, or his trial testimony that he was not aware of any such photographs, was done with the intent to suppress the photographs. All of the relevant record evidence—including Defendant Dougherty's statements to Plaintiff during their December 2012 secretly recorded meeting; Defendant Dougherty's May 2015 narrative prepared for ADA Garramone; Defendant McNamara and Garramone's recollections from their interviews with all three Defendants during Plaintiff's post-conviction proceedings; and the deposition testimony of Defendants Paladino and Dougherty—suggests that Defendant Paladino did not interact with Defendant Dougherty at the scene of Plaintiff's arrest, did not observe Defendant Dougherty taking the photographs, and was not aware of their existence at the time of Plaintiff's

33

trial. (Dkt. No. 307-13, at 38; Dkt. No. 307-3, at 37; Dkt. No. 300-16, at 74-75, 80; Dkt. No. 300-18, at 80, 101, 104, 140; Dkt. No. 300-4, at 29, 31, 93-94, 169; Dkt. No. 300-30, at 27, 110, 122). Plaintiff has presented no evidence to the contrary. Thus, Defendant Paladino is entitled to summary judgment on Plaintiff's *Brady* claim against him as well.

### iii.    *Defendant Cerminaro*

The issue of whether Defendant Cerminaro acted with the intention of suppressing the photographs—by failing to inform prosecutors of their existence, and by not referencing them in his Supporting Deposition, subsequent narratives regarding Plaintiff's arrest, or testimony during Plaintiff's criminal proceedings—presents a closer question. Unlike Defendant Paladino, Defendant Cerminaro does not seriously dispute that he was with Defendant Dougherty when the photographs were taken, and thus was or should have been aware of their existence prior to Plaintiff's trial. (Dkt. No. 346-2, at 15 n.10 (confirming that "Defendant Cerminaro unquestionability [sic] admits being in the Kemble Street alleyway part of the crime scene" while Defendant Dougherty was taking photographs)). Defendant Cerminaro's explanation for his failure to disclose the photographs—both during interviews conducted by Defendant McNamara and his staff in connection with Plaintiff's post-conviction proceedings, and during his deposition in these proceedings—has consistently been that, at the time of Plaintiff's criminal proceedings and to this day, he simply did not, and does not, remember observing Defendant Dougherty take the photographs. (Dkt. No. 300-6, at 53-54, 63-65, 81, 90-91, 123-24, 154-55; Dkt. No. 300-16, at 75, 82, 86-87, 129, 133-34; Dkt. No. 300-18, at 100-03). Plaintiff has pointed to no concrete evidence to rebut this explanation.

However, given Defendant Cerminaro's presence during Defendant Dougherty's efforts to photograph the scene, his significant involvement in every stage of Plaintiff's criminal proceedings, and the specific, pointed questions about the existence of photographs he was asked

at Plaintiff's trial, (Dkt. No. 300-22, at 184-85, 188), a jury could reasonably find that his explanation for not disclosing the photographs' existence in his Supporting Deposition or at any subsequent point—that he forgot about the photographs almost immediately after they were taken, and *never* remembered them at *any* point throughout Plaintiff's criminal proceedings, even when specifically asked about photographs—stretches credulity. Thus, the Court finds that Plaintiff has raised a triable issue of fact with respect to the intent element of his *Brady* claim against Defendant Cerminaro.

> c.   Prejudice

Nonetheless, even though Plaintiff has raised a triable issue of fact as to the intent element with respect to his *Brady* claim against Cerminaro, and even assuming he could do so with respect to either or both of the other Defendants, his *Brady* claim against all three Defendants must fail because he has not raised a triable issue of fact as to the prejudice element. The prejudice element of a *Brady* claim is essentially an inquiry into the *materiality* of the withheld evidence. Undisclosed "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality:

> "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) . . . . [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."

*Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419,

434-35 (1995)). In the context of civil *Brady* claims under § 1983, the Second Circuit has

explained:

> To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed
> evidence, a showing that "does not depend on factual innocence, but rather what would
> have been proven absent the violation . . . [with] reference to the likely effect that the
> suppression of [the] particular evidence had on the outcome of the trial." *Poventud v. City
> of New York*, 750 F.3d 121, 134 (2d Cir. 2014) (en banc) (internal quotation marks and
> emphasis omitted). Stated differently, to show prejudice the claimant "must demonstrate
> a reasonable probability that, had the evidence been disclosed, the result of the
> proceeding would have been different." *United States v. Ulbricht*, 858 F.3d 71, 112 (2d
> Cir. 2017) (internal quotation marks omitted). For example, a § 1983 plaintiff proceeding
> on a *Brady* theory can succeed on his claim if, had the withheld information been
> disclosed prior to trial, "he would have been acquitted based on reasonable doubt or
> convicted on a lesser charge." *Poventud*, 750 F.3d at 134-35.

*Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019).

Here, the withheld photographs portray the route along which Defendant Cerminaro

chased Plaintiff. (Dkt. No. 300-7). They show a small, knotted bag on the ground, with

additional white chunky and powdery substance scattered along the chase route. (*Id.*). They also

depict Plaintiff's rental vehicle and the five cell phones discovered in the vehicle. (*Id.*). Several

pictures depict Plaintiff's injuries incurred during the chase, and one appears to show a white

powdery substance on his black shirt. (*Id.*). Overall, the pictures do not facially contradict, and

appear generally consistent with, Defendant Cerminaro's trial testimony that he stopped Plaintiff

in a vehicle containing multiple disposable cell phones, pursued Plaintiff after he fled from the

scene, and, during the chase, observed Plaintiff rip open a bag containing a white chunky and

powdery substance, pour it out as he ran, and discard it on the ground before being

apprehended.[18]

---

[18] Defendants argue that these photographs, had they been produced, would not have changed the outcome of
Plaintiff's trial. They present sworn affidavits from six of the jurors from Plaintiff's criminal trial who initially voted
to convict Plaintiff, and who have since reviewed the photographs. (Dkt. Nos. 300-23, 300-24, 300-25, 300-26, 300-

Plaintiff's only evidence to the contrary is an affidavit from the defense attorney who represented him in his criminal case, Rebecca Wittman. (Dkt. No. 325-17). In her affidavit, Wittman explains that, had the photographs been available during Plaintiff's trial, she would have used the photographs to impeach the testimony of Defendants Cerminaro and Paladino, and specifically their testimony that the knotted bag was the only contraband observed or collected at the scene of Plaintiff's arrest. (*Id.* ¶¶ 3-4). She further argues that, in one of the pictures, the torn plastic bag "appears to be empty," which raises "reasonable doubt as to whether the 1.2 grams of cocaine sought to be introduced at trial was actually discarded in a bag by Mr. Jeanty or was in fact collected from loose contraband on the ground." (*Id.* ¶ 10). She believes that her efforts could have led to the suppression of "certain evidence," "could have affected the jury verdict and may have led to an acquittal." (*Id.* ¶ 9). She states that her opinion "is based in part on the content of the 3/23/10 jury notes," but does not explain this statement further or reference any specific portion of the jury notes that supports her conclusion. (*Id.*).[19]

Wittman's affidavit explains how she could have used the photographs to defend Plaintiff at trial, impeach the credibility of the prosecution's key witnesses, and cast doubt on the validity of the drug evidence used to convict Plaintiff, either for purposes of an evidence suppression

---

27, 300-28, 300-29). Each juror avers that, after reviewing the photographs, they still believe Plaintiff is guilty beyond a reasonable doubt and would still vote to convict him. (*Id.*). One of the jurors, who identifies himself as the "final hold out for a not guilty verdict" at Plaintiff's trial, states that he believes the photographs "are more incriminating of [Plaintiff] as they depict his multiple disposable cell phones and white powder on his shirt," and that none of the facts that he believed supported a conviction "are in anyway [sic] undermined by the pictures." (Dkt. No. 300-24, at ¶¶ 8-12). Defendants also point out that, according to Plaintiff's own testimony, the attorney who represented him in his § 440 proceedings reviewed the photographs and, after doing so, made clear to Plaintiff that he believed Plaintiff was guilty and should accept a disorderly conduct plea. (Dkt. No. 300-8, at 214-15; Dkt. No. 300-9, at 92-93).

[19] Wittman also makes a number of contentions regarding her beliefs about how the photographs would have assisted Plaintiff had he been re-tried following the vacatur of his conviction, including in combination with other evidence post-dating Plaintiff's conviction, such as Defendant McNamara's deposition testimony and Plaintiff's recording of his December 2012 meeting with Defendant Dougherty. (*Id.* ¶¶ 5-8). These assertions are not relevant to the question of whether the failure to produce the photographs prejudiced him in his *original* trial, when the other evidence Wittman cites did not yet exist.

motion or before a jury at trial. When read in contrast to Plaintiff's prosecuting attorneys' concrete explanations of how they believe the photographs would have been beneficial to *their* case and supported a conviction,[20] Wittman's affidavit may raise a triable issue of fact as to whether the photographs should be considered "exculpatory" or "impeachment" evidence for *Brady* purposes. However, standing on its own, the affidavit does *not* support a finding that there is a "reasonable probability" that the outcome would have been different had the photographs been disclosed. Wittman's opinions that the jury at Plaintiff's trial would have been sufficiently swayed by her arguments regarding the photographs to rule in Plaintiff's favor, or that the presiding judge would have accepted her arguments and suppressed "certain evidence" from trial, are conclusory and unsupported by any concrete evidence.

To be sure, Wittman may very well have been able to use the photographs to cross-examine Defendants Cerminaro on certain issues, such as whether any contraband was observed on the ground outside the knotted bag Defendant Cerminaro collected. However, withheld impeachment evidence is only material for *Brady* purposes if it would "likely have placed the government's evidence against [Plaintiff] in such a different light as to undermine . . . confidence in the outcome of the trial." *Payne*, 63 F.3d at 1210. Here, Wittman offers no concrete reason why the photographs damage the credibility of officers so significantly as to raise a triable issue of fact regarding whether their introduction at trial would have led to a different outcome, particularly given that: (1) the photographs facially corroborate Defendant Cerminaro's

---

[20] Specifically, Defendant McNamara testified that he believed the photographs were generally favorable to the prosecution, and that had the pictures been available, the DA's office could have used them at trial to corroborate the police's testimony and clarify the prosecution's narrative for the jury. (Dkt. No. 300-16, at 262-65; Dkt. No. 300-17, at 27). ADA Garramone testified that the photograph of the cell phones found in Plaintiff's vehicle could have been used at trial to show that Plaintiff had fled the scene and left his personal belongings in the vehicle, and to suggest that Plaintiff was using "burner phones," a typical practice employed by drug dealers to evade detection. (Dkt. No. 300-18, at 169-71, 175-77). Kurt Schultz, the ADA who prosecuted Plaintiff, testified to his belief that the photographs would have directly undermined an argument Plaintiff's defense attorney made at trial regarding the lack of a photograph showing white powder on Plaintiff's black shirt. (Dkt. No. 300-20, at 25, 28).

testimony that he saw Plaintiff tear open a bag of contraband, scatter its contents, and discard the bag on the ground before being apprehended in the area in which the contraband was located;[21] (2) laboratory testing of the recovered contraband revealed no traces of environmental contaminants, undermining any argument (either before a jury or for purposes of an evidence suppression motion) that Defendant Cerminaro collected contraband from the ground and charged Plaintiff with it; (3) Defendant Paladino's testimony suggests he was never present on the ground in the alley where the contraband was located and the photographs were taken; and (4) the photographs do not call into question other key aspects of Defendant Cerminaro's testimony, including that he found Plaintiff driving a rental car containing multiple cell phones, that Plaintiff fled the scene when questioned and left his driver's license and rental agreement in Defendant Cerminaro's hands, and that Plaintiff led Defendant Cerminaro on a rooftop chase before being apprehended in the location where the contraband was found. *Cf., e.g.*, *Gonzalez v. U.S.*, No. 12-cv-5226, 2013 WL 4584794, at *15-16, 2013 U.S. Dist. LEXIS 123950, at *50-54 (S.D.N.Y. Aug. 29, 2013) (finding undisclosed impeachment evidence regarding an arresting officer's credibility may have led the jury to conclude that "he misrepresented some of the circumstances of an armed confrontation or shooting" he observed, but that the evidence nonetheless did not undermine the Court's confidence in the criminal defendant's gun possession conviction, as the conviction was supported by other evidence that "corroborated key aspects of

---

[21] Wittman asserts that the knotted plastic bag located at the scene of Plaintiff's arrest "appears to be empty" in one of the photographs, and that this raises "reasonable doubt as to whether the 1.2 grams of cocaine sought to be introduced at trial was actually discarded in a bag by Mr. Jeanty or was in fact collected from loose contraband on the ground." (*Id.* ¶ 10). The parties dispute whether the photograph depicts an empty bag or, instead, a small amount of contraband near the knot of the bag. Even assuming the jury agreed with Wittman that the photographs depict an empty bag with separate contraband strewn across the ground, Wittman offers no reason to believe that there is a "reasonable probability" that the jury would not simply have concluded that the "loose contraband on the ground" came from the bag, consistent with Defendant Cerminaro's testimony that Plaintiff had torn the bag open and spilled out its contents as he ran. Furthermore, a photograph of a seemingly empty bag is consistent with Defendant Paladino's trial testimony that Plaintiff was charged with a small amount of contraband that remained near the knot of the bag, rather than all the contraband that had initially been in the bag itself before being spilled out. (Dkt. No. 300-22, at 244).

[the officer's] testimony relevant to the gun possession charge," including "the recovery of two guns from the location" and the defendant's "capture shortly thereafter, in the area"), *report and recommendation adopted* 2013 WL 5289793, 2013 U.S. Dist. LEXIS 134303 (S.D.N.Y. Sept. 19, 2013). While it is often possible for skilled attorneys to find ways to successfully spin even seemingly damning evidence in their client's favor, here, Wittman's assertions that she would have been able to do so are insufficient to raise this possibility from the level of pure speculation to the level of "reasonable probability," and therefore fail to present a genuine issue of material fact sufficient to survive summary judgment.

Given the totality of the evidence, Plaintiff has not raised a triable dispute of fact as to whether there is a reasonable probability that the use of the photographs to impeach officers' testimony suggesting that no other contraband was found at the scene would have altered the jury's verdict. Therefore, all three Defendants are entitled to summary judgment on Plaintiff's *Brady* claim.

### 2. *Fabrication of Evidence Claim*

Fabrication of evidence claims relate to the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity." *Zehrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). Thus, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). The traditional elements for such a claim are: "(1) [an] investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir.

40

2012). Defendants argue that, in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), the Supreme

Court added a "favorable termination" element akin to the "favorable termination" element in a

malicious prosecution claim. (Dkt. No. 300-39, at 23-24). Defendants argue that Plaintiff has

failed to raise a triable issue of fact as to the "fabrication of evidence" or "favorable termination"

elements of his claim against all three Defendants. (*Id.* at 17-20; Dkt. No. 307-16, at 8 n.3).

a.    Fabrication of Evidence

i.    *Defendant Cerminaro*

Plaintiff's fabrication-of-evidence theory with respect to Defendant Cerminaro is that: (1)

while chasing Plaintiff, Defendant Cerminaro never saw Plaintiff possess any contraband at any

time; (2) after Plaintiff was apprehended, while searching the area, Defendant Cerminaro found

loose bits of a substance with the appearance of cocaine scattered across the ground; (3)

Defendant Cerminaro either found an empty knotted bag also lying on the ground, or had one on

his person; (4) Defendant Cerminaro picked up pieces of loose substance off the ground and

commingled them with the empty bag; (5) Defendant Cerminaro constructed a false narrative

that he had seen Plaintiff pull a bag out of his waistband, ripped it open and spilled out its

contents during the chase; (6) Defendant Cerminaro wrote this false narrative in his Supporting

Deposition and maintained throughout Plaintiff's criminal proceedings; (7) during Plaintiff's

criminal proceedings, Defendant Cerminaro did not reveal that contraband other than the bag had

been found at the chase scene, in order to conceal the fact that he had improperly commingled

the loose contraband with the bag; and (8) Defendant Cerminaro's false testimony and the

substance he had collected off the ground were improperly used as evidence to convict Plaintiff.

(Dkt. No. 317-1, at ¶¶ 5, 7-8; Dkt. No. 319-1, at ¶ 15; Dkt. No. 325-1, at ¶¶ 31-32, 34, 36, 53, 59,

65-66, 70).

Plaintiff's "commingling" theory rests on little more than speculation. Plaintiff concedes that he did not see Defendant Cerminaro, or anyone else, commingle loose contraband with an empty bag, and that Defendants Cerminaro and Paladino both testified that they did not do so. (Dkt. No. 300-38, at ¶¶ 53-54; Dkt. No. 325-1, at ¶¶ 53-54). Plaintiff also does not raise evidence challenging the New York State Police Forensic Investigation Center's findings that the substance used to charge Plaintiff contained no traces of grass, dirt, or other environmental contaminants. (Dkt. No. 300-19, at 2-43).

Plaintiff relies heavily on statements made by Defendant Dougherty in their secretly recorded December 2012 meeting which, Plaintiff argues, suggest that loose contraband on the ground was, in fact, observed, collected and possibly even added to the knotted bag in connection with Plaintiff's arrest. (Dkt. No. 307-13, at 14, 28, 44). However, the context of these statements and Defendant Dougherty's use of the third person make clear that Defendant Dougherty was not describing actions he personally participated in, but merely his imprecise understanding of evidence collection activities performed by others. (Dkt. No. 307-13, at 14, 28, 44). In his subsequent sworn deposition testimony and affidavit, Defendant Dougherty testified that the bag Defendant Cerminaro showed him already had white substance in it when Defendant Dougherty arrived on the scene; that Defendant Dougherty did not personally participate in the collection of evidence at the scene of Plaintiff's arrest; that Defendant Dougherty never saw Defendant Cerminaro or anyone else pick up materials from the ground and place them in the knotted bag; and that based on Defendant Dougherty's subsequent investigation into the circumstances of Plaintiff's case, he understands that the loose contraband was left on the ground and not collected, and that Plaintiff was charged based only on the substance found in the bag itself. (Dkt. No. 307-3, at ¶¶ 12, 26; Dkt. No. 300-4, at 20-21, 28-29, 45-46, 171-74; Dkt. No.

300-5, at 26). Taken in context of the entire record, the statements Plaintiff relies on can only be reasonably read as speculation about events Defendant Dougherty did not personally witness or participate in, not reliable statements establishing Defendant Dougherty's firsthand knowledge.

Plaintiff also relies heavily on certain statements in Defendant McNamara's deposition testimony, in which he described his questioning of Defendant Cerminaro during his 2015 investigation into Plaintiff's case. Specifically, Defendant McNamara testified that he "got the impression that [Defendant Cerminaro] found the bag and he was going back and picking everything up, trying to pick up everything that he could, that [Plaintiff was] discarding"; that Defendant Cerminaro told him he "picked up a bag that [Plaintiff] had discarded and he picked up all the other chunks that he could locate that he saw [Plaintiff] throwing"; that he "remember[ed] Cerminaro saying that he went back and picked up all the cocaine"; and that "it was my understanding it was cocaine in its crack form so he could pick it up." (Dkt. No. 300-16, at 170-73). However, when specifically asked if he had questioned the officers as to whether they had picked up additional contraband from the ground and added it to the bag, Defendant McNamara said "I don't remember asking that question," and "I don't believe they would do that because it doesn't make any sense." (Dkt. No. 300-16, at 165-66). The following day, Defendant McNamara clarified that "what I remember specifically [Defendant Cerminaro] telling me was that he picked up a baggy and he collected that," and that he did not "remember anyone talking about picking up pieces of crack cocaine and putting it back in the bag." (Dkt. No. 300-17, at 23).[22] He further testified that, in 2015, he had specifically asked ADA Garramone to review the lab reports for evidence of such commingling, and no such evidence was found. (*Id.* at 23-24).

---

[22] Plaintiff claims that this clarification was the result of improper witness coaching, (Dkt. No. 334, at 6-8), but there is no evidence in the record from which the Court can reasonably draw this inference.

Especially in light of his subsequent clarifications, which are uncontroverted, Defendant McNamara's imprecise recollections from a meeting that took place several years before his deposition are insufficient to raise a genuine dispute as to whether Defendant Cerminaro improperly commingled evidence.

Finally, Plaintiff argues that the withheld photographs clearly show an empty bag, undermining Defendant Cerminaro's narrative that it contained white substance in it when he found it. (Dkt. No. 317-1, at ¶¶ 7-8; Dkt. No. 325-1, at ¶¶ 31, 65; Dkt. No. 325-17, at ¶ 10). The parties dispute whether the photograph depicts a white substance in the bag, and the picture itself is not perfectly clear. But even crediting Plaintiff's contention that the photograph depicts an empty bag, it does not support Plaintiff's commingling theory, as it is consistent with Defendant Paladino's testimony that the substance Plaintiff was charged with was caught in the knot of the bag (where it would not necessarily be clearly visible in the photograph), rather than in the bag itself. (Dkt. No. 300-30, at 139-41).

While Plaintiff has failed to raise a genuine dispute of fact as to his commingling theory, reading his submissions "to raise the strongest arguments that they suggest," *McPherson* 174 F.3d at 280, he *has* raised a genuine dispute of fact as to whether Defendant Cerminaro's narrative that he saw Plaintiff possess, rip open and discard a bag of contraband was false. Because only Plaintiff and Defendant Cerminaro were present during the chase that led to Plaintiff's arrest, the question of whether or not Plaintiff ever possessed such a bag essentially requires a determination of which witness's version of events is more credible. Plaintiff has steadfastly and adamantly maintained his innocence since his conviction. Defendants have pointed to no record evidence suggesting he ever conceded to possessing, ripping open or discarding a bag of narcotics on October 15, 2009, nor to any material inconsistencies in his

testimony that would undermine his denials. Furthermore, in his depositions, when questioned about his reasons for possessing multiple cell phones, possessing a large amount of money and driving a rental car (facts which Defendants claim are indicative of drug trafficking), Plaintiff provided explanations that, on their face, are not inconsistent or unreasonable. (Dkt. No. 300-2, at 60-61, 76-78, 183; Dkt. No. 300-8, at 192-96, 251-54).

On the other hand, the Court notes that there were omissions in Defendant Cerminaro's testimony during Plaintiff's criminal proceedings concerning the existence of photographs and the fact that several pieces of a white chunky substance were scattered across the ground. *See* Section II.E *supra* (summarizing the material portions of Defendant Cerminaro's testimony during Plaintiff's criminal proceedings); Section IV.B.1.b.iii (concluding that a reasonable jury could find Defendant Cerminaro's explanations for failing to disclose the existence of photographs during Plaintiff's trial not credible). And there is some record evidence, albeit minimal, that a reasonable jury could conclude supports the contention that Defendant Cerminaro happened to find contraband on the ground near the chase scene and constructed a false narrative to link it to Plaintiff. (Dkt. No. 300-30, at 23 (Paladino's testimony that he found no contraband or other evidence when he searched the roof, arguably contradicting Defendant Cerminaro's testimony that Plaintiff ripped open the bag and began spilling its contents while running across the roof); Dkt. No. 300-22, at 242 (same testimony at Plaintiff's trial); Dkt. No. 33-5, at ¶ 11 (Defendant McNamara's affidavit affirming that the area of Plaintiff's arrest is a "well known location for active narcotics trafficking," which could support a jury finding that narcotics unrelated to Plaintiff were on the ground at the time of Plaintiff's arrest); Dkt. No. 325-9, at 75 (Defendant Cerminaro's trial testimony that, on the day of Plaintiff's arrest, no cocaine residue was observed on his mouth, face or clothing)).

Under these circumstances, where Plaintiff's version of events is not "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" his testimony, the Court cannot simply disregard that testimony on a summary judgment motion. *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see id.* at 554 (holding that a District Court may disregard a plaintiff's testimony on a summary judgment motion "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete"); *Frost v. New York City Police Dep't*, 980 F.3d 231, 245 (2d Cir. 2020) (reiterating that "[i]t is a bedrock rule of civil procedure that 'a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented,'" and warning that the *Jeffreys* exception is "narrow" and applies only where "a witness's testimony is so problematic that no reasonable juror could credit it"). Because granting Defendant Cerminaro summary judgment on the "fabrication" element of Plaintiff's claim against him would require the Court to credit Defendant Cerminaro's version of events and discount Plaintiff's, the Court finds that Plaintiff has raised a genuine dispute of material fact as to that element.

ii.   *Defendant Paladino*

By contrast, Plaintiff has raised no genuine dispute of material fact as to his fabrication of evidence claim against Defendant Paladino. Defendant Paladino's testimony at Plaintiff's trial and at his deposition consistently suggests that his search for evidence was confined to the rooftops on which the chase occurred, and that while he was on the Kemble Street side of the rooftops at one point, he never stepped foot in the alleyway where the contraband was found. (Dkt. No. 300-30, at 30, 32-33, 74-75, 122; Dkt. No. 300-22, at 260). It also consistently suggests that, from his vantage point on the rooftop, he saw Defendant Cerminaro in the process of collecting evidence, but did not see him pick up any specific item of evidence off the ground.

(Dkt. No. 300-30, at 28, 75, 146-50; Dkt. No. 300-22, at 242). Defendant Paladino's version of events is corroborated by Defendant Dougherty, who testified that he never saw or spoke to Defendant Paladino on Kemble Street on the day of Plaintiff's arrest, (Dkt. No. 300-4, at 29, 31, 94, 169); Defendant Cerminaro, who has consistently averred that he met Defendant Paladino and gave him the bag of contraband on Park Avenue, and has never suggested that Defendant Paladino ever joined him on Kemble Street or in the adjacent alleyway, (Dkt. 300-3; Dkt. No. 300-6, at 100-01); and Plaintiff himself, who testified that he never saw Defendant Paladino on Kemble Street during his arrest, (Dkt. No. 300-8, at 205-06). Plaintiff has raised no evidence to contradict these facts, or to suggest that Defendant Paladino participated in, or was aware of, any improper "commingling" of evidence.

Plaintiff has also raised no evidence calling into question Defendant Paladino's testimony that, after obtaining the bag of contraband from Defendant Cerminaro, he took it back to the police station, removed the contraband from the knot of the bag in which it was caught, weighed and tested it, and secured it in a safe in his office. (Dkt. No. 300-30, at 32-41, 80-81, 84-85, 139, 141). Plaintiff attempts to draw sinister conclusions from the six-day delay between Defendant Paladino's receipt of the contraband and his completion of the corresponding property log, his testimony that he has no documentation to prove that the evidence remained secure during the intervening period, and his acknowledgement that he theoretically could have tampered with the evidence during the intervening period. (Dkt. No. 300-30, at 40, 69-71, 76-79, 191-96). But Plaintiff provides no evidence beyond mere speculation to suggest that the contraband was actually tampered with by Defendant Paladino or anyone else. Therefore, because Plaintiff has failed to raise a triable issue of fact with respect to his fabrication of evidence claim against Defendant Paladino, Defendant Paladino is entitled to summary judgment on this claim.

### iii.      *Defendant Dougherty*

Plaintiff also has adduced no evidence to support his fabrication of evidence claim against Defendant Dougherty. As previously discussed, the record evidence suggests that Defendant Dougherty did not directly participate in the collection of evidence, let alone see anyone improperly commingling contraband, at the scene of Plaintiff's arrest. *See* Section IV.B.2.a.i. *supra* (reviewing and analyzing evidence). To the extent any statements he made in the secretly recorded December 2012 meeting can arguably be read to imply otherwise, those statements are speculative and unreliable.[23] (*Id.*). The fact that Defendant Dougherty at one point asked Defendant Cerminaro to place the bag of contraband down in the place where he found it so he could photograph it, (Dkt. No. 307-15, at ¶¶ 15-16), hardly constitutes the fabrication of evidence, especially since the resulting photograph was never even given to prosecutors or used as evidence at Plaintiff's trial. Furthermore, Defendant Dougherty's failure to require Defendant Cerminaro to amend his Supporting Deposition to specifically mention the additional loose contraband found on the ground does not constitute the fabrication of evidence, as there is no evidence that Defendant Dougherty was attempting to conceal, or was even aware of, improper commingling of evidence by Defendant Cerminaro. Therefore, Defendant Dougherty is entitled to summary judgment on Plaintiff's fabrication of evidence claim against him.

---

[23] Plaintiff's argument that Defendant Dougherty's interrogatory responses establish his awareness of misconduct by Defendants Cerminaro and Paladino, (Dkt. No. 319, at 7-8), is meritless. In his interrogatory responses, Defendant Dougherty averred, in relevant part, that he "did not 'collect' anything depicted in the photographs and does not know who may have done so," that he "is informed and believes that Defendant Cerminaro may have retrieved certain items and/or materials," and that he "is further informed and believes that some or all of the injury allegedly sustained by Plaintiff was or may have been the result of the actions of police officers other than Defendant." (Dkt. No. 319-11, at 8, 23). The plain language of these responses cannot reasonably be read as an admission that Defendant Dougherty actually knew or believed that any other Defendant had violated the law, or that he saw Defendant Cerminaro pick up materials other than the knotted bag. (Dkt. No. 300-4, at 136-44). Furthermore, Defendant Dougherty's conduct towards Plaintiff at the deposition, however unprofessional and offensive, is irrelevant to the question of his culpability.

b.       Favorable Termination

The City Defendants argue that, even if Plaintiff has raised a triable issue of fact with

respect to the "fabrication" element, his fabrication of evidence claim must be dismissed because

he cannot meet the "favorable termination" requirement the Supreme Court articulated in

*McDonough v. Smith*, 139 S. Ct. 2149 (2019). The City Defendants assert that the "favorable

termination" analysis in the context of a fabrication of evidence claim is equivalent to the

"favorable termination" analysis in the context of a malicious prosecution claim, and thus rest

solely on their arguments regarding Plaintiff's malicious prosecution claims. (Dkt. No. 300-39, at

23-24 & n.23). Because the Court is not convinced that the analyses are necessarily the same,

and Defendants have made no other arguments on this point, the Court declines to grant

Defendant Cerminaro summary judgment on this element of Plaintiff's claim against him.

In *McDonough*, the Court considered when the statute of limitations began to run for a

fabricated evidence claim by a plaintiff who alleged he was indicted, arrested, and prosecuted

twice based on fabricated evidence before ultimately being acquitted. *McDonough*, 139 S. Ct. at

1253-54. The Court held:

> There is not "a complete and present cause of action," to bring a fabricated-evidence
> challenge to criminal proceedings while those criminal proceedings are ongoing. Only
> once the criminal proceeding has ended in the defendant's favor, or a resulting conviction
> has been invalidated within the meaning of *Heck*, will the statute of limitations begin to
> run.

*Id.* at 2158 (citations omitted) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007). In so ruling,

the Court analogized fabricated evidence claims to malicious prosecution claims, reasoning that

both types of claims "challenge the integrity of criminal prosecutions undertaken 'pursuant to

legal process'" and implicate the Court's long-standing concerns with "parallel criminal and civil

litigation over the same subject matter and the related possibility of conflicting civil and criminal

judgments." *Id.* at 2156-57 (citations omitted). At the same time, the Court acknowledged that,

"[b]ecause [the plaintiff's] acquittal was unquestionably a favorable termination, we have no occasion to address the broader range of ways a criminal prosecution (as opposed to a conviction) might end favorably to the accused . . . Such considerations might call for a context-specific and more capacious understanding of what constitutes 'favorable' termination for purposes of a § 1983 false-evidence claim, but that is not the question before us." *Id.* at 2160 n.10.

Although *McDonough* was fundamentally a statute of limitations case, "[m]ost courts in this Circuit read *McDonough* to require favorable termination in fair trial claims that allege a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding." *Gondola v. City of New York*, No. 16-cv-369, 2020 WL 1433874, at *4, 2020 U.S. Dist. LEXIS 50972, at *8-9 (E.D.N.Y. Mar. 24, 2020) (collecting case law). However, courts disagree on whether the "favorable termination" analysis for purposes of a fabricated evidence claim is the same as the analysis for purposes of a malicious prosecution claim. Some courts, relying on *McDonough*'s observation that both types of claims implicate similar concerns about using civil litigation to collaterally attack criminal proceedings, have applied the same "favorable termination" standards used in the malicious prosecution context when analyzing fair trial claims. *See, e.g.*, *id.* at *3-6, 2020 U.S. Dist. LEXIS 50972, at *6-15; *Hagans v. Nassau Cty. Police Dep't*, No. 18-cv-1918, 2020 WL 1289529, at *6-7, 2020 U.S. Dist. LEXIS 47090, at *14-18 (E.D.N.Y. Mar. 18, 2020); *Daniels v. Taylor*, 443 F. Supp. 3d 471, 478-80 (S.D.N.Y. 2020), *appeal docketed*, No. 20-1331 (2d Cir. Apr. 20, 2020).

Other courts, however, have reached a different conclusion. For example, in evaluating whether an Adjournment in Contemplation of Dismissal ("ACD") constituted a "favorable determination" for fair trial purposes, one court reasoned that:

> [B]ecause fair trial jurisprudence, starting with *Heck* and continuing through
> *McDonough*, is primarily concerned with the potential for invalidating criminal
> convictions, the favorable termination requirement for fair trial claims (assuming there is
> one) is necessarily different and more expansive than the one for malicious prosecution
> claims. Thus, although this Court, like many, has found in the context of malicious
> prosecution claims that an ACD is not a favorable termination, it does not find that this
> ruling applies to a fair trial claim. Nor does the Court find that the Second Circuit's
> recent clarification of the favorable termination standard in *Lanning v. City of Glens
> Falls*, 908 F.3d 19, 25 (2d Cir. 2018), applies to Plaintiff's fair trial claim. Rather,
> because the *Heck* bar only considers whether a judgment in favor of the plaintiff would
> necessarily imply the invalidity of his conviction or sentence, the Court finds, consistent
> [with] the well-established rule in this Circuit, that an ACD does not preclude Plaintiff's
> fair trial claim.

*Ross v. City of New York*, No. 17-cv-3505, 2019 WL 4805147, at *8, 2019 U.S. Dist. LEXIS

169762, at *18-20 (E.D.N.Y. Sept. 30, 2019) (citations and internal quotation marks omitted).

Another court reached a similar conclusion and found that a dismissal in the interest of justice,

similar to the one Plaintiff obtained here, constituted a "favorable determination" for purposes of

the plaintiff's fabrication of evidence claim, even though it did *not* constitute a favorable

determination for purposes of his malicious prosecution claim. *Simon v. City of New York*, No.

16-cv-1017, 2020 WL 1323114, at *3-6, 2020 U.S. Dist. LEXIS 47919, at *8-19 (E.D.N.Y. Mar.

19, 2020). The court explained:

> Assuming, as did *Ross*, that the dicta in *McDonough* introduced a favorable termination
> element into Plaintiff's fair trial claim, it does not follow that the strict "affirmative
> indication of innocence" standard [used in § 1983 malicious prosecution claims]
> necessarily applies. To hold otherwise would be to abandon the longstanding distinction
> between malicious prosecution claims and fair trial claims based on the fabrication of
> evidence. As the Second Circuit explained in *Lanning*, "[a] § 1983 claim for malicious
> prosecution essentially alleges a violation of the plaintiff's right under the Fourth
> Amendment to be free from unreasonable seizure." *Lanning*, 908 F.3d at 28. Because
> "[t]he touchstone of the Fourth Amendment is reasonableness," an affirmative indication
> of innocence is necessary to allege malicious prosecution because, "absent an affirmative
> indication that the person is innocent of the offense charged, the government's failure to
> proceed does not necessarily imply a lack of reasonable grounds for the prosecution." *Id.*
>
> In contrast, a fair trial claim based on the fabrication of evidence arises out of the
> principle that "[n]o arrest, no matter how lawful or objectively reasonable, gives an
> arresting officer or his fellow officers license to deliberately manufacture false evidence

against an arrestee" and that to find otherwise "would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice." *Ricciuti*, 124 F.3d at 130. Because the fabrication of evidence is definitionally unreasonable, the favorable termination requirement for a fair trial claim does not stem from the nature of the constitutional violation, but from the prudential best practice of avoiding conflicting civil and criminal judgments resulting from parallel civil and criminal litigation. *McDonough*, 139 S. Ct. at 2157 (citing *Heck*, 512 U.S. at 484-85).

In sum, *McDonough* does not alter the enduring distinction between malicious prosecution and fair trial claims; the two claims arise out of different constitutional rights, protect against different constitutional injuries, and implicate different constitutional concerns. Favorable termination is required for a fair trial claim insofar as it is necessary to avoid the risk that a judgment for the plaintiff on his civil claim would conflict with or impugn the validity of the earlier criminal proceeding against him. *McDonough*, 139 S. Ct. at 2157-58. Here, the risk is nonexistent. A jury verdict that Cruz violated Plaintiff's due process right to a fair trial by falsifying evidence would not conflict with or challenge the validity of the dismissal of charges against Plaintiff in the interest of justice. Therefore, Plaintiff's dismissal in the interest of justice is a favorable termination for the purposes of his § 1983 fair trial claim.

*Id.* at *5-6, 2020 U.S. Dist. LEXIS 47919, at *15-19.

Here, Defendants have not addressed the case law drawing a distinction between the fair trial "favorable termination" analysis and the malicious prosecution "favorable termination" analysis. The Court finds the reasoning of *Ross* and *Simon* persuasive under these circumstances where, as in *Simon*, Plaintiff's conviction has been vacated and his indictment dismissed, and thus the "the risk that a judgment for [Plaintiff] on his civil claim would conflict with or impugn the validity of the" final outcome of his criminal proceedings is "nonexistent." *Id.* at *6, 2020 U.S. Dist. LEXIS 47919, at *17. Given Plaintiff's pro se status and the Court's obligation to construe his submissions "to raise the strongest arguments that they suggest," *McPherson* 174 F.3d at 280, as well as Defendants' failure to address the question, the Court declines to grant summary judgment to Defendant Cerminaro on this ground.[24]

---

[24] The Court separately evaluates whether the dismissal of Plaintiff's indictment in the interest of justice constitutes a "favorable termination" for purposes of his malicious prosecution claims below, in connection with its analysis of those claims. *See* Section IV.D.2 *infra.*

3.      *Count I Summary*

For the foregoing reasons, with respect to Plaintiff's first cause of action, the Court finds

that: (1) Defendants Cerminaro, Paladino and Dougherty are all entitled to summary judgment on

Plaintiff's *Brady* claim against them; (2) Defendants Paladino and Dougherty are entitled to

summary judgment on Plaintiff's fabrication of evidence claim against them; and (3) Plaintiff's

fabrication of evidence claim against Defendant Ceramino may proceed to trial.

**C.      Count II: Fair Trial Claim Against Defendants Cerminaro, Paladino and Dougherty Arising from Plaintiff's Post-Conviction Proceedings**

The City Defendants argue that Plaintiff's second cause of action "relates to the same

inculpatory photographs and allegedly fabricated evidence as the first cause of action," that both

causes of action "are the same and originate from the same indictment," and that the second

cause of action is thus "totally duplicative of Plaintiff's first cause of action and thus risks

inconsistent verdicts." (Dkt. No. 300-39, at 29-30). From the face of the Amended Complaint,

however, Plaintiff's second cause of action appears to be based on a related, but distinct, set of

facts as his first cause of action. Specifically, his first cause of action contends that Defendants

Cerminaro, Palladino and Dougherty withheld and fabricated evidence in his criminal trial,

leading to his conviction and incarceration. (Dkt. No. 33, at ¶¶ 630-41). By contrast, his second

cause of action alleges that, during Plaintiff's post-conviction proceedings, rather than confess

the truth to the DA's office, these Defendants continued to stand by the fabricated narrative

regarding Plaintiff's guilt, leading the DA's office to oppose Plaintiff's § 440 motion and begin

the process of a retrial before ultimately moving to dismiss the indictment in the interest of

justice. (Dkt. No. 33, at ¶¶ 642-47). Unlike Plaintiff's first cause of action, Plaintiff's second

cause of action proceeds solely on a fabrication of evidence theory, not a *Brady* theory, as

Plaintiff does not allege that any exculpatory or impeachment evidence was withheld during his post-conviction proceedings. (*Id.*).

As to Defendant Cerminaro, the Court has already found that Plaintiff has raised a genuine dispute of fact as to whether he fabricated his narrative regarding Plaintiff's actions on the day of his arrest. It is undisputed that he stood by this narrative when interrogated by Defendant McNamara and his staff in connection with Plaintiff's post-conviction proceedings. It logically follows that there is a genuine dispute of fact as to whether Defendant Cerminaro forwarded false information to prosecutors in connection with Plaintiff's post-conviction proceedings. It would not necessarily be inconsistent for a jury to find for Plaintiff on the first cause of action, but for Defendant Cerminaro on the second.[25] In any event, Defendants have cited no authority for the proposition that a mere *risk* of inconsistent judgments requires dismissal *at the summary judgment stage* before any jury verdict has actually been reached.[26] Defendants make no other argument as to why Plaintiff's second cause of action should be dismissed. Therefore, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's second cause of action against Defendant Cerminaro.

As to Defendants Dougherty and Paladino, the Court has already found that Plaintiff has failed to adduce any record evidence suggesting that they either fabricated evidence themselves or were aware of any fabrication of evidence by Defendant Cerminaro. Plaintiff has similarly adduced no record evidence suggesting that, during Plaintiff's post-conviction proceedings,

---

[25] For example, the jury could find that Defendant Cerminaro did indeed fabricate evidence and caused Plaintiff to suffer a "deprivation of liberty" in the form of conviction and incarceration, but that Plaintiff suffered no additional "deprivation of liberty" during his post-conviction proceedings as a result of Defendant Cerminaro's continued fabrications.

[26] The case Defendants cite, *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74 (2d Cir. 2006), involved an appeal from the District Court's denial of a motion to set aside a jury verdict, and the rule they cite, Fed. R. Civ. P. 49, merely provides rules governing special verdicts and general verdicts with answers to written questions.

either Defendant became aware that Defendant Cerminaro's narrative about seeing Plaintiff possessing a bag of contraband was false. Therefore, both Defendants are entitled to summary judgment on Plaintiff's second cause of action against them.

**D.      Count III: Malicious Prosecution Claim Against Defendants Cerminaro, Paladino and Dougherty Arising from Plaintiff's Criminal Conviction**

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution Claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). The elements for a malicious prosecution claim in New York are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted). Additionally, a *federal* claim of malicious prosecution requires a § 1983 plaintiff to show some deprivation of liberty consistent with the concept of "seizure" within the meaning of the Fourth Amendment. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). The City Defendants argue that Plaintiff has failed to raise a genuine dispute of material fact with respect to the "probable cause" or "favorable termination" elements, (Dkt. No. 300-39, at 30-39), and Defendant Dougherty argues that the claim against him must be dismissed for the additional reason that he "had no role in and did not participate in bringing criminal proceedings against Plaintiff," (Dkt. No. 307-16, at 11-12).

   1.      *Probable Cause*

"The existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable

55

cause." *Norwood v. Mason*, 524 F. App'x 762, 766 (2d Cir. 2013) (internal quotations omitted). The presumption, however, is rebuttable "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)). Moreover, if the prosecutor "relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows." *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) (citations omitted).

As discussed in this Court's analysis of Plaintiff's fabrication of evidence claim against Defendant Cerminaro, Plaintiff has raised a genuine dispute of material fact as to whether Defendant Cerminaro fabricated his narrative about seeing Plaintiff possess, rip open and discard a bag of contraband. *See* Section IV.B.2.a.i. *supra*. Defendant Cerminaro's testimony, and this allegedly fabricated narrative in particular, was crucial evidence on which the prosecution relied in procuring Plaintiff's indictment. (Dkt. No. 308-4, at 4-11). Therefore, Plaintiff has raised a genuine dispute as to whether the presumption of probable cause arising from Plaintiff's indictment has been rebutted.

The City Defendants argue that, even assuming Defendant Cerminaro did not actually see Plaintiff discard a bag of contraband, probable cause for possession of cocaine nonetheless existed because:

> (1) Plaintiff was stopped in a rental car by Defendant Cerminaro; (2) Plaintiff had five cell phones in said car; (3) Plaintiff ran from Defendant Cerminaro during the police stop, (4) cocaine was found along the chase route containing cocaine [sic], (5) Defendant Cerminaro found a torn corner knotted plastic bag along the chase route; (6) Plaintiff presented with a white powdery substance on his shirt while at the Utica Police (inculpatory and booking photographs); (7) Plaintiff was found with $1,739 of cash on his person.

(Dkt. No. 300-39, at 35). The City Defendants argue that, viewed collectively, the facts that Plaintiff was driving a rental vehicle, possessed multiple cell phones, carried a large amount of cash on his person, and fled from the traffic stop leaving his driver's license and other possessions behind constitute evidence of narcotics *trafficking*, and thus independently constitute probable cause to prosecute Plaintiff for narcotics *possession*. (Dkt. No. 300-38, at ¶ 38 & n.4 (citing record evidence); Dkt. No. 33-5, at ¶ 11(a)-(d)). However, while this circumstantial evidence supported a prosecution for narcotics possession (and eventual guilty verdict) when viewed *in combination with* Defendant Cerminaro's eye-witness testimony, it is questionable whether these facts would provide probable cause for a possession charge *in the absence of* that testimony, which was the key evidence establishing that Plaintiff actually possessed narcotics on the day in question.

Thus, if, as Plaintiff contends, Defendant Cerminaro never actually saw Plaintiff in possession of any narcotics, there is at least a serious question as to whether the mere presence of narcotics on the ground near him (in a neighborhood known for being a center of narcotics trafficking, *see* Dkt. No. 33-5, at ¶ 11(a)), combined with the other facts Defendants cite, constituted probable cause to prosecute Plaintiff for possessing cocaine. As such, Plaintiff has raised a genuine dispute of material fact with respect to the "probable cause" element of his malicious prosecution claim against the City Defendants.

2.   *Favorable Termination*

As to the "favorable termination" element, the standard for determining whether the dismissal of Plaintiff's conviction in the interest of justice constitutes a "favorable termination" for purposes of his § 1983 claim differs from the standard used for purposes of his New York state law claim. *Simon*, 2020 WL 1323114, at *3, 2020 U.S. Dist. LEXIS 47919, at *8-10 (explaining the differing standards). For purposes of a § 1983 claim, a Plaintiff can only satisfy

57

the favorable termination element by showing that "the prosecution terminated in some manner indicating that the person was not guilty of the offense charged," and thus "a dismissal in the interest of justice [that] leaves the question of guilt or innocence unanswered . . . cannot provide the favorable termination required." *Lanning v. City of Glens Falls*, 908 F.3d 19, 26, 28-29 (2d Cir. 2018) (citations omitted).

However, "for malicious prosecution claims brought under New York law, federal courts must faithfully apply New York tort law." *Id.* at 28. For purposes of a New York state law malicious prosecution claim, "any termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused." *Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001). Even under New York law, however, a termination does not qualify as "favorable" "if charges are dismissed out of mercy, since mercy presupposes the guilt of the accused." *Id.* For dismissals in the interest of justice, "the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." *Id.* at 396. "A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges." *Id.*; *see also Jeanty v. City of Utica*, No. 16-cv-0966, 2017 WL 6408878, at *6, 2017 U.S. Dist. LEXIS 218307, at *15-16 (N.D.N.Y. Aug. 18, 2017) (collecting cases applying New York "favorable termination" standard to dismissals in the interest of justice).

Here, Plaintiff cannot meet the "favorable termination" element under either standard. The record of Plaintiff's § 440 proceedings makes very clear that the only basis on which Judge Donalty granted an evidentiary hearing on Plaintiff's motion was Plaintiff's allegation that a

*Brady* and/or *Rosario* violation occurred during his trial; that Plaintiff's conviction was vacated on that basis alone after the prosecution chose to consent to the vacatur; and that the prosecution chose to proceed with a retrial at that time. (Dkt. No. 317-4, at 9-10; Dkt. No. 325-21).

Later, when Defendant McNamara moved to dismiss Plaintiff's indictment in the interest of justice, he stated on the record that he believed the "evidence was pretty clear" that Plaintiff was properly convicted, but that he nonetheless believed that the indictment should be dismissed for reasons unrelated to Plaintiff's guilt or innocence. These reasons included that Plaintiff had already served a full prison sentence for the conviction, that Plaintiff was not a known drug dealer in the community, that he had a family and a job, that the drug evidence used in Plaintiff's conviction had long since been destroyed, and that a conviction could lead to Plaintiff's deportation. (Dkt. No. 325-13, at 5-9). In granting Defendant McNamara's motion, Judge Dwyer explicitly "agree[d] with all of the statements" that Defendant McNamara made, and added his observations that "[i]f there was a second conviction I would not give [Plaintiff] anymore jail or prison time," that Plaintiff "has family that he works very hard in supporting," and that "he's done well for himself" and is "working to better himself." (*Id.* at 16-17). Moreover, after hearing Plaintiff's argument that he should have a retrial to prove that his conviction was procured by fabricated testimony, Judge Dwyer made clear that "the Court is not saying that . . . it does not feel that there was sufficient evidence on the record to support the original conviction." (*Id.* at 9-17).

The foregoing record evidence shows that, not only did the dismissal of Plaintiff's indictment fall short of establishing Plaintiff's actual innocence as required for a § 1983 malicious prosecution claim, it was a dismissal based on merciful and practical considerations, and thus is not a "favorable termination" even under the more lenient state law standard. Plaintiff

argues that Defendant McNamara's true motivations in moving to dismiss Plaintiff's conviction were his knowledge that there was insufficient evidence to convict Plaintiff and his desire to keep evidence of police misconduct out of the public eye, (Dkt. No. 325, at 33-36), but points to no evidence in the record that would support this contention. To the contrary, all the record evidence regarding Defendant McNamara's motivations supports the conclusion that he believed Plaintiff was guilty and could have been convicted on a re-trial (including as a result of the prosecution's use of the photographs that were withheld in his original trial), but that he moved to dismiss the indictment for the reasons stated on the record before Judge Dwyer. (Dkt. No. 300-16, at 113-15, 188-90, 259-65; Dkt. No. 33-5, at ¶ 12(a)-(e)).[27] Even if Plaintiff were to prove at trial that his prosecution was based on false testimony by Defendant Cerminaro that he had seen Plaintiff possess a bag of contraband, and that there was otherwise no probable cause for his prosecution, there is no evidence in the record from which the Court can infer that the dismissal of his indictment was based, even in part, on a suspicion by prosecutors or Judge Dwyer that Defendant Cerminaro had fabricated his version of events, or otherwise by any serious doubt of Plaintiff's guilt.

The cases Plaintiff relies on are not to the contrary. In *Thompson v. Clark*, 364 F. Supp. 3d 178 (E.D.N.Y. 2019), the court found that the fact that a prosecutor moved to dismiss criminal charges "in the interest of justice" did not mean that the dismissal was not a "favorable termination," noting that the "court did not give its reasons on the record for a dismissal in the interest of justice," and opining that "any ambiguity on whether the dismissal was on the merits should be decided in defendant's favor." *Id.* at 196-97. That conclusion does not apply here,

---

[27] The Court finds no support in the record for Plaintiff's contention that his dismissal-in-the-interest-of-justice proceedings should not be afforded the presumption of regularity because of bias or misconduct by Judge Dwyer and other court officers. (Dkt No. 325, at 17-22).

where both the prosecution and the presiding judge articulated specific reasons for the indictment's dismissal, and explicitly disavowed any notion that their belief in Plaintiff's innocence was one of those reasons. In the other case Plaintiff cites, *Hincapie v. City of New York*, 464 F. Supp. 3d 61 (S.D.N.Y. 2020), a plaintiff established favorable termination where he alleged that his indictment was dismissed based on newly discovered exculpatory evidence that a state court had "determined on the merits . . . . would have produced a more favorable verdict at trial," and the prosecution chose not to retry him "because it did not believe it could prove the case." *Id.* at 71-73. By contrast, here, Plaintiff has failed to muster any evidence that the photographs withheld at his trial would have proved his innocence, *see* Section IV.B.1.c *supra*, and while Defendant McNamara did cite evidentiary problems as one reason for dismissing the indictment, it was for the practical reason that the crucial drug evidence had been destroyed pursuant to a court order, not because any newly surfaced evidence cast doubt on the validity of Plaintiff's conviction.

Because there is no evidence from which a jury could find that the dismissal of Plaintiff's indictment constituted a "favorable termination" under either § 1983 or New York state law, all three Defendants are entitled to summary judgment on his federal and state malicious prosecution claims.

### 3. *Lack of Prosecution*

The Court also agrees with Defendant Dougherty that, even assuming Plaintiff has demonstrated a genuine dispute as to all the other elements of his malicious prosecution claims, his claim against Defendant Dougherty must be dismissed because of Defendant Dougherty's limited role in Plaintiff's prosecution. "While police officers do not generally 'commence or continue' criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the

prosecution, such as giving advice and encouragement or importuning the authorities to act.'"

*Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quoting *Manganiello*, 612 F.3d

at 163).[28] It is undisputed that, after taking photographs of the scene of Plaintiff's arrest and

uploading them to the RMS system, Defendant Dougherty played no further role in Plaintiff's

prosecution. (Dkt. No. 307-15, at ¶ 27; Dkt. No. 319-1, at ¶ 27). He did not testify in any of

Plaintiff's criminal proceedings, did not make any representation or presentation to the District

Attorney's office in connection with those proceedings, and did not otherwise participate in

Plaintiff's indictment, prosecution or conviction. (Dkt. No. 307-15, at ¶¶ 38-40; Dkt. No. 319-1,

at ¶¶ 38-40). Based on these undisputed facts, Plaintiff cannot maintain a malicious prosecution

claim against Defendant Dougherty.

E.   **Count IV: Malicious Prosecution Claim Against Defendants Cerminaro, Paladino and Dougherty Arising from Plaintiff's Post-Conviction Proceedings**

The City Defendants argue that Plaintiff's fourth cause of action relates to the same

prosecution that is the subject of his third cause of action, and must be dismissed to avoid the

risk of inconsistent verdicts. (Dkt. No. 300-39, at 40). From the face of the Amended Complaint,

Plaintiff's fourth cause of action alleges distinct facts related to his post-conviction proceedings

rather than his original criminal proceedings. (Dkt. No. 33, at ¶¶ 656-66). However, the ultimate

dispensation—the vacatur of Plaintiff's conviction and the dismissal of his indictment in the

interest of justice—is the same. The Court's analysis finding that this dismissal was not a

"favorable termination" for purposes of his third cause of action applies with equal force to his

---

[28] Defendants Cerminaro and Paladino do not argue that their role in Plaintiff's criminal proceedings does not satisfy this standard.

fourth cause of action. *See* Section IV.D.2 *supra.* Therefore, all three Defendants are entitled to summary judgment on Plaintiff's fourth cause of action against them.

### F. Counts I-IV Qualified Immunity Defense

The City Defendants and Defendant Dougherty raise qualified immunity defenses with respect to the *Brady* and malicious prosecution claims alleged in Plaintiff's first through fourth causes of action. (Dkt. No. 300-39, at 48-54; Dkt. No. 307-16, at 16-17). However, the only remaining claim from Plaintiff's first four causes of action is his fabrication of evidence claim against Defendant Cerminaro. The City Defendants do not raise a qualified immunity defense with respect to this particular claim, and in any event, it is clear that no such defense could lie. *See Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."). Because Plaintiff's other claims have been dismissed on their merits, the Court need not address whether any or all of the City Defendants would be entitled to such a defense to those claims.

### G. Count V: Failure to Intervene Claim against Defendants Paladino and Dougherty

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994). Therefore, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used . . . (2) that a citizen has been unjustifiably arrested . . . or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* To prevail on a failure to intervene claim, a plaintiff must establish that the defendant had a "realistic opportunity to intervene to prevent the

harm from occurring." *Id.* "Moreover, the failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012).

Here, the only "primary claim[] underlying the failure to intervene claim," *id.*, that has survived summary judgment is Plaintiff's fabrication of evidence claim against Defendant Cerminaro.[29] The only "constitutional violation . . . by a law enforcement official," *Anderson*, 17 F.3d at 557, as to which Plaintiff has established a genuine dispute is Defendant Cerminaro's alleged construction of a false narrative that he saw Plaintiff possess and discard a bag of contraband. Neither Defendant Paladino nor Defendant Dougherty were present while Defendant Cerminaro chased Plaintiff across the rooftops, and there is no evidence suggesting they ever had any reason to doubt his story that, during that chase, he saw Plaintiff discard the bag of contraband he showed them. Furthermore, as previously discussed at length, there is no evidence in the record suggesting that either Defendant Dougherty or Defendant Paladino saw Defendant Cerminaro pick loose pieces of contraband up off the ground and add them to the evidence used to charge Plaintiff. *See* Section IV.B.2.a.ii-iii *supra.* Therefore, there is no evidence suggesting that either Defendant had a "realistic opportunity to intervene to prevent the harm from occurring," *Anderson*, 17 F.3d at 557, and both Defendants are entitled to summary judgment on Plaintiff's failure to intervene claim against them.

---

[29] While the Court has found that Plaintiff raised a genuine dispute as to whether Defendant Cerminaro's failure to disclose the photographs taken at the scene, in his Supporting Deposition or subsequently, was intentional, *see* Section IV.B.1.b.iii *supra*, the Court found that Plaintiff's *Brady* claim against him could not be sustained because Plaintiff did not show a "reasonable probability" that disclosure of the photographs would have changed the outcome of his trial, *see* Section IV.B.1.c. Accordingly, Plaintiff may not sustain a failure to intervene claim against Defendant Dougherty based on his failure to require Defendant Cerminaro to amend his Supporting Deposition to disclose the photographs' existence.

**H.      Count VI: *Monell* Claim against Defendant City of Utica, and Supervisory Liability Claims against Defendants Williams and Dougherty**

Plaintiff's sixth cause of action is a *Monell* claim against Defendant City of Utica. Additionally, in his briefing, Plaintiff makes arguments in support of supervisory liability claims against Defendants Williams and Dougherty. (Dkt. No. 319, at 17-20; Dkt. No. 325, at 36-39). The Amended Complaint itself does not explicitly contain such claims, and as the City Defendants correctly point out, the Court did not read such claims into Plaintiff's complaint on its Rule 12 review, (Dkt. No. 346, at 14-15), though Plaintiff's sixth cause of action in the Amended Complaint does include allegations that could be read to imply such claims, (Dkt. No. 33, at ¶¶ 676-702). For purposes of the present summary judgment motions, and in light of its obligation to construe Plaintiff's pleadings liberally, the Court will evaluate the merits of the supervisory liability claims against Defendants Williams and Dougherty suggested by the Amended Complaint and Plaintiff's briefing, in addition to Plaintiff's *Monell* claim against Defendant City of Utica.

1.      *City of Utica*

It is well-established that a municipality may not be held liable under § 1983 on the basis of respondeat superior. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978). Rather, municipalities are responsible only for "their own illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), and are not vicariously liable for civil rights violations perpetrated by their employees, *see Monell*, 436 U.S. at 691. In order to sustain a § 1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and that the violation resulted from an identified municipal policy or custom. *Id.* at 694-95. A municipal policy or custom may be established by any of the following: 1) a formal policy, officially promulgated by the municipality, *id.* at 690; 2) action taken by the official responsible for

establishing policy with respect to a particular issue, *Pembaur*, 475 U.S. at 483-84; 3) unlawful

practices by subordinate officials so permanent and widespread as to practically have the force of

law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1985) (plurality opinion); or 4) a

failure to train or supervise that amounts to "deliberate indifference" to the rights of those with

whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

> In order to support a claim based on a failure to train and supervise, Plaintiff must prove:

> "(1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights."

*Young v. County of Fulton*, 160 F.3d 899, 903-04 (2d Cir. 1998) (citing *Walker v. City of New*

*York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotations and alterations omitted)).

Here, the only misconduct of a *constitutional* magnitude that Plaintiff has presented any

evidence of is Defendant Cerminaro's alleged fabrication of evidence against him in the form of

false testimony. On this record, Plaintiff has, at the most, raised a question as to whether one

officer deliberately falsified testimony to secure Plaintiff's conviction. He has presented no

evidence that the City of Utica has a widespread policy or custom of allowing police officers to

fabricate evidence or present intentionally false testimony against criminal defendants, or that the

City of Utica systematically fails to train police officers on the importance of testifying

truthfully.

Plaintiff's arguments supporting his *Monell* claim largely rely on the City of Utica's

alleged failure to properly investigate his January 2011 civilian complaint filed with the Utica

Police Department and hold the subject officers accountable. (Dkt. No. 325, at 39-43).

"[E]vidence that the municipality had notice of but repeatedly failed to make any meaningful

investigation into charges that police officers" violated complainants' civil rights certainly may form the basis of a *Monell* claim. *Ricciuti*, 941 F.2d at 123. However, even assuming that the police department's actions with respect to his civilian complaint (discussed further below, *see* Section IV.H.2 *infra*) constituted a failure to properly investigate his complaint, a single incident, without more, is insufficient to establish the systemic and repeated failure necessary for a "policy or custom" under *Monell*. *See, e.g.*, *Nguedi v. Caulfield*, 813 F. App'x 1, 3 (2d Cir. 2020) ("[A] single case is insufficient to establish the existence of" a policy or custom for purposes of a *Monell* claim (citing *Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016))); *Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir. 1987) (finding that there no *Monell* claim existed where "the only relevant evidence presented by appellees was the manner in which they themselves were" treated). Therefore, Defendant City of Utica is entitled to summary judgment on Plaintiff's *Monell* claim against it.[30]

### 2.    *Defendants Williams and Dougherty*

Traditionally, to state a claim based on supervisory liability in the Second Circuit, a plaintiff must allege that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

---

[30] Plaintiff's argument that Defendant City of Utica must be denied summary judgment because, as the City of Utica's 30(b)(6) representative, "Defendant Williams coul[d] not answer questions about training, prior lawsuits and prior instances of Utica Police Officer misconduct of the type complained of in this lawsuit," (Dkt. No. 325, at 43), is without merit. Plaintiff fails to point to any specific defects in Defendant Williams' testimony that he believes prevent him from being able to adduce the evidence necessary to prove a failure-to-train claim. Plaintiff's remaining contentions regarding his inability to obtain the "correct" training material, (*id.*), largely seek to re-litigate discovery disputes that have already been resolved.

*Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995)). However, the Second Circuit recently held that the *Colon* test was abrogated

by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Court held that:

> [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must
> plead and prove "that each Government-official defendant, through the official's own
> individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937.
> "The factors necessary to establish a [§ 1983] violation will vary with the constitutional
> provision at issue" because the elements of different constitutional violations vary. *Id.*
> The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, No. 19-3712, 2020 WL 7687688, at *6, 2020 U.S. App. LEXIS 40392, at

*17 (2d Cir. Dec. 28, 2020). *Tangreti* was decided in the context of an Eighth Amendment

deliberate indifference claim against a prison official, and therefore did not specify the "factors

necessary" to establish a claim against a supervisor for the types of claims Plaintiff alleges here.

*Id.* However, the Court need not address this issue, because on the record here, it is clear that

Plaintiff cannot establish a constitutional claim against Defendants Williams and Dougherty.

As to Defendant Williams, Plaintiff argues that he first "became aware of the wrong

inflicted on Plaintiff" when Plaintiff filed a civilian complaint in January 2011. (Dkt. No. 325, at

37). After a preliminary investigation, Defendant Williams chose not to take action because he

felt Plaintiff's complaints were best addressed in the context of his criminal matter, a decision

which Plaintiff alleges violates the Utica Police Department's policies on how such complaints

should be handled. (*Id.*). He further argues that, when Defendant Dougherty again brought

Plaintiff's complaint to Defendant Williams' attention in 2012, Defendant Williams again failed

to conduct a meaningful investigation or bring disciplinary action, instead allowing Defendant

Dougherty to address the issue directly with Plaintiff. (*Id.* at 38).

As with Plaintiff's *Monell* and failure to intervene claims, the only possible constitutional

violation for which Defendant Williams could be liable is Defendant Cerminaro's allegedly false

testimony that he saw Plaintiff possess the bag of contraband collected at the scene of his arrest.
Construing the facts in the light most favorable to Plaintiff, there is no evidence in the record
from which a factfinder could reasonably infer that Defendant Williams was ever presented with
any concrete evidence, beyond Plaintiff's own allegations in his January 2011 civilian complaint,
that Defendant Cerminaro had fabricated evidence or testified falsely against Plaintiff.[31] "The
mere failure to investigate an allegation of unconstitutional activity, without more . . . does not
provide a basis for finding liability under section 1983." *Toole v. Connell*, No. 04-cv-0724, 2008
WL 4186334, at *7, 2008 U.S. Dist. LEXIS 123184 (N.D.N.Y. Aug. 1, 2008), (citing *Wingate v.
Horn,* No. 05-cv-2001, 2007 WL 30100, at *6, 2007 U.S. Dist. LEXIS 203, at *19-20 (S.D.N.Y.
Jan. 4, 2007)), *report and recommendation adopted* 2008 WL 4186334, 2008 U.S. Dist. LEXIS
73760 (N.D.N.Y. Sept. 10, 2008). Furthermore, according to Plaintiff's own account of events,
Defendant Williams *did* conduct at least a preliminary investigation, and determined that
Plaintiff's allegations were best addressed through his criminal proceedings and, later, through a
meeting between Plaintiff and Defendant Dougherty. Assuming Plaintiff is correct that his
civilian complaint was handled improperly under the Utica Police Department's policies, he has
failed to provide any evidence suggesting that Defendant Williams' chosen course of action was
so utterly inadequate as to violate Plaintiff's *constitutional* rights.

Plaintiff's supervisory liability arguments with respect to Defendant Dougherty are
largely duplicative of the arguments made in the context of his other claims. (Dkt. No. 319, at
17-20). The Court has already addressed these arguments at length in the its analysis of

---

[31] Assuming Plaintiff's civilian complaint did provide Defendant Williams with evidence that Defendant Cerminaro failed to disclose the existence of photographs during Plaintiff's criminal proceeding—a failure which the Court has found did not, in itself, amount to a constitutional violation, *see* Section IV.B.1.c *supra*—there is no evidence that this would give Defendant Williams reason to believe that Defendant Cerminaro's entire testimony about what he observed on the day of Plaintiff's arrest was false, particularly given that, as discussed in Section IV.B.1.c *supra*, the nondisclosed photographs, on their face, appear to generally corroborate Defendant Cerminaro's version of events.

Plaintiff's fair trial claims against Defendant Dougherty, and has found that there is no evidence

from which Plaintiff can establish that any of Defendant Dougherty's actions, directly or as a

supervisor, violated Plaintiff's constitutional rights. *See* Sections IV.B.1.b.i, IV.B.2.a.iii, *supra.*

For the same reasons, Plaintiff has failed to raise a triable issue of fact with respect to a

supervisory liability claim against Defendant Dougherty.

I.      **Count VII: Defamation Claim against Defendants McNamara and County of Oneida Arising from the August 2015 Observer-Dispatch Article**

In general, to state a claim for defamation under New York law, a plaintiff must allege:

"(1) a false statement about the plaintiff; (2) published to a third party without authorization or

privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that

either constitutes defamation per se or caused 'special damages.'" *Gargiulo v. Forster & Garbus*

*Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citations omitted). "To be actionable . . . the

statement must do more than cause discomfort or affront; the statement is not measured by the

sensitivities of the maligned, but the critique of reasonable minds that would think the speech

attributed odious or despicable characterizations to the subject." *Chau v. Lewis*, 771 F.3d 118,

127 (2d Cir. 2014).

Even otherwise defamatory statements may be protected by certain qualified, or

conditional, privileges. For example, a qualified privilege "attaches to statements in which the

party communicating possesses a legal duty to communicate information about another, provided

that the communicator has a good faith belief that the information is true." *Chase v. Grilli*, 512

N.Y.S.2d 125, 126 (2d Dep't 1987). Another qualified privilege is the so-called "common

interest privilege," which extends to "communication made by one person to another upon a

subject in which both have an interest." *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992)

(citation omitted). Courts have found that statements to the media by district attorneys, or their

representatives, are covered by such qualified privileges. *See Friedman v. Rice*, 5 N.Y.S.3d 816, 824-25 (N.Y. Sup. Ct. 2015) (statements to the media by information officers at Nassau District Attorney's Office protected by the common interest privilege); *Wyllie v. Dist. Atty. of Cnty. of Kings*, 770 N.Y.S.2d 110, 115 (2d Dep't 2003) (statements to press by spokesman for King's County D.A. protected by common interest privilege); *Chase*, 512 N.Y.S.2d at 126 ("[A] qualified privilege attaches to the allegedly defamatory statements, inasmuch as the defendants, acting in their capacity as representatives of the Nassau County District Attorney's office, communicated certain information about the plaintiff's arrest and conviction.").

However, "[t]he shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Liberman*, 80 N.Y.2d at 437. There are two standards for malice: 1) "the constitutional standard which requires the statements to be made with a high degree of awareness of their probable falsity"; and 2) "the common law standard which requires a showing of ill will as the speaker's sole motivation for making alleged defamatory statements." *Friedman*, 5 N.Y.S.3d at 824 (citing *Liberman*, 80 N.Y.2d at 438).

Applying the foregoing standards, there is no evidence in the record from which Plaintiff can sustain a defamation claim against the County Defendants with respect to any of the statements attributed to Defendant McNamara in the August 2015 Observer-Dispatch article.[32]

First, as the case law the County Defendants cite makes clear, Defendant McNamara's statement that Plaintiff is a "bit of a difficult individual" is merely a statement of opinion, and is thus cannot be the basis of a defamation claim. *See, e.g.*, *Chau*, 771 F.3d at 128 ("New York law protects derogatory statements which may be categorized as 'opinion' as opposed to 'fact' . . . .

---

[32] Because Plaintiff's defamation claims against Defendant McNamara fail on their merits, and because the County Defendants do not argue that Defendant County of Oneida may not be held liable for defamatory statements made by Defendant McNamara, the Court does not consider that question.

[S]tatements more likely to be characterized as fact are readily understood by the reader to have a precise, unambiguous and definite meaning and can be objectively characterized as true or false."); *Williams v. Varig Brazilian Airlines*, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (finding that employer's statements that terminated employee was "difficult to work with" were non-actionable opinions, and citing case law finding statements that certain property owners "are very difficult to deal with" "have been held to be protected expressions of opinion"); *North State Autobahn, Inc. v. Progressive Ins. Grp.*, 953 N.Y.S.2d 96, 100 (2d Dep't 2012) (noting lower court's decision finding statements that auto body shop was a "problem shop/difficult to deal with" were non-actionable statements of opinion). Plaintiff does not meaningfully argue to the contrary; he explains why he believes Defendant McNamara's opinion is unreasonable, but does not present a basis for finding the opinion actionable. (Dkt. No. 317, at 14-15).

Second, assuming Defendant McNamara made the statement that "[t]he cocaine in evidence was destroyed following [Plaintiff's] conviction, as is standard for the office," and assuming that statement was false,[33] the statement is not defamatory. It does not "attribute[] odious or despicable characterizations" to Plaintiff. *Chau*, 771 F.3d at 127. Indeed, it does not say or imply anything about Plaintiff at all.

Third, the record does not support a finding that Defendant McNamara's use of the term "crack" to describe the substance found at the scene of Plaintiff's arrest was false or defamatory. The deposition testimony (including from Plaintiff's own criminal defense attorney) and other record evidence reflects that the evidence found at the scene of Plaintiff's arrest included an off-

---

[33] Plaintiff claims that "there is no policy for destroying evidence," and that the "purpose of destroying the evidence in Plaintiffs [sic] case was to deny Plaintiff the opportunity to have the drugs and bag tested after conviction." (Dkt. No. 317, at 17). The Court need not resolve this dispute for purposes of evaluating Plaintiff's defamation claim, but notes that the statement as written appears to reference a policy by which, "[a]fter a conviction, and the passage of time within which an appeal can be perfected," Defendant McNamara's office "obtains court orders authorizing the destruction" of drug evidence. (Dkt. No. 33, at ¶ 7(b)).

white, chunky substance consistent with "crack" cocaine; that Defendant McNamara understood

from his investigation into Plaintiff's case that the substance Plaintiff was charged with was

"crack"; that the terms "cocaine" and "crack" are often used interchangeably; and that the term

"crack" was used to describe the substance during Plaintiff's criminal proceedings. (Dkt. No.

300-16, at 84, 136, 170-71, 204; Dkt. No. 33-5, at ¶ 11(c); Dkt. No. 317-30, at 106; Dkt. No.

300-6, at 21, 92; Dkt. No. 300-22, at 187; Dkt. No. 308-4, at 7-9). Plaintiff alleges that

Defendant McNamara's motivation in using that term was its "well known" "negative

connotation in regards to black males," (Dkt. No. 317, at 17), but he points to no evidence to

support that contention, and the Court's review of the record reveals none.[34]

The remainder of the statements Plaintiff alleges are defamatory reflect Defendant

McNamara's understanding of the events surrounding Plaintiff's arrest and conviction.[35] As

statements made by a DA to the media about a case the DA's office was involved in, they are

protected by a qualified privilege. *See, e.g.*, *Friedman*, 5 N.Y.S.3d at 824; *Wyllie*, 770 N.Y.S.2d

at 115; *Chase*, 512 N.Y.S.2d at 126. Thus, even assuming that there is a genuine dispute as to

whether each of the allegedly defamatory statements are false and may be fairly attributed to

Defendant McNamara, Plaintiff's defamation claim fails because there is no evidence in the

record from which a reasonable jury could find that Defendant McNamara acted with the malice

required to overcome this qualified privilege.

---

[34] Plaintiff argues that statements made by Defendant McNamara with respect to a case involving a different factual context—the reversal of a public official's sex offense conviction by the New York Appellate Division based on prosecutorial misconduct—constitute evidence of Defendant McNamara's racial bias against Plaintiff. (Dkt. No 317, at 18-19). This argument is conjectural and does not provide a basis for the Court to infer racist or malicious intent on Defendant McNamara's part.

[35] Plaintiff concedes that Defendant McNamara's technically false statement that Plaintiff was found with six, rather than five, cell phones in his vehicle on the day of his arrest "can't be said to be defamatory" standing alone, (Dkt. No. 317, at 15), and challenges this statement as defamatory only to the extent that it contributes to an overall false impression that Plaintiff was guilty of a crime.

To the contrary, all the record evidence reflects that Defendant McNamara's statements were based on, and consistent with, the information he received through his investigation into Plaintiff's case, including his discussions with the officers involved in the case, and that he believed the statements to be substantially true at the time he made them. (Dkt. No. 300-16, at 192-206; Dkt. No. 308-5, at ¶¶ 23-27 (describing investigation and citing record evidence)). There is no evidence from which a jury could infer that his statements were made with a "high degree of awareness of their probable falsity."[36] *Friedman*, 5 N.Y.S.3d at 824; *see also Moore v. Dormin*, 676 N.Y.S.2d 90, 91 (2d Dep't 1998) (Rosenberger, J. concurring) (finding statements by prosecutor about police officer's perjury were not made with malice where he "took great pains to substantiate his claims" and "was clearly not indifferent to the question of truth"). Furthermore, the fact that Defendant McNamara did not tell the reporter that evidence was intentionally withheld or fabricated, or that officers committed perjury, in Plaintiff's case is entirely consistent with his conclusion, based on his investigation, that no such willful misconduct occurred. (Dkt. No. 308-5, at ¶ 27; Dkt. No. 317-1, at ¶ 27; Dkt. No. 307-15, at ¶ 53; Dkt. No. 319-1, at ¶ 53).

Nor is there any evidence to infer that Defendant McNamara's statements were made with the "ill will" sufficient to overcome a qualified privilege. The fact that Defendant McNamara found Plaintiff to be a "difficult individual," standing alone, does not establish that his statements to the Observer-Dispatch—which appear to be a straightforward recitation of his understanding of the facts of Plaintiff's case in response to a reporter's questions—were made with malice. *See, e.g.*, *Liberman*, 80 N.Y.2d at 439 ("If the defendant's statements were made to

---

[36] Plaintiff's contention that Defendant McNamara's deposition statements prove his knowledge that Defendant Cerminaro improperly picked loose substance up off the ground and improperly attributed it to Plaintiff, (Dkt. No. 317, at 12-13), has already been addressed in the context of Plaintiff's fabrication of evidence claim, and is without merit. *See* Section IV.B.2.a.i *supra*.

further the interest protected by the privilege, it matters not that defendant *also* despised plaintiff. Thus, a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'") (citation omitted). The record as a whole is also inconsistent with a finding of ill will given the evidence that, whatever his personal feelings about Plaintiff may have been, Defendant McNamara investigated Plaintiff's allegations of impropriety; consented to a vacatur of Plaintiff's conviction; and moved to dismiss Plaintiff's indictment, explaining in open court that he believed Plaintiff was deserving of clemency and articulating his reasoning. (Dkt. No. 308-5, at ¶¶ 23-27; Dkt. No. 325-13, at 6-9; Dkt. No. 300-16, at 59-60, 95-107, 113-14, 235-36). For the foregoing reasons, the County Defendants are entitled to summary judgment on Plaintiff's seventh cause of action against them.

J.      **Count VIII: Defamation Claim against Defendants McNamara and County of Oneida Arising from Defendant McNamara's May 2016 Affidavit**

Plaintiff's eighth cause of action is a defamation claim against the County Defendants for statements made in an affidavit Defendant McNamara submitted in connection with a motion to dismiss Plaintiff's complaint in a state court proceeding. The County Defendants argue that Plaintiff's claim must be dismissed both because the statements are not defamatory, and because they are "statements contained within an affidavit submitted to Court in a judicial proceeding," and thus are "entitled to an absolute privilege." (Dkt. No. 308-6, at 25-27). Plaintiff does not respond to these contentions. (Dkt. No. 317).

As with his statements in the Observer-Dispatch article, the statements about Plaintiff that Defendant McNamara makes in his affidavit are materially consistent with his on-the-record statements during Plaintiff's post-conviction proceedings, and the record establishes that they reflect his truthful understanding of Plaintiff's case as determined by the investigation he conducted in response to Plaintiff's § 440 motion. As such, the Court's analysis with respect to

Plaintiff's seventh cause of action, *see* Section IV.I supra, applies with equal force here. Furthermore, in the absence of any argument by Plaintiff to the contrary, the Court agrees with the County Defendants that the affidavit reflects Defendant McNamara's statement as a litigant in a judicial proceeding, and thus is subject to an absolute privilege that bars Plaintiff's defamation claim. (Dkt. No. 308-6, at 25-27 (collecting relevant case law)).

### K.   Count XI:[37] Defamation Claim against Defendants Cerminaro and City of Utica

The City Defendants argue that, after dismissing Plaintiff's federal claims, the Court should decline to exercise supplemental jurisdiction over his eleventh cause of action, which is a state-law defamation claim against Defendants Cerminaro and the City of Utica arising from Defendant Cerminaro's allegedly false Supporting Deposition. (Dkt. No. 300-39, at 53). Because the Court has determined that Plaintiff's § 1983 fabrication of evidence claim against Defendant Cerminaro survives summary judgment, and because the City Defendants make no other argument in favor of the defamation claim's dismissal, the Court will not grant summary judgment to Defendants Cerminaro and the City of Utica on Plaintiff's eleventh cause of action.

### L.   Summary/Conclusion

Based on the foregoing analysis, the Court finds that Plaintiff's fabrication of evidence claim against Defendant Cerminaro and his defamation claim against Defendants Cerminaro and the City of Utica survive summary judgment and may proceed to trial. As to Plaintiff's other claims, the Court has carefully reviewed all of Plaintiff's arguments, including those explicitly analyzed above and all other arguments he raises, and finds them without merit. Therefore, all

---

[37] Count IX, a defamation claim against Gatehouse Media and various individuals, and Count X, a respondeat superior and joint and several liability claim against Gatehouse Media, have been previously dismissed. (Dkt. No. 99).

other claims alleged in Plaintiff's Amended Complaint shall be dismissed with prejudice. Given

that, the Court need not address the remaining arguments Defendants raise in their briefing.[38]

## V.      OTHER PENDING MOTIONS

### A.      Motion for Sanctions

In their motion for sanctions, the City Defendants ask the Court to draw an adverse

inference that the five cell phones found in Plaintiff's possession contained evidence of drug

trafficking, on the grounds that Plaintiff failed to preserve the contents of these phones. (Dkt. No.

310-7). However, it appears that these phones left Plaintiff's possession years before he filed this

litigation in 2016. (Dkt. No. 310-5, at 5-6). The City Defendants rely heavily on the fact that

Plaintiff admitted in his deposition that he contemplated bringing civil litigation against the City

Defendants as early as the day of his arrest, and argue that his obligation to preserve the cell

phones accrued at that time. (*Id.* at 6; Dkt. No. 348, at 1-2). Even crediting Plaintiff's testimony

that he contemplated bringing this litigation much earlier than 2016, it is not clear whether he

"should have known that the [cell phones] may be relevant to future litigation," *Kronisch v. U.S.*,

150 F.3d 112, 126-27 (2d Cir. 1998), particularly in light of the fact that the cell phones were

returned to him shortly after his arrest and were not used, or even collected, as evidence in his

criminal case. In any event, drawing the requested adverse inference would not change the

outcome of the Court's analysis with respect to any of Plaintiff's claims. Therefore, the Court

declines to draw such an inference, and as such, the Court need not address the arguments raised

in the parties' briefing on the motion. This is without prejudice to Defendants' ability to renew

---

[38] In several places in his briefing, Plaintiff appears to suggest that the Court should grant summary judgment in *his* favor, *see, e.g.,* (Dkt. No. 325, at 45-46), but he has not filed a cross-motion for summary judgment. Even assuming that any of Plaintiff's opposition filings could be reasonably construed as cross-motions for summary judgment, Plaintiff has, at most, demonstrated that a genuine dispute of material fact exists with respect to one of his claims; he has not proven that he is entitled to summary judgment on any of his claims.

this motion in a pretrial submission after considering this decision and the claims remaining for trial.

**B.     Rule 56(d) Motion**

Plaintiff has also filed an affidavit with each of his opposition filings requesting that, pursuant to Fed. R. Civ. P. 56(d), the Court delay resolution of the pending summary motions to allow Plaintiff time to take depositions of Judge Dwyer, Micaela Parker (a reporter with the Observer-Dispatch and a former Defendant in this matter), ADA Sarah Demellier, and Attorney Zachary C. Oren (counsel to the City Defendants). (Dkt. Nos. 317-3, 319-3, 325-3). Fed. R. Civ. P. 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

"A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials 'must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiffs allegation is in the hands of the defendant is insufficient.'" *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016) (citing *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Plaintiff's basis for deposing ADA Demellier is a May 3, 2016 email in which she wrote that, on the morning of August 10, 2015, she "spoke with [Defendant McNamara] about [her] concerns with the case," and following that discussion and a meeting with Defendant Paladino, Defendant McNamara moved to dismiss Plaintiff's indictment in the interest of justice. (Dkt. No. 317-3, at 133; Dkt. No. 319-3, at 133; Dkt. No. 325-3, at 133). Plaintiff contends that Demellier's testimony is necessary to establish what these "actual concerns" were, as he believes

that this would help him prove that the dismissal of his indictment was a "favorable termination." (Dkt. No. 317-3, at ¶¶ 21-22; Dkt. No. 319-3, at ¶¶ 21-22; Dkt. No. 325-3, at ¶¶ 21-22). The information Plaintiff seeks is not essential to justify his opposition. Plaintiff has already deposed multiple representatives from the Oneida County DA's office, including Defendant McNamara himself. He has had ample opportunity to thoroughly examine their recollection of what the office's "concerns" were in Plaintiff's case, as well as to question them regarding Demellier's email and the meetings referenced therein. He has elicited significant, detailed and consistent testimony explaining the DA's office's conclusions regarding Plaintiff's case and their reasons for moving to dismiss his indictment. Plaintiff offers no reason to believe that ADA Demellier's testimony would differ so materially from that of her colleagues as to alter the Court's "favorable termination" analysis.

In a similar vein, Plaintiff contends that Judge Dwyer must be deposed so that he can "explain the statement he made before dismissing the indictment" and reveal his true reasons for doing so. (Dkt. No. 317-3, at ¶¶ 23; Dkt. No. 319-3, at ¶¶ 23; Dkt. No. 325-3, at ¶¶ 23). This information is not essential to justify Plaintiff's opposition. At the August 10, 2015 hearing, Judge Dwyer very clearly stated his reasons for dismissing Plaintiff's indictment, and Plaintiff offers no legitimate reason to believe that his testimony regarding his reasoning would materially conflict with the reasons he gave on the record in open court. Plaintiff's other contentions—including those regarding his beliefs about the prosecution's true motivations for dismissing the indictment, and how a full evidentiary hearing may have impacted Judge Dwyer's analysis had one been held—are speculative and irrelevant to the Court's "favorable termination" analysis.

Plaintiff contends that Micaela Parker's testimony is necessary to establish her sources of information for the allegedly defamatory Observer-Dispatch article, particularly in light of

Defendant McNamara's statements suggesting that some of the statements in the article did not come from him. (Dkt. No. 317-3, at ¶¶ 26-28; Dkt. No. 319-3, at ¶¶ 26-28; Dkt. No. 325-3, at ¶¶ 26-28). This information is not essential to justify Plaintiff's opposition. Plaintiff's defamation claims against Parker and her fellow media Defendants have already been dismissed. (Dkt. No. 99). For purposes of Plaintiff's defamation claim against the County Defendants, the Court construed the facts in the light most favorable to Plaintiff and found that, even assuming that Defendant McNamara was the source for all of the allegedly defamatory statements in the article, Plaintiff's defamation claim could not be sustained. *See* Section IV.I *supra*.

Plaintiff argues that Zachary Oren's testimony is necessary to establish whether the feet visible in one of the photographs taken at the scene of Plaintiff's arrest belonged to Defendant Cerminaro. (Dkt. No. 317-3, at ¶¶ 29-38; Dkt. No. 319-3, at ¶¶ 29-38; Dkt. No. 325-3, at ¶¶ 29-38). Even assuming Plaintiff's contention in his affidavit regarding attorney-client privilege waiver has any merit, the information Plaintiff seeks is not essential to justify his opposition. Regardless of whose feet appear in the particular photograph Plaintiff focuses on, Defendants do not reasonably dispute that Defendant Cerminaro was present when Defendant Dougherty was photographing the scene, and that he witnessed Defendant Dougherty take those photographs. Especially given its obligation to construe the facts in the light most favorable to Plaintiff, the Court assumed that fact to be true when analyzing Plaintiff's claims. Thus, establishing definitively that the feet in the photograph belong to Defendant Cerminaro would not assist Plaintiff's opposition or alter the Court's analysis in any way.

For the foregoing reasons, Plaintiff's request pursuant to Fed. R. Civ. P. 56(d) is denied.

### C.   Motion to Disqualify Counsel

Plaintiff brings a motion to disqualify counsel for the City Defendants and Defendant Dougherty, based on "unprofessional and unethical conduct." (Dkt. No. 334). Plaintiff's

argument that Zachary Oren must be disqualified because he may be called to testify on whether

the feet in a particular photograph belong to Defendant Cerminaro, (*id.* at 3-6), has been

addressed above, *see* Section V.B *supra*, and is without merit, particularly in light of the fact that

Plaintiff's *Brady* claim has been dismissed and the question of whose feet were in the

photograph is no longer a relevant issue. Plaintiff also argues that Charles Brown, an attorney in

the corporation counsel's office who was present at the December 2012 meeting Plaintiff

surreptitiously recorded, may be called as a witness regarding Plaintiff's fabrication of evidence

claim. (*Id.* at 3, 6). Plaintiff has sought corporation counsel's disqualification on this basis before

without success, (Dkt. No. 55, 63, 180, 193), and has presented no reason for the Court to

reconsider those decisions. The Court has reviewed Plaintiff's remaining arguments, and finds

that none provide a basis for disqualification at this time.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's request to delay resolution of the pending summary judgment

motions and conduct additional discovery pursuant to Fed. R. Civ. P. 56(d), (Dkt. Nos. 317-3,

319-3, 325-3), the City Defendants' motion for sanctions, (Dkt. No. 310), and Plaintiff's motion

to disqualify counsel, (Dkt. No. 334), are **DENIED**; and it is further

**ORDERED** that the City Defendants' motion for summary judgment (Dkt. No. 300) is

**DENIED** with respect to Plaintiff's fabrication of evidence claim (First and Second Causes of

Action) against Defendant Cerminaro and his defamation claim (Eleventh Cause of Action)

against Defendants Cerminaro and City of Utica, and **GRANTED** in all other respects; and it is

further

**ORDERED** that the motions for summary judgment by Defendant Dougherty (Dkt. No.

307) and the County Defendants (Dkt. No. 308) are **GRANTED** in their entirety; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice:** Plaintiff's *Brady* claim (First Cause of Action); Plaintiff's fabrication of evidence claim (First Cause of Action) against Defendants Dougherty and Paladino; Plaintiff's fabrication of evidence claim (Second Cause of Action) against Defendants Dougherty and Paladino; Plaintiff's malicious prosecution claims (Third and Fourth Cause of Action); Plaintiff's failure to intervene claim (Fifth Cause of Action); Plaintiff's *Monell* claim (Sixth Cause of Action); and Plaintiff's defamation claims (Seventh and Eighth Causes of Action) against Defendants McNamara and the County of Oneida.

**IT IS SO ORDERED.**

Dated: January 14, 2021
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

82