**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

VLADIMIR JEANTY,

                              Plaintiff,                    6:16-cv-00966 (BKS/TWD)

v.

Police Officer MICHAEL F. CERMINARO, badge #1301,

                              Defendant.

---

**Appearances:**

Vladimir Jeanty
Uniondale, NY 11553
*Plaintiff, pro se*

Zachary C. Oren
First Assistant Corporation Counsel
One Kennedy Plaza
Utica, NY 13502
*Attorney for Defendant*

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.      INTRODUCTION

Plaintiff pro se Vladimir Jeanty brought this action against various Defendants under 42

U.S.C. § 1983 and New York law for alleged constitutional and tort injuries resulting from his

arrest on October 15, 2009 and subsequent prosecution, as well as a related news report. (Dkt.

No. 33). On January 14, 2021, the Court issued a ruling on Defendants' motions for summary

judgment (the "January 14 Decision"), in which it dismissed all of Plaintiff's remaining claims

except for his fabrication of evidence claims (First and Second Cause of Action) against

Defendant Cerminaro and his defamation claims (Eleventh Cause of Action) against Defendants

Cerminaro and the City of Utica, and resolved various ancillary motions. *Jeanty v. City of Utica*, No. 16-cv-00966, 2021 WL 149051, 2021 U.S. Dist. LEXIS 7737 (N.D.N.Y. Jan. 14, 2021). The parties have since stipulated to the dismissal of Plaintiff's defamation claims, (Dkt. No. 424), leaving Plaintiff's fabrication of evidence claims against Defendant Cerminaro as his only claims.[1] Presently before the Court are the parties' pre-trial motions in limine, which raise various evidentiary objections, (Dkt. Nos. 413, 414), as well as Defendant's renewed motion for spoliation sanctions against Plaintiff, (Dkt. No. 407). The Court heard oral argument on the motions at the final pretrial conference in this matter on June 28, 2021. For the reasons that follow, both parties' motions in limine are granted in part and denied in part to the extent set forth in this decision, and Defendant's motion for sanctions is denied.

## II.    PLAINTIFF'S CRIMINAL AND DISCIPLINARY HISTORY

Both parties' motions in limine raise various arguments with respect to Plaintiff's criminal history and his prison disciplinary record.

### A.    Plaintiff's Criminal Record (D-25)

Defendant seeks to admit Exhibit D-25, which is a New York State Department of Criminal Justice Services Criminal History Repository for Plaintiff dated October 23, 2009 (the "Criminal History Report"). The parties discuss two possible bases for admission of this exhibit: (1) impeachment of Plaintiff's character for truthfulness under Fed. R. Evid. 609; and (2) relevance to the damages Plaintiff seeks.

#### 1.    *Impeachment for Truthfulness*

Plaintiff seeks an order precluding Defendant from introducing Plaintiff's Criminal History Report or questioning him on his prior convictions, arguing that impeachment by

---

[1] As the defamation claim has been dismissed, the Court has not addressed any of the arguments in the parties' motions in limine concerning that claim.

evidence of these convictions is improper under Fed. R. Evid. 609, and that any probative value the convictions have is substantially outweighed by the risk of unfair prejudice under Fed. R. Evid. 403. (Dkt. No. 414-1, at 7-13). Defendant argues that, with the exception of one conviction for narcotics possession, all of Plaintiff's convictions are admissible for impeachment under Rule 609. (Dkt. No. 419, at 10-11).

Rule 609(a)(1) of the Federal Rules of Evidence provides that, in a civil case, "subject to Rule 403," evidence of a prior conviction "must be admitted" to impeach a witness where the conviction was "for a crime that . . . was punishable . . . by imprisonment for more than one year." Fed. R. Evid. 609(a)(1)(A). "The Rule requires district courts to admit the name of a conviction, its date, and the sentence imposed unless the district court determines that the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *United States v. Estrada*, 430 F.3d 606, 620-21 (2d Cir. 2005) (quoting Fed. R. Evid. 403). Rule 609(a)(2) of the Federal Rules of Evidence provides that, "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). "The presumption under Rule 609(a)(2) . . . is that the 'essential facts' of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed, are included within the 'evidence' that is to be admitted for impeachment purposes." *Estrada*, 430 F.3d at 615.

The applicability of these rules is limited by Rule 609(b), which provides that "if more than 10 years have passed since the witness's conviction or release from confinement for it,

whichever is later," "[e]vidence of the conviction is admissible only if . . . its probable value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1).[2] As an initial matter, it is undisputed that all of the convictions listed on Plaintiff's Criminal History Report (and his release from confinement from those convictions) occurred before the 2009 arrest giving rise to this litigation, and thus, as of now, are more than ten years old. Defendant argues that the ten-year lookback period under Fed. R. Evid. 609(b) should be measured from the date of Plaintiff's 2009 arrest, and that most of his prior convictions occurred within that ten-year period. (Dkt. No. 419, at 9-10). However, courts in this Circuit typically measure Fed. R. Evid. 609(b)'s ten-year lookback period from the time of trial. *See, e.g., Dougherty v. Cnty of Suffolk*, No. 13-cv-6493, 2018 WL 1902336, at *3, 2018 U.S. Dist. LEXIS 67465, at *8-9 (E.D.N.Y. Apr. 20, 2018) (finding that Fed. R. Evid. 609(b) applied to convictions that occurred more than ten years prior to trial, but less than ten years before the 2012 incident giving rise to the litigation); *U.S. v. Bumagin*, 136 F. Supp. 3d 361, 377 (E.D.N.Y. 2015) (finding that Fed. R. Evid. 609(b) did not apply to certain of the defendant's convictions where he was released from incarceration for those convictions "less than ten years before trial will begin in this case"); *U.S. v. Brown*, 606 F. Supp. 2d 306, 313 (E.D.N.Y. Mar. 10, 2009) (finding that Fed. R. Evid. 609(b) was applicable to the defendant's conviction for criminal possession where, "as of . . . the first day of trial in the underlying action, [the defendant's] conviction . . . was more than ten years old"); *see also United States v. Thomas*, 815 F. App'x

---

[2] Fed. R. Evid. 609(b) also requires that a party seeking to use such a conviction for impeachment purposes "give[] an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b)(2). Plaintiff argues that Defendant has not provided the necessary written notice. (Dkt. No. 414-1, at 9-10). Defendant argues that he provided such notice in his Fed. R. Civ. P. 26 pretrial disclosures, and that Plaintiff has therefore "had adequate opportunity to argue as to the Court as to why the jury should not hear about his prior convictions." (Dkt. No. 419, at 8). The Court agrees that, based on Defendant's notice in his pretrial disclosures of his intent to seek admission of Plaintiff's Criminal History Report, Plaintiff has had a "fair opportunity" to contest the admission of his ten-year old convictions (and, in fact, did so in his own motion in limine). The Court therefore finds that the requirements of Fed. R. Evid. 609(b) have been met.

671, 677 (3d Cir. 2020) (citing circuit caselaw considering end point for Rule 609(b) as the date of trial).[3] Therefore, the Court finds that the "more stringent" balancing test under Fed. R. Evid. 609(b) applies to all of Plaintiff's convictions. *Brown*, 606 F. Supp. 2d at 313-14.

The Second Circuit has "recognized that Congress intended that convictions over ten years old be admitted 'very rarely and only in exceptional circumstances.'" *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993) (quoting S.Rep. No. 1277, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. (93 Stat.) 7051, 7062). Courts reviewing the admission of convictions under Rule 609(b) must "'make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice.'" *Jones v. N.Y. City Health & Hosps. Corp.*, 102 F. App'x. 223, 226 (2d Cir. 2004) (quoting *United States v. Mahler*, 579 F.2d 730, 734 (2d Cir. 1978)). In conducting the necessary balancing test, "courts in this Circuit consider the following factors: '[1] the impeachment value of the prior crimes, [2] the date of the conviction and the [witness's] subsequent history, [3] the degree of similarity between the past crimes and this crime, [4] the centrality of the [witness's] credibility in this case, and [5] the importance of the [witness's] testimony.'" *Brown*, 606 F. Supp. 2d at 311-12 (citation omitted). "Although all of these factors are relevant, '[p]rime among them is [the first factor, *i.e.*] whether the crime, by its nature, is probative of a lack of *veracity*." *Id.* (quoting *U.S. v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977)).

"[C]ourts in this Circuit have consistently admitted convictions over ten years of age when the prior crimes involved falsification and the credibility of the testifying witness was

---

[3] In *United States v. Oliver*, 626 F.2d 254 (2d Cir. 1980), the only case from this Circuit that Defendant cites in support of his argument, the Second Circuit merely found that the District Court "acted well within [its] discretion in ruling that, if [a criminal defendant] took the stand, his prior convictions . . . all within 10 years of the present arrest, would be admitted to impeach [his] credibility." *Id.* at 264. The case does not establish, or suggest, a general rule that, in a civil case arising from an allegedly unlawful arrest like this one, Fed. R. Evid. 609(b)'s lookback period is measured from the date of the allegedly improper arrest, rather than the time of trial.

crucial to the outcome of the current case." *United States v. Chervin*, No. 10-cr-918, 2013 WL 124270, at *5, 2013 U.S. Dist. LEXIS 4012, at *15 (S.D.N.Y. Jan. 10, 2013) (citing *Zinman*, 983 F.2d at 434; *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981)). In *Zinman*, 938 F.2d at 434, the Second Circuit affirmed the district court's admission of Zinman's 17-year old conviction for Medicare fraud. It observed that the district court's "on-the record determination" included findings that "making a false statement to a government agency is a crime akin to perjury, and that Zinman's conviction therefore bore heavily on his credibility," "the jury's assessment of Zinman's credibility was highly relevant to several disputed issues in the case," and "any resulting prejudice to Zinman was substantially outweighed by the probative value of the evidence." *Id.* The Second Circuit found "this determination was supported by the record and was well within the district court's discretion." *Id.*

Plaintiff's Criminal History Report includes the following convictions that require proof of or admission to a dishonest act or false statement and, therefore, bear on Plaintiff's propensity for truthfulness: (1) two August 2004 felony convictions of Offering a False Instrument to File in the First Degree, N.Y Penal Law § 175.35; (2) a September 2000 misdemeanor conviction of Possession of a Forged Instrument in the Third Degree, N.Y Penal Law § 170.20; and (3) two misdemeanor convictions, one in April 1995 and one in August 1993, of Issuing a Bad Check, N.Y Penal Law § 190.05(1). *See* N.Y Penal Law § 175.35 (requiring proof or admission of "knowing that a written instrument contains a false statement or false information" and offering or presenting it to a public officer or public servant with knowledge that it would become part of the records of such public office or public servant); N.Y Penal Law § 170.20 (requiring proof or admission of "knowledge that [a possessed or uttered instrument] is forged" and "intent to defraud, deceive or injure another"); N.Y Penal Law § 190.05(1) (requiring proof or admission

of "knowing that he or his principal . . . does not then have sufficient funds with the drawee to cover" a check, and "inten[t] or belie[f] at the time of utterance that payment will be refused by the drawee upon presentation").

Beginning with Plaintiff's 2004 (17-year-old) convictions of Offering a False Instrument to File in the First Degree, these are felony convictions that have significant impeachment value with respect to Plaintiff's propensity for truthfulness. They are also entirely dissimilar to the drug possession crime that Plaintiff was allegedly wrongfully convicted of, and there is thus a relatively low risk that the jury will unfairly infer that these prior convictions make it more likely that Plaintiff possessed cocaine on the day of his arrest. Moreover, the issues in this case turn heavily on the jury's evaluation of the credibility of Plaintiff's and Defendant's competing narratives regarding the circumstances of Plaintiff's arrest, and Plaintiff's testimony is crucial evidence the jury will need to consider in making that determination. Thus, notwithstanding the age of these convictions, which weighs somewhat against their admissibility, the Court finds that, in light of the nature of the convictions and the centrality of Plaintiff's credibility to the jury's evaluation of this case, the probative value of these convictions substantially outweighs any prejudice to Plaintiff from their admission. Fed. R. Evid. 609(b). Therefore, Defendant may introduce evidence of these convictions to impeach Plaintiff for truthfulness, but that evidence must be strictly limited to "the 'essential facts' of [the] convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed." *Estrada*, 430 F.3d at 615.

The Court reaches a different conclusion with respect to Plaintiff's 2000 (21-year-old), 1995 (26-year-old) and 1993 (28-year-old) convictions. While these convictions do bear on Plaintiff's truthfulness to some degree, they are misdemeanor convictions that are less serious and more stale than Plaintiff's 2004 felony convictions. In light of the fact that Plaintiff may be

impeached by his more recent felony convictions, any minimal additional probative value these older misdemeanor convictions have in determining his propensity for truthfulness does not substantially outweigh the risk of unfair prejudice under Fed. R. Evid. 403. As such, Defendant may not impeach Plaintiff with evidence of these convictions.

### 2. *Relevance to Damages*

Defendant argues that Plaintiff's incarceration history is relevant to his claim for emotional distress damages. Specifically, Defendant argues that "the fact that Plaintiff[] claims that *this* incarceration caused him to seek therapy, as opposed to other incarceration, is relevant to the causation question on damages before the jury," and that "Plaintiff's incarceration history and the lack of any emotional injuries from his prior incarceration is relevant to the compensatory damages question in this case for the jury to decide." (Dkt. No. 413-4, at 18; Dkt. No. 419, at 11-12). Plaintiff argues that any probative value of his incarceration history is substantially outweighed by the risk of unfair prejudice under Fed. R. Evid. 403, and that, if the Court does admit Plaintiff's incarceration history as relevant to his emotional damages claim, the Court should bifurcate the liability and damages phase of the trial to avoid any risk of unfair prejudice in his liability case. (Dkt. No. 414-1, at 13-15). Defendant opposes Plaintiff's request for bifurcation, arguing that bifurcation would be "unduly burdensome to [him] as [he has] already began significant trial preparations for all issues" and would "unnecessarily prolong this litigation." (Dkt. No. 419, at 12). Plaintiff also reserves the right to withdraw his claim for emotional distress damages if the Court admits his incarceration history and denies his request for bifurcation, and argues that, if he does so, his criminal and incarceration history will not be admissible, as this history is irrelevant to the other types of damages he seeks, particularly "loss of liberty" damages. (Dkt. No. 414-1, at 15-18).

Courts in this Circuit have held that, where emotional distress damages arising from unlawful incarceration are at issue, a "plaintiff's prior arrest and incarceration history are relevant to the jury's determination of damages" "[b]ecause a plaintiff 'who has had a number of prior arrests and detentions is likely to have suffered less distress than one who has never before been detained'"; therefore, "defendants may inquire into plaintiff's past arrests and incarcerations," but "may not . . . inquire into the reasons for [the] plaintiff's prior arrests." *Banushi v. Palmer*, No. 08-cv-2937, 2011 WL 13894, at *3, 2011 U.S. Dist. LEXIS 419, at *7-9 (E.D.N.Y. Jan. 4, 2011) (quoting *Wilson v. City of New York*, No. 06-cv–229, 2006 U.S. Dist. LEXIS 90050, at *1-2[4] (E.D.N.Y. Dec. 13, 2006)); *Ramos v. Cnty. of Suffolk*, 707 F. Supp. 2d 421, 424 (E.D.N.Y. 2010) (permitting the defendant to question the plaintiff about her prior arrests "because it affected the plaintiff's claim for emotional distress damages," but precluding the defendant from "go[ing] into what the reason for the arrest is"); *Picciano v. McLoughlin*, No. 07-cv-0781, 2010 WL 4366999, at *2, 2010 U.S. Dist. LEXIS 114704, at *7 (N.D.N.Y. Oct. 28, 2010) (finding that the "plaintiff's subsequent arrests are probative of Plaintiff's claim for emotional damages, and the probative value of the testimony is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); *Cicero v. City of New York*, No. 11-cv-0360, 2011 WL 3099898, at *3, 2011 U.S. Dist. LEXIS 80880, at *7 (E.D.N.Y. July 25, 2011) ("Courts have held that information regarding past convictions is 'relevant to the extent plaintiff seeks to recover damages for emotional distress'" because "'a person who has previously been incarcerated may suffer less damage as a result of a

---

[4] No parallel Westlaw citation available.

subsequent wrongful incarceration' than a person incarcerated for the first time." (quoting *Green v. Baca*, 226 F.R.D. 624, 656-57 (C.D. Cal. 2005))).

Here, the Court finds that Defendant may inquire into the fact that Plaintiff was arrested in October 2003 and the length of his resulting incarceration, as that information has significant probative value for his emotional distress damages claim. However, Defendant may *not* inquire into the reason for that arrest or incarceration (and, specifically, may not elicit testimony that the arrest or incarceration was related to Plaintiff's possession or sale of narcotics). Any probative value that information has, if any, is substantially outweighed by the risk of unfair prejudice, confusing the issues or misleading the jury under Fed. R. Evid. 403, especially given the similarity of that conviction to the 2010 conviction that gave rise to this case. To the extent Defendant seeks admission of Plaintiff's other arrests that did not result in felony convictions, the Court finds that, as these arrests predated Plaintiff's 2009 arrest by a number of years and did not result in Plaintiff's incarceration, any probative value they may have to Plaintiff's emotional distress damages claim is substantially outweighed by the risk of unfair prejudice under Fed. R. Evid. 403. Moreover, because Plaintiff's Criminal History Report contains substantial prejudicial information about the reasons for Plaintiff's arrests and incarceration whose probative value is substantially outweighed by the risk of unfair prejudice, Fed. R. Evid. 403, Exhibit D-25 is not admissible into evidence for purposes of this limited permissible inquiry.

Having reached this conclusion, the Court denies Plaintiff's request to bifurcate the proceedings. Under Federal Rule of Civil Procedure 42, a court may bifurcate the trial of issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). "[B]ifurcation requires the presence of only one of these conditions," *Ricciuti v. New York City Transit Authority*, 796 F.Supp. 84, 86 (S.D.N.Y.1992), and the decision to bifurcate a trial

rests "firmly within the discretion of the trial court." *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.1984). "On a case-by-case basis, courts should examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether bifurcation will lessen or eliminate the likelihood of juror confusion." *Lewis v. City of New York*, 689 F.Supp.2d 417, 429 (E.D.N.Y.2010) (citations omitted). Having considered these factors, the Court does not find bifurcation to be appropriate in this case. The Court recognizes that, in cases involving emotional distress damages claims, some courts have bifurcated trials to avoid prejudice that damages-related evidence of prior arrests and incarcerations would cause to a plaintiff's liability case. *See, e.g., Wisdom v. Undercover Police Officer No. C0127*, 879 F. Supp. 2d 339, 342 (E.D.N.Y. 2012). However, here, where some of Plaintiff's more serious prior convictions will be admitted in any event to impeach him for truthfulness, the Court does not find that additional prejudice caused by the admission of his 2003 arrest and subsequent incarceration (without explanation of the reason for that arrest and incarceration) creates an undue prejudice that would warrant bifurcation under Fed. R. Civ. P. 42(b). Moreover, the parties may request a limiting instruction to the jury regarding the purpose for which they may consider this evidence. *See Mensler v. Wal-Mart Transp., LLC*, No. 13-cv-6901, 2015 WL 7573236, at *4, 2015 U.S. Dist. LEXIS 159396, at *12 (S.D.N.Y. Nov. 24, 2015) ("Where the prejudicial effect of the damages evidence can be cured with a limiting instruction to the jury, as is the case here, bifurcation is not justified.").

Finally, in the event Plaintiff chooses to withdraw his claim for emotional distress damages, the Court agrees with Plaintiff's contention that his prior arrests and incarceration are irrelevant to his separate claim for "loss of liberty" damages, i.e. the damages that he may be entitled to collect simply by virtue of being wrongfully deprived of liberty for a period of time,

separate and apart from any mental, physical or emotional distress he may have suffered as a result of that deprivation. *See Kerman v. City of New York*, 374 F.3d 93, 121-32 (2d Cir. 2004) (establishing that loss of liberty damages are entirely separate from emotional distress damages, and may be awarded even in the absence of any proof of physical, mental or emotional harm). Defendant does not appear to argue that Plaintiff's criminal history is relevant to his claim for loss of liberty damages, and the case law establishes that it is not. *See, e.g., Davis v. Velez*, 15 F. Supp. 3d 234, 251-52 (E.D.N.Y. 2014); *Nibbs v. Goulart*, 822 F. Supp. 2d 339, 344-45 (S.D.N.Y. 2011). Therefore, if Plaintiff chooses to withdraw his claim for emotional distress damages, inquiry into his arrest in 2003 and resulting incarceration will not be permitted.

### B.    Plaintiff's Prison Record (D-27)

Defendant seeks to admit Exhibit D-27, Plaintiff's Inmate Status Report for Parole Board Appearance, as relevant to Plaintiff's claim for emotional distress damages and loss of liberty damages. Defendant argues that he "should be able to examine Plaintiff on how his own violations resulted [in] [Special Housing Unit ("SHU")] confinements and [how his] failure to engage in constructive behaviors caused him to max out on his sentence." (Dkt. No. 413-4, at 18; *see also* Dkt. No. 419, at 13). Defendant also argues that "one of Plaintiff's disciplinary issues in prison was for 'false information' which relates directly to his propensity for truthfulness, thus it should be admitted on this basis as well." (*Id.*). Plaintiff opposes admission of the Parole Report, arguing that it does not actually demonstrate that his incarceration was lengthened by any disciplinary problems, that it "serves no purpose other [than] to put Plaintiff in a bad light before the jury," and that any probative value it has is substantially outweighed by the risk of unfair prejudice. (Dkt. No. 418, at 13-14).

1.    *Impeachment for Truthfulness*

Rule 608(b) "states that the court may, on cross-examination of a witness, allow inquiry as to specific instances of conduct, 'if they are probative of the character for truthfulness or untruthfulness of ... the witness.'" *Tapp v. Tougas*, No. 05-cv-1479, 2018 WL 1918605, at *3, 2018 U.S. Dist. LEXIS 66743, at *9 (N.D.N.Y. Apr. 20, 2018) (quoting Fed. R. Evid. 608(b)). A disciplinary conviction for false information may relate to a witness's credibility if it is a "specific instance[ ] of conduct that [is] probative of the character for truthfulness of the [witness]." *Id.*, at *4, 2018 U.S. Dist. LEXIS 66743, at *10 (allowing inquiry into the plaintiff's prison infraction for false information). However, "the actual disciplinary histories are not admissible to attack character for truthfulness because they are extrinsic evidence prohibited by Rule 608(b)." *Id.* (citing *Eng v. Scully*, 146 F.R.D. 74, 78 (S.D.N.Y. 1993) ("Rule 608(b) of the Federal Rules of Evidence prohibits the introduction of extrinsic evidence of specific instances of conduct for the purpose of attacking one's credibility. Fed. R. Evid. 608(b). This rule does not prohibit inquiry into Plaintiff's conduct for impeachment but does prohibit the introduction into evidence of his disciplinary records.")). Therefore, Exhibit D-27 is not admissible for impeachment with respect to Plaintiff's disciplinary conviction.

Moreover, the inmate status report does not contain any information beyond a one-sentence summary of Plaintiff's tier III discipline conviction "for unauthorized exchange, having other inmates' criminal material and false information." While a disciplinary conviction for false information may relate to a witness's credibility, the Court must consider whether the specific incident has probative value regarding the witness's credibility. *See Brevard v. Schunk*, No. 18-cv-42, 2020 WL 374563, at *3, 2020 U.S. Dist. LEXIS 11089, at *7-9 (N.D.N.Y. Jan. 23, 2020) (finding that false information disciplinary conviction was "only minimally probative" of the plaintiff's character for truthfulness and excluding cross examination regarding the incident). At

the pretrial conference, Defendant represented that this incident involved Plaintiff doing legal work on behalf of another inmate, and referred the Court to Plaintiff's deposition testimony; however, in his deposition testimony, Plaintiff did not acknowledge having been untruthful. (Dkt. No. 300-8, at 42-45, 120-24, 126-28). On this record, the Court does not find that Plaintiff's disciplinary conviction related to doing legal work without prior permission is probative of Plaintiff's character for truthfulness or untruthfulness. Therefore, cross examination of Plaintiff regarding his disciplinary conviction for false information is precluded.

### 2. *Relevance to Loss of Liberty Damages*

As to Plaintiff's claim for loss of liberty damages, Defendant argues that he should be able to inquire into "Plaintiff's own actions which may have made his incarceration worse or lengthier and thus Plaintiff failed to mitigate his damages," and should be able to admit Exhibit D-27 for that purpose. (Dkt. No. 419, at 13). However, neither Exhibit D-27 nor any other evidence on Defendant's exhibit list establishes that Plaintiff's period of incarceration was extended as a result of disciplinary infractions or misbehavior on his part.[5] Absent such evidence, the Court finds that the probative value of Exhibit D-27 and Defendant's proposed line of inquiry, if any, is substantially outweighed by the risk of unfair prejudice, confusing the issues or misleading the jury under Fed. R. Evid. 403. Therefore, the Court will not allow cross-examination into Plaintiff's prison disciplinary record or admission of Exhibit D-27 for this purpose.

---

[5] The Court notes that Plaintiff contends that he "was denied 'conditional release' because Plaintiff would not accept responsibility for a crime Plaintiff did not commit," and because he refused to complete a drug treatment program which would have "again required [him] to accept responsibility for the charges underlying [h]is conviction." (Dkt. No. 418 at 13-14).

### 3. *Relevance to Emotional Distress Damages*

As to Plaintiff's claim for emotional distress damages, Defendant argues that he "expect[s] that Plaintiff will testify to great lengths about how bad the New York State prison system was" and that he "should be able to examine Plaintiff on how his own violations resulted [in] SHU confinements." (Dkt. No. 413-4, at 18). Defendant is apparently referring to Exhibit D-27's note that, "[o]n 8/2/11 [Plaintiff] was found guilty of a tier III discipline for unauthorized exchange, having other inmates' criminal material and false information," which "carried a 3 month SHU sanction." To the extent—and only to the extent—that Plaintiff puts the mental or emotional distress he suffered during his confinement in the SHU at issue through his testimony, Defendant may conduct a limited inquiry as to the reasons for such confinement. Otherwise, neither Exhibit D-27 nor a general line of inquiry into Plaintiff's prison disciplinary record carries any probative value to Plaintiff's claim for emotional distress damages that is not substantially outweighed by the risk of unfair prejudice, confusing the issues or misleading the jury under Fed. R. Evid. 403.

## III. DEFENDANT'S MOTION IN LIMINE

### A. Testimony of Seankirre Walker, Muriel Jeanty, Cleavon Wills and Walter Romero Regarding Plaintiff's "Mental and Emotional State"

Defendant seeks to preclude Seankirre Walker,[6] Muriel Jeanty, Cleavon Wills and Walter Romero from presenting testimony regarding Plaintiff's "mental and emotional state," on the grounds that: (1) calling multiple witnesses to testify on this subject "needlessly present[s] cumulative evidence" so as to warrant their testimony's exclusion under Fed. R. Evid. 403; and (2) "none of these witnesses were disclosed as, nor are they qualified to be expert witnesses,"

---

[6] Since Plaintiff represents that Walker "won't testify as she is unavailable," (Dkt. No. 418, at 2), Defendant's motion to preclude her testimony is denied as moot.

and any testimony they present on Plaintiff's "mental fitness" constitutes lay opinion testimony that is "based on scientific, technical, or other specialized knowledge," and therefore prohibited by Fed. R. Evid. 701. (Dkt. No. 413-4, at 4-5). Plaintiff responds that these witnesses "will testify as to what they observed or experienced between themselves and Plaintiff before and after Plaintiff's incarceration," and that each will present testimony regarding their interactions with Plaintiff "under separate and different circumstances": Wills "as to Plaintiff's changed state of mind, work ethic and overall demeanor while at work," Romero "as to Plaintiff's changed behavior in social settings/environments," and Jeanty "as to Plaintiffs [sic] changed behavior in their home environment and family setting." (Dkt. No. 418, at 2).

Under Fed. R. Evid. 701, these witnesses obviously may not provide testimony or assessments regarding Plaintiff's mental or emotional health that is "based on scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c), and Plaintiff confirmed at the pre-trial conference that he does not seek to have these witnesses present such testimony. These witnesses *may* testify as to their direct observations of Plaintiff's behavior before and after his incarceration, so long as their testimony is limited to facts that are derived from their "personal knowledge," Fed. R. Evid. 602, and opinions that are "rationally based on [their] perception" of Plaintiff's behavior, Fed. R. Evid. 701(a). Such lay testimony may be relevant in corroborating Plaintiff's own testimony that he suffered mental and emotional distress as a result of Defendant's alleged fabrication of evidence, and may be helpful to the jury in determining whether, and in what amount, to award Plaintiff damages for such emotional distress. Moreover, because Plaintiff represents that each witness will provide distinct testimony as to their observations of how Plaintiff's mental and emotional distress manifested itself in different aspects of his life, preclusion of their testimony as cumulative under Fed. R. Civ. P. 403 would

be premature. *See, e.g., Ali v. Connick*, No. 11-cv-5297, 2016 WL 3002403, at *11, 2016 U.S. Dist. LEXIS 67466, at *33 (E.D.N.Y. May 23, 2016) ("It would ordinarily be inappropriate for any party to call two witnesses to offer the same testimony because such testimony would be cumulative. However, at this time it is impossible to know whether [one witness's] testimony will be cumulative of [another witness's] because neither has testified." (quoting *Giladi v. Strauch*, No. 94-cv-3976, 2007 WL 415365, at *10, 2007 U.S. Dist. LEXIS 8666, at *34-35 (S.D.N.Y. Feb. 6, 2007)).

Therefore, the Court denies Defendant's motion to preclude the testimony of Muriel Jeanty, Cleavon Wills and Walter Romero without prejudice, subject to his right to object at trial to the extent such testimony becomes cumulative.

### B.    Testimony of Plaintiff's Mental Health Counselor, Yvette Brown-Sutnick

Defendant seeks to preclude the testimony of Plaintiff's mental health counselor, Yvette Brown-Sutnick, on the grounds that Plaintiff failed to timely disclose Brown-Sutnick as a non-retained uncompensated treating physician, and did not provide a description of "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" or a "summary of the facts and opinions to which the witness is expected to testify," pursuant to Fed. R. Civ. P. 26(a)(2)(A) and (C). (Dkt. No. 413-4, at 7-10). Defendant argues that, even if the Court allows Brown-Sutnick to testify, it should, "at minimum," hold a *Daubert* hearing to assess her qualifications and the reliability of her testimony under Fed. R. Evid. 702. (*Id.* at 10-13). Defendant also asserts that Brown Sutnick is "at best . . a licensed mental health counselor" who is not qualified to make any "medical diagnosis of Plaintiff," or "give any causation medical opinion testimony." (Dkt. No. 413-4, at 13).

Plaintiff does not appear to dispute that his non-compliance with the requirements of Fed. R. Civ. P. 26(a)(2) with respect to Brown-Sutnick precludes her from testifying as an expert

under Fed. R. Evid. 702, 703, or 705. Plaintiff nonetheless contends that she may testify as a fact witness whose testimony is "limited to her personal treatment of Plaintiff using Her personal notes." (Dkt. No. 418, at 4). Plaintiff relies on case law establishing that treating physicians who are not qualified or disclosed as experts may nonetheless testify as fact witnesses "solely as to their personal knowledge of their patient's treatment," including "the physician's opinions regarding the patient's condition, diagnosis, treatment and prognosis based on his or her observations of the patient during the period of consultation," and the physician's opinions as to "causation based on a treating physician's treatment of his or her patient." (*Id.* at 5 (collecting case law)). However, Plaintiff has not addressed what, if any, opinions he expects to elicit from Brown-Sutnick regarding diagnosis and causation and to what extent any such opinions by a "licensed mental health counselors" are admissible.

At this stage, the Court grants Defendant's motion to the extent it seeks to preclude Brown-Sutnick from presenting expert testimony pursuant to Fed. R. Evid. 702, 703 and 705. At the pretrial conference, the Court ordered that, to the extent Plaintiff intends to continue to pursue his emotional distress damages claim and call Brown-Sutnick as a witness, he should submit a proffer by July 6, 2021 explaining "what relevant, admissible testimony from Yvette Brown-Sutnick he seeks to offer at trial." (Dkt. No. 437, at 2). The Court reserves judgment on Brown-Sutnick's testimony until after its review of any such proffer.

### C. Testimony of Other Witnesses

Defendant moves to preclude the testimony of various fact witnesses Plaintiff intends to call, arguing that these witnesses' testimony is relevant only to claims which have been dismissed. (Dkt. No. 413-4, at 5-7). In response to Plaintiff's request to issue subpoenas to thirteen witnesses, which included most of the witnesses whose testimony Defendant seeks to preclude, (Dkt. No. 393), the Court ordered Plaintiff to submit a letter with "a particularized

description of what relevant testimony would be provided by" many of the witnesses, (Dkt. No. 397). Plaintiff submitted such a letter, (Dkt. No. 417), and the Court and the parties discussed Plaintiff's subpoena requests at a telephonic conference on June 17, 2021, after which the Court ordered further supplemental briefing with respect to the relevance of several witnesses. The parties submitted such briefing, (Dkt. Nos. 431, 434), and the relevance of certain witnesses was further discussed at the June 28, 2021 pretrial conference. Having considered the arguments raised in the various briefing, the June 17 telephonic conference and the June 28 pretrial conference, the Court explains its rulings with respect to each witness whose testimony Defendant seeks to preclude.

        1.      *Rebecca L. Wittman, Esq.*

Defendant moves to preclude the testimony of Rebecca L. Wittman, Esq., the attorney who represented Plaintiff in his criminal trial, arguing that her testimony is only relevant to Plaintiff's dismissed *Brady* claims. (Dkt. No. 413-4, at 5-6). Plaintiff has not responded to this argument. (Dkt. Nos. 418, 419). Wittman lacks any personal knowledge of what happened at the scene of Plaintiff's arrest or what evidence was collected, Fed. R. Evid. 602, and Plaintiff has not proffered any relevant testimony she might have on his fabrication of evidence claims. Therefore, the Court grants Defendant's motion to preclude Wittman from testifying at trial.

        2.      *Scott McNamara*

Defendant moves to preclude the testimony of Oneida County District Attorney ("DA") Scott McNamara, arguing that his testimony is only relevant to Plaintiff's dismissed *Brady* claims. (Dkt. No. 413-4, at 5-6). Plaintiff argues that McNamara "will testify to the fact that

Defendant Cerminaro told him that He (Cerminaro) picked the loose contraband off the ground" at the scene of Plaintiff's arrest, which contradicts Defendant's version of events. [7]

In his deposition, McNamara testified that, after questioning Defendant and other officers during Plaintiff's post-conviction proceedings, he "got the impression that [Defendant] found the bag and he was going back and picking everything up, trying to pick up everything that he could, that [Plaintiff was] discarding"; that Defendant told him he "picked up a bag that [Plaintiff] had discarded and he picked up all the other chunks that he could locate that he saw [Plaintiff] throwing"; that he "remember[ed] Cerminaro saying that he went back and picked up all the cocaine"; and that "it was my understanding it was cocaine in its crack form so he could pick it up." (Dkt. No. 300-16, at 170-73). However, when specifically asked if he had questioned the officers as to whether they had picked up additional contraband from the ground and added it to the bag, McNamara said "I don't remember asking that question," and "I don't believe they would do that because it doesn't make any sense." (*Id.* at 165-66). The following day, McNamara clarified that "what I remember specifically [Defendant] telling me was that he picked up a baggy and he collected that," and that he did not "remember anyone talking about picking up pieces of crack cocaine and putting it back in the bag." (Dkt. No. 300-17, at 23).

---

[7] Plaintiff also argues that McNamara's testimony will establish that "Defendant Cerminaro also told DA McNamara that He (Cerminaro) is in a photograph taken by Lt. Dougherty." (Dkt. No. 417, at 8). However, the Court does not find that McNamara's testimony is admissible to establish this fact. McNamara's testimony establishes only that, when questioned by McNamara, Defendant did not deny that his feet were visible in one of the photographs and admitted he was present at the time the photographs were taken, but maintained that he had no recollection of the photographs being taken. (Dkt. No. 300-16, at 75, 82, 86-87, 129, 133-34). In his deposition, Defendant testified that he does not recall whether or not the feet visible in the relevant photograph are his, but that he has been told that they are; he has not denied that they are his feet and, more importantly, has admitted that he was present while Dougherty photographed the scene of Plaintiff's arrest. (Dkt. No. 300-6, at 53-54, 132, 136-37, 139). Moreover, Dougherty has testified that the feet visible in the photograph are, in fact, Defendant's. (Dkt. No. 300-4, at 26-27, 71). In light of this testimony by Defendant and Dougherty themselves—who, unlike McNamara, have direct, firsthand knowledge of who was present and what occurred at the time the photographs were taken—the Court finds that any minimal probative value of McNamara's testimony on this point is substantially outweighed by the danger of needlessly presenting cumulative evidence. Fed. R. Evid. 403.

The Court has already found that, "[e]specially in light of his subsequent clarifications," these "imprecise recollections from a meeting that took place several years before his deposition are insufficient to raise a genuine dispute as to whether Defendant Cerminaro improperly commingled evidence," i.e. by picking up loose substance off the ground and adding it to the torn bag he collected. *Jeanty*, 2021 WL 149051, at *21, 2021 U.S. Dist. LEXIS 7737, at *66-68. In ruling on a motion for reconsideration by Plaintiff, the Court has also found that, in the absence of other competent evidence and in light of the record as a whole, McNamara's second-hand recollections are similarly insufficient to raise a triable issue as to Plaintiff's alternative theory that Defendant fabricated evidence by charging him with possession of drugs that came from the loose contraband scattered on the ground, rather than from the torn bag. *Jeanty v. City of Utica*, No. 16-cv-00966, 2021 WL 2525061, at *7, 2021 U.S. Dist. LEXIS 116595, at *21-22 (N.D.N.Y. April 15, 2021). Those questions are not at issue in this trial.

However, McNamara's testimony that he recalled Defendant Cerminaro telling him that he *did*, in fact, collect loose substance off the ground—testimony which McNamara did not unambiguously recant,[8] and which is inconsistent with Defendant Cerminaro's version of events as described in his Supporting Deposition, his testimony during Plaintiff's criminal proceedings, and his deposition testimony in this case—bears on Defendant Cerminaro's credibility as a witness, and the truthfulness of his narrative regarding what he did and observed at the scene of

---

[8] McNamara testified that "what I remember specifically [Defendant] telling me was that he picked up a baggy and he collected that," and that he did not "remember anyone talking about picking up pieces of crack cocaine and putting it back in the bag," (Dkt. No. 300-17, at 23), but it is unclear whether he intended to recant his prior testimony that Defendant had told him that he also "picked up all the other chunks that he could locate that he saw [Plaintiff] throwing," (Dkt. No. 300-16, at 170-73).

Plaintiff's arrest. As these are key issues in the case, the Court will allow McNamara to testify for this purpose, and accordingly denies Defendant's motion to preclude his testimony.[9]

### 3. *Kurt Schultz, Esq., Grant Garramone, and Sarah Demellier*

Defendant moves to preclude the testimony of Kurt Schultz, Assistant DA ("ADA") Grant Garramone, and ADA Sarah Demellier, arguing that these witnesses' testimony is only relevant to Plaintiff's dismissed *Brady* claims. (Dkt. No. 413-4, at 5-6). At the phone conference to discuss Plaintiff's subpoena requests, after the Court indicated that it would permit McNamara to testify, Plaintiff withdrew his request that the Court issue a subpoena to Schultz, Garramone and Demellier, and indicated that he no longer intends to call them at trial. Therefore, Defendant's request to preclude the testimony of these witnesses is denied as moot.

### 4. *Inv. Joseph Trevasani and Charles Brown, Esq.*

Defendant moves to preclude the testimony of Inv. Joseph Trevasani and Charles Brown, Esq., arguing that these witnesses' testimony is only relevant to Plaintiff's dismissed *Brady* claims (for Trevasani and Brown) and Plaintiff's dismissed *Monell* claim (for Trevasani). (Dkt. No. 413-4, at 5-7). Plaintiff argues that these witnesses have relevant testimony based on what they learned from Trevasani's investigation into Plaintiff's civilian complaint and Brown's investigation into Plaintiff's Freedom of Information Law ("FOIL") requests; their statements during a December 2012 surreptitiously recorded meeting involving them, Plaintiff and Dougherty; and Brown's "reasons for withholding the [allegedly exculpatory] photographs from

---

[9] At the pretrial conference, the Court ordered the parties to update the Court by July 6, 2021 as to "[w]hether the parties have agreed to stipulate to a set of relevant facts regarding the vacatur of Plaintiff's conviction and subsequent dismissal of his indictment in the interest of justice, and if not, what the parties' respective positions are regarding which facts and admissible evidence should be presented to the jury on these issues." (Dkt. No. 437, at 2). The Court reserves judgment on whether McNamara may present any testimony regarding the vacatur and dismissal of Plaintiff's conviction pending the parties' update.

3/11/2010 to July 19, 2010," when they were disclosed to Plaintiff in connection with his FOIL requests. (Dkt. No. 417, at 5-7).

Neither Trevasani nor Brown were present at the scene of Plaintiff's arrest or involved in his prosecution, and neither has firsthand, personal knowledge of the circumstances of Plaintiff's arrest or the evidence collected at the scene that would be relevant or helpful to the jury. Fed. R. Evid. 602. Any secondhand knowledge they have comes from their investigations into Plaintiff's case years after the fact. Plaintiff has pointed to no specific testimony regarding the results of those investigations, or things these witnesses were told by Defendant or other officers involved in Plaintiff's arrest or prosecution, that would call these officers' credibility into question, or otherwise be relevant to the issues before the jury.[10] To the extent both individuals made speculative statements during the 2012 meeting with Plaintiff about what they believed officers should have or may have done at the scene of Plaintiff's arrest, or what evidence they believed was or should have been collected, nothing in the record suggests that these statements were based on their personal knowledge of what actually happened, or indeed, were anything more than pure off-the-cuff speculation. Finally, the issue of Brown's alleged four-month delay in disclosing the allegedly exculpatory photographs to Plaintiff in response to his FOIL request is not relevant in this case. Therefore, the Court grants Defendant's motion to preclude Trevasani and Brown from testifying at trial.

5.    *Sgt. Edin Selimovic*

Defendant moves to preclude the testimony of Sgt. Edin Selimovic, arguing that his testimony is only relevant to Plaintiff's dismissed *Brady* claims. (Dkt. No. 413-4, at 5-6).

---

[10] Plaintiff argues that Trevasani "will testify that based on his personal knowledge and experience, in the circumstances of this case it is an absolute certainty that Defendant Cerminaro picked up at least some of the larger chunks of cocaine," (Dkt. No. 417, at 6), but Trevasani's speculative statements in the 2012 meeting hardly support this conclusory assertion, and Plaintiff otherwise cites no record support for it.

Plaintiff argues that Selimovic "created the CD-Rom containing the photographs" that was produced to Plaintiff, and he seeks to have Selimovic testify as to the date and time each photograph was taken according to the photographs' metadata.[11] Defendant objects to this testimony on the grounds that: (1) "Selimovic was never disclosed, even as unretained expert, under FRCP 26," and "[a]s such this disclosure on the eve of trial is overwhelming prejudice to Defendant"; and (2) "Selimovic was tendered as an expert on the Utica Police Department Records Management System, not as a forensic computer scientist with a specialty in photographs," and he is "not qualified as an expert in this regard nor has he been disclosed as such." (Dkt. No. 434, at 3).

Even accepting Defendant's contention that testimony about the photographs' metadata concerning the date and time each picture was taken constitutes testimony "based on scientific, technical, or other specialized knowledge within the scope of [Fed. R. Evid.] 702," Fed. R. Evid. 701(c), the Court finds that Selimovic is qualified to present such testimony. Selimovic has a "bachelor's degree in cyber crime investigations with a focus in digital forensics" and a "masters . . . in cyber security with [a] focus on digital forensics," and is responsible for "oversee[ing] all [Information Technology] functions for the [UPD]." (Dkt. No. 319-23, at 11, 14). He was the UPD officer responsible for extracting the photographs from the UPD's record system and producing them to Plaintiff, along with their accompanying metadata. (Dkt. No. 300-7, at 3). In his deposition, Selimovic gave clear testimony regarding the process for determining the date and time each photograph was taken, including that "[y]our true accurate date and time is your meta data which is in the photo itself." (Dkt. No. 431-4, at 5). He also clearly testified as to the

[11] The Court addresses the parties' separate, but related, contention regarding the admissibility of the time-stamped version of the photographs used at Selimovic's deposition, which Plaintiff seeks to admit at trial, below. *See* Section III.D.2 *infra*.

limitations of using the metadata to obtain such information, including how pieces of metadata—such as "date/time created," "date/time modified," and "date/time accessed"—may be affected by the operating system used to view the photographs. (Dkt. No. 431-4, at 6-9). The Court rejects Defendant's attempt, on the eve of trial, to bar Plaintiff from calling Selimovic to present the exact same analysis he presented in his deposition by arguing that Selimovic was never qualified to present that testimony in the first place.

Moreover, while it is true that Plaintiff never made the required expert disclosures under Fed. R. Civ. P. 26 with respect to Selimovic, in these unusual circumstances and out of deference to Plaintiff's pro se status, the Court finds this failure excusable. Here, Selimovic was not an expert retained by Plaintiff, but was proffered by Defendant as the UPD's Information Technology specialist. Selimovic himself was responsible for creating and producing to Plaintiff the CD containing the photographs and their accompanying metadata. He was ordered by the Magistrate Judge to provide a sworn affidavit affirming that "the photographs on the CD are all of the photographs related to RMS 09-52210, that the metadata is complete . . . and that the photographs are exactly as taken from the system," (Dkt. No. 279, at 3), and he did so, (Dkt. No. 300-7). Selimovic was questioned at his deposition regarding the photographs and metadata that he himself had extracted. As described above, his testimony suggested that his expertise was not limited to surface-level knowledge of how the UPD maintained the photographs in their record system, but included the ability to explain how those photographs' metadata may be interpreted, at least at the level necessary to answer Plaintiff's questions. Based on all this, it was entirely reasonable for Plaintiff, as a pro se litigant, to believe that Selimovic's testimony was all he needed to establish the date and time each photograph was taken according to the metadata, and for him not to understand that he needed to disclose Defendant's own proffered witness as an

expert.[12] Furthermore, Defendant can hardly claim prejudice from Plaintiff's failure to disclose Selimovic as an expert earlier. Plaintiff seeks only to have Selimovic testify on the same topics on which he was questioned in his deposition nearly two years ago, and Defendant was certainly on notice by that time that Plaintiff may seek to call Selimovic as a witness on these topics. Therefore, the Court denies Defendant's motion to preclude Selimovic from testifying at trial.

6.    *Chief Mark Williams and Sgt. James Laurey*

Defendant moves to preclude the testimony of UPD Chief Mark Williams and Sgt. James Laurey, arguing that their testimony is only relevant to Plaintiff's dismissed *Monell* claim. (Dkt. No. 413-4, at 6-7). Plaintiff argues generally that these witnesses' testimony is necessary to establish that Defendant failed to follow UPD policies, procedures and training with respect to the collection of evidence at the scene of Plaintiff's arrest. (Dkt. No. 431, at 1-5). Defendant responds that such a line of inquiry is irrelevant because Defendant's violation of UPD procedures, even if established, does not itself amount to a constitutional violation. (Dkt. No. 434, at 1-2). While the Court agrees with this proposition (and Plaintiff does not dispute it, *see* Dkt. No. 431, at 3), inconsistencies between Defendant's explanation of his actions at the scene of Plaintiff's arrest and official UPD policies, procedures and training may be relevant to the jury's evaluation of his credibility and truthfulness, and the Court will permit inquiry into the issue for that purpose. The question, then, is whether the testimony from Williams or Laurey that Plaintiff seeks to admit is relevant to that purpose.

---

[12] The Court also observes that, during a discovery conference in this matter on January 30, 2020, Defendant Dougherty's counsel made the following representations with respect to the photographs' metadata: "the metadata says, 'camera, date, time taken.' All the pertinent information is contained in the metadata, which is on the CD. And so we know how the pictures were taken . . . we know when they were taken . . . I can't imagine what has not been provided here in relation to the photographs . . . [the photographs] were taken on the 15th as the metadata from the camera itself shows." Especially as a pro se litigant, it would be understandable for Plaintiff to rely on counsel's on-the-record concession that the metadata accurately reflects the date and time each photograph was taken.

As to Williams, Plaintiff argues that he is the "person that would be most familiar with the policies and procedures and what and how UPD officers are required to know and do while performing their duties as UPD Officers while on the job," and that his testimony is necessary to establish "that UPD officers are required to be fully familiar with all General Orders relating to their jobs," that "supporting depositions should include the facts," and "what to do with evidence and/or found property." (Dkt. No. 431, at 2, 4). Examining the portions of Williams' deposition testimony Plaintiff relies on, Williams testified that all UPD officers are expected to have a "working knowledge of every single policy in [the UPD] procedural manual," but that officers are "not expected to memorize [the manual] or know it offhand." (Dkt. No. 431-2, at 19). When asked specifically about the UPD's General Order governing evidence collection and processing, he testified that officers are expected to comply with that policy "within reason" because "[p]olicies don't necessarily cover every circumstance they can come across," the "policies tend to be black and white, but we do have a lot of gray areas," and "there may be times [the officers] have to act outside the policy if it's reasonable." (*Id.* at 27). With respect to the distinction between "found property" and "evidence," Williams only testified that, typically, an officer would fill out a property receipt for "any property taken, whether it's for safekeeping, found property or evidence." (*Id.* at 9-10). Here, however, Defendant testified that he did not collect the narcotics he asserts constituted "found property." Williams was never asked, nor did he testify, about the standard or proper procedure when an officer identifies narcotics as "found property," and Plaintiff offers no specific testimony from Williams that is relevant to whether or not Defendant followed UPD policies and procedures on the day of his arrest. [13]

---

[13] The generalized testimony about basic UPD practices, including the practice for found property collected should be readily obtainable from any of the various officers who are testifying. To the extent the officers at trial offer testimony that is inconsistent with Williams' on these points, the Court would reconsider its decision to preclude Williams from testifying.

As to Laurey, Plaintiff argues that his testimony is necessary to establish the training that Defendant would have received as a UPD officer, and that according to Defendant's own version of events, he violated that training by: (1) leaving loose cocaine that he identified as "found property" scattered along the ground, rather than collecting it; and (2) immediately collecting the torn bag he allegedly saw Plaintiff discard, rather than waiting for an evidence technician to collect it. (Dkt. No. 431, at 4-5). As to the first issue, the appropriate procedure with respect to contraband identified as "found property" is discussed nowhere in the excerpts from Laurey's deposition that Plaintiff cites. (Dkt. No. 431-3). As to the second, while Laurey did testify that evidence technicians are the only officers trained and allowed to collect evidence, he also testified that, when an officer discovers narcotics evidence, rather than leaving it for an evidence technician to collect, the officer might "secure" the evidence immediately by collecting it and keeping it on the officer's person until it can be placed into evidence, since "you don't want someone just grabbing it and picking it up . . . . so you would secure it, handle it that way . . . until it's turned over to somebody properly to handle it." (Dkt. No. 431-3, at 6-10). Therefore, it does not appear that Laurey has any relevant testimony regarding Defendant's supposed non-compliance with his UPD training.

The Court finds that neither Williams nor Laurey has any relevant testimony to offer that is not substantially outweighed by the danger of confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. Therefore, the Court grants Defendant's motion to preclude these witnesses from testifying at trial.[14]

---

[14] As discussed below, while the Court is not permitting Williams or Laurey to testify, the Court *will* allow Plaintiff to explore the issue of Defendant's compliance or non-compliance with UPD policies and procedures, and may allow him to use the UPD General Orders and training materials included on his exhibit list to the extent they are relevant to these issues. The Court assumes that the parties can stipulate to the authenticity of these exhibits without the need for testimony by Williams or Laurey.

7. *Hon. Michael L. Dwyer*

Defendant moves to preclude the testimony of the Hon. Michael L. Dwyer, the judge who presided over Plaintiff's criminal case, arguing that his testimony is relevant only to Plaintiff's dismissed *Brady* claims. (Dkt. No. 413-4, at 5-6). Plaintiff argues that Judge Dwyer "will testify about the effect of Defendant Cerminaro's false and fabricated statements to the Court during the 2009/2010 prosecution" of Plaintiff. (Dkt. No. 417, at 9).

Judge Dwyer was not present at the scene of Plaintiff's arrest and has no "personal knowledge" of anything that happened there. Fed. R. Evid. 602. His involvement in Plaintiff's arrest and prosecution was limited to presiding over his criminal case as a judge. Plaintiff has not proffered any testimony he might have that would be relevant or helpful to the jury in resolving the remaining issues before it. Because Defendant has already stipulated that the allegedly fabricated evidence in this case was "likely to influence a jury's verdict" and that Plaintiff suffered a "deprivation of life, liberty, or property as a result" of the alleged fabrication, the probative value of any testimony Judge Dwyer could present regarding those elements, if any, would be substantially outweighed by a danger of undue delay and wasting time. Fed. R. Evid. 403. Therefore, the Court grants Defendant's motion to preclude Judge Dwyer from testifying at trial.

**D.    Plaintiff's Exhibits**

Defendant raises objections to a number of Plaintiff's proposed exhibits. (Dkt. No. 413-4, at 13-17). The Court addresses each of Defendant's objections in turn.

1. *P-25, P-25A and P-25B*

Exhibits P-25, P-25A and P-25B are Utica Police Department ("UPD") property receipts and property logs from two other incidents, unrelated to Plaintiff's case. Defendant argues that "these exhibits have nothing to do with this case," that they are therefore irrelevant under Fed. R.

Evid. 401, and that any probative value they have is substantially outweighed by the danger of jury confusion, Fed. R. Evid. 403. (Dkt. No. 413-4, at 13-14). Plaintiff asserts that these exhibits demonstrate that "loose cocaine" found by UPD is typically collected and documented as "found property." Plaintiff apparently intends to use these exhibits to impeach Defendant's testimony that the reason he did not collect any loose substance off the ground in the alley where Plaintiff was arrested is that he considered the loose substance to be "found property," rather than evidence that could be linked to Plaintiff. (Dkt. No. 418, at 5-7).

The credibility of Defendant's explanation for not collecting loose contraband is certainly a relevant inquiry that Plaintiff may explore with Defendant and other UPD witnesses on cross-examination. However, as to the admission of Exhibits P-25 through P-25B themselves, it does not appear that Plaintiff has any foundation for why or how the "found property" identified in these exhibits was collected, why it was identified as such, or whether the collection procedures utilized in those cases are consistent with the UPD's policy or standard practice. Such information is necessary to determine whether the fact that the UPD collected drugs as "found property" in two other, unrelated cases has any relevance to Defendant's explanation of why he did not do so in Plaintiff's case. Therefore, at this time, it does not appear to the Court that Plaintiff will be able to establish the necessary foundation or relevance of these particular exhibits to justify their admission into evidence. Plaintiff is not precluded from seeking to elicit testimony, from Defendant or other officers, about the UPD's typical practice with respect to narcotics identified as "found property."

    2.    *P-26; P-27; P-28; P-35; P-41; P-44 through P-45P; P-47; P-50 through P-52; P-53B; P-53C; and P-60*

Defendant argues, in general terms, that Exhibits P-26, P-27, P-28, P-35, P-41, P-44 through P-45P, P-47, P-50 through P-52, P-53B, P-53C, and P-60 are relevant only to Plaintiff's

*Brady* claims and must be precluded, but does not specifically discuss the relevance of each particular exhibit. (Dkt. No. 413-4, at 14).

Plaintiff argues that Exhibits P-26, P-26A and P-26B are the UPD's "records [relating to Plaintiff's case] from 2009 to 2018," which "include 'information' [Defendant] omitted from His narrative and other UPD records which were provided to the DA and trial jury," and that they should "be admitted to show the entire scope of Defendant Cerminaro's fabrication." (Dkt. No. 418, at 7). At the pre-trial conference, the Court observed that while many of the records included in these exhibits appear relevant, many others appear to be duplicative of other exhibits, have limited relevance, or may be confusing to the jury. The Court instructed that, by July 6, the parties should update the court on "[w]hether the parties have agreed to stipulate to a single set of relevant, admissible, non-duplicative Utica Police Department records related to Incident Number 09-52210, and if not, what the parties' respective positions are on which specific records should be admitted." (Dkt. No. 437, at 1-2). The Court reserves judgment on Defendant's motion to preclude the use of Exhibits P-26, P-26A and P-26B pending this update.

Exhibit P-27 is a discovery motion Plaintiff's defense attorney filed in his criminal trial, and Exhibit P-28 is the prosecution's response to that motion. Exhibit P-35 is a copy of the jury notes from Plaintiff's criminal trial. Plaintiff has not responded to Defendant's contention that these exhibits are relevant only to Plaintiff's dismissed *Brady* claim, nor has he made any showing that these exhibits are relevant to Plaintiff's fabrication of evidence claim. The Court finds that these exhibits are not relevant under Fed. R. Evid. 401 and, alternatively, that any probative value they have is outweighed by the risk of confusing the issues, undue delay, and waste of time. Fed. R. Evid. 403. Therefore, the Court grants Defendant's motion to preclude Plaintiff's use of Exhibits P-27, P-28 and P-35 at trial.

Exhibit P-41 appears to be a copy of certain FOIL requests from Plaintiff to the City of Utica, as well as responses from Charles Brown. Plaintiff argues that these documents "are admissible to lay out a complete narrative and foundation as to the 2012 recording" of the meeting between Plaintiff, Dougherty, Trevasani and Brown. These documents appear irrelevant to the issues before the jury on Plaintiff's fabrication of evidence claims, and any probative value they do have is substantially outweighed by the risk of confusing the issues, undue delay and waste of time. Fed. R. Evid. 403. Even assuming Plaintiff uses some portion of the 2012 recording as impeachment evidence (as discussed further below), Exhibit P-41 is not necessary to establish the foundation for its use, as both Plaintiff and Dougherty were present at the meeting and can provide any background information regarding the recording that is necessary for the jury to understand. Therefore, the Court grants Defendant's motion to preclude the use of Exhibit P-41 at trial.

Exhibits P-44A through P-44U are versions of the photographs taken at the scene of Plaintiff's arrest, which contain timestamps supposedly showing the date and time each photograph was taken based on the photographs' metadata. Defendant objects to the foundation of these time stamps, arguing that "Plaintiff or someone used software to create this alleged timestamp from the metadata," that "Sergeant Selimovic provided no foundation for the reliability of this process by which the software interprets the metadata," and that "this software is inherently unreliable as the screenshots of the photographs interpreting the underlying metadata state in the software box 'Change Time Taken.'" (Dkt. No. 434, at 3). However, having reviewed the CD produced by Defendant, the Court observes that the time stamps on the exhibits are consistent with those in the metadata of the photographs on the CD, which Selimovic's sworn affidavit represents "have not been edited, altered, deleted or otherwise modified by me in any

way manner shape or form." (Dkt. No. 300-7, at 3). And Selimovic is free to present testimony at trial, consistent with his deposition testimony, regarding the limitations of using software to generate time stamps from metadata, which may impact the weight the jury gives to the time stamps on these photographs. Therefore, the Court denies Defendant's motion to preclude the use of these photographs without prejudice at this time.[15]

Exhibits P-45A through P-45K are photographs of the scene of Plaintiff's arrest which were taken by him in 2010, and were used as exhibits in his criminal trial. Exhibits P-45M through P-45P are the remaining exhibits used in Plaintiff's criminal trial, many of which are duplicative of other exhibits the parties seek to admit. Following discussion at the pretrial conference, Plaintiff withdrew his request for admission of these exhibits with the exception of Exhibit P-45K, which Plaintiff indicated he seeks to use when examining Officer Paladino about his testimony during Plaintiff's criminal trial. The Court ordered Plaintiff to "provide a proffer of the testimony from his criminal trial regarding Exhibit P-45K which he asserts makes this exhibit relevant," (Dkt. No. 437, at 2), and reserves judgment on the exhibit's admissibility pending that proffer.

Exhibits P-47, P-50 through P-52, P-53B and P-53C are various documents relating to Plaintiff's efforts to obtain post-conviction relief. Exhibit P-60 appears to be a printout from the UPD's record system. The Court has instructed the parties to update the Court by July 6 on "[w]hether the parties have agreed to stipulate to a set of relevant facts regarding the vacatur of Plaintiff's conviction and subsequent dismissal of his indictment in the interest of justice, and if not, what the parties' respective positions are regarding which facts and admissible evidence

---

[15] Plaintiff also has argued that "[i]f Counsel objects to the timestamp of each photographs . . . the CD-ROM itself can be admitted and the photographs and time/date taken can be obtained directly from the files on the CD-ROM on a computer." (Dkt. No. 431, at 7). The Court's decision is without prejudice to the parties' ability to agree to such a solution, or to stipulate to the date and time each photograph was taken and obviate the need for Selimovic's testimony.

should be presented to the jury on these issues." (Dkt. No. 437, at 2). The Court reserves judgment on the admissibility of these exhibits pending that update.

3.  *P-36; P-37; P-53 through P-53F; and P-58*

Defendant argues that Exhibits P-36, P-37, P-53 through P-53F and P-58 "have no relevance to the actually contested factual disputes before the jury" because Defendant has already stated that he "intend[s] to stipulate to all of the elements of a fabrication of evidence § 1983 claim except for the second element." (Dkt. No. 413-4, at 14). Plaintiff has not responded to Defendant's objection regarding these exhibits.

Exhibits P-36, P-37, and P-53F relate to Plaintiff's conviction and his post-conviction proceedings. As noted previously, the Court has instructed that the parties update the Court by July 6 on "[w]hether the parties have agreed to stipulate to a set of relevant facts regarding the vacatur of Plaintiff's conviction and subsequent dismissal of his indictment in the interest of justice, and if not, what the parties' respective positions are regarding which facts and admissible evidence should be presented to the jury on these issues," (Dkt. No. 437, at 2). Therefore, the Court reserves judgment on the admissibility of these exhibits pending that update.

Exhibits P-53A through P-53D are transcripts of several pre-trial conferences that occurred in Plaintiff's criminal case, including his arraignment and bond hearing, at which no substantive testimony was taken and no substantive issues were discussed. Plaintiff has not made any showing that these exhibits are relevant to the issues currently before the jury on Plaintiff's fabrication of evidence claims, and the Court does not perceive any such relevance. Therefore, the Court grants Defendant's motion to preclude Plaintiff's use of Exhibits P-53A through P-53D at trial.

Exhibit P-53E is a transcript of a May 13, 2010 oral argument on Plaintiff's motion to set aside the jury verdict in his criminal case, which was denied. The transcript includes argument

by both the prosecution and Plaintiff's defense counsel regarding possible ambiguities in the chain of custody of the drug evidence that was collected and used at Plaintiff's trial. However, it contains no testimony from witnesses with personal knowledge of the evidence that was collected, and counsel's argument regarding these issues has no relevance to the jury's consideration of the facts. Therefore, the Court grants Defendants' motion to preclude Exhibit P-53E.

Exhibit P-58 is a transcript from Plaintiff's grand jury proceedings, in which Defendant and Officer Paladino testified. Defendant's prior sworn testimony is admissible as an admission by a party-opponent under Fed. R. Evid. 801(d), and his allegedly false testimony during Plaintiff's criminal proceedings—including his grand jury proceedings—is highly relevant to Plaintiff's fabrication of evidence claims against him. Therefore, Defendant's entire testimony set forth in Exhibit P-58 will be admissible as evidence at trial. Moreover, to the extent either officer offers testimony that is inconsistent with their grand jury testimony, a prior inconsistent statement in Exhibit P-58 may be used as impeachment evidence subject to Rule 613(b).

### 4. *P-56 and P-57*

Exhibits P-56 and P-57 consist of UPD training materials regarding evidence collection, processing, and preservation. Defendant argues that this evidence is relevant only to Plaintiff's dismissed *Monell* claim and should be precluded. (Dkt. No. 413-4, at 15). Plaintiff argues that these documents are relevant to show that "Defendant Cerminaro was trained on how to properly process the alleged torn plastic bag and contraband found on the ground," and that the "jury should be allowed to see how Defendant Cerminaro deviated from his training." (Dkt. No. 418, at 9). Plaintiff also argues that the training materials constitute potential rebuttal evidence. (*Id.*).

As discussed above, inconsistencies, if any, between Defendant's account of his actions at the scene of Plaintiff's arrest and any training he received from the UPD on proper evidence

collection and documentation procedures may be relevant to the jury's evaluation of his credibility and the truthfulness of that account. Exhibits P-56 and P-57 may be relevant to a cross-examination on this issue. As such, the Court denies Defendants' motion to preclude the use of these exhibits at this time, and reserves judgment on their admissibility until trial.

### 5. *P-67 through P-74*

Exhibits P-67 through P-74 are excerpts from the transcripts of the depositions of Scott McNamara, Grant Garramone, Kurt Schultz, Mark Williams, Charles Brown, Edin Selimovic, James Laury, and Joseph Trevasani. Defendants move to preclude these transcripts to the extent the witnesses are precluded from testifying at trial. (Dkt. No. 413-4, at 15). The Court grants Defendants' motion as to Exhibits P-68 (Grant Garramone), P-69 (Kurt Schultz), P-70 (Mark Williams), P-71 (Charles Brown), P-73 (James Laurey) and P-74 (Joseph Trevasani), as these witnesses are not testifying at trial, and no showing has been made that their deposition testimony is relevant or admissible. As McNamara and Selimovic are testifying at trial, and extrinsic evidence of any prior inconsistent statement may be admissible under Rule 613(b), the Court does not at this time preclude the admissibility of their deposition testimony (Exhibits P-67 and P-72).[16]

### 6. *P-54*

Exhibit P-54 is a transcript of Plaintiff's recording of a December 2012 meeting between Plaintiff, Lt. Sean Dougherty, Inv. Joseph Trevasani, and Charles Brown. Defendant argues that the transcript "has been proven to be entirely unreliable" as the recording "has been transcribed at least twice" with "108 discrepancies between the two transcripts of this same recording,"

---

[16] Plaintiff argues that, "[s]hould the Court disallow the testimony of the requested fact witnesses, their deposition testimony should be admitted as rebuttal testimony." (Dkt. No. 418, at 10). However, the limitations of the Federal Rules of Evidence apply to rebuttal evidence just as they do to Plaintiff's case-in-chief.

including as to "who the actual speaker is." (Dkt. No. 413-4, at 15-16). Defendant also argues that "the underlying recording on the CD itself has been transferred across many devices and mediums, such that it cannot be properly authenticated"; that the transcript is "entirely hearsay"; and that, as this Court noted at the summary judgment stage, "many of the statements [on the recording] were too speculative" to constitute competent evidence. (*Id.* at 16). Plaintiff argues that the "evidence is not the transcript" but the "recording itself"; that the "recording is authentic because Plaintiff made the recording and has submitted an affidavit describing the recording process"; and that the recording "cannot be speculative" because Dougherty "was a direct observer and participant" in Plaintiff's arrest and "was speaking from His own personal observations and knowledge of events" on the date of Plaintiff's arrest. (Dkt. No. 418, at 11-12).

As to the authentication issues, to the extent Plaintiff seeks to admit the transcript (as distinct from the recording itself), the Court agrees that the transcript is too unreliable, lacking in foundation and likely to cause jury confusion to be admissible, given the many discrepancies between different versions of the transcript and Plaintiff's own admissions that the transcript contains errors, including as to the speakers of each statement. However, these authentication issues do not preclude Plaintiff's use of the recording itself, as Plaintiff himself made the recording and can testify as to the necessary facts regarding its creation,[17] and both Plaintiff and Dougherty are testifying and can confirm whether they recognize their own voices, and the voices of others who were present at the meeting, on the recording.

---

[17] Defendant cites no case law or other authority establishing that Plaintiff's own testimony regarding how the recording was created on his phone and extracted to another medium, combined with testimony of witnesses who were present at the meeting identifying the speakers on the recording, is insufficient to authenticate the recording for evidentiary purposes. *See* Fed. R. Evid. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is," including, among other things, a witness's testimony "that an item is what it is claimed to be" or "an opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.")

As to the relevance of the recording itself, the Court has already explained the reasons why the statements on the recording that Plaintiff seeks to rely on—including from Trevasani and Brown, who were not present at the scene of Plaintiff's arrest and played no role in his prosecution, and Dougherty, who was present at the scene of Plaintiff's arrest but did not have personal knowledge of whether Defendant collected any drug evidence other than the torn bag itself—are speculative and not admissible as to the evidence that was collected at the scene of Plaintiff's arrest. *Jeanty*, 2021 WL 149051, at *21, 2021 U.S. Dist. LEXIS 7737, at *65-66; *Jeanty*, 2021 WL 2525061, at *6, 2021 U.S. Dist. LEXIS 116595, at *18-19. However, Plaintiff may question Dougherty about his experiences and observations at the scene of Plaintiff's arrest; if Dougherty's trial testimony is inconsistent with statements made by Dougherty during the meeting, those statements may be admissible as extrinsic evidence for impeachment purposes, subject to Fed. R. Evid. 613. Therefore, the Court grants Defendants' motion to preclude Plaintiff's use of the transcript of the 2012 meeting, and grants Defendants' motion to preclude Plaintiff's use of the recording of that meeting, except as to any use under Fed. R. Evid. 613.

       7.     *P-64*

Exhibit P-64 is an email dated August 13, 2015 from ADA Sarah Demellier, which includes the full text of what Demellier describes as "a text message I receive[d] from Investigator Paladino." Defendant objects to the exhibit on hearsay grounds, (Dkt. No. 413-4, at 16), while Plaintiff argues that the email is proper "[i]mpeachment evidence or rebuttal evidence," (Dkt. No. 418, at 12). As Paladino is testifying at trial, Plaintiff may question him about his statement, but P-64 would only be admissible as extrinsic impeachment evidence subject to Fed. R. Evid. 613(b) if it is a prior inconsistent statement. Therefore, the Court grants Defendants' motion to preclude Plaintiff's use of Exhibit P-64, except as to any use under Fed. R. Evid. 613.

8.  *P-39*

Exhibit P-39 consists of portions of Defendant's personnel file.[18] Defendant argues that these documents consist of extrinsic evidence that is inadmissible to impeach Defendant's character for truthfulness under Fed. R. Evid. 608(b). (Dkt. No. 413-4, at 17). Plaintiff responds that the records are admissible under Fed. R. Evid. 404(b) because they "go[] to intent and motive" and "'complete[] the narrative' regarding the incident at issue,'" and that, under Fed. R. Evid. 608(b), he should be permitted to cross-examine Defendant regarding the incidents described in the records in order to impeach Defendant's character for truthfulness. (Dkt. No. 418, at 12-13).

Fed. R. Evid. 608(b) provides that, "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). Here, the January 2013 incident described in Defendant's personnel records, in which an internal investigation found that he violated the UPD's policies regarding truthfulness and falsifying reports, is clearly relevant to Defendant's propensity for truthfulness, and Plaintiff may inquire into this incident on cross-examination. However, because Fed. R. Evid. 608(b) forbids the use of extrinsic evidence for this purpose, Exhibit P-39 itself is not admissible on this ground. Moreover, Plaintiff has not presented any basis for admitting Exhibit P-39 under Fed. R. Evid. 404(b), given that the

---

[18] The version of Exhibit P-39 provided to the Court also includes an affidavit dated May 13, 2016 from Scott McNamara, as well as various other documents relating to Plaintiff's post-conviction proceedings. It is unclear whether these documents are intended to be a part of Exhibit P-39 or a separate exhibit entirely, and the parties have not argued as to the admissibility of these documents. As such, the Court rules only on the admissibility of Defendant's personnel records.

incidents described in the personnel file were unrelated to the incident at issue in this case and do not suggest anything about Defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"—or anything else that would render the evidence admissible—with respect to his alleged fabrication of evidence against Plaintiff. Therefore, Plaintiff may cross-examine Defendant regarding the January 2013 determination, but Exhibit P-39 is not admissible at trial.

## IV.   PLAINTIFF'S MOTION IN LIMINE

### A.   Plaintiff's Financial Status, Employment History and Receipt of Disability and Public Assistance Benefits, Including D-28 through D-31

Plaintiff seeks an order precluding Defendant from introducing evidence concerning Plaintiff's financial history, financial status, employment history, tax history, and receipt of public assistance benefits, on the grounds that this information is irrelevant to Plaintiff's claims and that any probative value it has is outweighed by the risk of unfair prejudice. (Dkt. No. 414-1, at 4-7, 21-22). Defendant argues that, because Plaintiff seeks lost income as damages, this evidence is relevant to calculating Plaintiff's damages. (Dkt. No. 419, at 5-6). Defendant also seeks to use Plaintiff's 2009 income tax return to cross-examine Plaintiff on the fact that, at the time of his arrest, he was found with a sum of money that totaled 10% of his total declared income that year, in order to impeach the credibility of his explanation for having that sum of money in cash on his person. (*Id.* at 7).

The Court agrees that, to the extent evidence of Plaintiff's financial history (including, without limitation, his tax returns and evidence of collateral benefits that constituted part of his income) is relevant to assessing his claim for lost income damages and calculating the appropriate amount of such damages, the evidence is admissible for that limited purpose, and its significant probative value to that question is not substantially outweighed by any of the factors

listed in Fed. R. Evid. 403. Because, at this stage, the parties have only argued in general terms and have not debated the relevance of any particular document to this purpose,[19] the Court reserves judgment on the admissibility of any particular exhibit until trial.

As to Defendant's second argument regarding Plaintiff's 2009 tax return, the jury must understand the totality of the circumstances surrounding Plaintiff's arrest in order to properly evaluate the credibility of Plaintiff's and Defendant's competing versions of events. The fact that Plaintiff was arrested with $1,739 on his person is one of those circumstances, and Plaintiff's reason for having that amount of cash on his person is a disputed and relevant issue. Therefore, the Court will permit Defendant to use Plaintiff's 2009 tax return for purposes of a limited inquiry into the fact that the $1,739 found on Plaintiff's person represented 10% of his total reported income for that year, as the Court finds that that information has at least some probative value that is not substantially outweighed by any of the factors listed in Fed. R. Evid. 403.

### B. Testimony About Defendant's Military Service, Community Service, Civic Service or Commendations

Plaintiff seeks to preclude Defendant "from presenting any testimony and/or evidence of any military service, community service, or any other civic involvement or professional commendations concerning [Defendant] or any other member of the UPD, as such testimony would lead to improper bolstering of [the witness's] character and propensity for good deeds and would be unduly prejudicial to plaintiff pursuant to Rule 403." (Dkt. No. 414-1, at 18). Plaintiff argues that "[t]his prohibition should extend to all non-party witnesses as well under the same reasoning." (*Id.*). Defendant responds that "Defendant Cerminaro does not have any military service," but does not address the other aspects of Plaintiff's objection. (Dkt. No. 419, at 13).

---

[19] Plaintiff specifically objects to Exhibits D-28 through D-31, but beyond the generalized arguments discussed above, neither party has addressed the specific relevance of any of these exhibits to Plaintiff's damages claim.

Because Plaintiff has not pointed to any specific testimony by any particular witness that he seeks to preclude, and because it is not clear to the Court what, if any, testimony Defendant or any other witness will present on this point, the Court denies Plaintiff's motion at this time, without prejudice to his right to make any appropriate objections at trial.

### C.       DA's Office Members' Opinions about Witnesses' Credibility

Plaintiff seeks to preclude Defendant from eliciting testimony from any witness from the Oneida County DA's Office "regarding their opinion on any police or civilian witnesses' credibility." (Dkt. No. 414-1, at 19-20). Defendant argues that, unlike cases Plaintiff cites where prosecuting attorneys were forbidden from vouching for the credibility of another witness, here the witnesses from the DA's Office are Plaintiff's own witnesses and he "must live with their answers." (Dkt. No. 419, at 14).

The only member of the Oneida County DA's Office who will be testifying at trial is the DA himself, Scott McNamara. McNamara did opine on the credibility of the officers when he moved for dismissal of the indictment. *See* Dkt. No. 325-13, at 5 (McNamara explaining that he did "not believe the police intentionally lied" and "did not believe the intent of the police were trying to hide anything"). As the credibility of witnesses is fundamentally a question the jury must decide, and is an especially key issue in this case, McNamara's opinion on the credibility of the officers carries a high risk of unfair prejudice, confusing the issues and misleading the jury. *Cf. United States v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) ("It is a well-recognized principle of our trial system that determining the weight and credibility of a witness's testimony belongs to the jury . . . Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility . . . are inadmissible under [Federal Rule of Evidence] 702." (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)). At the same time, if the jury learns that Plaintiff's indictment was dismissed without additional

explanation or context, there is a risk that the jury could draw the false and improper inference that McNamara moved to dismiss the indictment in part because he believed Cerminaro's narrative was fabricated, which would be unfairly prejudicial to Defendant. In light of the Court's instruction that the parties update the Court by July 6 on "[w]hether the parties have agreed to stipulate to a set of relevant facts regarding the vacatur of Plaintiff's conviction and subsequent dismissal of his indictment in the interest of justice, and if not, what the parties' respective positions are regarding which facts and admissible evidence should be presented to the jury on these issues," (Dkt. No. 437, at 2), the Court reserves judgment on this aspect of Plaintiff's motion pending that update.

> **D.**     **Exhibits D-1 through D-7 and D-21 through D-23 and Testimony Regarding the $1,739 Recovered from Plaintiff's Person; and Other Evidence or Testimony Relating to "Any Event Preceding the Rooftop Chase to the End of the Police Investigation in the Alleyway/Driveway"**

Finally, Plaintiff seeks to preclude or redact some of the photographs that were taken at the scene of Plaintiff's arrest and at the police station following Plaintiff's arrest (specifically, Exhibits D-1 through D-7 and D-21 through D-23), and to preclude Defendant from eliciting testimony about the cash found on Plaintiff's person at the time of his arrest, on the grounds that the probative value of this evidence is outweighed by the danger of unfair prejudice to Plaintiff. (Dkt. No. 414-1, at 20-21, 22-23). The evidence Plaintiff seeks to preclude—including photographs of the chase and arrest scene as it existed shortly after the events at issue occurred, photographs of what officers observed in Plaintiff's vehicle and at the chase scene at the time of his arrest, the testimony that Plaintiff had $1,739 on his person at the time of his arrest, and documentation of the injuries Plaintiff suffered as a result of the chase—is all highly relevant to the jury's understanding of the totality of the circumstances surrounding Plaintiff's arrest and, consequently, to their evaluation of the credibility of the competing narratives about what really

happened at the scene. This significant probative value is not substantially outweighed by any of the factors listed in Fed. R. Evid. 403. Therefore, the Court denies Plaintiff's motion to preclude this evidence.

## V.    DEFENDANT'S RENEWED MOTION FOR SANCTIONS

Defendant renews his motion seeking spoliation sanctions for Plaintiff's "failure to produce for inspection and forensic examination the five cell phones he had in his possession at the time of his arrest." (Dkt. No. 407-2, at 3). Specifically, Defendant seeks "an adverse jury instruction" that those cell phones contained evidence of drug trafficking. (Dkt. No. 407, at 2). Plaintiff opposes Defendant's motion. (Dkt. No. 433).

"A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (parentheticals in original). "[The] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation . . . Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Kronisch v. U.S.*, 150 F.3d 112, 126-27 (2d Cir. 1998).

In analyzing Defendants' motion at the summary judgment stage, the Court observed:

In their motion for sanctions, the City Defendants ask the Court to draw an adverse inference that the five cell phones found in Plaintiff's possession contained evidence of drug trafficking, on the grounds that Plaintiff failed to preserve the contents of these phones. (Dkt. No. 310-7). However, it appears that these phones left Plaintiff's possession years before he filed this litigation in 2016. (Dkt. No. 310-5, at 5-6). The City Defendants rely heavily on the fact that Plaintiff admitted in his deposition that he contemplated bringing civil litigation against the City Defendants as early as the day of his arrest, and argue that his obligation to preserve the cell phones accrued at that time. (*Id.* at 6; Dkt. No. 348, at 1-2). Even crediting Plaintiff's testimony that he contemplated bringing this litigation much earlier than 2016, it is not clear whether he "should have known that the [cell phones] may be relevant to future litigation," *Kronisch v. U.S.*, 150 F.3d 112, 126-27 (2d Cir. 1998), particularly in light of the fact that the cell phones were returned to him shortly after his arrest and were not used, or even collected, as evidence in his criminal case.[20]

*Jeanty*, 2021 WL 149051, at *37, 2021 U.S. Dist. LEXIS 7737, at *119-21. Considering Defendant's arguments in both the original motion and the renewed motion, Defendant has not met his burden of establishing when Plaintiff's obligation to preserve the cell phones arose, much less that it arose years before this litigation was even commenced. Plaintiff's vague deposition testimony that he contemplated bringing some sort of civil litigation on the day of his arrest, without more specific evidence as to when he came to understand that the cell phones (which, again, were never used as evidence against him in his criminal case) would be relevant to that litigation, is not sufficient. Defendant also has not met his burden of proving that the cell phones—which apparently left Plaintiff's possession long before he even filed this action—were destroyed with a culpable state of mind. Therefore, the Court denies Defendant's motion for spoliation sanctions.

---

[20] Defendant misconstrues this statement, arguing that the Court inappropriately suggested that Defendant, rather than Plaintiff, had the burden to preserve the cell phones as evidence. (Dkt. No. 407-2, at 4). The Court did no such thing; to the contrary, the Court agrees that the obligation to preserve the cell phones, if any existed, lied with the Plaintiff. However, because the cell phones were returned to Plaintiff and were not collected or used as evidence in his criminal case, it is doubtful whether, at that time, Plaintiff reasonably "should have known that the [cell phones] may be relevant to future [civil] litigation" regarding his arrest and prosecution, which he did not file until years later. In other words, this fact raises doubt as to when Plaintiff's obligation to preserve the cell phones arose in the first place.

**VI.      CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendant's motion in limine (Dkt. No. 413) is **GRANTED in part and DENIED in part** to the extent set forth in this opinion; and it is further

**ORDERED** that Plaintiff's motion in limine (Dkt. No. 414) is **GRANTED in part and DENIED in part** to the extent set forth in this opinion; and it is further

**ORDERED** that Defendant's renewed motion for sanctions (Dkt. No. 407) is **DENIED.**

**IT IS SO ORDERED.**

Dated:   July 2, 2021
          Syracuse, New York

Brenda K. Sannes
U.S. District Judge